# EXHIBIT A

COPY



IN THE MATTER OF THE CLAIM OF

-----------------------------------------------X

SHERRIE R. DEANDA,

Claimant,

- against -

COUNTY OF WESTCHESTER, WESTCHESTER COUNTY POLICE, WESTCHESTER COUNTY POLICE OFFICER TIMOTHY HICKS (#1097),

Respondents.

-----------------------------------------------X

148 Martine Avenue
White Plains, New York 10601
October 25, 2012
10:10 a.m.

Examination pursuant to General Municipal Law Section of 50-H Claimant, SHERRIE R. DEANDA, taken by Taryn Chapman-Langrin, before a Notary Public of the State of New York.

A P P E A R A N C E S:

ARONWALD & PYKETT, LLP
Attorneys for Claimant
81 Main Street, Suite 450
White Plains, New York 10601

BY: WILLIAM I. ARONWALD, ESQ.

WESTCHESTER COUNTY LAW DEPARTMENT
Attorneys for Respondents
148 Martine Avenue
White Plains, New York 10601

BY: TARYN CHAPMAN-LANGRIN, ESQ.

IT IS HEREBY STIPULATED AND AGREED, by and between the attorneys for the respective parties hereto, that this examination may be sworn to before any Notary Public.

IT IS FURTHER STIPULATED AND AGREED that the filing and certification of the said examination shall be waived.

IT IS FURTHER STIPULATED AND AGREED that all objections to questions except as to form shall be reserved for the trial.

S H E R R I E R. D E A N D A, the Claimant herein, having been first duly sworn by Joseph Carollo, a Notary Public of the State of New York, was examined and testified as follows:

THE COURT REPORTER: Please state your name for the record.

THE WITNESS: Sherrie R. Deanda.

THE COURT REPORTER: And your address.

THE WITNESS: Fourteen Rockledge Road, Apartment 2A, Hartsdale, New York 10530.

EXAMINATION BY MS. LANGRIN:

Q Good morning, Ms. Deanda. My name is Taryn Chapman Langrin, representing the County of Westchester. And I'm just going to ask you a couple of questions about your claim against the County. If for any reason you don't understand my question, let me know and I'll rephrase the question.

If you need to speak to your attorney for any reason, let me know and that can be accomplished. Need to go to the ladies room, get some water, whatever, that can be accomplished too. The last thing I would ask you is to respond to me verbally. When I ask a question a lot of people

shake or nod their head. You can't do that because the court reporter doesn't get the information for the transcript.

Who lives with you at [redacted]

A My son, [redacted], same last name.

Q How old is your son?

A [redacted]

Q Do you have any other children?

A Yes, one. [redacted], same last name. [redacted].

Q But [redacted] doesn't live with you?

A No.

Q What is your date of birth?

A [redacted].

Q Okay. And are you alleging any type of medical issues as a result of the incident that occurred on [redacted]

A No.

Q Did you go see any psychiatrist or psychologist as a result of the incident?

A No.

Q So at this point I won't ask for your social security number because that's the only way we usually ask for it is for your medical records.

But at this point you're telling me there aren't any reasons for me to get your medical records so I won't ask you, okay? Now could you tell me what your educational background is?

A One year of college.

Q Okay. Where did you go to college?

A Howard University.

Q Okay. Are you presently employed?

A Yes.

Q Where are you employed?

A Kempner Corp.

Q Where are they located?

A 257 Mamaroneck Avenue, White Plains 10605.

Q What's your position there?

A Real estate accounting manager/office manager.

Q How long have you worked for them?

A Eighteen years.

Q Okay. And you allege that something occurred to you on May 28th, 2012?

A Yes.

Q And you remember the date?

A Correct.

Q Do you recall what day of the week that

was?

A Monday.

Q Okay. As a result of the incident on Monday, May 28th, 2012, did you maintain any notes, calendars, diaries of what happened?

A I did write a brief account of what happened.

Q And on where did you write that?

A On a notepad at home.

Q Do you still have that notepad?

A Yes.

Q What did you write on the notepad?

A Just a brief account as to what happened.

Q Can you tell me what that was that you wrote?

A That I was driving to the city to have breakfast with my family and return my granddaughter and my cousin and I was supposed to be there. I'll tell you exactly what I wrote.

Q We'll get into the specific incident. But I want to know what you wrote on the notes.

A I'm supposed to be there at 8:15 but due to a loss of a cell phone etc., etc., that's how I wrote it, I was running a little late so I was

-DEANDA-

rushing to get there and I was pulled over by the police and arrested for possession of Paula's medicine and it was a nightmare. That's basically all I put.

Q Okay. You said you still have those notes at home?

A Yes.

Q On how many pieces of paper?

A Just one.

Q Is the paper lined or is it unlined?

A Lined.

MS. LANGRIN: I would just make a request for the notes that she just described.

MR. ARONWALD: We'll take it under advisement.

Q Now, you were driving in a vehicle when the incident happened?

A Yes.

Q What type of vehicle were you driving?

A ML 350 Mercedes, 2009. Sorry.

Q What color was the vehicle?

A Gray.

Q All right. Is it a four-door, two-door?

A Four.

-DEANDA-

Q To whom does the vehicle belong?
A To me.
Q Okay. To whom is the vehicle registered?
A Me.
Q Okay. Who was driving with you at the time of the incident?
A My ten-year-old granddaughter, Jada Deanda and my ten-year-old cousin, Peyton Sutton.
Q Now why did you have the two children in the vehicle with you?
A They spent the night at my house. I had a cookout the day before and they spent the night at my house and I was returning Peyton to her parents and after we had breakfast I was returning my granddaughter home to her parents.
Q Who are Jada's parents?
A Peter Deanda and Jasmine Hudgens.
Q Where do they reside?
A 200 West 145th street, New York, New York.
Q Who are Peyton's parents?
A Monique and Mark Sutton. I don't have their address handy but they live in North Carolina.
Q Before the incident occurred where were you intending on going?

A To my sister's house, 127 West 82nd. Her name is Paula Fontenette.
Q Before the incident occurred where were you coming from?
A My home.
Q Okay. Now where did the incident occur?
A On the Bronx River Parkway.
Q Do you have a particular intersection near where it occurred?
A No.
Q Or a particular exit you recall?
A No.
Q Do you know what town you were in when it occurred?
A I think I was approaching in the Yonkers -- I'm not sure.
Q Okay. Do you know what direction you were traveling?
A South.
Q Where were the two children seated that were in the vehicle with you?
A Jada was sitting behind me and Peyton was sitting behind the passenger's seat.
Q And you were the only three passengers in

the vehicle?

A Correct.

Q Approximately what time did the incident occur?

A About 8:00 a.m.

Q What was the weather like on that day?

A Sunny and beautiful, warm.

Q Now, can you tell me the route that you took from your house to get to where the incident occurred?

A Yes. I went straight from my complex out on East Hartsdale which turns into Fenimore and you get right on the Bronx River Parkway, exit 15.

Q So you got on exit 15 on the Bronx River Parkway?

A Correct.

Q At the time that you were traveling on the parkway do you recall what the speed limit was on the parkway?

A 40 miles an hour.

Q And at the time that the incident occurred when the officer pulled you over do you recall how fast you were traveling at that time?

A About 50.

-DEANDA-

Q So is there a reason why you were traveling over the speed limit?

A I was kind of rushing because I was supposed to be there at 8:15 because my cousins actually flew into Philly. So they rented a car and drove to New York because of the air traffic when they came on Friday. So they had to actually drive back to Philly. But we were trying to catch a bite to eat before they left. So I told them I would have their daughter back by 8:15.

Q Is it a possibility you were driving more than 50 miles an hour?

A No.

Q How about 70 miles per hour?

A No. I was pretty much in shock when he pulled me over. Then I realized and I said, Well, I'm going 50 miles an hour. That's how I remember the exact speed.

Q You were in shock when he pulled you over? Why is that?

A I didn't think I was speeding at all. But then I looked and I was going 50 miles an hour.

Q About how long were you on the Bronx River Parkway at the time you were pulled over? Were you

-DEANDA-

on it for ten minutes?

A About 15 minutes.

Q At some point then you became aware that an officer was following you?

A I saw him when he came right out.

Q Okay. So how was it that he came right out? Did he put his sirens on?

A I was driving south and he was this way.

Q Going the other direction?

A No.

Q What do you mean by going this way? You were driving south.

A I passed a bridge. I went under a bridge.

Q An overpass?

A Yes. When I passed him I saw him to my right. But I was surprised when he came with his lights behind me because I'm like, I'm not speeding. But I'm like, Wow, I'm going 50.

Q When you first saw him what did you see? What was he doing, the officer?

A I don't know what he was doing but the lights were on. You mean when I pulled over?

Q When you first saw him as you're passing the overpass what was he doing, was he sitting in

the vehicle, driving at the time? What was he doing?

A I think he was sitting.

Q Did you actually pass the officer prior to him pulling you over then?

A Yes.

Q So then when you first saw him did he have his lights and sirens on?

A Yes. Not sirens, just lights.

Q Flashing lights?

A Yes.

Q There came a moment you became aware he wanted you to pull over?

A I was the only one there so he had to want me.

Q How did he signal that he wanted you to pull over specifically? You saw the flashing lights. Did he drive up parallel to you?

A He just came right close to me in the back so I pulled over.

Q So you pulled over on the side of the road?

A Correct.

Q Were you on the shoulder?

A It was grass there. Shoulder and grass.
Q What did you do then once you pulled over? Did he come to the vehicle?
A I just waited for him to come.
Q So you stayed in the vehicle?
A What I actually did is I went to my glove compartment and pulled out my registration and insurance card.
Q You were trying to get ready for him?
A Yes, so I could get this over with as soon as possible so I could get to the city.
Q Did you in fact pull out the registration and insurance cards?
A Yes.
Q Would you be able to describe the officer for you me, his height, race, weight, to the extent that you can?
A Yes. He's about 150, 150 pounds.
Q What's his race?
A White.
Q About how tall?
A Maybe five-ten.
Q Do you know what his age is?
A No idea.

-DEANDA-

Q Do you know the officer's name?
A I don't remember.
Q What if I told you it was Timothy Hicks? Would that ring a bell to you?
A Yes.
Q How is it that you recall the officer that pulled you over was Timothy Hicks? Did you see a name plate, look at any documents?
A A name.
Q Was this the only officer in the vehicle that pulled you over? Was he the only officer that approached your vehicle?
A He's the only officer that approached my vehicle, yes. I'm not sure if he was the only officer. I was nervous. I hate being pulled over. It always make me nervous.
Q Was this officer in uniform?
A Yes.
Q What about the vehicle he came out of, was that a marked police vehicle?
A Yes, Westchester County Police, it said.
Q Did you see that?
A Yes.
Q So when the officer approached your

vehicle did you have a conversation with him at that time?

A Yes.

Q What was that conversation about?

A Well, he told me that I was -- he asked me if I knew why I was pulled over. And I said, No. And he said, You were speeding, you were going whatever miles an hour he told me. I said, That's not true, I wasn't going that fast.

I just told him I know I was going over the speed limit is what I told him, I said. But I apologized and I said I was really in a hurry. Then he asked me for my license, registration and insurance and I was like, Well have it already. But it dropped and I didn't realize.

Q It dropped out of your hand?

A Yes.

Q Which hand did you have it in before it dropped?

A I'm not sure.

Q Where did it drop once it dropped, onto the seat or to the floor?

A I didn't realize it dropped. So I'm looking for it everywhere because I actually had

everything ready for him, my license, registration, so I could get this over with. And it dropped. I'm looking all over for it.

Q So you looked on the floor of the vehicle, maybe, the seats of the vehicle? Where did you look to try and find it?

A Just right around my seat where I was.

Q So there was no one else sitting in the front seat with you because the children were in the back?

A No one in the front seat. So I didn't even realize I dropped it. I opened my purse to see if I put it back in there. Anyway, I found them. The registration and the insurance dropped on the floor. I picked those up. I went into my purse to get my license because the license I didn't take out yet.

Q So you knew the license was in your purse?

A The license was the only thing in my purse. I just had the other two in my hands. So I opened my purse and gave him everything he wanted.

Q So at the time that you went into your purse, was your purse closed at that time then? Did you have your purse closed? When you went in to get

your license was your purse closed at that time someway by a zipper?

A Yes.

Q So you had to open the flap or open a zipper to get the license?

A Yes.

Q After you pulled out the license did you give it to the officer?

A Yes.

Q And then did you leave your purse open?

A Yes. You know what, when I was going through my purse to get my license, it's just a little purse so I had to go through a bunch of stuff and pull that out.

Q Can you describe for me the purse, the color of it? Do you still have it?

A I still have it. It's metallic gold.

Q All right.

A Coach, small clutch.

Q Okay. So you gave the license to the officer?

A Yes.

Q And did you give your insurance and registration to the officer?

-DEANDA-

A Yes.
Q And what did he do at that time when you gave him those documents?
A When I went into my purse to get the license he saw I had a bunch of stuff in there and he saw I had pills. He questioned me about the pills and I told him -- he said, Can I see those? I said sure. I gave it to him.
Q What kind of pills were they?
A They were a pill thing of Oxycodone.
Q What is Oxycodone?
A It's a drug that my sister takes for whatever she takes it for. At that time I wasn't really sure exactly. I know it's used for pain.
Q You do know it's for pain. Why did you have your sister's drugs in the car?
A Because it was a Memorial Day weekend and she was at my house and she takes a large dose of all kinds of stuff and she left them there.
Q She left them in your purse?
A This is why it got confusing even with the officer. The reason she had my purse is earlier that week I was at her house and she was going out. She asked me and said, Your purse fits perfect for

my outfit, can I use it? So I gave it to her. That's my favorite purse. I usually have a big purse. I always have a big purse. This is kind of a small purse for me. I use that as a wallet.

So I'm like, Well, when you come this weekend make sure you bring it back. Well, she brought it back but she just left it there. She didn't intend to give it back to me at that point. She just left it there by accident.

Q Left it where?

A On my dresser. She went back with my cousins home because she was going to spend the night too.

Q Which sister was this?

A Paula Fontenette. So she was actually going to spend the night but since a whole long thing. So she didn't spend the night and she left the purse there. But she actually was -- she brought it back to give to me but she really wasn't intending to give it back to me. But she left it there and left all her stuff in there.

Q That morning?

A Yes.

Q The morning of May 28th?

-DEANDA-

A Yes. I was bringing her her pills and returning the kids.

Q So you knew when you left to go on your journey on that morning that you had the pills?

A Yes.

Q Did you know that?

A I knew they were in the purse and I had a bunch of my stuff on the dresser. So I just put my stuff in the purse and took off. The purse was a complete mess. I took my money, my change, my credit cards, because this is what I usually keep in there. And I threw it in there knowing I'm giving her the rest of the contents in the purse and taking my purse back.

Q How old is your sister Paula?

A She is 52.

Q Okay. Now when the officer first saw the pills in your pocketbook, where were they, were they in a pocket?

A Right on top. As I was going through everything I'm not sure exactly where they were. But it's a small purse and I was just digging for my driver's license. So in the process of that the pills, everything kind of popped out.

-DEANDA-

Q Can you tell me were they in a container, some type of pill case or something?

A They were in a little bottle.

Q Did the little bottle have any type of prescription information on it?

A No.

Q Why is it that the little bottle didn't have any prescription information? Did it have any type of label on it?

A No.

Q There was no label whatsoever?

A I can tell you only a speculation. They're not mine.

MR. ARONWALD: Don't speculate. You don't know, you don't know.

Q It's your testimony there was no label of any sort on this bottle of pills with the Oxycodone? No label of any sort?

A No.

Q But they did belong to your sister Paula as far as you were concerned?

A Yes.

Q How many pills were in this little pill holder?

A I don't know.
Q More than 10, more than 15?
A I only know -- actually I do know but I only know because they counted them.
Q Who is they?
A The officers back at the police station.
Q So they were counted at the police station but they were not counted on the scene when you were first pulled over?
A No.
Q How many were there when they were counted later at the police station?
A Forty. I think that's what they said.
Q So now the officer -- did the officer ask you to whom these pills belonged?
A No.
Q He did not. Did you tell him that information or volunteer that information?
A I volunteered that information.
Q You specifically told the officer the pills belonged to your sister?
A Yes.
Q Did you tell him your sister's name, who they belonged to?

-DEANDA-

A No. I just said my sister and she left them at my house and I'm returning them. I'll wait for you to ask questions.

Q After you told them that they belonged to your sister what did he say?

A He asked me, Is this your purse? And I said, Yes.

Q Okay. What else did he ask you? Did he ask you for what reason you had your sister's?

A Do you know what these pills are?

Q Okay.

A Sorry. He said these pills are Oxycodone. He told me what they were. He said these pills are Oxycodone.

Q At that point you knew what they were? You knew they were Oxycodone?

A Yes.

Q After he identified them for you what other conversation did you have?

A I tried to explain to him that they belonged to my sister. Yes, the purse is mine and she borrowed the purse and she was at my house yesterday and I'm actually returning them to her. She called me last night and she was all panicked so

-DEANDA-

I'm bringing them to her first thing in the morning.

Q Is there any way you didn't tell the officer the pills were yours?

A I kept going on and on.

Q When I do that, that means let me finish the question. Is there any possibility that you did not tell the officer who the pills belonged to?

A No, there's no possibility of that.

Q You specifically remember telling the officer that the pills belonged to your sister?

A Yes. Right at that time I only told them they belonged to my sister. I referred to them as my sister's. He went away from the car, went to his car.

Q When he went to his car what did you observe him doing?

MR. ARONWALD: Just answer the question that you're asked.

Q When he went to his car what did you observe him doing?

A I didn't pay attention to him.

Q How long was he away from your car?

A A couple of minutes.

Q What were you doing when he went back to

his car?
A I immediately called my sister.
Q That would be Paula, who the pills belonged to?
A Yes. I told her I was pulled over for speeding and now they're questioning me about your pills.
Q What other conversation did you have with Paula? You're on the phone with your sister saying I got pulled over for speeding.
A I just told her what was going on.
Q What, if anything, did she say?
A Basically, oh, she told me if you need me to talk to him, no problem, I'll talk to him, I'll tell him they're mine.
Q Did you in fact offer that to the officer when he returned to your vehicle?
A Not right away.
Q At some point you did?
A Yes.
Q At some point the officer came back to your vehicle. And what did he do when he came back to your vehicle?
A He questioned me further about the pills.

Q How did he question you? What did he say?

A He said, Do you know these pills are Oxycodone and it's an illegal substance and it's a felony to carry these pills with no --

Q Prescription or any type of identifying label?

A I told him, I'm sorry but my sister left these at my house last night and she needs them and I'm bringing them to her.

Q When you spoke to your sister on the telephone while the officer was at his car did you ask your sister why the pills did no have any type of label or identifying information on them?

A No. I didn't know they were illegal.

Q Okay.

A I've heard stuff on the news but I was just in awe that he was questioning me about the pills.

Q After he told you that they were illegal and that it's a felony, what did he say to you next?

A I really don't recall.

Q What race do you identify yourself as?

A African American.

Q Do you believe race had any -- played a

-DEANDA-

role in this at all?

MR. ARONWALD: How is that relevant to the 50-H hearing?

MS. LANGRIN: If she doesn't want to answer it, it's okay.

MR. ARONWALD: It's not what she wants. I'm objecting because --

MS. LANGRIN: I'll withdraw it.

Q After he said to you that he thought it was illegal and a felony, what happened next? Did he ask you to get out of the vehicle at any point?

A Yes.

MR. ARONWALD: Are you having a problem?

MS. LANGRIN: We can stop.

A There was something I wanted to say to her.

MS. LANGRIN: If you want to speak to your attorney first you can.

A He asked me -- oh, I'll just move on. There was something. He asked me something. Oh, this is what I wanted to tell you. When I opened my purse I also had a lot of money in there and he asked me what I was doing with all that money.

Q And were these like in cash?

-DEANDA-

A I'm starting to think. Yes. I'm starting to think that pills, money. He asked me what I was doing with that money. So you asked me what the officer said. He asked me what I was doing with such a large sum of money and I told him it wasn't his concern what kind of money I had in my purse.

When I started to think he's thinking pills, money, I said, I have bank receipts for every bit of the money in my wallet. And he asked me where I worked and I told him the Kempner Corporation.

Q How much money did you have?

A About $1,200.

Q They were in what type of bills, large bills, small bills, twenties, hundreds?

A Twenties.

Q Would you care to tell me why you had $1,200?

A My niece just had a baby and she had the baby in White Plains. She lives in the city. She was at my house for the cookout and she went into labor and she had the baby. But we knew already that was a chance.

And I shop a lot. And a lot of times

when I'm shopping when you use your credit cards too much they decline it with fraud and you have to verify. And I knew I needed to do a lot of shopping for her because she absolutely had nothing so I didn't want to run into that problem.

Q What's your nieces name?

A Ashley Kur (phonetic).

Q How old is she?

A Twenty-five.

Q Now were these bills folded up, were they sort of in your purse just straight?

A Straight, yes.

Q Not folded?

A As I said, I usually use that purse as a wallet.

Q After you had the conversation about the money what happened next?

A At that time is when he went to the car, to his car.

Q So you had the conversation about the money before he went to his car?

A Yes.

Q At some point he went back to your car. And what happened when he came back to your car?

A He asked me to step out of the vehicle.
Q When he asked you to step out of the vehicle did you ask him any questions?
A I asked him why. Why do I have to step out of the vehicle?
Q What did he tell you?
A I don't recall.
Q Did you in fact step out of the vehicle?
A Yes.
Q Where were the children?
A They were in the back seat.
Q These children, were they in a car seat at all or anything?
A No.
Q Because they were above the age for that?
A Yes.
Q They were in their seat belts?
A Yes.
Q You stepped out of the car and what happened?
A He asked me to walk over to his vehicle and I asked, Walk over to your vehicle, why? I said, I have kids in the car. And he didn't say anything and he had me turn around and handcuffed

me. Then he put me in the vehicle. He took me to the other side of his vehicle, handcuffed me, put me in the car.

Q Where were the children?

A In the car. I again asked him what about my children who are in the car in the back seat. He ignored me. He went to talk to the other officer that came.

Q So there was another officer that came on the scene?

A While I was still in the car actually a female officer came and she might have come with somebody else. I'm not sure.

Q Did she come -- when she came did they have any lights or sirens on when they arrived?

A I didn't notice.

Q When this female officer came did she come over to you?

A No.

Q Can you identify the female officer?

A Yes.

Q Race?

A White. Shorter than I am. I don't know how much she weighed.

-DEANDA-

Q Do you know that female officer's name?

A I don't recall.

Q All right. When the female officer came did she have any conversation with you?

A No.

Q You had no conversation with this female officer?

A No.

Q So once you were put in handcuffs and you sat in the back of the police vehicle, what happened next?

A The female officer came over to Officer Hicks and told him, What are you going to do about the kids that are in the car?

Q You heard this as you were sitting in the back of the police vehicle?

A They were right outside the window. She said, What are you going to do with the kids in the car? And he was really surprised that there were kids in the car.

Q How do you know that he was surprised that there were children this the car?

A He said, Kids in the car, there are kids in the car? I'm not sure exactly what he said. But

he said, There are kids in the car? I'm not sure exactly what else he said. But he was really surprised there were kids in the car. And I said, Have I not told you that three or four times already? I'm just saying this. I don't even know if he could hear me because I was inside the car.

Q He's having that conversation with the female officer?

A Yes.

Q Okay.

A Then they walked away.

Q Where did they go when they walked away?

A Just ahead of the car between my car, the car I was in and my car. So they walked up. I don't know what they said or anything. Then I see the kids coming. Then he comes back to the car and he asks me about --

Q While you were seated in the back seat?

A Yes. He asked me about the kids and, Do you have anybody to come pick the kids up? And I said, I was taking them to their parents in the city so I could have them come get the kids. And he said, No, do you have anybody closer, anybody at your house that could come get the kids; you need to

have them picked up in ten minutes otherwise they're going to go to the County.

Q Meaning to the county police station?

A The county or --

MR. ARONWALD: What do you remember him saying?

A I don't remember exactly what his words were but it had something to do with maybe the Child Protective Services.

Q You needed to make arrangements to have someone come pick them up or he would have to turn them over?

A But he said in ten minutes and he was adamant that I called someone closer. You have no one at your house, he said. I said, My son's at my house because my house is closer. I said, My son's at my house but he didn't have a driver's license or a car. And he said, Well, you need to call somebody now to come get them within ten minutes.

Q Did you in fact do that?

A I told them my sister was on the phone.

Q The one who the pills actually had belonged to?

A Right. I could have her come get the

kids.

Q Did you in fact call her?

A He told me that your sister's in the city. That was too far. By then I'm pretty sure the phone hung up and I gave him the phone. He took my phone to call.

Q Your cell phone?

A Yes. I'm pretty sure that's how it went. I'm not sure exactly.

Q You believe he took your cell phone to call your sister?

A Yes. I didn't tell him initially who I was having come pick up the kids. So I'm not really sure whether he called them or they were already on the phone. I said he could come pick the kids up. He didn't realize it was the city. I'm just telling you the feel of it. He didn't realize I was calling them to actually come get them.

Q That would be Paula?

A Yes. He spoke to my sister on the phone.

Q Did he? And you overheard this conversation?

A No.

Q How do you know he spoke with your sister,

you observed it?

A Yes. He was outside the vehicle but I wasn't paying attention. And when he got back in the car he told me they were coming to get -- he just told me as soon as he got in the car he spoke to my sister and hung up. I'm not sure exactly how that went. He got in the car and he said, I highly doubt the person I just spoke with has a prescription.

Q That's what he said to you?

A Yes.

Q Did you respond?

A No. At that point I had nothing to say.

Q And the person he allegedly spoke with was Paula, your sister?

A Yes.

Q So did someone come up and pick up the children?

A Well, yes, someone did come pick up the kids.

Q Who was it that came to pick up the children?

A My sister came to pick them up.

Q Which sister?

-DEANDA-

A Paula and Monique and Mark, Peyton's parents.

Q How long did it take them to get to where you were?

A About a half hour.

Q And you were still in the police car at the time that they came to pick the children up?

A No. They came to pick the kids up at the station.

Q So at some point then the officer drove away with you and took you to the station?

A Right after that conversation with my sister we sat there for a couple of minutes and the tow truck came, got my car.

Q So the tow truck towed your vehicle?

A Yes. Then I saw the two kids walk by the police car and get into the female officer's car.

Q Okay. So the female officer's car drove the children to the police station?

A Yes. I asked him where they were taking the kids.

Q Absolutely. So the children going to the police station were in a separate vehicle from you?

A Yes. They were scared.

-DEANDA-

Q I had a question for you regarding your sister. Let me back up. Did the officer say to you why he doubted that the person he spoke with didn't have a prescription?

A No.

Q Do you want to take a break?

A No.

Q So you arrive at the police station?

A Yes.

Q What happened when you arrived at the police station?

A Straight from the car you go into a door which leads you actually to a cell and I just sat there for a while.

Q They took you into a cell?

A Yes. Straight from the street basically you go into the cell.

Q You were handcuffed at the time?

A They unhandcuffed me there.

Q Let me know if you want to take a break. You sat in the cell for a little while?

A A long time.

Q How long do you think you sat in the cell?

A About four hours, five hours.

Q What happened during this four-hour time period that you were in the cell?

A They were back and forth, asking me questions about the pills because I didn't just have those pills, I had my pills as well.

Q What pills did you have?

A I had Ultram. I had them in a separate thing, in a little pill case I have.

Q I don't know what those are for. What are those for?

A Those are mild painkillers that I have. So I had those in a little pill container.

Q How did they discover that you had these pills? We already know about your sister's pills.

A They went through my purse and they searched the car as well.

Q So your purse was confiscated as well?

A Yes.

Q At what point in time was your purse confiscated? Before you left to go to the police station?

A Before he handcuffed me.

Q Did you ask him why your purse was being confiscated?

-DEANDA-

A No. They had me in handcuffs.

Q Was your purse searched at the scene, do you know, in front of you where you could observe that?

A I don't know when this was searched.

Q So other than the pills that you had from your sister that were unidentified or unmarked, then you had a set of your own pills, the Ultram? Did you have any other pills anywhere in the vehicle?

A Well, yes. From the purse I kind of held the contents. When I first gave him the oxy pill bottle, the pill bottle was kind of open so I had to close it to give to him. Some leaked out in the car.

Q Some of the pills fell into the car?

A Into my purse. So he was making such a big deal that I had these pills, a really big deal.

Q Tell me how.

A He kept saying, You know you have Oxycontin, is what he said. Do you know you have Oxycontin, and do you know what Oxycontin is? He said, This is a Class D felony, or something like that. This is a felony. He kept reiterating this is a felony. So I was really nervous and I knew

stuff came out. He was really making a big deal about the pills.

Q That would include the pills that you had too, the Ultram?

A No.

Q Just about the Oxycodone?

A I put all my stuff on top. That's why the whole purse was so full because I knew most of the contents were coming out of there so my stuff would be fine.

Q Your pill, was it identified or marked in some way with a prescription?

A No. I had them in my own pill case. I had my allergy medicine in there and a few Ultram.

Q At any point in your view was the vehicle searched while you were able to observe that?

A Yes. I was in the back seat and I could see them taking everything out of the trunk and throwing it in the front. I was in the process of putting things in storage and taking things out so I had a whole bunch of stuff in there. My son's laptop, they threw that. They cracked the screen.

Q Let's just take it step by step. In terms of your vehicle, what did you observe that was

searched with regard to your vehicle. You're telling me the trunk was searched and you observed that. What type of things were taken out of your trunk?

A Book bag.

Q You said laptop?

A Laptop. I have some stuff in my car. A car vac, clothes, a bunch of clothes.

Q Is there any reason?

A A couple of chairs.

Q Is there any reason why all these things were in your trunk?

A I was in the process of taking stuff out of storage. I took the stuff out of storage and I was putting stuff back into storage, some clothes. It was just a bunch of stuff. I don't even remember all the stuff that was in there.

Q When they took the things out of the trunk where did they put them?

A I just saw them throw them up.

Q Throw them up meaning throw them up in the air?

A Throw them towards the front of the car. Some things they took out and put on the ground but

-DEANDA-

most things they threw into the back seat.

Q Did you ask them any questions about why this was done?

A No.

Q Did you observed your trunk being searched? And what other parts of the vehicle was searched? How about the inside?

A I saw him go into the driver side and look through there.

Q And you say look through there. Did you see them look on the side?

A I don't know what they were doing in there. I can only assume they were searching.

Q Do you know if there were any other pills found in there other than what you told me about?

A Yes.

Q Where were those pills located and what were they?

A On the driver side there is a little compartment there.

Q There were pills found there?

A When he was making such a big deal out of them I knew other pills fell down and he was making such a big deal about the amount of pills. I knew

other pills fell in my purse so I just pulled my stuff in my purse. Whatever was in my purse I just put it over the driver side and I put my own stuff there too.

Q So you yourself had placed the pills on the driver side? Do you want to call it a compartment on the door?

A Yes.

Q Okay. So you put them there while the officer was standing there?

A While he had gone to the car.

Q What type of pills were these?

A Whatever was in the bottle. So I'm not sure if she just had her oxy in there or if there were other things in there.

Q So that means when the officer searched the driver side compartment, so to speak, on the door, he found some more Oxycodone pills?

A Oxycodone, and my pills, and he found a couple of Orange pills or whatever, yellow pills.

Q What were those for?

A My sister told those were Flexeril.

Q What's Flexeril for?

A It's a muscle relaxer.

Q Those belonged to your sister?
A Yes.
Q When he found them were they in any type of pill container?
A Those were just--
Q Out?
A Those were just out. My whole pill container of the things I had, I just put that in there. I didn't dump mine out. I just put the pill thing in. Mine had Ultram in it. That's it.
Q Did you see them searching the other part of the vehicles? We discussed the trunk.
A Somebody went in on my side and then someone went in on the other side.
Q That would be the passenger side?
A Passenger side, yes.
Q Did you have any pills on the passenger side door?
A No.
Q Did they go into the glove compartment as far as you could observe?
A No, not as far as I could observe. But I know they did.
Q Were there any pills in the glove

compartment?

A No.

Q Were there pills anywhere else in the car other than where you've described to me?

A No.

Q While you were in the cell -- let's get back to the police station, right? We're in the police station in the cell. At some point were the children picked up from the police station?

A Yes.

Q Who came to pick the children up?

A My sister Paula and Mark and Monique.

Q Approximately what time did they arrive in the police station?

A No idea.

Q But you were aware that they did pick up the children?

A When they came up the lady officer came back and said, Your sister and the other parents came to pick the kids up. So I'm like, Good.

Q Did you have any discussion with your sister at that time when they came to pick up the children?

A No.

-DEANDA-

Q So what happened as you were in the cell for the four hours?

A Well, they came in, counted the money in front of me. That's how I know that they went into the glove compartment because in the glove compartment I had a stack of brand-new ones that I never took out of there from God knows when. That's how I knew they went into the glove compartment.

Q In between the driver seat and the passenger front seat?

A Yes.

Q That's where the ones were?

A Yeah. He counted all of the money in front of me.

Q You were still in the cell at that time?

A Yes. While I was in the cell they were asking me questions about the different pills they found. I was trying to be as helpful as possible.

Q What type of questions were they asking?

A What are these brown pills? I told them I don't know but I would imagine if you found brown pills in there, my sister takes Flexeril so maybe that was part of what she had in there. There were a couple of Benadryl. They were like, What are the

-DEANDA-

pink pills? I said, The pink pills would be Benadryl.

Q Whose pills did those belong to?

A The Benadryl, that would belong to my sister as well.

Q What other pills did they identify for you?

A They were trying, looking in the computer trying to identify them.

Q Now, they counted the money. Who counted it?

A Officer Hicks counted it in front of me.

Q The one who initially pulled you over?

A Yes. I was in the cell, he was outside the cell, and he pulled over a chair and counted everything. While I was in the cell the female officer came in looking for money so she could get the kids something out of the vending machine.

Q She was looking for money from you?

A She asked one of the officers. She said she didn't have any change. I told them they could feel free to take any of my money and give the girls anything that they want.

Q Did they in fact do that?

A Yes.

Q How much did they take from you to get something for the kids?

A I think she told me $4 in quarters.

Q All right. So how much money was counted by Officer Hicks in front of you, do you know?

A I don't remember exactly but something around $1,200.

Q After he counted this money in front of you what happened next?

A He went back to his computer. At that point I just asked them if I could go to the bathroom. I had went to the bathroom and came back to the cell. I was freezing in there.

Q Were you in the cell by yourself?

A Yes. It was freezing in there so I just put my head down.

Q Were you ever told you were under arrest and what you were charged with while you were in the cell?

A No, not once.

Q Did you ask them whether or not you could speak with a lawyer or anything?

A Didn't even think to do that.

-DEANDA-

Q So how long did you stay at the police station in the cell?

A Until about 2:00.

Q And that would be in the morning?

A No, afternoon. It was 2:00 or 3:00. I'm not sure. I really don't know.

Q Okay. Did someone come to pick you up?

A All I know is I got home at 6:00.

Q You got home at 6:00?

A No. At that point a little while after. I was there for quite a while.

Q Were you fingerprinted and everything while you were there?

A Yes. But I still hadn't been fingerprinted.

Q So you had been fingerprinted while you were there. Were you told you were placed under arrest?

A No.

Q When were you told for the first time that you were placed under arrest?

A I just assumed.

Q You just assumed. No one ever came and said the words to you?

A No.

Q No one ever came and said, We're going to charge you with this offense?

MR. ARONWALD: I think she said she was told by Officer Hicks that possession of the oxycodone is a Class D felony.

MS. LANGRIN: That doesn't mean he said the words, We're placing you under arrest.

MR. ARONWALD: She was handcuffed and put in a police car and placed in a jail cell.

MS. LANGRIN: I'm not disputing whether she was free to leave. That's not the issue.

A I asked him while I was in the cell, What about the ticket, the speeding ticket? And I asked him about that numerous times. And he said, I don't understand. He said, You're worried about the ticket and you're facing a Class D or Class C felony.

Q All right. It was your understanding then you felt you were under arrest? At the time that you were at the police station you felt you were under arrest?

A I didn't know either way.

Q At some point you left the police station?

A Yes.

Q Okay. And you feel you left the police station about 2:00 or 3:00?

MR. ARONWALD: Just so we're clear, whether she ever heard the magical words, You are under arrest, okay, it is our position that from the time that she was placed in handcuffs and put in the back of a police car she was in police custody and she was not free to leave.

MS. LANGRIN: I'm not disputing that. That's why I asked her did anyone say the words. And then the second question I asked her was what was her understanding. I'm not disputing whether she was or not.

A I can honestly say I really just don't remember.

Q I'm just trying to get the facts. That's all.

MR. ARONWALD: Go on with the questioning because you'll see there's a time she was taken to court.

MS. LANGRIN: I'm trying to get there.

Q I'm just trying to get the facts. At some point you left the police station at 2:00 to

-DEANDA-

3:00 p.m., around there?

MR. ARONWALD: I think she corrected herself and said she's really not sure what time.

A I had no clocks in front of me. I'm just guessing.

Q You got back home at 6:00?

A Yes.

Q At some point you left the police station at some point?

A Yes.

Q Before you went home. Where did you go when you left the police station?

A He came into the cell and took pictures of me and fingerprinted me.

Q And he did that in the cell?

A Yes.

Q That would be Officer Hicks?

A Yes.

Q Okay. So at some point did you leave the cell, leave the police station?

A Yes.

Q Where did you go?

A I went to White Plains Court.

Q Okay.

MR. ARONWALD: Just so you know, this was Memorial Day so everything was closed. Courts were closed.

A They were saying that they really didn't want to stay here and baby-sit me. First they told me I would be spending the night there.

Q At the police station?

A At the police station.

Q In the cell?

A In the cell where I went to the bathroom. And I said, you can't be serious. They said yes. They were talking back and forth about having to stay there.

Q They were talking. Who's they?

A Officers. I didn't turn around to see who was talking.

Q Were you physically searched at all on your person? If you don't remember or don't know just tell me.

A I don't remember. I just had on a little flimsy dress.

Q We talked about the search of your vehicle. I'm just asking were you searched on your

-DEANDA-

person?

A Definitely not outside, so no.

Q At some point you were taken to the White Plains Court?

A Yes. Well, they were able to get -- they asked for maybe an emergency arraignment, a temporary arraignment, or something like that and they took me to the White Plains Court. I heard them talking on the phone to someone telling them they were taking me to the White Plains Court.

Q So you went in a police vehicle to the White Plains Court?

A I went in a paddy wagon thingy.

Q Were you by yourself, meaning any other persons other than the drivers?

A I was by myself.

Q How many drivers?

A One, the female officer. Well, they took me out of the cell and they put me in cuffs in the front with chains.

Q So did you arrive at the White Plains Court?

A Yes.

Q What happened when you arrived at court?

Were you arraigned?

A Yes.

Q You were arraigned?

A It was just an informal arraignment at a desk as soon as you walk in.

Q Who was sitting at the desk?

A There was a judge. There were a couple of other prisoners being arraigned.

Q Do you know the name of the judge? If you don't it's okay.

MR. ARONWALD: Again, just to help you, she described the judge as an African American female. The only one who fits that description would be Barbara Leak, who was probably the duty judge.

The arraignment was only for purposes of setting bail. It wasn't a formal arraignment of guilty or not guilty. There were no charges presented at that time.

Q Was bail then set for you by this judge, this African American female judge?

A Yes.

Q What was the bail set at?

A At $5,000.

Q Anything happen? Did you have any conversation with the judge other than the setting of bail?

A She asked me a question and I didn't have to answer.

Q What was the question?

A It was just that do you have anything to say.

Q Did you respond to that?

A Not really. I didn't have anything to say.

Q So she set bail at 5,000?

A I know they confirmed that I had never been arrested and a couple of people were making comments like, What is she here for, domestic violence?

Q So did the judge comment that you had never been arrested?

A Yes.

Q Okay. What else did the judge comment?

A The judge told me she was setting the bail for $5,000.

Q Did you request --

A They did tell me that you're being

-DEANDA-

arrested, you're being charged with possession of an illegal substance at that point.

Q Okay. This was during your conversation with the judge?

A Yes.

Q I think they'd have to if they're setting bail. They'd have to tell you something.

A Then she said I'm to be at court at 9:00 a.m. She told the officers to make sure she's at court at 9:00 a.m. and no paperwork gets lost.

Q That would be 9:00 a.m. the next morning?

A Tuesday morning.

Q Okay. At any point did you ask to speak with a lawyer when you were before the judge or anything?

A No. I asked her if I could, you know, if I could get out of there, if I could post bail. And the officer, the lady officer who was transporting me, she told me no and I had to go to Valhalla.

Q So when you left going before this judge, where did you go after that?

A Valhalla.

Q You went to the Westchester County Jail?

A Yes.

-DEANDA-

Q Who escorted you there, that would be the female officer?

A Yes.

Q What happened when you arrived at the Westchester County Jail?

A I went through the in-processing.

Q Could you describe what you went through?

A Signed paperwork for health insurance and if I'm mentally disabled and all that type of stuff. They took me to a back room and told me I could make a phone call at that point.

Q And did you in fact make a phone call?

A Yes. I called my son.

Q You called your son. Which son was that?

A Amir.

Q What did you say to Amir during this phone call?

A I told him -- I'm so sorry. I spoke with Peter while I was at the police station. The officer told me, Your sons keep calling here every five minutes; would you like to call them? He said, Your son keeps calling here every five minutes.

Q That would be Peter?

A Yes.

-DEANDA-

Q Did you speak with Peter?

A Yes.

Q What was your conversation with Peter about that time?

A He's like, Mom, what's going on? And I told him what happened. Not what happened, but I told him that I'll talk to you later but basically I've been arrested and they were taking me to White Plains.

Q How many times did you speak with Peter?

A Just once.

Q Did you speak with your other son, Amir, while you were at the police station?

A No.

Q All right.

A He said they'd be by the phone waiting for me to call.

Q So let's gets back to when you went to the jail.

A I spoke with Amir and after I made my phone --

Q So you spoke with Amir while you were at the jail?

A While I was at Valhalla.

-DEANDA-

Q That's the jail. When you say Valhalla that's the Westchester County Jail. You went to the Westchester County Jail?

A Yes.

Q So you spoke with Amir?

A I spoke with Amir.

Q And what did you speak with Amir about?

A I told them they set bail for $5,000 and I told him where I had money, my emergency money, and he came.

Q So your son posted bail for you?

A Yes.

Q When did he post the bail, at what time?

A At 4:20 or something like that. At 4:15 or 5:20. I'm not sure which one it was. It must have been 5:20 because I know I got home at 6:00.

Q Before the bail was posted what other processing did you go through at the jail?

A I went in an office where they took my picture. When I first got there I signed, they gave me some paperwork to read and sign, and I went to take my picture. And then they gave me the phone call and I spoke with an officer there who was taking --

-DEANDA-

Q Your photograph?
A Yes. She told me that I had to be in court at 9:00 a.m. in the morning and I told her -- anyway we talked.
Q What did you talk about?
A She just told me or she advised me to get an outside attorney. And I said, Oh, I fully plan to do that but I'm just upset that I won't have an attorney to go with me to court in the morning because I'm going to make sure I get the right attorney because this is insane.
Q Do you know the name of that officer you spoke with? It's okay. How long were you at the Westchester jail which you refer to as Valhalla?
A I just went in at that point and made my phone call and they took me to another room.
Q How long in total were you at the Westchester County Jail?
MR. ARONWALD: Do you know or are you just guessing?
A I'd be guessing.
Q Two hours, three hours?
A Maybe two hours.
Q How did you get home?

MR. ARONWALD: Just so we're clear because you're under oath here. Don't think you have to answer the question. If you don't know just say you don't know.

Q Absolutely. I'm not trying to trick you. I'm just trying to get the facts. If you don't know, you don't know. So where did you go after you left the jail?

A Home.

Q Who came to pick you up to take you home?

A Amir.

Q What did you do when you went home?

A Laid down for a little bit.

Q At some point then did you go to court the next day?

A Yes. I laid down a little bit and then I made some phone calls.

Q Who did you call?

A My family to let them know I was okay. I called my sister.

Q Did you call an attorney?

A That evening later on when I just laid down for a while. Then I got up and got the computer out and looked for attorneys.

-DEANDA-

Q So the next day you had to go the court which would be May 29th and you had to be there at 9:00 in the morning. Did you in fact go to court?
A Yes.
Q Who did you go to court with?
A My niece Citea (phonetic) and my son Amir.
Q Did you have an attorney with you when you went to court the next morning?
A No.
Q When you went to court the next morning, 5/29, that would be May 29th, what happened at court?
A I sat there until 3:30 before I saw anybody.
Q So what time did you arrive at court the next morning?
A I arrived there at 8:30.
Q And you sat there until 3:30?
A About 3:30.
Q What were you doing while you sat there until 3:30?
A Just sitting.
Q In court?
A Yes.

Q At some point did you see a judge then?
A Yes.
Q Which judge did you see? Do you recall?
A No.
Q Was it a male or female judge?
A Male.
Q What happened when you saw the judge?
MR. ARONWALD: By the way, this is not the White Plains City Court that she went to.
A Yonkers.
Q You went to Yonkers Court? Were you formally arraigned in Yonkers Court?
MR. ARONWALD: Do you know what formally arraigned means?
Q Were you told the charges against you and asked how you pled?
A I asked for an adjournment to get time to get an attorney.
Q Were you granted that?
A Yes.
Q How long was your matter adjourned for?
A Two weeks or three weeks.
Q All right. In that three-week time did you get a lawyer?

A Yes.

Q What attorney did you get?

A Bill Aronwald.

Q So when was it that you returned back to court, three weeks later?

A Yes, whenever it was adjourned to.

Q So three weeks later and you went with your attorney?

A Yes.

Q Were you formally arraigned at that time?

A Yes.

Q Were you told the charges against you and asked how you pled?

A Yes.

Q What were the specific charges against you?

MR. ARONWALD: I suspect she was actually formally arraigned and a not guilty plea was entered on that Tuesday.

MS. LANGRIN: I'd like for her to say it.

Q Were you formally told the charges at that time?

A Yes.

Q What were you told?

-DEANDA-

A I was told that I was being charged with possession of an illegal substance, which was a class whatever felony. I don't know what they said.
Q They asked you how you pled?
A Yes.
Q How did you plead?
A Not guilty.
Q Then there came a time you had to go to court again after that?
A Oh.
Q Something else you wanted to add?
A When I went to court on Tuesday by myself.
Q The first time when you asked for the adjournment?
A Yes. The judge gave me paperwork to attend a TASC, whatever it's called.
Q What type of TASC?
A TASC. That was the name of the drug program for an evaluation.
MR. ARONWALD: I provided you with a copy of the felony complaint. I also provided you with a copy of the TASC referral.
Q Did you in fact attend any type of drug program? Did you attend any of this?

A I complied with what he asked me to do.
Q When did you have to attend that program?
A He said I had a week to make an appointment. But I made an appointment the next day or that day to get the quickest appointment I could get.
Q Who did you meet with when you had the appointment?
A I went to the government building on East Post Road. I'm not sure who it was.
Q What did you do at the appointment?
A He asked questions and then he told me I had to go somewhere else. This was just the initial evaluation to set me up with wherever I'm supposed to go.
Q Okay.
A He gave me a couple of locations I could go to and I picked one and made an appointment to go see them.
Q What location did you chose?
A He told me at that point when I go they'll do a drug test or something.
Q Okay. So what location did you chose for that second appointment?

A It's in White Plains. I forget the street.

Q When you went to that second appointment what happened there?

A I met with -- I had to pay money.

Q How much money did you have to pay and for what reason?

A I had to pay for -- they told me when I came there -- I should have looked all this up. I didn't realize. Before I went the paperwork told me I would need to have a money order for $7, a money order for something, and pay I don't remember how much, like $100 or something.

So I had what they told me. I wrote out a check for one or a check for both of them and gave them cash. They told me a certain amount had to be in cash.

Q What was this money for?

A For tests that they needed to run and for me to just be there to see the counselors.

Q This was in White Plains?

A Yes.

Q Did you in fact see a counselor on that second day, meeting?

-DEANDA-

A Yes. She informed me that it would be a three-part consultation and they would send recommendations. And each time I went I had to have these checks and the cash.

Q So we were at the second consultation then, right, because you had the initial?

A Yes. From there they told me I had to go back to them at least three times.

Q Did you in fact attend the three times?

A Yes.

Q What happened during these three times?

A The counselor would ask me a bunch of questions.

Q Was the counselor assigned to you?

A Yes. There were three different ones.

Q So you never saw the same counselor at the same time?

A Correct. Three different ones and they ask you a bunch of personal questions. Then before you leave you have to go into the bathroom with that person and pee in the cup while they watch you.

Q And that would be the drug testing?

A Yes.

Q So when this occurred how many times did

you have to do that?

A Three.

Q Now when you say that you have to urinate in the cup, when you say that someone's watching you, you go into a bathroom, you were not able to close the door and provide the sample? Someone was specifically watching you?

A Yes.

Q Were you informed of the results of these urine tests?

A No.

Q You were never informed of your results?

A No. I mean, I knew the results. I never even asked.

Q Did there come another time when you went back to court with your attorney?

A Yes.

Q When was that, how many weeks later? Would that be June some time, July, or something else?

MR. ARONWALD: I believe it was July 26th.

Q And you went back with your counselor at that time?

A Yes.

Q What happened on that court date of July 26th?

MR. ARONWALD: The charges were withdrawn by the District Attorney's office.

Q How many times did you actually go to court then?

A Three times, two with my attorney and once alone.

Q And once by yourself where you asked for the adjournment?

A Yes.

Q Now, when you went to court on July 26th the charges were withdrawn?

A Yes.

Q Were you informed as to why they were being withdrawn?

A No.

MR. ARONWALD: She knew from me why they were withdrawn.

MS. LANGRIN: Why were they withdrawn?

MR. ARONWALD: You didn't ask her so she didn't tell you. But there came a point when I had discussions with Assistant District Attorney Paul Stein. He is a branch chief for

the White Plains City Court. I explained to him that the oxycodone pills did not belong to Ms. Deanda, but belonged to her sister and her sister had a valid prescription.

I relayed to him both verbally and by letter the same thing that Sherrie had explained to you about pretty much what occurred on the time of her arrest. And I offered to have the sister provide him with a copy of the prescription and the prescription bottle.

I provided in the letter the information from the prescription, the prescription number, the pharmacy that filled the prescription, the doctor who prescribed the oxycodone and suggested that we would--

MS. LANGRIN: This was all by letter.

MR. ARONWALD: By letter. We suggested we would be willing to make the sister available so that he can interview the sister himself rather than relying on what I was saying and instead--

MS. LANGRIN: Do you have a copy of the letter?

MR. ARONWALD: Let's see. If you'd like, you can make a copy of it and give it back to me. This was faxed to Mr. Stein on the 14th of June. The matter was on the June 26th calendar. This was a letter advising him I had been retained to represent her. I laid out the facts. This is the letter.

Then what happened was I was told by Mr. Stein that I should take or have the sister go directly to the -- that letter is dated when?

MS. LANGRIN: June 14th, 2012.

MR. ARONWALD: I spoke to Mr. Stein. Mr. Stein basically told me to have the sister go to the county police because they were the police agency.

And on June 25th I went with both Sherrie and her sister to the Valhalla, the police barracks, and Paula was interviewed by a police officer by the name of Grasso, G-R-A-S-S-O. And she provided him with a written statement which she signed, a copy of which I was not given.

MS. LANGRIN: I was going to ask you.

MR. ARONWALD: I do not have a copy of it. The police refused to give it to me. They said I should get it from the DA's office. I never received it from the DA's office.

In addition, Officer Grasso took a photograph at my request of the prescription bottle that Paula had as well as the bottle of Ultram that Sherrie had. So he took photographs of those both bottles.

I asked for copies of photographs. They were not provided to me. I was told they would be forwarded to Mr. Stein together with the written statement of Paula. And on June 25th I wrote another letter confirming what had taken place earlier that morning at the barracks.

MS. LANGRIN: May I have a copy of that too?

MR. ARONWALD: You can make a copy of that. And then the next court date was July 26th. And at that time based upon the information that had been provided as well the information that had been provided to Officer Grasso by Paula Fontenette, Mr. Stein advised me on July 25th that he was going to withdraw

the charges on July 26th, which is what he did.

You can ask Ms. Deanda about this, but there was something else that happened at the barracks.

MS. LANGRIN: When you went back with her sister?

MR. ARONWALD: When she was there on the day of the arrest. When Paula came to the barracks she brought with her, her prescription bottle and asked to see the arresting officer so that she could show him the prescription.

MS. LANGRIN: Was that when she came to pick up the children?

MR. ARONWALD: Yes. She was told she wasn't allowed to see Officer Hicks. She was told by the desk officer that they didn't care to see the prescription bottle, it was out of their hands and they needed to discuss it with the DA.

Q On the day of the arrest your sister came to pick up the children. But as far as you know she also came to show her prescription bottle?

A She told me this after. I didn't know what occurred while I was back there.

-DEANDA-

MR. ARONWALD: I think that's also included in the written statement she gave Officer Grasso which Mr. Stein should have.

MS. LANGRIN: You don't have a copy of that statement?

MR. ARONWALD: I asked for it. They wouldn't give it to me. They told me I had to get it from the DA.

Q Tell me what your sister told you about when she came to pick up the children.

A I called her, everybody, and let them know I was home but I talked to them later. My sister was the first person I called and she was all upset that she felt like she got me into this trouble.

But she told me she brought everything down there and she said the officers were so dismissive, rude, they were disrespectful. They kids told them they were questioning the kids, what do your parents do for a living, questioning the kids on personal stuff and, you know, because the kids told them that immediately that they gave us soda. Our kids don't drink soda, but we had soda, we had chips.

And they were asking and Peyton told

her mother they were asking all kinds of questions, what you do for a living, what daddy does for a living.

Q Who is their father? You said they asked what daddy does for a living.

A My sister Paula came and Peyton's parents came, Monique and Mark Sutton.

Q They were asking what Mr. Sutton does?

A They were asking what each of their parents do.

Q What does Mr. Sutton do for a living?

MR. ARONWALD: Is that really relevant to anything? It has nothing to do with the issues in this case. I'm going to object.

MS. LANGRIN: It was his child that was involved when the arrest occurred. But if you don't want her to answer that's fine.

MR. ARONWALD: He's not making the claim here.

MS. LANGRIN: I know. It's just trying to get a full flavor for what happened here. That's all.

Q Go ahead. They were asking what else the parents did for a living?

A My sister said, I brought the prescription down there, I brought the prescription bottle for them to look at.

Q This would have been another prescription bottle? Because the one that was in the vehicle didn't have any identifying.

A She explained in her written report why she carries her stuff like that.

Q I was going to ask you, why did the bottle that she brought down to the police station--

A I don't recall. In that report though.

Q Did you ever ask her though why the bottle that was in the car with you did not have any identifying information, but then the one she brought down to the station had some identifying information?

A She told me that the nature of what she takes, she doesn't need everybody knowing what she takes. She said she doesn't feel comfortable carrying this around.

MR. ARONWALD: The amount of pills that were in that unmarked bottle was just a portion of what was in the prescription bottle.

The prescription was for more than 40

pills. So she didn't basically take the entire prescription, she just took a quantity.

A The prescription is huge. She just takes what she needs.

Q Do you see here on the letter dated June 4th, 2012, which I haven't really read in detail, but it's from your attorney. It looks like a physician Dr. Jay Fields is the one that prescribed the pills. Do you know about that? That's what your attorney writes in the letter on June 14th, 2012.

MR. ARONWALD: I got it off the prescription.

MS. LANGRIN: I'm just asking what her knowledge is.

A She did leave the prescription bottle with me. I didn't look at it.

MR. ARONWALD: She was also, according to the prescription bottle and I don't know whether that's in the letter, the prescription bottle said she was to take three tablets every four to six hours as needed with a max of 12 a day. So she was staying over there for a weekend and so she had basically what would

amount to a little more than a three-day supply of the pills.

The other thing you should also know is that even though the charges were withdrawn on July 26th, and despite our requests and despite the District Attorney's authorization to the county police, the county police still have not released the pills that are seized, all of which were validly prescribed.

So that is also part of the claim. I have had a number of conversations with the county police about it and I've been given one explanation or another.

MS. LANGRIN: What were you told as to why they were not given to you?

MR. ARONWALD: I spoke to Sergeant Lavin, who I guess would be one of the unnamed John Doe's in the lawsuit. But Sergeant Lavin explained to me initially that he needed to have Paula Fontenette come to retrieve her pills.

I explained to him that Ms. Fontenette what disabled and it is inconvenient for her to have to travel from the Bronx, Manhattan, to

Valhalla. And he said that's just too bad, that's the way it had to be.

Then I called him again after I received an authorization from Paula Fontenette to represent her in connection with retrieving the pills. And at this point he told me he didn't even have the pills, they were still at the lab for analysis.

So I contacted the DA's office. The DA's office basically notified the laboratory that any request for examination had been canceled and the pills should be returned to the county police.

And that happened over a month ago and I have not been able to speak to Sergeant Lavin since that time to make the arrangements for these pills, which are expensive. Oxycodone is an expensive pill. I don't know why.

He also indicated that at this point he's now going to require a notarized letter from the doctor.

MS. LANGRIN: Sergeant Lavin told you this?

MR. ARONWALD: A notarized letter from the

-DEANDA-

doctor saying the prescription is still in effect, which is legally incorrect. The pills do not belong to anyone other than the person for which they had a valid prescription, and therefor the pills should be returned.

So there are a whole bunch of obstacles he's placing in terms of returning the pills, even though the District Attorney's office has said that the items are to be returned.

MS. LANGRIN: Just off the record for a minute.

(Discussion held off the record.)

Q The Ultram pills that were yours, were those prescribed to you?

A Yes.

Q Who prescribed those to you?

A Dr. Kamer.

MR. ARONWALD: Just from a technical point of view, she was not charged with possession of the Ultram. She was only charged with possession of the Oxycodone.

MS. LANGRIN: But they have them seized and you want them back. So it's just additional information about the pills.

-DEANDA-

Q Who prescribed the Ultram to you? These are your pills that the police currently still have. Who prescribed them to you?

A Dr. Kamer.

Q Thank you. I think I might have asked you this before but I'll ask again. As a result of what happened you to on May 28th have you been caused to see a doctor at all for anything that's happened to you?

A No.

Q A psychiatrist, psychoanalyst, anybody of that nature?

A No.

Q Can you tell me then how this has affected your life?

A Just to remember it.

MS. LANGRIN: Would I have your consent if I were to get the DA file? If I get the DA file a lot of times they will ask do I have the consent of the person. Would you consent in order for me to get the DA file.

MR. ARONWALD: Only if I am provided with a complete copy of everything from the file.

MS. LANGRIN: Absolutely.

MR. ARONWALD: I have not gotten anything from the file. I have not gotten a copy of Paula's statement. I haven't gotten a photograph of the prescription bottles. So I have no objection.

MS. LANGRIN: What you should know is I also cannot get everything. So I think what I can say to you is you will get a copy of whatever I'm getting. A lot of times we are not able to get everything either.

MR. ARONWALD: I had requested a copy of Paula's statement from the DA's office and they didn't release it to me.

But basically it seems to me that if we bring this action in federal court, which we may very well do unless we resolve it, I will ask the judge to issue a so-ordered subpoena requiring the Assistant District Attorney and the Yonkers City Court to basically provide the Court with their entire files.

MS. LANGRIN: What I'm saying to you is I'm able to get certain documents. I'm not able to get all of them. A lot of times I would need your consent. And then whatever I

get I will give to you. I can't give you the whole file if they don't give it to me.

MR. ARONWALD: You're free to tell them that.

MS. LANGRIN: That I have your consent?

MR. ARONWALD: Absolutely.

Q I think I asked a question.

A It's just been devastated. I've been embarrassed. I hate to even think about it. I tried not to even think about it until I came here. I should have, just so I know what to say. I take Zoloft and usually my prescription is for 50 milligrams and I always just take half of it as needed. And I find I'm taking the whole pill now. My nerves are bad. That's it.

Q Okay.

A I haven't felt that, Oh, I need to go talk to somebody.

Q All right. Let me look at my notes one last time and we should be gone.

A I feel like an idiot.

Q Don't.

MR. ARONWALD: Is there any need to mark the letters I gave you as exhibits for the

-DEANDA-

50-H.

MS. LANGRIN: No because I'm uncomfortable with some because I haven't really read them. We'll have another bite at the apple with the deposition. And actually the letters are really coming from you.

MR. ARONWALD: Okay. The letters should be in the DA's files because they --

MS. LANGRIN: They may not give them to me. There are things we cannot get. They'll give me what I can get legally.

MR. ARONWALD: You're certainly authorized to tell them I have given you copies of letters that are purported to have been sent by me to them and you would like to have them at least confirm the receipt of those letters.

MS. LANGRIN: If I can get the entire file I'm going to get it. Just letting you know they'll even say to me, You can't have this. Even with your consent I still can't get certain things.

MR. ARONWALD: I believe, and of course this is also under seal, but I believe if I recall correctly that on July 26th when the

Assistant District Attorney's office withdrew the charges, they withdrew the charges with an explanation to the Court that they had determined that the oxycodone pills belonged to Sherrie's sister and that she had a valid prescription for it.

MS. LANGRIN: Okay.

Q One last question. Officer Hicks, when he asked you about the pills at the time that you were detained on the Bronx River Parkway, did you tell him that you did not have a prescription for those pills?

You told him that, that you didn't have a prescription for the oxycodone? You told him you did not have a prescription for that, right? Let me ask it a different way. Did the officer ask you did you have a prescription for Oxycodone?

A Yes.

Q And you told him no?

A I think every time he asked me a question I kept telling him--

Q I'm not trying to trick you. I just want let you know I'm not trying to trick you.

A I'm just trying to answer. I just kept

telling them they belonged to my sister.

Q That's what I'm getting at. You specifically recall telling Officer Hicks at the scene on the Bronx River Parkway that the pills belonged to your sister?

A Correct.

Q Have you ever seen the police report regarding your arrest?

MR. ARONWALD: No.

A No.

MS. LANGRIN: I have nothing further.

(Time noted: 11:45 a.m.)

______________________________

SHERRIE R. DEANDA

Subscribed and sworn to before me this ______ day of ________________ 2012.

___________________________________, Notary Public.

-DEANDA-

# I N D E X

RESPONDENT'S EXHIBITS:

A: Notice of Claim


| DOCUMENTS/INFORMATION REQUESTED: | PAGE |
|---|---|
| Notes Written by Claimant | 8 |

C E R T I F I C A T I O N

I, JOSEPH CAROLLO, a Court Reporter and Notary Public within and for the State of New York, do hereby certify:

That the witness whose deposition is herein before set forth, was duly sworn by me, and that the within transcript is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 25th day of October, 2012.

Joseph Carollo

JOSEPH CAROLLO

A
able 15:16 43:17 57:6 73:6 84:16 87:11,23 87:24
absolutely 31:5 39:23 65:6 86:25 88:7
accident 21:10
accomplished 4:22,23
account 7:7,14
accounting 6:16
action 87:16 93:13
adamant 36:15
add 69:12
addition 77:6
additional 85:25
address 4:10 9:23
adjourned 67:22 68:7
adjournment 67:18 69:15 74:11
advised 64:7 77:24
advisement 8:16
advising 76:6
African 28:24 58:13 58:22
afternoon 52:6
age 5:11 15:24 32:16
agency 76:17
ago 84:15
AGREED 3:2,8,13
ahead 35:14 80:24
air 12:7 44:23
allege 6:20
allegedly 38:15
alleging 5:16
allergy 43:15
allowed 78:16
American 28:24 58:13 58:22
Amir 5:7 61:16,17 62:13,21,23 63:6,7,8 65:12 66:7
amount 45:25 71:17 81:22 83:2
analysis 84:9
answer 26:18 29:6 59:6 65:4 80:18 90:25
anybody 35:21,24,24 66:15 86:12
anyway 18:14 64:5
Apartment 4:12
apologized 17:13
apple 89:5
appointment 70:5,5,6 70:9,12,19,25 71:4
approached 16:13,14 16:25
approaching 10:16
Approximately 11:4
48:14
Aronwald 2:5,7 8:15 23:15 26:18 29:3,7 29:14 36:6 53:5,10 54:5,20 55:3 56:3 58:12 64:20 65:2 67:9,14 68:4,18 69:21 73:22 74:4,19 74:22 75:19 76:2,14 77:2,19 78:8,15 79:2 79:7 80:13,19 81:22 82:13,19 83:17 84:25 85:19 86:23 87:2,12 88:4,7,24 89:8,13,23 91:10
arraigned 58:2,4,9 67:13,15 68:11,19
arraignment 57:7,8 58:5,17,18
arrangements 36:11 84:17
arrest 51:19 52:19,22 53:9,21,23 54:7 75:9 78:9,21 80:17 91:9
arrested 8:3 59:15,19 60:2 62:9
arresting 78:11
arrive 40:9 48:14 57:22 66:16
arrived 33:16 40:11 57:25 61:5 66:18
Ashley 31:8
asked 17:6,14 20:25 25:7 26:19 29:20,21 29:24 30:3,4,5,10 32:2,3,5,22,23 33:6 35:20 39:21 50:21 51:13 53:14,15 54:12 54:13 57:7 59:5 60:17 67:17,18 68:14 69:5,14 70:2,13 73:15 74:10 77:11 78:11 79:7 80:5 86:6 88:8 90:10,21
asking 41:4 49:18,20 56:25 79:25 80:2,9 80:10,24 82:15
asks 35:18
assigned 72:15
Assistant 74:24 87:19 90:2
assume 45:14
assumed 52:23,24
attend 69:17,24,25 70:3 72:10
attention 26:22 38:4
attorney 4:20 29:19 64:8,10,12 65:22 66:8 67:19 68:3,9 73:17 74:8,25 82:8
82:11 87:19
attorneys 2:5,11 3:3 65:25
Attorney's 74:5 83:7 85:9 90:2
authorization 83:7 84:5
authorized 89:13
available 75:20
Avenue 1:9 2:12 6:14
aware 13:4 14:13 48:17
awe 28:18
a.m 1:11 11:6 60:10,11 60:12 64:4 91:13

B
baby 30:20,21,23
baby-sit 56:7
back 12:9,11 14:20 18:11,14 21:7,8,9,12 21:20,21 22:15 24:7 26:25 27:22,23 31:24 31:25 32:12 33:7 34:11,17 35:17,19 38:4 40:3 41:4 43:18 44:16 45:2 48:8,20 51:12,14 54:9 55:8 56:14 61:11 62:19 68:5 72:9 73:17,23 76:3 78:6,25 85:24
background 6:5
bad 84:2 88:16
bag 44:6
bail 58:18,21,24 59:4 59:13,22 60:8,18 63:9,12,14,18
bank 30:9
Barbara 58:15
barracks 76:20 77:16 78:5,10
based 77:21
basically 8:4 27:14 40:17 62:8 76:15 82:2,25 84:11 87:15 87:20
bathroom 51:14,14 56:12 72:21 73:6
beautiful 11:8
believe 28:25 37:11 73:22 89:23,24
bell 16:5
belong 9:2 23:21 50:4 50:5 75:3 85:4
belonged 24:16,22,25 25:5,22 26:8,11,13 27:5 36:24 47:2 75:4 90:5 91:2,6
belts 32:18
Benadryl 49:25 50:3,5
big 21:3,4 42:18,18 43:2 45:23,25
Bill 68:4
bills 30:15,16,16 31:11
birth 5:14
bit 30:10 65:14,17
bite 12:9 89:5
blood 93:14
Book 44:6
borrowed 25:23
bottle 23:4,5,8,18 42:13,13 46:14 75:12 77:8,8 78:11,18,23 81:3,6,10,13,23,24 82:17,20,22
bottles 77:10 87:5
branch 74:25
brand-new 49:7
break 40:7,21
breakfast 7:18 9:15
bridge 13:14,14
brief 7:7,14
bring 21:7 87:16
bringing 22:2 26:2 28:10
Bronx 10:8 11:14,15 12:24 83:25 90:11 91:5
brought 21:8,20 78:10 79:16 81:2,3,11,16
brown 49:21,22
building 70:10
bunch 19:14 20:6 22:9 43:22 44:9,17 72:13 72:20 85:7

C
C 2:2 53:18 93:2,2
calendar 76:6
calendars 7:6
call 36:19 37:3,7,12 46:7 61:12,13,18,22 62:18 63:24 64:17 65:19,22
called 25:25 27:3 36:15 37:15 61:14,15 65:21 69:17 79:12,14 84:4
calling 37:18 61:21,23
calls 65:18
canceled 84:12
car 12:6 20:17 26:14 26:15,16,20,23 27:2 28:12 31:19,20,22,24 31:25 32:13,20,24 33:4,6,7,12 34:15,20 34:21,23,24,25 35:2 35:4,7,14,14,15,15 35:17 36:19 38:5,6,8 39:7,15,18,18,19
40:13 41:17 42:15,16 44:8,9,24 46:12 48:4 53:11 54:9 81:14
card 15:9
cards 15:14 22:12 31:2
care 30:18 78:17
Carolina 9:23
Carollo 4:4 93:4,22
carries 81:9
carry 28:5
carrying 81:21
case 23:3 41:9 43:14 80:15
cash 29:25 71:17,18 72:5
catch 12:9
caused 86:8
cell 7:24 37:8,11 40:14 40:16,18,22,24 41:3 48:7,9 49:2,16,17 50:15,16,17 51:15,16 51:21 52:3 53:11,14 55:15,17,22 56:11,12 57:20
certain 71:17 87:23 89:22
certainly 89:13
certification 3:9
certify 93:6,12
chains 57:21
chair 50:16
chairs 44:11
chance 30:24
change 22:11 50:22
Chapman 4:15
Chapman-Langrin 1:15 2:13
charge 53:4
charged 51:20 60:2 69:2 85:20,21
charges 58:19 67:16 68:13,16,22 74:4,14 78:2 83:5 90:3,3
check 71:16,16
checks 72:5
chief 74:25
child 36:9 80:16
children 5:10 9:10 10:21 18:10 32:11,13 33:5,7 34:23 38:19 38:23 39:8,20,23 48:10,12,18,24 78:14 78:22 79:11
chips 79:24
chose 70:21,24
Citea 66:7
city 7:17 15:12 30:21 35:22 37:4,17 67:10 75:2 87:20
claim 1:2 4:17 80:19

**finish** 26:6
**first** 4:3 13:20,24 14:8 22:18 24:10 26:2 29:19 42:12 52:21 56:7 63:21 69:14 79:14
**fits** 20:25 58:14
**five** 40:25 61:22,23
**five-ten** 15:23
**flap** 19:5
**flashing** 14:11,18
**flavor** 80:22
**flew** 12:6
**Flexeril** 46:23,24 49:23
**flimsy** 56:23
**floor** 17:23 18:5,16
**folded** 31:11,14
**following** 13:5
**follows** 4:6
**Fontenette** 10:3 21:16 77:24 83:21,23 84:5
**forget** 71:2
**form** 3:14
**formal** 58:18
**formally** 67:13,14 68:11,19,22
**forth** 41:4 56:14 93:8
**Forty** 24:14
**forwarded** 77:13
**found** 18:14 45:16,22 46:19,20 47:4 49:19 49:22
**four** 8:25 35:5 40:25 49:3 82:23
**Fourteen** 4:11
**four-door** 8:24
**four-hour** 41:2
**fraud** 31:3
**free** 50:23 53:13 54:10 88:4
**freezing** 51:15,17
**Friday** 12:8
**front** 18:10,12 42:4 43:20 44:24 49:5,11 49:15 50:13 51:7,10 55:6 57:21
**full** 43:9 80:22
**fully** 64:8
**further** 3:8,13 27:25 91:12 93:12

G

**General** 1:13
**getting** 87:10 91:3
**girls** 50:23
**give** 19:9,24 21:9,20,21 42:14 50:23 76:3 77:3 79:8 88:2,2,3 89:10,12
**given** 76:24 83:13,16 89:14 93:10
**giving** 22:13
**glove** 15:7 47:21,25 49:6,6,9
**go** 4:22 5:20 6:7 19:14 22:4 35:13 36:3 40:13,18 41:21 45:9 47:21 51:13 54:20 55:13,24 60:20,22 63:19 64:10 65:8,15 66:2,4,6 69:9 70:14 70:16,19,19,22 72:8 72:21 73:6 74:6 76:11,16 80:24 88:18
**God** 49:8
**going** 4:16 9:25 12:18 12:23 13:10,12,19 17:8,10,11 19:12 20:24 21:13,17 22:21 26:5 27:12 34:14,19 36:3 39:23 53:3 60:21 62:6 64:11 76:25 77:25 80:15 81:10 84:21 89:19
**gold** 19:18
**Good** 4:14 48:21
**gotten** 87:2,3,4
**government** 70:10
**granddaughter** 7:18 9:8,16
**granted** 67:20
**grass** 15:2,2
**Grasso** 76:21 77:6,24 79:4
**Gray** 8:23
**ground** 44:25
**guess** 83:18
**guessing** 55:7 64:21,22
**guilty** 58:19,19 68:19 69:8
**G-R-A-S-S-O** 76:21

H

**H** 4:2
**half** 39:6 88:14
**hand** 17:17,19 93:17
**handcuffed** 32:25 33:3 40:19 41:23 53:10
**handcuffs** 34:10 42:2 54:8
**hands** 18:21 78:19
**handy** 9:23
**happen** 59:2
**happened** 7:6,8,14 8:18 29:11 31:18,25 32:21 34:11 40:11 41:2 49:2 51:11 57:25 61:5 62:7,7 66:12 67:8 71:5 72:12 74:2 76:9 78:4 80:22 84:15 86:8,9
**Hartsdale** 4:12 11:13
**hate** 16:16 88:10
**head** 5:2 51:18
**health** 61:9
**hear** 35:7
**heard** 28:17 34:16 54:6 57:9
**hearing** 29:4
**height** 15:17
**held** 42:11 85:13
**help** 58:12
**helpful** 49:19
**hereto** 3:4
**hereunto** 93:16
**Hicks** 1:6 16:4,8 34:14 50:13 51:7 53:6 55:19 78:16 90:9 91:4
**highly** 38:8
**holder** 23:25
**home** 7:10 8:7 9:16 10:6 21:13 52:9,10 55:8,13 63:17 64:25 65:10,11,13 79:13
**honestly** 54:16
**hour** 11:21 12:13,15 12:18,23 17:9 39:6
**hours** 40:25,25 49:3 64:23,23,24 82:23
**house** 9:12,14 10:2 11:10 20:19,24 25:3 25:23 28:9 30:22 35:25 36:16,17,17,18
**Howard** 6:8
**Hudgens** 9:18
**huge** 82:4
**hundreds** 30:16
**hung** 37:6 38:7
**hurry** 17:13

I

**idea** 15:25 48:16
**identified** 25:19 43:12
**identify** 28:23 33:21 50:7,10
**identifying** 28:6,14 81:7,15,16
**idiot** 88:22
**ignored** 33:8
**illegal** 28:4,15,20 29:11 60:3 69:3
**imagine** 49:22
**immediately** 27:3 79:22
**incident** 5:17,21 7:4,21 8:18 9:7,24 10:4,7 11:4,10,22
**include** 43:4
**included** 79:3
**inconvenient** 83:24
**incorrect** 85:3
**indicated** 84:20
**informal** 58:5
**information** 5:3 23:6,9 24:19,19,20 28:14 75:13 77:22,23 81:15 81:17 85:25
**informed** 72:2 73:10 73:13 74:16
**initial** 70:14 72:7
**initially** 37:13 50:14 83:20
**insane** 64:12
**inside** 35:7 45:8
**insurance** 15:9,14 17:15 18:15 19:24 61:9
**intend** 21:9
**intending** 9:25 21:21
**interested** 93:15
**intersection** 10:9
**interview** 75:21
**interviewed** 76:20
**involved** 80:17
**in-processing** 61:7
**issue** 53:13 87:18
**issues** 5:17 80:14
**items** 85:10

J

**Jada** 9:8 10:23
**Jada's** 9:17
**jail** 53:11 60:24 61:6 62:20,24 63:2,3,4,19 64:15,19 65:9
**Jasmine** 9:18
**Jay** 82:9
**John** 83:18
**Joseph** 4:4 93:4,22
**journey** 22:5
**judge** 58:8,10,13,16,21 58:22 59:3,18,21,22 60:5,15,21 67:2,4,6,8 69:16 87:18
**July** 73:20,22 74:3,14 77:21,25 78:2 83:6 89:25
**June** 73:20 76:5,6,13 76:18 77:14 82:7,12

K

**Kamer** 85:18 86:5
**keep** 22:12 61:21
**keeps** 61:23
**Kempner** 6:12 30:11
**kept** 26:5 42:20,24 90:22,25
**kids** 22:3 32:24 34:15 34:19,21,24,24 35:2 35:4,17,20,21,23,25 37:2,14,16 38:21 39:9,17,22 48:21 50:19 51:4 79:19,19 79:21,22,23
**kind** 12:4 20:10 21:4 22:25 30:7 42:11,13
**kinds** 20:20 80:2
**knew** 17:7 18:19 22:4 22:8 25:16,17 30:23 31:4 42:25 43:9 45:24,25 49:9 73:14 74:19
**know** 4:19,21 7:22 10:14,18 13:22 15:24 16:2 17:11 19:12 20:15,16 22:7 23:16 23:16 24:2,4,4,5 25:11 28:3,15 33:24 34:2,22 35:6,16 37:25 40:21 41:10,15 42:4,6,20,21,22 45:13,15 47:24 49:5 49:22 51:7 52:7,9 53:24 56:3,20 58:10 59:14 60:17 63:17 64:13,20 65:4,5,8,8 65:20 67:14 69:4 78:22,24 79:12,21 80:21 82:10,20 83:4 84:19 87:7 88:12 89:19 90:24
**knowing** 22:13 81:19
**knowledge** 82:16
**knows** 49:8
**Kur** 31:8

L

**lab** 84:8
**label** 23:10,12,17,19 28:7,14
**labor** 30:23
**laboratory** 84:11
**ladies** 4:22
**lady** 48:19 60:19
**laid** 65:14,17,23 76:8
**Langrin** 4:13,15 8:13 29:5,9,15,18 53:8,12 54:11,23 68:21 74:21 75:18,24 76:13,25 77:17 78:6,13 79:5 80:16,21 82:15 83:15 84:23 85:11,23 86:18 86:25 87:7,22 88:6 89:3,10,18 90:8 91:12
**laptop** 43:23 44:7,8
**large** 20:19 30:6,15
**late** 7:25

Peter 5:11,12 9:18 61:20,24 62:2,4,11
Peyton 9:9,14 10:23 79:25
Peyton's 9:21 39:2 80:7
pharmacy 75:15
Philly 12:6,9
phone 7:24 27:10 36:22 37:5,6,6,8,11 37:16,21 57:10 61:12 61:13,17 62:17,22 63:23 64:17 65:18
phonetic 31:8 66:7
photograph 64:2 77:7 87:5
photographs 77:10,11
physically 56:19
physician 82:9
pick 35:21 36:12 37:14 37:16 38:18,20,22,24 39:8,9 48:12,17,21 48:23 52:8 65:11 78:14,22 79:11
picked 18:16 36:2 48:10 70:19
picture 63:21,23
pictures 55:15
pieces 8:9
pill 20:11 23:3,24 41:9 41:13 42:12,13 43:12 43:14 47:5,8,10 84:19 88:15
pills 20:7,8,10 22:2,5 22:19,25 23:18,24 24:16,22 25:11,13,14 26:4,8,11 27:4,8,25 28:3,5,13,19 30:3,9 36:23 41:5,6,6,7,15 41:15 42:7,9,10,16 42:18 43:3,4 45:15 45:18,22,24,25 46:2 46:6,13,19,20,21,21 47:18,25 48:4 49:18 49:21,23 50:2,2,4,7 75:3 81:22 82:2,10 83:3,9,22 84:7,8,13 84:18 85:3,6,8,14,25 86:3 90:5,10,13 91:5
pink 50:2,2
place 77:16
placed 46:6 52:18,22 53:11 54:8
placing 53:9 85:8
Plains 1:10 2:6,12 6:14 30:21 55:25 57:5,9 57:11,13,22 62:10 67:10 71:2,22 75:2
plan 64:8
plate 16:9
played 28:25
plea 68:19
plead 69:7
Please 4:7
pled 67:17 68:14 69:5
pocket 22:20
pocketbook 22:19
point 5:23 6:2 13:4 21:9 25:16 27:20,22 29:12 31:24 38:14 39:11 41:20 43:16 48:9 51:13 52:11 53:25 54:25 55:10,11 55:21 57:4 60:3,14 61:12 64:16 65:15 67:2 70:22 74:23 84:7,20 85:19
police 1:6,6 8:3 16:21 16:22 24:7,8,13 34:11,17 36:4 39:7 39:18,20,24 40:9,12 41:21 48:8,9,10,15 52:2 53:11,22,25 54:3,9,10,25 55:10 55:14,22 56:9,10 57:12 61:20 62:14 76:16,17,19,20 77:3 81:11 83:8,8,13 84:14 86:3 91:8
popped 22:25
portion 81:23
position 6:15 54:7
possession 8:3 53:6 60:2 69:3 85:20,22
possibility 12:12 26:7 26:9
possible 15:12 49:19
post 60:18 63:14 70:11
posted 63:12,18
pounds 15:19
prescribed 75:16 82:10 83:10 85:15,17 86:2,4
prescription 23:6,9 28:6 38:10 40:5 43:13 75:5,11,11,14 75:14,15 77:7 78:10 78:12,18,23 81:2,3,5 81:24,25 82:3,4,14 82:17,20,21 85:2,5 87:5 88:13 90:7,12 90:15,16,18
presented 58:20
presently 6:9
pretty 12:16 37:5,9 75:8
prior 14:5
prisoners 58:9
probably 58:15
problem 27:15 29:14 31:6
process 22:24 43:20 44:14
processing 63:19
program 69:20,25 70:3
Protective 36:10
provide 73:7 75:10 87:20
provided 69:21,22 75:13 76:22 77:12,22 77:23 86:23
psychiatrist 5:20 86:12
psychoanalyst 86:12
psychologist 5:21
Public 1:16 3:5 4:4 91:20 93:5
pull 14:14,18 15:13 19:15
pulled 8:2 11:23 12:17 12:20,25 13:23 14:21 14:22 15:3,8 16:8,12 16:16 17:7 19:8 24:10 27:6,11 46:2 50:14,16
pulling 14:6
purported 89:15
purposes 58:17
purse 18:13,16,19,21 18:22,24,24,25 19:2 19:11,13,14,16 20:5 20:21,23,25 21:3,4,4 21:5,19 22:8,10,10 22:14,15,23 25:7,22 25:23 29:23 30:7 31:12,15 41:16,18,20 41:24 42:3,11,17 43:9 46:2,3,3
pursuant 1:13
put 8:5 13:8 18:14 22:9 33:2,3 34:10 43:8 44:20,25 46:4,4,10 47:9,10 51:18 53:10 54:9 57:20
putting 43:21 44:16
PYKETT 2:5
p.m 55:2

Q

quantity 82:3
quarters 51:5
question 4:18,19,25 26:7,18 28:2 40:2 54:13 59:5,7 65:4 88:8 90:9,21
questioned 20:7 27:25
questioning 27:7 28:18 54:20 79:19,20
questions 3:14 4:17 25:4 32:4 41:5 45:3 49:18,20 70:13 72:14 72:20 80:2
quickest 70:6
quite 52:12

R

R 1:3,15 2:2 4:2,2,2,9 91:17 93:2
race 15:17,20 28:23,25 33:23
read 63:22 82:7 89:4
ready 15:10 18:2
Real 6:16
realize 17:16,24 18:13 37:17,18 71:11
realized 12:17
really 17:13 20:15 21:20 28:22 34:20 35:3 37:14 42:18,25 43:2 52:7 54:16 55:4 56:6 59:11 80:13 82:7 89:4,7
reason 4:18,21 12:2 20:23 25:10 44:10,12 71:8
reasons 6:3
recall 6:25 10:12 11:19 11:23 16:7 28:22 32:8 34:3 67:4 81:12 89:25 91:4
receipt 89:17
receipts 30:9
received 77:5 84:4
recommendations 72:4
record 4:8 85:11,13 93:10
records 5:25 6:3
refer 64:15
referral 69:23
referred 26:13
refused 77:3
regard 44:2
regarding 40:2 91:9
registered 9:4
registration 15:8,13 17:14 18:2,15 19:25
reiterating 42:24
related 93:13
relaxer 46:25
relayed 75:6
release 87:14
released 83:9
relevant 29:3 80:13
relying 75:22
remember 6:23 12:18 16:3 26:10 36:6,8 44:17 51:8 54:17 56:20,22 71:13 86:17
rented 12:6
rephrase 4:19
report 81:8,12 91:8
reporter 4:7,10 5:3 93:4
represent 76:7 84:6
representing 4:15
request 8:13 59:24 77:7 84:12
requested 87:12 92:8
requests 83:6
require 84:21
requiring 87:19
reserved 3:15
reside 9:19
resolve 87:17
respective 3:3
respond 4:24 38:13 59:10
Respondents 1:8 2:11
RESPONDENT'S 92:4
rest 22:14
result 5:17,21 7:4 86:7
results 73:10,13,14
retained 76:7
retrieve 83:21
retrieving 84:6
return 7:18
returned 27:18 68:5 84:13 85:6,10
returning 9:14,15 22:3 25:3,24 85:8
right 8:24 11:14 13:6,7 13:17 14:20 18:8 19:19 22:21 26:12 27:19 34:4,18 36:25 39:13 48:8 51:6 53:20 62:16 64:11 67:24 72:7 88:20 90:16
ring 16:5
River 10:8 11:14,15 12:24 90:11 91:5
road 4:11 5:6 14:23 70:11
Rockledge 4:11 5:5
role 29:2
room 4:22 61:11 64:17
route 11:9
rude 79:18
run 31:6 71:20
running 7:25
rushing 8:2 12:4

S

S 2:2 4:2
sample 73:7
sat 34:11 39:14 40:14 40:22,24 66:14,19,21
saw 13:6,16,20,24 14:8 14:18 20:6,7 22:18 39:17 44:21 45:9

**transcript** 5:4 93:9
**transporting** 60:19
**travel** 83:25
**traveling** 10:19 11:18 11:24 12:3
**trial** 3:15
**trick** 65:6 90:23,24
**tried** 25:21 88:11
**trouble** 79:15
**truck** 39:15,16
**true** 17:10 93:10
**trunk** 43:19 44:3,5,13 44:19 45:6 47:13
**try** 18:7
**trying** 12:9 15:10 49:19 50:9,10 54:18 54:23,24 65:6,7 80:21 90:23,24,25
**Tuesday** 60:13 68:20 69:13
**turn** 32:25 36:12 56:17
**turns** 11:13
**twenties** 30:16,17
**Twenty-eight** 5:9
**Twenty-five** 31:10
**two** 9:10 10:21 18:21 39:17 64:23,24 67:23 74:8
**two-door** 8:24
**type** 5:16 8:20 23:3,5 23:10 28:6,13 30:15 44:4 46:13 47:4 49:20 61:10 69:18,24

U

**Ultram** 41:8 42:9 43:5 43:15 47:11 77:9 85:14,21 86:2
**uncomfortable** 89:3
**understand** 4:18 53:17
**understanding** 53:20 54:14
**unhandcuffed** 40:20
**unidentified** 42:8
**uniform** 16:18
**University** 6:8
**unlined** 8:11
**unmarked** 42:8 81:23
**unnamed** 83:18
**upset** 64:9 79:14
**urinate** 73:4
**urine** 73:11
**use** 21:2,5 31:2,15
**usually** 5:25 21:3 22:12 31:15 88:13

V

**vac** 44:9
**Valhalla** 60:20,23 62:25 63:2 64:15 76:19 84:2
**valid** 75:5 85:5 90:6
**validly** 83:10
**vehicle** 8:17,20,22 9:2 9:4,11 10:22 11:2 14:2 15:4,6 16:11,13 16:15,20,21 17:2 18:5,6 27:18,23,24 29:12 32:2,4,6,9,22 32:23 33:2,3 34:11 34:17 38:3 39:16,24 42:10 43:16,25 44:2 45:7 56:25 57:12 81:6
**vehicles** 47:13
**vending** 50:19
**verbally** 4:25 75:6
**verify** 31:4
**view** 43:16 85:20
**violence** 59:17
**volunteer** 24:19
**volunteered** 24:20

W

**wagon** 57:14
**wait** 25:3
**waited** 15:5
**waiting** 62:17
**waived** 3:10
**walk** 32:22,23 39:17 58:6
**walked** 35:12,13,15
**wallet** 21:5 30:10 31:16
**want** 7:22 14:15 29:5 29:18 31:6 40:7,21 46:7 50:24 56:7 80:18 85:24 90:23
**wanted** 14:14,17 18:22 29:16,22 69:12
**wants** 29:7
**warm** 11:8
**wasn't** 17:10 20:14 21:20 30:6 38:4 58:18 78:16
**watch** 72:22
**watching** 73:5,8
**water** 4:23
**way** 5:24 13:9,12 26:3 43:13 53:24 67:9 84:3 90:17 93:14
**weather** 11:7
**week** 6:25 20:24 70:4
**weekend** 20:18 21:7 82:25
**weeks** 67:23,23 68:6,8 73:19
**weighed** 33:25
**weight** 15:17
**went** 11:12 13:14 15:7 18:16,23,25 20:5 21:12 26:14,14,16,20 26:25 30:22 31:19,22 31:24 33:8 37:9 38:8 41:16 47:14,15 49:5 49:9 51:12,14 55:13 55:25 56:12 57:12,14 60:24 61:7,8 62:19 63:3,20,22 64:16 65:13 66:9,11 67:10 67:12 68:8 69:13 70:10 71:4,11 72:4 73:16,23 74:13 76:18 78:6
**West** 9:20 10:2
**Westchester** 1:6,6,6 2:11 4:16 16:22 60:24 61:6 63:3,4 64:15,19
**We'll** 7:21 8:15 89:5
**we're** 48:8 53:3,9 54:5 65:2
**whatsoever** 23:12
**WHEREOF** 93:16
**White** 1:10 2:6,12 6:14 15:21 30:21 33:24 55:25 57:4,9,11,13 57:22 62:9 67:10 71:2,22 75:2
**WILLIAM** 2:7
**willing** 75:20
**window** 34:18
**withdraw** 29:9 77:25
**withdrawn** 74:4,14,17 74:20,21 83:5
**withdrew** 90:2,3
**witness** 4:9,11 93:7,11 93:16
**words** 36:8 52:25 53:9 54:6,13
**worked** 6:18 30:11
**worried** 53:17
**wouldn't** 79:8
**Wow** 13:19
**write** 7:7,9,13
**writes** 82:11
**written** 76:22 77:14 79:3 81:8 92:9
**wrote** 7:16,20,22,25 71:15 77:15

X

**X** 1:2,8 92:2

Y

**Yeah** 49:14
**year** 6:6
**years** 6:19
**yellow** 46:21
**yesterday** 25:24
**Yonkers** 10:17 67:11 67:12,13 87:20
**York** 1:10,16 2:6,12 4:5,12 9:20,20 12:7 93:6

Z

**zipper** 19:3,6
**Zoloft** 88:13

$

**$1,200** 30:14,19 51:9
**$100** 71:14
**$4** 51:5
**$5,000** 58:25 59:23 63:9
**$7** 71:12

#

**#1097** 1:7

1

**10** 24:3
**10/6/1962** 5:15
**10:10** 1:11
**10530** 4:12
**10601** 1:10 2:6,12
**10605** 6:14
**11:45** 91:13
**12** 82:23
**127** 10:2
**14** 5:5
**14th** 76:4,13 82:12
**145th** 9:20
**148** 1:9 2:12
**15** 11:14,15 13:3 24:3
**150** 15:19,19

2

**2A** 4:12
**2:00** 52:4,6 54:4,25
**200** 9:20
**2009** 8:21
**2012** 1:10 5:18 6:21 7:5 76:13 82:7,12 91:19 93:17
**25** 1:10
**25th** 76:18 77:14,25 93:17
**257** 6:14
**26th** 73:22 74:3,14 76:6 77:21 78:2 83:6 89:25
**28th** 5:18 6:21 7:5 21:25 86:8
**29th** 66:3,12

3

**3:00** 52:6 54:4 55:2
**3:30** 66:14,19,20,22
**30** 5:11
**350** 8:21

4

**4th** 82:7
**4:15** 63:15
**4:20** 63:15
**40** 11:21 81:25
**450** 2:6

5

**5,000** 59:13
**5/29** 66:12
**5:20** 63:16,17
**50** 11:25 12:13,18,23 13:19 88:13
**50-H** 1:14 29:4 89:2
**52** 22:17

6

**6:00** 52:9,10 55:8 63:17

7

**70** 12:15

8

**8** 92:9
**8:00** 11:6
**8:15** 7:23 12:5,11
**8:30** 66:18
**81** 2:6
**82nd** 10:2

9

**9:00** 60:10,11,12 64:4 66:4