# EXHIBIT D

UNITED STATES DISTRICT COURT

**ORIGINAL**

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------X

SHERRIE DEANDA,

Plaintiff,

INDEX NO.

13 CV 1203 (KMK)

-against-

TIMOTHY HICKS, ANGELA CAPORALE, ROBERT PAVONE AND WILLIAM THOMAS IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES AS A POLICE OFFICER OF THE COUNTY OF WESTCHESTER,

Defendants.

---------------------------------------------X

148 Martine Avenue
White Plains, New York 10601
March 31, 2014
Time: 10:07 a.m.

EXAMINATION BEFORE TRIAL OF SHERRIE DEANDA, a Plaintiff, in the above-captioned matter, held at the above time and place before Judy Pisani, a Notary Public of the State of New York.

SHERRIE DEANDA

A P P E A R A N C E S:

WESTCHESTER COUNTY ATTORNEY'S OFFICE
148 Martine Avenue
White Plains, New York 10601
BY: TARYN CHAPMAN-LANGRIN, ESQ.

ARONWALD & PYKETT, ESQS.
Attorneys for Plaintiff
81 Main Street Suite 450
White Plains, New York 10601
BY: WILLIAM I. ARONWALD, ESQ.

ALSO PRESENT:

Officer Timothy Hicks

SHERRIE DEANDA

221. UNIFORM RULES FOR THE CONDUCT OF DEPOSITIONS

221.1 Objections at Depositions

(a) Objections in general. No objections shall be made at a deposition except those which, pursuant to subdivision (b), (c) or (d) of Rule 3115 of the Civil Practice Law and Rules, would be waived if not interposed, and except in compliance with subdivision (e) of such rule. All objections made at a deposition shall be noted by the officer before whom the deposition is taken, and the answer shall be given and the deposition shall proceed subject to the objections and to the right of a person to apply for appropriate relief pursuant to Article 31 of the CPLR.

(b) Speaking objections restricted. Every objection raised during a deposition shall be stated succinctly and framed so as not to suggest an answer to the deponent and, at the request of the questioning attorney, include a clear statement as to any defect in form or the basis or error or irregularity. Except to the extent permitted by CPLR Rule 3115 or by this rule, during the course of the examination persons in attendance shall not make statements or comments that interfere with the questioning.

221.2 Refusal to answer when an objection is made.

A deponent shall answer all questions at a deposition, except (i) to preserve a privilege or right of confidentiality, (ii) to enforce a limitation set forth in an order of the court, or (iii) when the question is plainly improper and would, if answered, cause significant prejudice to any person. An attorney shall not direct a deponent not to answer accept as provided in CPLR Rule 3115 or this subdivision. Any refusal to answer or direction not to answer shall be accompanied by a succinct and clear statement of the basis therefor. If the deponent does not answer a question, the examining party shall have the right to complete the remainder of the deposition.

SHERRIE DEANDA

221. UNIFORM RULES FOR THE CONDUCT OF DEPOSITIONS

221.3 Communication with the deponent.

An attorney shall not interrupt the deposition for the purpose of communicating with the deponent unless all parties consent or the communication is made for the purposes of determining whether the question should not be answered on the grounds set forth in section 221.2 or these rules and, in such event, the reason for the communication shall be stated for the record succinctly and clearly.

IT IS FURTHER STIPULATED AND AGREED that the transcript may be signed before any Notary Public with the same force and effect as if signed by a clerk or a Judge of the court.

IT IS FURTHER STIPULATED AND AGREED that the examination before trial may be utilized for all purposes as provided by the CPLR.

IT IS FURTHER STIPULATED AND AGREED that all rights proved to all parties by the CPLR cannot be deemed waived and the appropriate sections of the CPLR shall be controlling with respect thereto.

IT IS FURTHER STIPULATED AND AGREED by and between the attorneys for the respective parties thereto that a copy of this examination shall be furnished, without charge, to the attorneys representing the witness testifying therein.

SHERRIE DEANDA

SHERRIE DEANDA, having been duly sworn by Judy Pisani, a Notary Public within and for the State of New York, was examined and testified as follows:

oOo

EXAMINATION BY MS. CHAPMAN-LANGRIN:

Q. Good morning, Ms. Deanda. We've met before. My name is Taryn Chapman-Langrin, Senior Assistant County Attorney, representing Officer Hicks and a couple of the other officers in your action against them. Okay?

I would just ask you to keep your responses verbal. There should be no nods or shakes of the head. If you don't understand my question for any reason, please let me know and I'll rephrase the question. If you need to take a break; drink water, go to the ladies' restroom, that's not a problem, just let me know. Okay?

What's your present address?

A. 14 Rockledge Road, Hartsdale, New York 10530.

Q. Who lives with you?

A. My son, Amir.

Q. How old is Amir?

A. I think he will be 30 this year.

MR. ARONWALD: Speak up.

A. 29. I'm sorry.
Q. Does your son, [redacted] drive?
A. Yes, but he doesn't have a current driver's license.
Q. You have a another son?
A. Yes, [redacted].
Q. And what is [redacted] age?
A. 31. He will be 32 this year.
Q. Where does he reside?
A. He resides at [redacted] something, 5 or 6.
Q. Okay. What is your Social Security number?
A. [redacted]
Q. What is your marital status?
A. Divorced.
Q. When were you divorced?
A. July 2000 -- I mean July 1997.
Q. What was your ex-husband's name?
A. [redacted]. Same last name.
Q. What was his occupation?
A. An engineer. What type of engineer is he or was he?
Q. It's okay. Engineer is fine.
As a result of the divorce, did you get

any alimony or child support?
A. Child support.
Q. Do you still get the child support?
A. No.
Q. When did that end?
A. When Amir --
Q. Turned 18?
A. No, after that. In college.
Q. After college?
A. Yeah.
Q. Okay. And you never received alimony?
A. No.
Q. What college did Peter go to?
A. Peter went to Westchester Business Institute.
Q. What type of degree does he have?
A. None.
Q. Is Peter the father of one of the children that was --
A. Oh, were you referring to my ex-husband?
Q. No. I'm sorry. Your son.
A. Okay.
Q. I apologize for being unclear.
Your son Peter went to Westchester Business Institute?

A. Correct.

Q. Didn't get a degree?

A. Correct.

Q. Is he the father of one of the children that was in the vehicle?

A. Yes.

Q. Who was the mother of the child that was in the vehicle?

A. [redacted]

Q. Who was their daughter who was in the vehicle?

A. [redacted]

Q. What grade is [redacted] in presently?

A. Sixth.

Q. What's your date of birth?

A. [redacted]

Q. And what is your educational background?

A. Two -- one year -- one full year of college.

Q. Where did you go?

A. Howard University.

MR. ARONWALD: Keep your voice up.

Q. What was the reason you didn't complete college?

A. Got pregnant.

SHERRIE DEANDA

Q. Did you have a particular course of study for that one year?

A. Accounting, computer sciences. Still currently my field.

Q. Are you currently employed?

A. Yes.

Q. Where are you employed?

A. The Kempner Corporation.

Q. Where are they located?

A. 257 Mamaroneck Avenue, White Plains 10605.

Q. What's your position?

A. Accounting manager/office manager.

Q. What are your duties as that?

A. I handle everything financial.

Q. Do you keep financial records?

A. Yes.

Q. What else do you do?

A. I take in all the money, pay all the bills payroll, etc.

Q. How long have you been working for the Kempner Corporation?

A. 19 years.

Q. What type of business is the Kempner Corporation engaged in?

SHERRIE DEANDA

A. Real estate investments, but we own it and manage properties, so principals as well.

Q. There was an incident occurred to you on May 28th, 2012?

A. Correct.

Q. What was your salary from Kempner Corporation at that time?

A. Maybe 105.

Q. Is that your sole source of income?

A. Yes.

Q. Do you own or rent your home?

A. I own.

Q. Do you own a vehicle?

A. I lease a vehicle.

Q. What vehicle is that?

A. It's a Mercedes ML450.

Q. What type of vehicle is it? Describe it, is it an SUV or something else?

A. SUV.

Q. What color?

A. Blue, dark blue.

Q. What year is it?

A. 2012.

Q. Is that the vehicle that you were driving on

the date of the incident?
A. No.
Q. You were driving a different vehicle?
A. Correct.
Q. What vehicle were you driving on the date of the incident?
A. I was driving a gray Mercedes ML350.
Q. Was that also an SUV?
A. I guess it's considered an SUV. Yeah, yes.
Q. Were the windows tinted in that vehicle you were driving on May 28, 2012?
A. No. It comes standard. I don't think so, no. I didn't have them tinted.
Q. On the date of the incident, were you on medication?
A. No -- um, allergy medicine.
Q. What medicine were you on?
A. Claritin, ZYRTEC. Oh, yes, I take -- regularly I take a blood pressure medicine, Amlophine, A-M-L-O-P-H-I-N-E.
Q. What does Amlophine treat?
A. High blood pressure.
Q. Were all those medicines by prescription?
A. No. Claritin and ZOLOFT are

SHERRIE DEANDA

over-the-counter. Oh, and I take at that time Ultram sometimes.

Q. What's Ultram for?

A. That's a mild pain killer. For lower back pain. That's what it was prescribed for.

Q. Which medicines of what you told me are by prescription?

A. The Amlophine, and then there's another one, hydro something, but I just really don't know the name of it. It's a water pill and it goes with the high blood pressure medicine.

MR. ARONWALD: It's hydrochlorothiazide. Is something HDCC I think is the name.

MS. CHAPMAN-LANGRIN: Okay.

Q. Have you ever been convicted of a crime?

A. No.

Q. Have you ever had any previous traffic stops prior to the date of this incident?

A. Yes.

Q. When?

A. I don't know.

Q. Was it in 2011?

A. I would have to really think about it. I really don't know.

SHERRIE DEANDA

Q. All right. Do you know if it occurred in the Village of Chester? Why don't you tell me what you recall about it. If you recall anything.
A. Chester? What county is that?
Q. That is in Orange County. At least that's what I saw. What do you recall about it?
A. I'm not sure.
Q. What were you stopped for?
A. Was I stopped for speeding?
Q. You have to tell me.
A. You said it's in Orange County?
Q. That's what I saw.
A. It must have been speeding.
MR. ARONWALD: If you don't remember, say you don't remember. Please don't guess. Don't guess.
Q. Do you think you were stopped for speeding?
MR. ARONWALD: That's guessing. Do you know?
Q. Do you know whether you were stopped for speeding?
A. Yes.
Q. Okay. Did you have to pay a fine for that?
A. Yes.
Q. Do you recall what the fine was?
A. No.

SHERRIE DEANDA

Q. Did you get points on your license from that?

A. No. I went to court to fight it and it was dismissed. I had to pay a surcharge for the court.

Q. As a result of this incident, May 28, 2012, were you given a ticket?

A. Yes.

Q. Has that been resolved?

A. Yes.

Q. In what way has it been resolved?

A. I went to court and I --

Q. Did you plead guilty? Was it dismissed or something else?

A. Yeah, I pled guilty and it was -- I had to pay a fine.

Q. Do you recall what that was?

A. No.

Q. Do you recall when you went to court for that?

A. No.

Q. Okay. That's all right. Did you review any documents in preparation for this deposition? That would include videos or anything else.

A. Yes.

Q. What did you review?

A. The document that was sent by you guys.
Q. Which document was that? I've sent a lot of documents.
A. The testimony when I was deposed.
Q. Of your 50-h Hearing?
A. Yes.
Q. Is that the only thing you reviewed?
A. Yes.
Q. You alleged that an incident occurred to you on May 28th, 2012; do you recall it?
A. Yes.
Q. What day of the week was May 28, 2012?
A. Monday, Memorial Day.
MR. ARONWALD: One second.
(Off the record.)
Q. Where did the incident occur?
A. On the Bronx River Parkway.
Q. What direction were you --
A. South.
Q. -- traveling?
Just wait for me to finish the question before you answer, even if you know what I'm going to say. It happens all the time.
A. Yes.

SHERRIE DEANDA

Q. What time did the incident occur?

A. Approximately 8:15 in the morning.

Q. Were there persons in the vehicle with you?

A. Yes.

Q. Who was in the vehicle?

A. My granddaughter, Jada Deanda; my cousin, Peyton Sutton.

Q. I don't think we had any discussion about Peyton. How old is Peyton?

A. Ten. She was ten at that time. She will be 12 this year.

Q. Where does Peyton reside?

A. In Charlotte.

Q. Charlotte?

A. South Carolina.

Q. Is that North Carolina?

A. North Carolina.

Q. What's her address?

A. I don't know offhand.

Q. All right. At the time of the incident, you were driving which direction?

A. South.

Q. And did you become aware at some time that an officer wanted you to pull over the vehicle?

A. Yes.

Q. How did you become aware of that?

A. Looking through my review mirror.

Q. And what did you hear? Did you see lights or sirens?

A. The lights.

Q. What did you do when it became apparent to you he wanted you to pull over?

A. I pulled over.

Q. When you pulled over, what happened next?

A. He came to the vehicle. It took him a minute to get there, so I had everything ready for him, so I thought, because I was in a hurry.

Q. You were in a hurry? Now, you said that an officer came to the vehicle?

A. Yes, Officer Hicks.

Q. There's an Officer Hicks who is sitting next to me to my right. Would you take a look at him, and is this the officer that pulled you over on May 28, 2012? Do you recognize him?

A. Yes.

Q. Do you know Officer Hicks' apparent age?

A. No.

Q. Is he younger than you?

SHERRIE DEANDA

A. Yes.

Q. Would you say he's about the age of --

MR. ARONWALD: This is all speculative. How could she possibly say whether he's younger or older than she is?

MS. CHAPMAN-LANGRIN: If she doesn't know, she doesn't know.

MR. ARONWALD: Okay. If you don't know, say I don't know.

Q. Would you say he's about the age of your sons?

A. I don't know.

Q. What happened when Officer Hicks came to your vehicle? Did you have a conversation with him?

A. Yes. I rolled my window down. He asked for my license and registration, which I thought I had in my hand, but I just wanted to have it all already because I knew what he wanted.

I couldn't find my driver's license. Apparently, I dropped it. I'm looking all over for it. I figured maybe I put it in my purse, put it back in my purse or didn't take it out. I opened my purse --

Q. What type of purse is this?

SHERRIE DEANDA

A. It's a small, clutch Coach bag.

Q. Do you still have the purse, currently?

A. Yes, I do.

Q. What color is it?

A. It's metallic gold.

Q. He asked you for your license and registration and you're searching through your bag to obtain it?

A. Well, I was looking for it. I knew I had it in my hand. I opened the purse up and I was just looking for it.

Q. Did there come a time when he observed something in your purse?

A. Yes.

Q. When he observed that, did he ask to see it?

A. Yes.

Q. Did he use the words, "May I see that?" Let me rephrase it.

What is it that he observed, to your knowledge?

A. When I opened my purse, he said you -- what did he say? He said, "What are those pills?" That's what he asked. He said, "What are those pills? What's in the bottle?" I told him -- I don't think I said

SHERRIE DEANDA

anything immediately. He said, "Those are OxyContin. Those are OxyContin pills. Let me see that bottle." So I gave it to him.

Q. You gave him the bottle?

A. Yes.

Q. All right. What is OxyContin? Do you know what it is?

A. I've learned that it's a pain killer.

Q. When did you learn that?

A. Since I've been arrested. I knew my sister took pills for pain. She has fibromyalgia. I wasn't sure exactly what it -- you know, what it was. I knew -- what -- you know, I didn't know what it was. I don't know what it does, what it's for, anything like that.

Q. Does OxyContin also go by the name Oxycodone; do you know?

A. Yes, but he referred to it as both.

Q. What is fibromyalgia as you know it?

A. It's a nerve -- it's when you have some problem with your nerve and it causes pain throughout your body. So far as I know, I'm not a doctor. I haven't done the research on that.

Q. What is your sister's name?

SHERRIE DEANDA

A. Paula Fontenette.

Q. How old is Paula?

A. How old is Paula?

Q. Yes.

A. She is 53.

Q. Where does she reside?

A. 127 West 82nd Street, Number 6A, as in apple, New York, New York 10024.

Q. After you gave Officer Hicks the pill bottle, was that pill bottle unlabeled?

A. Was it unlabeled?

Q. Yes.

A. Yes, it was.

Q. That means it had no label on it; correct?

A. Correct.

Q. Do you know how it was that it came to have no label on the bottle?

A. No.

Q. When you gave him the unlabeled pill bottle, then what happened next?

A. He proceeded to tell me that it's Oxycodone/OxyContin, and, you know, this is a Class D Felony or Class C Felony. I'm not sure which one he said. He said -- you know -- at that point I was kind

SHERRIE DEANDA

of nervous and a little scared. I thought, Okay.

Q. Why were you scared or nervous?

A. Because he told me that I'm in possession of an illegal substance and it carries a Class D Felony. I explained to him, "They're not mine. They're my sister's. That's why I'm on my way to the city. She left them at my house. She needs them. I'm bringing them to her. They're hers."

He proceeded to tell me, "Is that your purse?" I said, "Yes, but I'm bringing her her medications, which is hers."

Q. Did you ever tell Officer Hicks that the purse was your sister's purse?

A. No.

Q. You never told him that?

A. No.

Q. Let's go back. You said you also told Officer Hicks that the pills belonged to your sister?

A. Correct.

Q. How was it then that you came into possession of the pills if the pills belonged to your sister?

A. This goes back a week prior. I was at her house. I had the purse on me. I carry a large purse and I carry a small purse. Like this purse I have, is

SHERRIE DEANDA

the smallest usually that I carry. I usually carry a large purse. I used that particular purse as a wallet, more or less. She said that, you know, "Your purse would be good with the outfit I have on," because she was going out.

Q. You said a week prior this conversation occurred?

A. Yes.

Q. About what date was that; do you know?

A. No.

Q. Where did this conversation occur?

A. At her house. She asked to borrow it. She had my purse, but this is a purse that I use a lot, you know, as my wallet. Of course, you know, I'm adamant that I'm going to get it back.

Q. You let her borrow your purse?

A. She borrowed my purse. That weekend was the Memorial Day weekend and I had cookout. I had a bunch of stuff going on at my house, and my niece was pregnant, due any day.

Q. Which niece was this? What's her name?

A. Ashley.

Q. Where does Ashley reside?

A. In the Bronx.

Q. What day were you having your barbecue?

MR. ARONWALD: She didn't say she was having a barbecue. She said she had a lot of stuff going on at her house.

MS. CHAPMAN-LANGRIN: Okay.

Q. Were you having a barbecue or something at your house that weekend?

A. That was the plan for Memorial Day but that didn't occur.

Q. Was your sister at your house that weekend?

A. Yes, but my cousins were here from North Carolina so we were all together. My sister was spending the weekend with me, but my cousins came up and surprised us. They usually stay at my sister's house so she had to go home. When they come in to town, they stay at my sister's house.

Q. Which cousins were at your house --

A. This is --

Q. -- from North Carolina? Wait until I finish.

A. Sorry.

Q. That's okay.

Which cousins were at your house from North Carolina on that Memorial Day weekend?

A. Monique and Mark Sutton. They have the

daughter, Peyton.

Q. What day did your sister arrive at your house during that weekend; was it Saturday, Sunday, Monday, or something else?

A. We were actually -- because my niece was in labor we had to take her to the hospital. Friday, so we were back and forth.

Q. Your sister first arrived at your house on Friday?

A. Friday evening.

Q. Then at some point she left?

A. Yes.

Q. When she left, did she go home or somewhere else?

A. Yes. We all went to the city for different things. We had to take my niece to the emergency room because she was having contractions.

Q. Let's take Friday night. Did she spend the night over your house from Friday to Saturday?

A. Yes.

Q. She spent the night?

A. Yes.

Q. Did she spend the night over your house from Saturday to Sunday?

SHERRIE DEANDA

A. No.

Q. Did she spend the night over your house from Sunday to Monday?

A. Oh, I'm sorry. She spent the night Saturday to Sunday. I'm sorry.

Q. So she spent the night from Friday to Saturday?

A. Right, and we went back to the city on Saturday, but the contractions -- we went to Roosevelt Hospital.

Q. Did she ever go home when she went back on Saturday?

A. No. We took her there and brought her back, and we all came back to my house.

Q. She spent from Saturday through Sunday?

A. Correct.

Q. Then did she ever go home on Sunday at all?

A. Yes.

Q. She did go home on Sunday?

A. Yes.

Q. Then she came back to your house on Sunday?

A. No. She went home Sunday evening with Monique and Mark.

Q. So she actually went home Sunday evening?

A. And then left Peyton with me. She wanted to spend the night.

Q. Did you ever advise your sister or have a telephone conversation with your sister that she had left her pills with you?

A. Yes -- well, no. She called me and told me that she left her -- she left the purse and the pills. She said, "Everything's on your dresser."

Q. When did she call you?

A. She called me shortly after she got home Sunday night.

Q. What did she say to you? She said she left her pills with you?

A. She was in pain and she said she left them.

Q. Did she tell you what type of pills she left with you?

A. She just said her pills.

Q. Did you know what type of pills she left with you?

A. She takes all kinds of stuff. I really just don't pay attention to it.

Q. Do you know if she left the Oxycodone pills with you?

A. Yes, she did.

SHERRIE DEANDA

Q. What she left with you on Saturday evening when she left were the Oxycodone pills?

A. Actually, she left them in the purse. She had every intention of taking it home but she left it. I was thinking, Good, because you're not getting it back. It's supposed to be here, but she left stuff in there. She left her pills and other things in there.

Q. Prior to you getting on the parkway on Monday before this incident occurred, you knew you had her Oxycodone pills?

A. Yes. I was making sure she got them.

Q. Right, but you knew that they were Oxycodone pills?

A. I wasn't sure exactly what they were. I knew I had her pills, her pain pills, that's how I refer to them and that's how she refers to them.

Q. Does she take other pain pills other than Oxycodone?

A. I'm not sure exactly what she takes but she takes a lot of different things.

Q. When you left to get on the parkway Monday morning, did you know those pills were in an unlabeled container?

A. Yes. I guess. I didn't pay any attention to

how they were packaged.

Q. But you knew they were packaged in some type of pill bottle?

A. Right.

Q. Okay. After the officer asked you to see the unlabeled pill bottle, you handed it to him?

A. Yes.

Q. And after that at some point he asked you did you have a prescription for the pills? Did he ask you that?

A. Yes.

Q. What did you respond?

A. I said, "No. They are my sister's. She has a prescription."

Q. Did he --

MR. ARONWALD: I can't hear you.

THE WITNESS: I said, "No. They are my sister's. She has a prescription. They're hers."

Q. He only asked you whether you had a prescription for the pills; correct?

A. Yes.

Q. Then you volunteered the information about your sister owning the pills?

A. Yes.

SHERRIE DEANDA

Q. After you told the officer that you believed that you didn't have a prescription for the pills --

MR. ARONWALD: That's not what she said. She didn't say believed she didn't have a prescription. She said she told him she did not.

MS. CHAPMAN-LANGRIN: Okay. She did not. She did not. She did not have a prescription for the pills.

Q. But they were your sister's. What happened next?

A. Let me correct you. I did not say I did not have a prescription. I was adamant that they're not mine. So I'm basically saying, Duh, they're not mine, of course I don't. I never actually said, I don't have a prescription at that time. I said, "They belong to my sister."

Q. Okay, but he never specifically asked you as to who the owner of those pills were; correct?

A. Correct.

Q. As to -- and you did not have a prescription for those pills?

A. No.

Q. After you had the conversation with the officer, at some point did he ask you to step out of

SHERRIE DEANDA

the vehicle?

A. Yes.

Q. Let me back up a minute.

After you had the conversation with the officer, did he return to his vehicle and you stayed in the vehicle, in your vehicle?

A. Yes.

Q. And he went back to his vehicle?

A. Yes.

Q. Were you able to see what he was doing in his vehicle?

A. I wasn't paying attention.

Q. What were you doing as he was in his vehicle? What were you doing in your vehicle, if anything?

A. I called my sister.

Q. You called your sister, and that would be --

A. Paula. I called her on the phone and told her that I was stopped for speeding and the officer is making a big deal out of her -- out of her pills.

Q. You say you were stopped for speeding. Let's back up.

Do you know what the speed limit was in the area you were driving?

A. Yes.

SHERRIE DEANDA

Q. What was the speed limit?
A. 40 miles per hour.
Q. What were you driving at the time you were pulled over?
A. 50.
Q. Any way you were driving 70 miles per hour?
A. No.
Q. So you had a conversation with your sister, Paula?
A. Yes.
Q. And that would be on your cellphone?
A. Yes.
Q. What was your conversation with Paula about?
A. I just told her, "I know I'm supposed to be there but I got stopped for speeding. I opened my purse to get my credentials out, and the officer is making a big deal out of your prescription," or out of your pills.
Q. You keep saying he's making a big deal. What do you mean by that?
A. He kept saying to me -- first he was saying, I believe those are OxyContin or Oxycodone, and then he said, "These are Oxycodone." I said, "I'm not sure what they are. They don't belong to me, but I'm not

sure what they are." He said, these are OxyContin or these are Oxycodone. "You know this carries a Class D Felony if you're in possession of these?"

Q. Okay.

A. So at that point I was really nervous and scared.

Q. Then what else did you speak to your sister, Paula, about while Officer Hicks was back at his car?

A. Oh, I just said, "Stay with me on the phone. Just stay with me on the phone."

Q. And she did stay with you on the phone?

A. Yes, she was on the phone. My phone is hands-free.

Q. Then at some point did Officer Hicks come back to your vehicle?

A. Yes.

Q. What, if anything, occurred at the time he came back to your vehicle -- and let me just say, you said that your phone is hands-free, so it's able to be audible through the car?

A. Yes.

Q. When the officer came back to your vehicle, was your sister still on the phone?

A. Yes.

SHERRIE DEANDA

Q. Did you have a conversation with Officer Hicks at that?

A. I wasn't completely sure if it disconnected or not because I didn't hear anything. I didn't say anything. I just was focused on what he was telling me.

Q. Okay, so when he came back --

A. And --

Q. Yes, go ahead.

MR. ARONWALD: Finish your answer.

A. To be completely honest, I was so nervous I totally forgot she was on the phone until I was actually in handcuffs.

Q. Where were you handcuffed? You were outside of the vehicle when you were handcuffed?

A. Yes.

Q. So you're saying at the time you were asked to step out of the vehicle and you were handcuffed, your sister was still on the phone that was being transmitted through your vehicle?

A. When he asked me to step out of the vehicle, I'm sure I didn't just step out of the vehicle. I'm sure I said, "Why?" I questioned it. But, okay, so I step out of the vehicle. He asked me, "Turn around.

SHERRIE DEANDA

Put your hands behind your back." I told him -- am I saying too much? Should I wait for you to ask me questions?

Q. Okay.

A. I told him, I said, "I have my kids in the backseat. What are you doing? I have the kids in the backseat."

Q. Even after you told him that, were you asked to step out of the vehicle?

A. Yes.

Q. Did you step out of the vehicle?

A. Yes.

Q. Where did he take you when you stepped out of the vehicle?

A. Just to the end of the car or just to the -- right there.

Q. Did he put you inside his vehicle?

A. After he put the handcuffs on me?

Q. No. Did he put you inside his vehicle after he asked you to step out of the vehicle?

MR. ARONWALD: Before he put the handcuffs on her or after?

MS. CHAPMAN-LANGRIN: Before he put the handcuffs on her.

SHERRIE DEANDA

Q. Did he take you to his vehicle? Did he put you inside of his vehicle directly after he asked you to step out of the vehicle?

MR. ARONWALD: Before you were handcuffed.

A. No. When I got into the vehicle, I was handcuffed.

Q. Who handcuffed you? Who put the handcuffs on you?

A. He did.

Q. Do you think it was a female officer that placed the handcuffs on you?

A. You know what, I really -- now that you're saying this, I'm just not a hundred percent of who did it.

Q. All right. But handcuffs were placed on you?

A. Before I got in the vehicle. When I was in the vehicle, I was in the vehicle like an animal.

Q. So you were handcuffed in the vehicle -- strike that.

Did a female officer arrive?

A. Yes, she did.

Q. Prior to the female officer arriving, you feel you were handcuffed inside Officer Hicks' vehicle?

A. No, not --

MR. ARONWALD: Are you asking her whether she was in handcuffs when she was in the vehicle, or are you asking whether she was handcuffed after she got into the vehicle?

MS. CHAPMAN-LANGRIN: I'm asking if she was handcuffed while she was in the vehicle before Officer Caporale arrived.

MR. ARONWALD: I'm objecting to the form of the question.

MS. CHAPMAN-LANGRIN: Okay.

MR. ARONWALD: If you're asking her whether or not she was already in handcuffs before she was placed in the vehicle, then I have no objection to the question. But you're asking whether she was handcuffed in the vehicle, and that's unclear.

Q. Let me break it up.

At some point a female officer arrived; correct?

A. Correct.

Q. Were you already in handcuffs prior to that officer arriving?

MR. ARONWALD: If you remember.

A. I cannot be a hundred percent certain.

Q. All right. At some point an officer arrived,

SHERRIE DEANDA

a female officer?

A. Yes.

Q. One officer?

A. I think there was another person there but I'm not sure.

Q. You're trying to say in addition to Officer Hicks and a female officer, there might have been another officer?

A. I'm really -- I was so shaken up. I can't be a hundred percent sure of that either.

Q. At some point you were placed in handcuffs.

A. I was focusing on the issues.

Q. At some time you were handcuffed?

A. Yes.

Q. And at some point was your person patted down or searched, if you will, your person? Do you recall that?

A. I don't recall that. Oh, yes. You know what, I think briefly.

Q. Okay. Who conducted that pat-down, if you will?

A. The female officer.

Q. Do you know that officer's name?

A. I don't remember her name.

Q. Okay.

A. I did read it in the -- in the -- but I don't remember her name.

Q. Your Third Amended Complaint specifies the only female officer as a defendant. Would that be an Angela Caporale?

MR. ARONWALD: Well --

A. I don't remember her name.

MR. ARONWALD: The name Angela Caporale was actually provided by you to me.

MS. CHAPMAN-LANGRIN: Right. Absolutely.

MR. ARONWALD: As the Jane Doe One that is referred to in the complaint, because until you gave us the name, neither one of us knew who she was.

MS. CHAPMAN-LANGRIN: Absolutely. Now I'm asking her does she knows that to be the female officer. If she doesn't, she can say she doesn't.

MR. ARONWALD: We don't know --

A. I don't know her name.

MR. ARONWALD: All we're doing is going based upon the information you gave us.

MS. CHAPMAN-LANGRIN: I get that. She can just say she doesn't know.

MR. ARONWALD: Okay.

Q. You recall the pat-down?

A. Vaguely.

Q. What do you recall, if anything, about it since you say vaguely?

A. Just nothing extensive. I didn't have any clothes on really. I just had a little sundress on. So just vaguely.

Q. After you were pat-down, then you were put back in Officer Hicks' vehicle?

A. Not back in. I was only put in his vehicle once.

Q. So then at some point then you were placed in Officer Hicks' vehicle?

A. Yes. Once I was put in handcuffs, I was placed in his vehicle. I didn't come out of the vehicle until we arrived at the police station in -- wherever -- Harrison.

Q. Was it Hawthorne?

A. Hawthorne.

Q. When you were placed in Officer Hicks' vehicle, the children were still in your vehicle?

A. Yes.

Q. And at some point the children were taken out

of your vehicle and put into the female officer's vehicle?

A. Yes.

Q. Did you see them walk by the police vehicle that you were in in order to be taken to the female officer's vehicle?

A. Yes.

Q. At some point, to your knowledge, did Officer Hicks have a telephone conversation with your sister, Paulette?

A. Paula. Yes.

Q. Do you want to take a break?

A. No.

Q. Did he specifically request to speak to your sister, Paula?

A. I think --

Q. Did he specifically request to speak to your sister, Paula?

A. I don't know.

Q. Did you offer your telephone to him to enable him to speak to your sister, Paula?

A. Yes, I think that's what occurred. Yes.

Q. You offered your phone to him?

A. Yes.

SHERRIE DEANDA

Q. Prior to you offering your phone to him to speak to your sister, Paula, did he convey to you or ask you who was going to pick up the children?

A. Yes.

Q. He did ask you that?

A. He told me, "You need to have someone come pick up these kids." I said, "Yes, of course. I can have my sister come down here, and Peyton's parents can come down." He told me, "Is this your sister that's in the city?" He said, "No, that's too long. You need to have somewhere here now." He said, "Could someone at your residence, at your house come to get them?" I said, "I live 10 or 15 minutes away and my sister is 25 to 30 minutes away, but the only option really is for someone from the city to come get them."

He said -- he told me that was not going to work, because they'll -- they're going to go to Children's Services or we're going to have them picked up. I'm not sure exactly how he referred to it, but he said, "I'm just going to have Children's Services come get them." I explained to him that my son is home but he doesn't have a driver's license and he doesn't have a car.

Q. Do you need to take a break?

A. No. Only option I have is for my sister to come get them.

Q. This is the sister that resides in the city?

A. Yeah.

Q. And that would be Paulette?

A. Paula.

Q. I'm sorry. At some point he did get on the phone with Paula?

A. Yes.

Q. Where were you when that telephone conversation occurred between Officer Hicks and your sister, Paula?

A. I was sitting in the backseat of Officer Hicks' police car.

Q. Were you able to overhear the conversation that Officer Hicks had with your sister, Paula?

A. No.

Q. Approximately how long were they on the telephone, if you know?

A. A couple of minutes. I actually -- I could hear -- I was right there -- I could hear but I don't recall exactly what he was talking about. I mean, I could hear them talking about picking the kids up. About --

Q. So you did overhear --

MR. ARONWALD: Let her finish the answer, please.

MS. CHAPMAN-LANGRIN: Okay. All right.

A. Just parts of it about picking the kids up and talking to her about -- it sounded like he was responding to her about the medicine. I figured that's what it was, because when he returned to the car, he said, "I highly doubt the person I spoke with has a prescription."

At that point -- and he told me, "You should really just shut up because I have a recorder, because this is being recorded, and you're just digging yourself in deeper." At that point I didn't say anything else.

Q. During the telephone conversation that Officer Hicks had with your sister -- strike that.

Did you ever have a conversation with your sister where she told you about what her conversation with Officer Hicks was while they were on the scene that day?

MR. ARONWALD: You mean at any time?

MS. CHAPMAN-LANGRIN: At any time.

Q. Did your sister ever tell you what her

SHERRIE DEANDA

conversation with Officer Hicks was about?

A. I really --

MR. ARONWALD: Do you understand the question?

THE WITNESS: Yeah.

A. Yes. She talked to me about her whole experience.

Q. I asked about a conversation with him. Did she tell you what she spoke to Officer Hicks about while they were on the scene during that telephone call?

A. Yes.

Q. What did she tell you about that conversation?

A. She told me that she told him that the -- she confirmed that the pills were hers. She has a prescription. She could bring everything down, and that was with the pills. Then she talked to him about trying to find out where I was so she could get the kids, and he hung up on her.

Q. That's what she told you?

A. That's what she told me.

Q. Did you ever tell Officer Hicks that you were on your way, prior to the arrest, that you were on your

SHERRIE DEANDA

way to your sister's house to return her pills to her?

A. Yes.

Q. You told him that?

A. Yes.

Q. Okay.

A. I'm sorry --

Q. Did you want to say something?

A. Yeah.

Q. Go ahead.

A. That was one of the things I told him. I thought I was being cooperative and telling him, so I volunteered, you know, she left her medicine. I even went as far as to tell him that -- I was trying to tell him about the purse incident and how I have everything and I'm trying to return her pills to her, and I was trying to get the kids back to the city because my cousin was going to Philly to catch a flight.

I thought I was being cooperative. I was trying to explain the whole thing just so he'd know that these aren't my pills. I'm sorry, I didn't realize this was a felony for me to bring her her pills but what am I going to do?

Q. While Officer Hicks was on the telephone with your sister, Paula, where was Officer Caporale; do you

know?

A. I think she was over, you know, getting the kids out of the car so she could bring them to her car or to the other car, because while -- once he got in the vehicle -- it all happened pretty fast -- once he got in the vehicle, that's when --

Q. You need to take a break?

A. That's when they walked by with the kids.

Q. What about this incident seems to be upsetting to you and that you're crying? I'm not attacking you. What about it was upsetting for you?

A. It was humiliating.

Q. What was humiliating about it?

A. The whole thing; being arrested, being spoken to in a demeaning -- and treated like a common criminal, and with the kids there. They were so scared. My granddaughter walked by and I could tell she was so scared.

MS. CHAPMAN-LANGRIN: We'll take a break for a minute, please.

A. And I told her, I said -- I tried to reassure her, put on a happy face that everything was going to be fine.

MS. CHAPMAN-LANGRIN: Why don't you get

yourself together. Get a tissue.

MR. ARONWALD: She's prepared to proceed.

THE WITNESS: I'm sorry.

MS. CHAPMAN-LANGRIN: That's all right.

MR. ARONWALD: Nothing to apologize for. Do you want to take a break?

THE WITNESS: No.

Q. Did your sister ever tell you that during her conversation with Officer Hicks that he asked her whether she owned the pills?

A. I really don't remember.

Q. After the conversation that Officer Hicks had with your sister, Paula, then the children were brought back to Officer Caporale's vehicle; do you recall that?

A. Yes.

Q. Then what happened next?

A. He got into the vehicle. I was still -- I was nervous and scared so I was still trying to explain everything. As soon as he sat down he said, "I highly doubt the person I spoke with has a prescription."

I was trying to explain everything and I stopped because he said, "Ma'am, you should really shut up because this is being recorded and you're just digging yourself in deeper."

SHERRIE DEANDA

After that I said nothing else.

Q. All right.

MR. ARONWALD: That was in the police car or that was in Hawthorne?

THE WITNESS: The police car.

MS. CHAPMAN-LANGRIN: She was talking about at the scene.

Q. At some point then was your vehicle searched by the officers?

A. Yes.

Q. And you observed that? You observed them searching the vehicle?

A. Yes.

Q. And to your knowledge what, if anything, was recovered from the vehicle?

A. They found more pills. They found a bunch of pills. They found -- I had one hundred brand new one dollar bills in the glove compartment.

Q. In the glove compartment? Where the cup holder is?

A. Yeah -- no, in the side.

Q. In the middle, from the front passenger seat and the driver's seat?

A. Correct.

SHERRIE DEANDA

Q. And you said they found a bunch of pills?

A. Well, not a bunch, but after he -- he intimidated me so much that when I first -- when I first opened my purse, the bottle wasn't screwed on tight so some pills came out, and whatever was in my purse, I just didn't -- I see TV shows and when it comes to drugs, no matter, you know, the volume, there's a -- you know, if you have -- the more you have, if you have one, you know -- so I had other -- there were other -- some pills leaked out and came out of the --

Q. While you were giving the unlabeled pill bottle to Officer Hicks, some pills leaked out?

A. No. When I opened it up, it was -- before I even knew there was a problem with the pills, the top wasn't screwed on all the way so some things came out.

Q. Some of the pills came out?

A. Some of the pills came out.

Q. Would that be the Oxycodone pills?

A. Yeah.

Q. Where did they go when they came out?

A. Just in the purse, just down in the purse.

Q. Did some of the pills fall on the floor of the vehicle?

SHERRIE DEANDA

A. No. They were in the -- when he went to the car, to his car, for the first time, I knew some of them came out. He was making such a big deal of it. I just took everything that was -- every pill that I had in that purse and put it in the side of my -- there's a compartment on the side of the door.

Q. The driver's side?

A. I said, I'm not going to get caught with all this stuff. I'm thinking, possession's nine-tenths of the law of what I know, so this is my purse, I'm in trouble.

Q. After you handed him the unlabeled pill bottle, you then began taking some pills out of your purse and putting them in the driver's side door compartment?

A. Yeah. When he went back to his vehicle, I thought, you know, okay, everything in here, let me just get rid of this. I just took it and put it on the side.

Q. Approximately how many Oxycodone pills did you put on the side door?

A. I have no idea. It was -- no idea.

Q. Okay.

A. I had my own stuff. I'm like -- I just --

Tylenol, everything I put in there.

Q. Did they find yellow pills when they searched the vehicle?

A. Yes.

Q. Who did they belong to?

A. Paula.

Q. What were those?

A. Flexeril.

Q. Did she have a prescription for the Flexeril?

A. Yes, she does.

Q. Did they find brown pills?

A. Or yellow. That's -- yellow/brown but I don't -- actually, yellow pills, I don't know.

Q. What other pills were found in the vehicle and where were they located?

A. I'm not sure exactly. I just know when they got back to -- when we got back to the police station, they were on the computer trying to figure out what everything was. I could hear them, so I was trying to be helpful.

If there was a yellow pill, then that was probably an allergy -- you know how you get allergy, severe sinus thing? That's what that would be.

Q. Okay. Was any other monies recovered from

your purse?

A. Yes.

Q. How much money was recovered from your purse?

A. We --

Q. How much money? How much?

A. Approximately $1,200.

Q. What was the reason you were carrying $1,200 in your purse?

A. I carry money like that, especially on the weekends. I shop a lot. My niece was having a baby. She didn't have anything so I knew we would go shopping.

When you use credit cards like I use credit cards, you know that if you use -- like the third time around, they deny it. You have to go through fraud. They think -- it happens to me all the time. So I like to have cash just in case. Plus, I was having people over and going to cookout.

Q. The hundred dollars in ones, where were those located?

MR. ARONWALD: Asked and answered.

Q. What was the reason you had those?

A. I went to the bank a couple of weeks prior and I took out money for a particular -- for something,

and I needed a whole bunch of ones for what I took it out for. They gave me brand new ones and I wanted to keep them.

Q. You wanted to keep them in your vehicle?

A. No. Actually, I just forgot they were in there. I didn't remember they were in there until they brought them to me.

Q. Okay.

A. No, I didn't want to just keep them in my vehicle, no.

Q. Okay. All right. So you saw the officers searching your vehicle, going through the vehicle. Was your son's laptop in there?

A. Yes.

Q. How long had your son's laptop been in your vehicle prior to the date of the incident?

A. I am not a hundred percent sure, because I want to say that when we were in the city --

MR. ARONWALD: If you're not sure, you're not sure.

THE WITNESS: Okay.

Q. Had it been in there a month before the date of the incident?

A. No, no. He was out and about and he gave it

SHERRIE DEANDA

to me to bring home.

Q. When was that?

A. Sometime during that weekend.

Q. You believe that the laptop was put into your vehicle sometime during the weekend?

A. Yeah.

Q. Which son did it belong to?

A. Amir.

Q. Was your laptop damaged at all, that laptop damaged?

A. The screen was damaged.

Q. How did the damage occur?

A. I don't know.

Q. After the officer searched the vehicle, did there come a time when you left the scene? Left the scene. Did there come a time when you left the scene?

A. Oh. Yes.

Q. And you were in Officer Hicks' vehicle upon leaving the scene?

A. Yes.

Q. And the children were in Officer Caporale's vehicle?

A. I was in his vehicle that he was in and they were in someone else's.

SHERRIE DEANDA

Q. Were they in the female officer's vehicle?

MR. ARONWALD: If you know.

A. They went into a car. I'm not sure exactly whose vehicle it was.

Q. All right. Prior to leaving the scene, did a tow truck arrive?

A. Yes.

Q. Did you observe the tow truck doing anything?

A. They took my vehicle.

Q. Then the tow truck left the scene. Officer Caporale left the scene, and Officer Hicks left the scene. You were in Officer Hicks' car; correct?

A. Yes.

Q. And then you arrived at the headquarters?

A. Yes.

Q. What happened when you arrived at headquarters?

A. When we came in, we came into a cell.

Q. You were placed in a cell?

A. Yeah. Where we came in, we came in -- like, you walk into the door, I'm pretty sure it was a cell.

Q. At some point were you fingerprinted?

A. Yes.

Q. Who fingerprinted you?

SHERRIE DEANDA

A. I think Officer Hicks.

MR. ARONWALD: Again, if you don't remember, please say you don't remember.

A. Officer Hicks.

Q. At some point did another officer approach you and ask you if you wanted to give an interview about what occurred?

A. No.

Q. How about an officer by the name of Robert, or Detective Pavone?

A. No.

Q. Do you recall if any officer, while you were at headquarters, approached you and asked you if you wanted to make a statement about what happened?

A. No.

Q. Or if you wanted to be interviewed about what happened?

A. No.

Q. You don't recall that?

A. No.

MR. ARONWALD: By the way, on that subject, I note in response to Rule 26 on the interrogatories, I have not been provided with any signed Miranda rights card. I haven't been

provided with any document indicating she was ever advised of her Miranda rights when she was in custody.

MS. CHAPMAN-LANGRIN: I'm not aware of that specific request. I also want to point out in the Third Amended Complaint that wasn't specified that that was one of your allegations.

MR. ARONWALD: No, no, no. You're asking her whether or not she was ever asked whether she was willing to be interviewed. I'm simply pointing out that you know that since she was in custody, the police were required to give her her Miranda rights before asking whether she wanted to be interviewed. I'm simply pointing out that within the discovery materials you have provided, there's been no indication that she was ever Mirandized.

MS. CHAPMAN-LANGRIN: I can still ask her the questions about whether one of our officers --

MR. ARONWALD: She's answered. She's answered.

MS. CHAPMAN-LANGRIN: That's fine. I can still ask her the question about whether one of our officers approached her to ask her whether she wanted to make a statement or to be interviewed.

SHERRIE DEANDA

MR. ARONWALD: She said no.

MS. CHAPMAN-LANGRIN: And that's right.

MR. ARONWALD: Okay.

MS. CHAPMAN-LANGRIN: Okay.

Q. At any point did you ask to consult with an attorney while you were at headquarters of any of the police officers?

A. No.

Q. While you were at the headquarters, did you ask to see or speak with the children?

A. No. I asked if they were okay.

Q. You have to answer my question.

A. Oh, I'm sorry.

Q. While you were at police headquarters, did you ever ask to see or speak to the children from any of the officers?

A. Not that I can recall.

Q. At some point the children were picked up from the headquarters?

A. Yes.

Q. Okay. And who picked up the children?

A. My sister, Paula. Monique and Mark who are Peyton's parents.

Q. And when your sister, Paula, came to the

headquarters to pick up the children, did you ever see her while she was there?

A. No.

Q. You do know that your sister came to pick up the children?

A. Yes.

Q. Did you ever have a conversation with your sister what, if anything, occurred when she arrived at the police headquarters?

A. Yes.

Q. And what was that conversation about?

MR. ARONWALD: Obviously, I'm preserving whatever objections I have --

MS. CHAPMAN-LANGRIN: Absolutely.

MR. ARONWALD: -- based upon hearsay, and any other legal grounds.

MS. CHAPMAN-LANGRIN: No problem.

Q. What did your sister tell you about any conversation she may have had, or what occurred to her when she came to police headquarters on the date of arrest?

A. She said she went down there. She came in there and told him who she was, and she provided -- she provided her prescription, an older prescription. She

didn't have a current prescription but she brought her pill bottle down that has all the information on it. She told them that the pills in question belong to her and this is my authorization to have them. She was brushed off.

Q. Did she tell you who she spoke with?

A. No.

Q. Did she tell you a name of an officer she spoke to?

A. No.

Q. Did she tell you that she had spoken with an Officer William Thomas when she came down on the date of arrest?

A. No.

Q. Did he ever tell you whether or not she spoke to or saw Officer Hicks on the date of arrest when she came down to police headquarters?

A. I don't know.

Q. You said that Mark came down to headquarters, as well, to pick up his child?

A. Yes.

Q. To your knowledge, did Mark ever have a conversation with any of the police officers about what occurred to you on the date of arrest?

A. I have no idea.
Q. At some point you left the police headquarters; correct?
A. Yes.
Q. Who took you to court?
A. The female officer.
Q. Was it the same female officer that was on the scene on the date of arrest?
A. Yes.
Q. When you went to court, what court did you go to?
A. White Plains. Can I stop for a minute?
Q. Absolutely.

(Discussion held off the record.)

Q. What happened when you went to the White Plains Court? Were you charged with anything?
A. The judge -- we went -- I waited. There were several people there. There was a judge at a desk and she was taking care of the people.
Q. Did she tell you that you were charged with anything specifically?
A. Yes.
Q. What were you charged with?

SHERRIE DEANDA

A. Unlawful possession of a controlled substance.

Q. Do you know the degree?

A. I don't recall.

Q. Was it fourth degree?

MR. ARONWALD: She doesn't know the degree.

MS. CHAPMAN-LANGRIN: Okay. No problem.

Q. At that time did you put in a plea to what you were being charged with?

A. No.

Q. How long were you at the White Plains Court?

A. Perhaps a half hour. I don't know.

Q. Were you represented by counsel at that time?

A. No.

Q. After you left the court, where did you go?

A. To Valhalla.

Q. So you went to Westchester County Jail?

A. Westchester County Jail.

Q. Did the female officer also transport you there?

A. Yes.

Q. How long were you at the Westchester County Jail?

A. About an hour and a half, maybe.

SHERRIE DEANDA

Q. What, if anything, occurred when you were at the jail? Were you processed in any way?
A. Yes, I was totally processed; picture taken, waiver signed for insurance and mental health. At that time they asked me if I wanted to make a phone call.
Q. Who did you call?
A. Amir.
Q. Was bail set for you?
A. Oh, yes.
Q. How much was the bail?
A. $5,000.
Q. Did you post bail?
A. I did.
Q. Who came and posted bail for you?
A. Amir.
Q. Where did Amir get the money to post bail for you?
A. I have a secret stash I keep at home for emergencies and I told him where to go get it.
Q. What time was it that you left the jail?
A. I want to say about 5:30.
Q. So you didn't spend overnight at the jail?
A. No.
Q. Then the next day did you have to go to

court?

A. Yes.

Q. What time did you arrive at court?

A. About 8:30.

Q. Were you represented by counsel at that point?

A. No.

Q. What happened when you went to court the next day? That would be the 29th.

A. Yes. I spent the entire day there. When it was time for me to see the judge, I told them I didn't have a chance to get an attorney, if I could get an adjournment until I could get -- to give me a moment to get an attorney.

Q. Were you granted that?

A. Yes.

Q. You were given another date to come back?

A. Yes.

Q. When was that date?

A. I'm not sure.

Q. Was it June 26th, do you recall?

A. I'm not sure, but you would think I'd know since it's my son's birthday.

Q. Okay. All right. In between the second time

SHERRIE DEANDA

you went to court, which was May 29th, and the next time you went to court, did you discuss at all what happened to you with your sister, Paula?

A. Yes.

Q. What were your discussions about?

A. Just telling her what occurred, and she's talking to me -- she was really upset because as far as she's concerned, she got me into this trouble. She told me what happened going down there. She couldn't believe that they just dismissed her. They wouldn't even look at what she came down there and provided.

Q. Did your sister, Paula, ever tell you she had made any complaints to the police department about what occurred to her when she came down on May 28th, 2012, any written complaints?

A. No.

Q. Have you ever seen any written complaints that your sister may have formed?

A. I'm not sure. I'm not sure how to answer that question.

Q. To your knowledge, did your sister ever put in a written complaint to the police department about what occurred to her when she came down to headquarters on the date of arrest?

SHERRIE DEANDA

A. I don't know. I know we went down to -- when we were getting the pills back, she was supposed to be deposed or something down there, and she had to write a statement and I don't recall what.

Q. Did you go down to the police station with her in order for her to write a statement?

A. Yes.

Q. Who was with you when you went down to the police station?

A. My attorney.

Q. Do you know what day that was?

A. No.

Q. Was it June 25th?

MR. ARONWALD: She said she doesn't know what day it is.

MS. CHAPMAN-LANGRIN: I'm allowed to just refresh her recollection.

MR. ARONWALD: Okay.

Q. So you don't know the day?

A. No.

Q. It was the three of you; Paula, your attorney and yourself?

A. Yes.

Q. Do you know who requested that your sister

SHERRIE DEANDA

come down to the police station and give a statement?

A. Well, we -- she wanted her pills back, her property that was in possession. That's what we went down there for.

Q. Who requested that your sister come down to the police station and make a statement, to your knowledge? You want to talk to your attorney?

A. Yeah.

Q. You're not supposed to but I'll allow it.

A. Oh, okay.

Q. Who requested that your sister come down to the police station and make a statement; do you know?

A. My attorney talked with --

Q. The District Attorney?

A. Yeah, and whoever he talked to to get the pills back. This was done between them, so we complied to what was asked of us.

Q. So the Department of Public Safety never asked your sister to come down and make a statement?

A. I don't know.

Q. Now, prior to your attorney having a conversation with the D.A. about your sister coming down to make a statement, did your attorney write any letters to the D.A.? Have you ever seen any of those

letters to the D.A. from your attorney?

MR. ARONWALD: From me to the District Attorney. Have you ever seen any of those letters? Do you know whether there were any letters?

A. I don't know. I don't recall.

Q. So you're down at the station. Did you see Officer Hicks when you came down to the station when your sister made the statement?

A. No.

Q. When you came to make the statement on June --

MR. ARONWALD: She didn't come down to make the statement.

Q. When your sister came to make the statement on June 25th, were you present when she actually wrote the statement?

A. No.

Q. Have you actually seen a copy of this statement?

A. No.

Q. Up to today, you've never seen a copy of the statement that your sister wrote?

A. No.

SHERRIE DEANDA

Q. To your knowledge, does your sister routinely remove the prescription labels from her prescription bottles?

A. Yes.

Q. How do you know that?

A. Because she takes a lot of medicine and that's how I always see them when she carries them around with her anyway.

Q. So you've seen them prior to the date of the incident, your sister's prescription bottles with the labels removed?

A. Well, she -- yeah. Yes.

Q. Did she ever tell you why she removes the labels from her prescription bottles?

A. I never asked. I just don't have a thought to pay attention to any of that stuff, what she does with her medicine.

Q. As part of the charges that were pending against you, were you required to undergo TASC Treatment, drug counseling?

A. Yes.

MR. ARONWALD: Required to seek TASC Counseling or whether she was required to go for TASC Evaluation?

SHERRIE DEANDA

THE WITNESS: Right, TASC Evaluation.

MS. CHAPMAN-LANGRIN: TASC Evaluation.

Q. As part of your TASC Evaluation, how many times did you undergo or participate with the TASC Program?

A. I went for the evaluation, which was a three-part interview and the initial consultation with the County -- the department in White Plains before they referred me to -- gave me the choice of which locations to go to.

Q. Which location did you ultimately go to?

A. There's one in White Plains. I'm not sure what street it's on.

Q. Prior to the date of this incident, which was May 28th, 2012, have you ever undergone a TASC Evaluation? Have you ever undergone a TASC Evaluation prior to the date of incident?

A. No.

Q. When you went to the evaluation, what occurred?

A. I saw three counselors. I spoke with three counselors. They advised me that I needed to bring cash and checks for certain amounts of money. I saw three counselors, three separate counselors and each

time I went, they had me take a urine test, give them a urine specimen. I don't know what else to say.

Q. As far at you know, did you complete your TASC Evaluation and participation?

A. I completed my TASC Evaluation.

Q. You didn't complete the rest of that after the evaluation?

A. No.

Q. Why not?

A. Because they recommended that I go to counseling three times a week because they said I take too much medicine. Ultram, is what they said.

Q. You didn't want to go to the counseling three times a week?

A. I only took Ultram as needed. When they tested me, I don't understand -- I hadn't had Ultram in like six months. I thought what was in question was the pills that I was being charged with. I thought.

Q. Did you ever receive any correspondence from the TASC Program that you did not complete your participation in the program?

A. No. They called me.

Q. Who called you?

A. They called me -- I don't know who called me.

He told me his name and told me what their recommendation was.

Q. Okay.

A. And he said that's what would be sent off to the court. I talked to -- well, I talked to him and I didn't understand why he was making that evaluation, so I completed what the court asked me to do.

Q. Other than your family members, that would be Paula, the parents of the children that were present in the vehicle, do you know of any other people who know about your arrest on May 28th, 2012?

MR. ARONWALD: Other than her sons?

MS. CHAPMAN-LANGRIN: Other than her sons, her family.

Q. Do you know anyone else who knows about your arrest?

A. My family.

Q. Anyone else, other than your family?

A. Fortunately, it wasn't in the paper.

Q. I was going to ask you that. It just says, Paragraph A1 in the complaint is that, "The defendant's cause to be public defamatory and false statements regarding the plaintiff which expose her to public hatred, contempt, ridicule and disgrace."

SHERRIE DEANDA

Other than your family members, are you aware of anyone else who knew about your arrest of May 28th, 2012?

A. When I went to court, I happened to see somebody that hopefully they didn't notice me, but no, so. No.

Q. The answer is no?

A. Yeah.

Q. Did you ever see any information about your arrest in the newspapers?

A. No.

Q. On the news?

A. No.

Q. Anywhere in the internet? Did you ever see anything about your arrest on the internet?

A. No.

Q. As a result of this incident, have you ever been --

A. Oh, I'm sorry. Actually, a friend of mine saw something about my arrest, yes.

Q. What friend is this?

A. Her name is Deidre Tate.

Q. Where allegedly did she see something about your arrest?

SHERRIE DEANDA

A. I have to ask her. She gave me something to look up and she -- it doesn't say what I was arrested for but she called me about it.

Q. Where does Deidre Tate live?

A. She lives in Bergen County, New Jersey. I'm not sure what town.

Q. Would you be able to get me her address?

A. Yes.

Q. And do you have her telephone number?

A. Not offhand.

Q. If I leave a space in the record, would you please include it?

A. Yes.

DATA REQUESTED: ________________________________________

________________________________________________________

Q. Up until this point in time, have you ever been caused to see any doctor as a result of the May 28th, 2012 arrest?

A. I haven't seen any doctors.

Q. You have not seen any psychiatrist or psychologist in connection with this arrest?

A. No. Just something I've been trying to handle myself.

Q. Your case was ultimately withdrawn by the

District Attorney?

A. Yes.

Q. When did that occur?

MR. ARONWALD: The charges were withdrawn and the court dismissed the case.

MS. CHAPMAN-LANGRIN: Okay. I'd like her to testify. Thank you.

MR. ARONWALD: I want the question to be accurate.

MS. CHAPMAN-LANGRIN: I know. The question was accurate.

Q. Go ahead.

A. You said when did that occur?

Q. Yes.

A. I don't remember the exact date. I do remember I was away and I got the call from my attorney.

Q. So you were away when the charges were withdrawn?

A. Yes.

Q. Okay. Where were you?

MR. ARONWALD: Can I just have a moment?

MS. CHAPMAN-LANGRIN: You're not supposed to, Counsel.

SHERRIE DEANDA

MR. ARONWALD: The problem is the question is confusing.

MS. CHAPMAN-LANGRIN: I don't think the question is confusing.

MR. ARONWALD: Go ahead.

MS. CHAPMAN-LANGRIN: I'll tell you what, the question stands. Please don't interrupt. Please.

MR. ARONWALD: Okay. Fine. I'll ask followup questions when you're done.

MS. CHAPMAN-LANGRIN: No, you're not going to ask followup questions.

MR. ARONWALD: Then --

MS. CHAPMAN-LANGRIN: Then you're going to pay for it.

MR. ARONWALD: Okay. Then I object, because --

MS. CHAPMAN-LANGRIN: You can object.

MR. ARONWALD: Okay.

MS. CHAPMAN-LANGRIN: You're able to object.

MR. ARONWALD: Just answer the question.

MS. CHAPMAN-LANGRIN: What was the question, please.

(Record read back.)

A. Yes.

SHERRIE DEANDA

Q. You did not have to appear in court on the day the charges were withdrawn?
A. No.
Q. You said you went on a family trip. When did you go on the family trip?
A. I don't remember the date.
Q. Was it July 17th through the 24th?
A. Probably, yes.
Q. Where did you go?
A. To Disney World.
Q. Who went with you?
A. Everybody.
Q. Tell me who.
A. Let's see. Amir, Nikki -- Nicole.
Q. Who's Nikki?
A. Do you want the whole name?
Q. Yes, I do.
A. Nicole Brock. She's my son's fiance. She's Amir's fiance. My two granddaughters; Nikir, N-I-K-I-R, and Nikaylah, N-I-K-A-Y-L-A-H.
Q. Who else went?
A. Paula Fontenette.
Q. Your sister, Paula?
A. Yes.

SHERRIE DEANDA

Q. How did you get to Disney World?
A. We flew. More people went.
Q. Okay. Who went?
A. Ashley Kerr.
Q. Who's that?
A. My niece. Tyreek, T-Y-R-E-E-K, Byard, B-Y-A-R-D.
Q. Who is that?
A. Her fiance.
Q. Whose fiance?
A. Ashley's fiancee, and their three children. That would be Amaya Byard, Amari Byard, Ashton Byard. And Donna Kerr.
Q. How many people went with you in total?
A. I don't know. A bunch of us.
Q. So there were additional people in addition to what you've told me about?
A. Yes.
Q. And where is the unlabeled prescription bottle that Officer Hicks saw on the date of your arrest?
A. I have no idea. In the garbage, I hope.
Q. Does your sister have it?
A. I don't have any idea.

SHERRIE DEANDA

Q. Does your attorney have it?

MR. ARONWALD: I do not.

MS. CHAPMAN-LANGRIN: Okay.

Q. What about the prescription bottle that your sister brought down to the headquarters on the date of arrest, and I think on the date that she gave the statement, where is that prescription bottle?

A. She saved it for the longest but I don't know.

Q. Do you know if she still has it?

A. I don't.

Q. Does your attorney have it?

MR. ARONWALD: I do not, but the County Police took photographs of it and they had it.

MS. CHAPMAN-LANGRIN: I've already told you that we do not have the photographs, that I consider it to be immaterial, and we'll take it up with the judge.

MR. ARONWALD: Obviously, you don't consider it immaterial because you're asking questions about where the prescription bottle is, which indicates you doubt whether there was a prescription bottle, but when Paula Fontenette went to the County Police, Officer Grasso, in my

SHERRIE DEANDA

presence, took photographs of the prescription bottle that Paula Fontenette brought with her.

We have never seen those photographs, and you have indicated to us that the County Police cannot locate the photographs and forwarded them to either the District Attorney's office or the court.

MS. CHAPMAN-LANGRIN: Counsel, first of all, I'm entitled to ask if she knows where they are.

MR. ARONWALD: And she said she doesn't know.

MS. CHAPMAN-LANGRIN: And so her testimony will stand.

MR. ARONWALD: I know, but then you asked her --

MS. CHAPMAN-LANGRIN: You already talked. Can I -- go ahead.

MR. ARONWALD: But then you asked her what she knows, where the prescription bottle is and she said she did not.

MS. CHAPMAN-LANGRIN: The actual -- right. That's right.

MR. ARONWALD: Then you asked her whether her lawyer has it.

MS. CHAPMAN-LANGRIN: That's right.

SHERRIE DEANDA

MR. ARONWALD: She's already told you she doesn't know who has it.

MS. CHAPMAN-LANGRIN: I'm entitled to ask her, Counsel.

MR. ARONWALD: You ask her.

MS. CHAPMAN-LANGRIN: And that's right, I've asked her. As for whether or not we have the prescription bottle, the photographs, as you know I consider to be immaterial because it wasn't the actual unlabeled bottle that was the subject of this arrest.

We will take it up with the judge. It's simple. We've explained that. We don't have the photographs that were taken. There's nothing new about that.

MR. ARONWALD: But you're not denying the photographs were taken?

MS. CHAPMAN-LANGRIN: I'm not denying the photographs were taken. That's never been an issue. We don't consider it to be material to this action.

MR. ARONWALD: We consider it material because that same prescription bottle was brought to police headquarters by Paula Fontenette

immediately after the arrest so that she could show the police that she did have a valid prescription for the Oxycodone.

MS. CHAPMAN-LANGRIN: Doesn't matter whether she had a valid prescription or not. This plaintiff was not in possession of a prescription bottle on the date of her arrest that belonged to her, so it doesn't really matter as far as defendants are concerned.

MR. ARONWALD: As to that, there is no dispute.

MS. CHAPMAN-LANGRIN: Okay.

MR. ARONWALD: Article 33 is our trump card.

MS. CHAPMAN-LANGRIN: Which doesn't apply.

MR. ARONWALD: So you say.

MS. CHAPMAN-LANGRIN: Read article 33 --

MR. ARONWALD: So you say.

MS. CHAPMAN-LANGRIN: Read Article 33. It doesn't apply.

MR. ARONWALD: So you say.

MS. CHAPMAN-LANGRIN: No, it says.

MR. ARONWALD: So you say.

MS. CHAPMAN-LANGRIN: All right. That's it. That's it. It says.

MR. ARONWALD: That's an issue for the judge.

MS. CHAPMAN-LANGRIN: That's right, Summary Judgment. And Article 33 doesn't apply.

MR. ARONWALD: Bring it on.

MS. CHAPMAN-LANGRIN: Bring it on. Bring it on.

Q. How else has this affected your life, the arrest?

A. I had trouble sleeping. It's humiliating. I just am. I have a great reputation in my family, always have. Just for something like this to happen to me is humiliating. I've had problems focusing, focusing at work.

Q. At any time prior to the date of this incident, were you ever treated for depression?

A. Yes.

Q. What was the cause of your depression?

A. It's just hereditary. So I had bouts of mild -- mild depression is how it's diagnosed. It's hereditary, so I would take ZOLOFT.

Q. Was this by prescription?

A. Prescription, yes. Sometimes, you know, as needed. So sometimes I take it. ZOLOFT's the type of medicine that you can just stop taking. In a 12 month

SHERRIE DEANDA

period, maybe I might take it for two months, a low dosages and then not take it and then maybe three, four, five months maybe, but nothing serious.

So, yeah mild depression I suffer from. This sure didn't help.

Q. When you suffer from the mild depression, how does it manifest itself? Does it mean that you can't sleep, can't eat, or something else?

A. No. I don't complete tasks, and I'm just sad, you know, unhappy but for no particular reason, you know.

MS. CHAPMAN-LANGRIN: I'm just going to consult with my client. We'll take a little break and we'll be back.

(Brief recess taken.)

Q. Just one more question, Ms. Deanda. When Officer Hicks observed the unlabeled pill bottle, I think you testified that the top was a little loose on the pill container. How was it that the top became loose; do you know?

A. I think it -- I don't know.

MR. ARONWALD: Do you know?

A. I don't know.

Q. As a result of the top coming loose, you're

SHERRIE DEANDA

saying it caused some pills to spill into your purse?

A. Yes.

Q. Did it also cause some pills to spill into the vehicle?

A. I'm not sure. In my haste of putting them --

MR. ARONWALD: Do you know, yes or no?

A. I don't know.

MS. CHAPMAN-LANGRIN: Okay. We're off the record. Thank you so much.

MR. ARONWALD: See you at two.

(Time noted: 11:43 a.m.)

SHERRIE DEANDA

STATE OF NEW YORK )

ss:

COUNTY OF WESTCHESTER )

I, SHERRIE DEANDA, hereby certify that having been first duly sworn to testify to the truth, gave the above deposition, which was recorded stenographically and reduced to this original transcript.

I FURTHER CERTIFY that the foregoing transcript is a true and correct transcript of the testimony given by me at the time and place specified hereinbefore.

I FURTHER CERTIFY that any corrections or changes to this testimony have been made by me on the Correction Sheet, which has also been signed by me before a Notary Public.

[signature]

SHERRIE DEANDA

Sworn to before me this

9th day of May, 2014.

[signature]

Notary Public

WILLIAM I. ARONWALD
Notary Public, State of New York
No. 4505839
Qualified in Westchester County
Commission Expires January 31, 2016

SHERRIE DEANDA

CORRECTION SHEET

PAGE(S) 56 \ LINE(S) 19 \ SHOULD READ --

"I entered the station in a small cage-like cell. I was ridiculed by the police who accused me of being a drug addict. The officers complained about having to babysit a drug abuser instead of being at a barbecue on Memorial Day."

Page 71, lines 13-14 should read: "I went to the one on Church Street in White Plains."

Page 73, line 20 should read: "My employers Peter and James Kempner and my assistant Lisa Poff"

Page 78, line 3 should read: "Yes, I did have ~~to~~ to appear"

Page 80, line 9 should read: "In my safe".

P.75, lines 15-16 should read: "115 East Midland Avenue, Paramus, New Jersey 07652. 917-217-2222.

[signature]

Sherrie Deanda

Subscribed and sworn to before me this 9th day of May, 2014

[signature]

WILLIAM I. ARONWALD
Notary Public, State of New York
No. 4505839
Qualified in Westchester County
Commission Expires January 31, 2016

SHERRIE DEANDA

*** I N D E X ***


| EXAMINATION BY: | PAGE |
| --- | --- |
| MS. CHAPMAN-LANGRIN | 5 |

| DATA REQUESTED | PAGE |
| --- | --- |
| Deidre Tate's address and phone number | 75 |

SHERRIE DEANDA

C E R T I F I C A T I O N

STATE OF NEW YORK )

) ss.

COUNTY OF WESTCHESTER )

I, JUDY PISANI, Court Reporter and Notary Public within and for the County of Westchester, State of New York, do hereby certify:

That I reported the proceedings that are hereinbefore set forth, and that such transcript is a true and accurate record of said proceedings.

AND, I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 2nd day of April, 2014.

Judy Pisani

JUDY PISANI

S

$1,200 (2)
53:7,8
$5,000 (1)
64:12

*

*** (2)
89:2,2

A

A1 (1)
73:22
able (5)
31:11;33:20;43:16;
75:8;77:20
Absolutely (4)
39:12,17;60:15;
62:14
Accounting (2)
9:4,13
accurate (3)
76:10,12;90:13
action (3)
5:10;82:22;90:15
actual (2)
81:21;82:11
actually (12)
25:6;26:25;28:4;
30:15;34:14;39:11;
43:21;52:14;54:6;
69:17,20;74:20
adamant (2)
23:15;30:13
addition (2)
38:7;79:17
additional (1)
79:17
address (4)
5:19;16:19;75:8;
89:7
adjournment (1)
65:14
advise (1)
27:4
advised (2)
58:3;71:23
affected (1)
84:8
Again (1)
57:3
against (2)
5:10;70:20
age (4)
6:8;17:23;18:3,11
ahead (5)
34:10;46:10;76:13;
77:6;81:17
alimony (2)
7:2,12
allegations (1)
58:8
alleged (1)
15:10
allegedly (1)
74:24
allergy (3)
11:17;52:23,23
allow (1)
68:10
allowed (1)
67:17
always (2)
70:8;84:12
Amari (1)
79:13
Amaya (1)
79:13
Amended (2)
39:5;58:7
Amir (9)
5:22,23;6:3;7:7;
55:9;64:8,16,17;
78:15
Amir's (1)
78:20
Amlophine (3)
11:20,22;12:9
A-M-L-O-P-H-I-N-E (1)
11:21
amounts (1)
71:24
Angela (2)
39:7,10
animal (1)
36:18
answered (3)
53:22;58:20,21
apologize (2)
7:23;48:6
apparent (2)
17:8,23
Apparently (1)
18:21
appear (1)
78:2
apple (1)
21:8
apply (3)
83:15,20;84:4
approach (1)
57:6
approached (2)
57:14;58:24
Approximately (4)
16:3;43:19;51:21;
53:7
area (1)
31:24
ARONWALD (80)
5:25;8:22;12:13;
13:15,18;15:15;18:4,
9;24:3;29:17;30:4;
34:11;35:22;36:5;
37:2,9,12,23;39:8,10,
13,20,22;40:2;44:3,
23;45:4;48:3,6;49:4;
53:22;54:20;56:3;
57:3,22;58:9,20;59:2,
4;60:13,16;63:7;
67:15,19;69:3,14;
70:23;73:13;76:5,9,
23;77:2,6,9,13,16,19,
21;80:3,14,20;81:11,
14,18,23;82:2,6,17,
23;83:11,14,16,18,21,
23;84:2,5;85:23;86:8,
12
around (3)
34:25;53:16;70:9
arrest (22)
45:25;60:22;61:14,
17,25;62:9;66:25;
73:12,17;74:3,11,16,
21,25;75:19,22;
79:22;80:7;82:12;
83:2,8;84:9
arrested (3)
20:11;47:15;75:3
arrive (4)
25:3;36:21;56:7;
65:4
arrived (8)
25:9;37:8,18,25;
40:18;56:15,17;60:9
arriving (2)
36:23;37:22
Article (4)
83:14,17,19;84:4
Ashley (3)
23:23,24;79:5
Ashley's (1)
79:12
Ashton (1)
79:13
Assistant (1)
5:8
attacking (1)
47:12
attention (4)
27:22;28:25;31:13;
70:17
Attorney (17)
5:9;59:7;65:13,15;
67:11,22;68:8,14,15,
22,24;69:2,4;76:2,18;
80:2,13
Attorney's (1)
81:7
audible (1)
33:21
authorization (1)
61:5
Avenue (1)
9:11
aware (4)
16:24;17:3;58:5;
74:3
away (4)
42:14,15;76:17,19

B

baby (1)
53:11
back (34)
12:5;18:23;22:18,
23;23:16;25:8;26:9,
12,14,15,22;28:7;
31:4,9,22;33:9,16,19,
23;34:8;35:2;40:11,
12;46:17;48:15;
51:17;52:18,18;
65:18;67:3;68:3,17;
77:24;85:15
background (1)
8:18
backseat (3)
35:7,8;43:14
bag (2)
19:2,8
bail (5)
64:9,11,13,15,17
bank (1)
53:24
barbecue (3)
24:2,4,7
based (2)
39:22;60:16
basically (1)
30:14
became (2)
17:8;85:20
become (2)
16:24;17:3
began (1)
51:14
behind (1)
35:2
belong (5)
30:16;32:25;52:6;
55:8;61:4
belonged (3)
22:19,22;83:8
Bergen (1)
75:6
big (4)
31:20;32:18,20;
51:4
bills (2)
9:19;49:19
birth (1)
8:16
birthday (1)
65:24
blood (4)
11:20,23;12:12;
90:16
blue (2)
10:22,22
body (1)
20:23
borrow (2)
23:13,17
borrowed (1)
23:18
both (1)
20:19
bottle (25)
19:25;20:3,5;21:10,
11,18,20;29:4,7;50:5,
14;51:14;61:3;79:21;
80:5,8,22,24;81:3,19;
82:9,11,24;83:8;
85:18
bottles (3)
70:4,11,15
bouts (1)
84:19
brand (2)
49:18;54:3
break (8)
5:16;37:17;41:13;
42:25;47:8,20;48:7;
85:14
Brief (1)
85:16
briefly (1)
38:20
bring (8)
45:18;46:22;47:4;
55:2;71:23;84:5,6,6
bringing (2)
22:8,11
Brock (1)
78:19
Bronx (2)
15:18;23:25
brought (7)
26:14;48:14;54:8;
61:2;80:6;81:3;82:24
brown (1)
52:12
brushed (1)
61:6
bunch (6)
23:19;49:17;50:2,3;
54:2;79:16
Business (3)
7:15,25;9:24
Byard (4)
79:7,13,13,13
B-Y-A-R-D (1)
79:8

C

call (5)
27:10;45:12;64:6,7;
76:17
called (10)

27:7,11;31:16,17, 18;72:23,24,25,25; 75:4
came (36) 17:12,16;18:14; 21:17;22:21;24:14; 26:15,22;33:19,23; 34:8;50:6,11,17,18, 19,22;51:4;56:19,19, 21,21;59:25;60:5,21, 23;61:13,18,20; 64:15;66:12,15,21; 69:9,12,16
can (12) 39:19,24;42:8,9; 58:18,22;59:18; 62:13;76:23;77:18; 81:17;84:25
Caporale (5) 37:8;39:7,10;46:25; 56:12
Caporale's (2) 48:15;55:22
car (15) 33:9,21;35:16; 42:24;43:15;44:9; 47:4,4,5;49:4,6;51:3, 3;56:4,13
card (2) 57:25;83:14
cards (2) 53:14,15
care (1) 62:21
Carolina (6) 16:16,17,18;24:13, 20,24
carries (3) 22:5;33:3;70:8
carry (5) 22:24,25;23:2,2; 53:10
carrying (1) 53:8
case (3) 53:18;75:25;76:6
cash (2) 53:18;71:24
catch (1) 46:18
caught (1) 51:9
cause (3) 73:23;84:18;86:4
caused (2) 75:18;86:2
causes (1) 20:22
cell (3) 56:19,20,22
cellphone (1) 32:12
certain (2) 37:24;71:24
certify (2) 90:10,14
chance (1) 65:13
CHAPMAN-LANGRIN (61) 5:6,8;12:15;18:7; 24:6;30:7;35:24;37:6, 11;39:12,17,24;44:5, 24;47:20,25;48:5; 49:7;58:5,18,22;59:3, 5;60:15,18;63:8; 67:17;71:3;73:14; 76:7,11,24;77:4,7,11, 14,18,20,22;80:4,16; 81:9,12,16,21,25; 82:4,7,19;83:5,13,15, 17,19,22,24;84:3,6; 85:13;86:10;89:4
charged (5) 62:18,22,25;63:10; 72:19
charges (4) 70:19;76:5,19;78:3
Charlotte (2) 16:14,15
checks (1) 71:24
Chester (2) 13:3,5
child (5) 7:2,3,4;8:8;61:21
children (15) 7:18;8:5;40:23,25; 42:4;48:14;55:22; 59:11,16,19,22;60:2, 6;73:10;79:12
Children's (2) 42:19,21
choice (1) 71:10
city (8) 22:7;25:16;26:9; 42:11,16;43:4;46:17; 54:19
Claritin (2) 11:19,25
Class (4) 21:23,24;22:5;33:3
client (1) 85:14
clothes (1) 40:8
clutch (1) 19:2
Coach (1) 19:2
college (5) 7:9,10,14;8:19,24
color (2) 10:21;19:5
coming (2) 68:23;85:25
common (1) 47:16
compartment (4) 49:19,20;51:7,16
Complaint (5) 39:5,14;58:7;66:23; 73:22
complaints (3) 66:14,16,18
complete (5) 8:23;72:4,7,21; 85:10
completed (2) 72:6;73:8
completely (2) 34:4,12
complied (1) 68:17
computer (2) 9:4;52:19
concerned (2) 66:9;83:10
conducted (1) 38:21
confirmed (1) 45:17
confusing (2) 77:3,5
connection (1) 75:22
consider (5) 80:18,20;82:10,21, 23
considered (1) 11:10
consult (2) 59:6;85:14
consultation (1) 71:8
container (2) 28:24;85:20
contempt (1) 73:25
contractions (2) 25:18;26:10
controlled (1) 63:2
conversation (25) 18:15;23:7,12;27:5; 30:24;31:5;32:9,14; 34:2;41:10;43:12,16; 44:17,19,21;45:2,9, 15;48:10,13;60:8,12, 20;61:24;68:23
convey (1) 42:3
convicted (1) 12:16
cookout (2) 23:19;53:19
cooperative (2) 46:12,19
copy (2) 69:20,23
Corporation (4) 9:9,22,25;10:7
CORRECTION (1) 88:2
correspondence (1) 72:20
counsel (5) 63:14;65:6;76:25; 81:9;82:5
counseling (4) 70:21,24;72:12,14
counselors (4) 71:22,23,25,25
County (14) 5:9;13:5,6,12; 63:18,19,23;71:9; 75:6;80:14,25;81:5; 90:6,9
couple (3) 5:10;43:21;53:24
course (4) 9:2;23:15;30:15; 42:8
court (22) 14:3,4,11,18;62:6, 11,11,18;63:12,16; 65:2,4,9;66:2,3;73:6, 8;74:5;76:6;78:2; 81:8;90:8
cousin (2) 16:7;16:18
cousins (4) 24:12,14,18,23
credentials (1) 32:17
credit (2) 53:14,15
crime (1) 12:16
criminal (1) 47:17
crying (1) 47:11
cup (1) 49:20
current (2) 6:4;61:2
currently (3) 9:5,6;19:3
custody (2) 58:4,12

D

DA (3) 68:23,25;69:2
damage (1) 55:13
damaged (3) 55:10,11,12
dark (1) 10:22
DATA (2) 75:15;89:6
date (26) 8:16;11:2,6,15; 12:19;23:10;54:17, 23;60:21;61:13,17, 25;62:9;65:18,20; 66:25;70:10;71:15, 18;76:16;78:7;79:21; 80:6,7;83:8;84:15
daughter (2) 8:11;25:2
day (16) 15:13,14;23:19,21; 24:2,9,24;25:3;44:22; 64:25;65:10,11; 67:12,16,20;78:3
deal (4) 31:20;32:18,20; 51:4
DEANDA (91) 5:1,2,7;6:1;7:1;8:1, 13,14;9:1;10:1;11:1; 12:1;13:1;14:1;15:1; 16:1,7;17:1;18:1; 19:1;20:1;21:1;22:1; 23:1;24:1;25:1;26:1; 27:1;28:1;29:1;30:1; 31:1;32:1;33:1;34:1; 35:1;36:1;37:1;38:1; 39:1;40:1;41:1;42:1; 43:1;44:1;45:1;46:1; 47:1;48:1;49:1;50:1; 51:1;52:1;53:1;54:1; 55:1;56:1;57:1;58:1; 59:1;60:1;61:1;62:1; 63:1;64:1;65:1;66:1; 67:1;68:1;69:1;70:1; 71:1;72:1;73:1;74:1; 75:1;76:1;77:1;78:1; 79:1;80:1;81:1;82:1; 83:1;84:1;85:1,17; 86:1;88:1;89:1;90:1
deeper (2) 44:15;48:25
defamatory (1) 73:23
defendant (1) 39:6
defendants (1) 83:10
defendant's (1) 73:22
degree (5) 7:16;8:3;63:4,6,7
Deidre (3) 74:23;75:5;89:7
demeaning (1) 47:16
deny (1) 53:16
denying (2) 82:17,19

department (4)
66:14,23;68:19;
71:9
deposed (2)
15:5;67:4
deposition (1)
14:22
depression (5)
84:16,18,20;85:5,7
Describe (1)
10:18
desk (1)
62:20
Detective (1)
57:11
diagnosed (1)
84:20
different (3)
11:4;25:16;28:21
digging (2)
44:15;48:25
direction (2)
15:19;16:22
directly (1)
36:3
disconnected (1)
34:4
discovery (1)
58:16
discuss (1)
66:3
discussion (2)
16:9;62:15
discussions (1)
66:6
disgrace (1)
73:25
dismissed (4)
14:4,12;66:11;76:6
Disney (2)
78:11;79:2
dispute (1)
83:12
District (4)
68:15;69:3;76:2;
81:7
divorce (1)
6:25
Divorced (2)
6:16,17
doctor (2)
20:23;75:18
doctors (1)
75:20
document (3)
15:2,3;58:2
documents (2)
14:22;15:4
Doe (1)
39:13
dollar (1)
49:19
dollars (1)
53:20
done (3)
20:24;68:17;77:10
Donna (1)
79:14
door (4)
51:7,15,22;56:22
dosages (1)
85:3
doubt (3)
44:10;48:21;80:23
down (30)
18:16;38:16;42:9,
10;45:18;48:20;
50:23;60:23;61:3,13,
18,20;66:10,12,15,24;
67:2,4,6,9;68:2,5,6,
12,20,24;69:8,9,14;
80:6
dresser (1)
27:9
drink (1)
5:16
drive (1)
6:3
driver's (6)
6:4;18:20;42:23;
49:24;51:8,15
driving (9)
10:25;11:4,6,8,12;
16:22;31:24;32:4,7
dropped (1)
18:21
drug (1)
70:21
drugs (1)
50:8
due (1)
23:21
Duh (1)
30:14
duly (1)
5:2
during (6)
25:4;44:17;45:11;
48:9;55:4,6
duties (1)
9:14

E

eat (1)
85:9
educational (1)
8:18
either (2)
38:11;81:7
else (16)
9:18;10:19;14:13,
23;25:5,15;33:8;
44:16;49:2;72:3;
73:16,19;74:3;78:22;
84:8;85:9
else's (1)
55:25
emergencies (1)
64:20
emergency (1)
25:17
employed (2)
9:6,8
enable (1)
41:21
end (2)
7:6;35:16
engaged (1)
9:25
engineer (3)
6:22,22,24
entire (1)
65:11
entitled (2)
81:10;82:4
especially (1)
53:10
estate (1)
10:2
etc (1)
9:20
Evaluation (12)
70:25;71:2,3,4,7,17,
17,20;72:5,6,8;73:7
even (5)
15:23;35:9;46:13;
50:16;66:12
evening (4)
25:11;26:23,25;
28:2
Everybody (1)
78:13
Everything's (1)
27:9
exact (1)
76:16
exactly (7)
20:13;28:15,20;
42:20;43:23;52:17;
56:4
EXAMINATION (2)
5:6;89:3
examined (1)
5:4
ex-husband (1)
7:20
ex-husband's (1)
6:19
experience (1)
45:8
explain (3)
46:20;48:19,22
explained (3)
22:6;42:22;82:14
expose (1)
73:24
extensive (1)
40:7

F

face (1)
47:23
fall (1)
50:24
false (1)
73:23
family (8)
73:9,15,18,19;74:2;
78:5,6;84:11
far (5)
20:23;46:14;66:8;
72:4;83:9
fast (1)
47:6
father (2)
7:18;8:5
feel (1)
36:24
Felony (5)
21:24,24;22:5;33:4;
46:22
female (15)
36:11,21,23;37:18;
38:2,8,23;39:6,18;
41:2,6;56:2;62:7,8;
63:20
fiance (4)
78:19,20;79:10,11
fiancee (1)
79:12
fibromyalgia (2)
20:12,20
field (1)
9:5
fight (1)
14:3
figure (1)
52:19
figured (2)
18:22;44:8
financial (2)
9:15,16
find (4)
18:20;45:20;52:3,
12
fine (7)
6:24;13:22,24;
14:15;47:24;58:22;
77:9
fingerprinted (2)
56:23,25
finish (4)
15:22;24:20;34:11;
44:3
first (6)
25:9;32:22;50:4,5;
51:3;81:9
five (1)
85:4
flew (1)
79:3
Flexeril (2)
52:9,10
flight (1)
46:18
floor (1)
50:24
focused (1)
34:6
focusing (3)
38:13;84:13,14
follows (1)
5:4
followup (2)
77:10,12
Fontenette (5)
21:2;78:23;80:24;
81:3;82:25
forgot (2)
34:13;54:6
form (1)
37:9
formed (1)
66:19
forth (2)
25:8;90:12
Fortunately (1)
73:20
forwarded (1)
81:6
found (5)
49:17,17,18;50:2;
52:15
four (1)
85:4
fourth (1)
63:6
fraud (1)
53:17
Friday (6)
25:7,10,11,19,20;
26:7
friend (2)
74:20,22
front (1)
49:23
full (1)
8:19
further (1)
90:14

G

garbage (1)
79:23
gave (11)
20:4,5;21:10,20;
39:15,23;54:3,25;
71:10;75:2;80:7
given (2)
14:6;65:18
giving (1)
50:13

glove (2) 49:19,20
goes (2) 12:11;22:23
gold (1) 19:6
Good (3) 5:7;23:5;28:6
grade (1) 8:14
granddaughter (2) 16:7;47:18
granddaughters (1) 78:20
granted (1) 65:16
Grasso (1) 80:25
gray (1) 11:8
great (1) 84:11
grounds (1) 60:17
guess (4) 11:10;13:16,16; 28:25
guessing (1) 13:18
guilty (2) 14:12,14
guys (1) 15:2

H

half (2) 63:13,25
hand (3) 18:18;19:11;90:19
handcuffed (12) 34:15,16,19;36:5,7, 8,19,24;37:4,7,16; 38:14
handcuffs (12) 34:14;35:19,22,25; 36:8,12,16;37:3,13, 21;38:12;40:16
handed (2) 29:7;51:13
handle (2) 9:15;75:24
hands (1) 35:2
hands-free (2) 33:14,20
happen (1) 84:12
happened (14) 17:11;18:14;21:21; 30:10;47:6;48:17; 56:17;57:15,18; 62:17;65:9;66:4,10; 74:5
happens (2) 15:24;53:17
happy (1) 47:23
Harrison (1) 40:19
Hartsdale (1) 5:20
haste (1) 86:6
hatred (1) 73:25
Hawthorne (3) 40:20,21;49:5
HDCC (1) 12:14
head (1) 5:14
headquarters (16) 56:15,18;57:14; 59:7,10,15,20;60:2, 10,21;61:18,20;62:4; 66:24;80:6;82:25
health (1) 64:5
hear (7) 17:5;29:17;34:5; 43:22,22,24;52:20
Hearing (1) 15:6
hearsay (1) 60:16
held (1) 62:15
help (1) 85:6
helpful (1) 52:21
hereby (1) 90:10
hereditary (2) 84:19,21
hereinbefore (1) 90:12
hereunto (1) 90:18
Hicks (30) 5:9;17:17,18;18:14; 21:10;22:13,19;33:9, 15;34:3;38:8;41:10; 43:12,17;44:18,21; 45:2,10,24;46:24; 48:10,13;50:14; 56:12;57:2,5;61:17; 69:9;79:21;85:18
Hicks' (8) 17:23;36:24;40:11, 15,22;43:15;55:19; 56:13
High (2) 11:23;12:11
highly (2) 44:10;48:20
holder (1) 49:21
home (13) 10:12;21:16;25:14; 26:12,18,20,23,25; 27:11;28:5;42:23; 55:2;64:19
honest (1) 34:12
hope (1) 79:23
hopefully (1) 71:6
hospital (2) 25:7;26:11
hour (4) 32:3,7;63:13,25
house (20) 22:8,24;23:13,20; 24:5,8,11,16,17,18, 23;25:3,9,20,24;26:3, 15,22;42:13;46:2
Howard (1) 8:21
Hudgins (1) 8:10
H-U-D-G-I-N-S (1) 8:10
humiliating (4) 47:13,14;84:10,13
hundred (6) 36:14;37:24;38:11; 49:18;53:20;54:18
hung (1) 45:21
hurry (2) 17:14,15
hydro (1) 12:10
hydrochlorothiazide (1) 12:13

I

idea (5) 51:23,23;62:2; 79:23,25
illegal (1) 22:5
immaterial (3) 80:18,21;82:10
immediately (2) 20:2;83:2
incident (20) 10:4;11:2,7,15; 12:19;14:5;15:10,17; 16:2,21;28:10;46:15; 47:10;54:17,24; 70:11;71:15,18; 74:18;84:16
include (2) 14:23;75:13
income (1) 10:10
indicated (1) 81:5
indicates (1) 80:23
indicating (1) 58:2
indication (1) 58:17
information (4) 29:23;39:23;61:3; 74:10
initial (1) 71:8
inside (4) 35:18,20;36:3,24
Institute (2) 7:15,25
insurance (1) 64:5
intention (1) 28:5
interested (1) 90:17
internet (2) 74:15,16
interrogatories (1) 57:24
interrupt (1) 77:8
interview (2) 57:7;71:8
interviewed (4) 57:17;58:11,15,25
intimidated (1) 50:4
into (12) 22:21;36:6;37:5; 41:2;48:18;55:5;56:4, 19,22;66:9;86:2,4
investments (1) 10:2
issue (2) 82:21;84:2
issues (1) 38:13

J

Jada (3) 8:13,14;16:7
Jail (6) 63:18,19,24;64:3, 21,23
Jane (1) 39:13
Jasmine (1) 8:10
Jersey (1) 75:6
judge (6) 62:19,20;65:12; 80:19;82:13;84:2
Judgment (1) 84:4
Judy (3) 5:2;90:8,23
July (3) 6:18,18;78:8
June (4) 65:22;67:14;69:12, 17

K

keep (8) 5:12;8:22;9:16; 32:20;54:4,5,10; 64:19
Kempner (4) 9:9,22,24;10:7
kept (1) 32:22
Kerr (2) 79:5,14
kids (10) 35:6,7;42:8;43:24; 44:6;45:21;46:17; 47:4,9,17
killer (2) 12:5;20:9
kind (1) 21:25
kinds (1) 27:21
knew (13) 18:19;19:10;20:11, 14;28:10,13,15;29:3; 39:15;50:16;51:3; 53:12;74:3
knowledge (7) 19:21;41:9;49:15; 61:23;66:22;68:8; 70:2
knows (4) 39:18;73:16;81:10, 19

L

label (2) 21:15,18
labels (3) 70:3,12,15
labor (1) 25:7
ladies' (1) 5:17
laptop (5) 54:14,16;55:5,10, 10
large (2) 22:24;23:3
last (1) 6:20

law (1)
51:11
lawyer (1)
81:24
leaked (2)
50:11,14
learn (1)
20:10
learned (1)
20:9
lease (1)
10:15
least (1)
13:6
leave (1)
75:12
leaving (2)
55:20;56:6
left (29)
22:8;25:12,14;27:2,6,8,8,13,15,16,19,23;28:2,3,4,5,7,8,22;46:13;55:16,16,17;56:11,12,12;62:3;63:16;64:21
legal (1)
60:17
less (1)
23:4
letters (4)
68:25;69:2,5,6
license (6)
6:5;14:2;18:17,20;19:7;42:23
life (1)
84:8
lights (2)
17:5,7
limit (2)
31:23;32:2
LINES (1)
88:3
little (4)
22:2;40:8;85:14,19
live (2)
42:14;75:5
lives (2)
5:21;75:6
locate (1)
81:6
located (3)
9:10;52:16;53:21
location (1)
71:12
locations (1)
71:11
long (6)
9:21;42:11;43:19;54:16;63:12,23
longest (1)
80:9
look (3)
17:19;66:12;75:3
Looking (4)
17:4;18:21;19:10,12
loose (3)
85:19,21,25
lot (6)
15:3;23:14;24:4;28:21;53:11;70:7
low (1)
85:2
lower (1)
12:5

## M

Ma'am (1)
48:23
making (6)
28:12;31:20;32:18,20;51:4;73:7
Mamaroneck (1)
9:11
manage (1)
10:3
manager (1)
9:13
manager/office (1)
9:13
manifest (1)
85:8
many (3)
51:21;71:4;79:15
marital (1)
6:15
Mark (5)
24:25;26:24;59:23;61:20,23
marriage (1)
90:16
material (2)
82:21,23
materials (1)
58:16
matter (4)
50:8;83:5,9;90:17
May (15)
10:5;11:12;14:5;15:11,13;17:20;19:18;60:20;66:2,15,19;71:16;73:12;74:4;75:19
Maybe (6)
10:9;18:22;63:25;85:2,3,4
mean (5)
6:18;32:21;43:23;44:23;85:8
means (1)
21:15
medication (1)
11:16
medications (1)
22:12
medicine (10)
11:17,18,20;12:12;44:8;46:13;70:7,18;72:13;84:25
medicines (2)
11:24;12:7
members (2)
73:9;74:2
Memorial (4)
15:14;23:19;24:9,24
mental (1)
64:5
Mercedes (2)
10:17;11:8
met (1)
5:7
metallic (1)
19:6
middle (1)
49:23
might (2)
38:8;85:2
mild (5)
12:5;84:20,20;85:5,7
miles (2)
32:3,7
mine (4)
22:6;30:14,14;74:20
minute (4)
17:12;31:4;47:21;62:13
minutes (3)
42:14,15;43:21
Miranda (3)
57:25;58:3,13
Mirandized (1)
58:17
mirror (1)
17:4
ML350 (1)
11:8
ML450 (1)
10:17
moment (2)
65:14;76:23
Monday (5)
15:14;25:4;26:4;28:9,22
money (7)
9:19;53:4,6,10,25;64:17;71:24
monies (1)
52:25
Monique (3)
24:25;26:24;59:23
month (2)
54:23;84:25
months (3)
72:18;85:2,4
more (5)
23:4;49:17;50:9;79:3;85:17
morning (3)
5:7;16:3;28:23
mother (1)
8:8
much (8)
35:3;50:4;53:4,6,6;64:11;72:13;86:11
must (1)
13:14
myself (1)
75:24

## N

name (20)
5:8;6:19,20;12:10,14;20:17,25;23:22;38:24,25;39:4,9,10,15,21;57:10;61:9;73:2;74:23;78:17
need (5)
5:16;42:7,11,25;47:8
needed (4)
54:2;71:23;72:16;84:24
needs (1)
22:8
neither (1)
39:15
nerve (2)
20:21,22
nervous (5)
22:2,3;33:6;34:12;48:19
New (12)
5:3,20;6:11,12;21:9,9;49:18;54:3;75:6;82:16;90:4,10
news (1)
74:13
newspapers (1)
74:11
next (8)
17:11,18;21:21;30:11;48:17;64:25;65:9;66:2
Nicole (2)
78:15,19
niece (6)
23:20,22;25:6,17;53:11;79:7
night (9)
25:19,20,22,24;26:3,5,7;27:3,12
Nikaylah (1)
78:21
N-I-K-A-Y-L-A-H (1)
78:21
Nikir (1)
78:20
N-I-K-I-R (1)
78:21
Nikki (2)
78:15,16
nine-tenths (1)
51:10
nods (1)
5:13
None (1)
7:17
North (5)
16:17,18;24:12,20,24
Notary (2)
5:3;90:8
note (1)
57:23
noted (1)
86:13
notice (1)
74:6
number (4)
6:13;21:8;75:10;89:7

## O

object (3)
77:16,18,20
objecting (1)
37:9
objection (1)
37:14
objections (1)
60:14
observe (1)
56:9
observed (6)
19:13,16,20;49:12,12;85:18
obtain (1)
19:9
Obviously (2)
60:13;80:20
occupation (1)
6:21
occur (7)
15:17;16:2;23:12;24:10;55:13;76:4,14
occurred (17)
10:4;13:2;15:10;23:8;28:10;33:18;41:23;43:12;57:8;60:9,20;61:25;64:2;66:7,15,24;71:21
Off (5)
15:16;61:6;62:15;73:5;86:10
offer (1)
41:21
offered (1)
41:24
offering (1)

42:2
**offhand (2)**
16:20;75:11
**office (1)**
81:7
**Officer (76)**
5:9;16:25;17:16,17, 18,20,23;18:14; 21:10;22:13,19;29:6; 30:2,25;31:6,19; 32:17;33:9,15,23; 34:2;36:11,21,23,24; 37:8,18,22,25;38:2,4, 7,8,9,23;39:6,19; 40:11,15,22;41:9; 43:12,14,17;44:18,21; 45:2,10,24;46:24,25; 48:10,13,15;50:14; 55:15,19,22;56:11,12, 13;57:2,5,6,10,13; 61:9,13,17;62:7,8; 63:20;69:9;79:21; 80:25;85:18
**officers (8)**
5:10;49:10;54:12; 58:19,24;59:8,17; 61:24
**officer's (4)**
38:24;41:2,7;56:2
**old (4)**
5:23;16:10;21:3,4
**older (2)**
18:6;60:25
**once (4)**
40:13,16;47:5,6
**one (20)**
7:18;8:5,19,19;9:3; 12:9;15:15;21:24; 38:4;39:13,15;46:11; 49:18,18;50:10;58:8, 19,23;71:13;85:17
**ones (3)**
53:20;54:2,3
**only (7)**
15:8;29:20;39:6; 40:12;42:15;43:2; 72:16
**oOo (1)**
5:5
**opened (6)**
18:23;19:11,22; 32:16;50:5,15
**option (2)**
42:15;43:2
**Orange (2)**
13:6,12
**order (2)**
41:6;67:7
**out (38)**
18:23;23:6;30:25; 31:20,20;32:17,18,18; 34:19,22,23,25;35:10, 12,14,21;36:4;40:17, 25;45:20;47:4;50:6, 11,11,14,17,18,19,22; 51:4,14;52:19;53:25; 54:3,25;58:6,12,15
**outcome (1)**
90:17
**outfit (1)**
23:5
**outside (1)**
34:15
**over (12)**
16:25;17:9,10,11, 20;18:21;25:20,24; 26:3;32:5;47:3;53:19
**overhear (2)**
43:16;44:2
**overnight (1)**
64:23
**over-the-counter (1)**
12:2
**own (5)**
10:2,12,13,14; 51:25
**owned (1)**
48:11
**owner (1)**
30:19
**owning (1)**
29:24
**Oxycodone (12)**
20:17;27:23;28:3, 11,13,19;32:23,24; 33:3;50:20;51:21; 83:4
**Oxycodone/OxyContin (1)**
21:23
**OxyContin (6)**
20:2,3,7,17;32:23; 33:2

**P**

**packaged (2)**
29:2,3
**PAGE (2)**
89:3,6
**PAGES (1)**
88:3
**pain (8)**
12:5,6;20:9,12,22; 27:15;28:16,18
**paper (1)**
73:20
**Paragraph (1)**
73:22
**parents (3)**
42:9;59:24;73:10
**Parkway (3)**
15:18;28:9,22
**part (2)**
70:19;71:4
**participate (1)**
71:5
**participation (2)**
72:5,22
**particular (4)**
9:2;23:3;53:25; 85:11
**parties (1)**
90:15
**parts (1)**
44:6
**passenger (1)**
49:23
**pat-down (3)**
38:21;40:3,10
**patted (1)**
38:16
**Paula (30)**
21:2,3,4;31:18; 32:10,14;33:9;41:12, 16,19,22;42:3;43:7,9, 13,17;46:25;48:14; 52:7;59:23,25;66:4, 13;67:22;73:10; 78:23,24;80:24;81:3; 82:25
**Paulette (2)**
41:11;43:6
**Pavone (1)**
57:11
**pay (8)**
9:19;13:22;14:4,15; 27:22;28:25;70:17; 77:15
**paying (1)**
31:13
**payroll (1)**
9:20
**pending (1)**
70:19
**people (7)**
53:19;62:20,21; 73:11;79:3,15,17
**per (2)**
32:3,7
**percent (4)**
36:14;37:24;38:11; 54:18
**Perhaps (1)**
63:13
**period (1)**
85:2
**person (5)**
38:5,16,17;44:10; 48:21
**persons (1)**
16:4
**Peter (6)**
6:7,20;7:14,15,18, 24
**Peter's (1)**
6:8
**Peyton (6)**
16:8,10,10,13;25:2; 27:2
**Peyton's (2)**
42:9;59:24
**Philly (1)**
46:18
**phone (15)**
31:18;33:10,11,12, 13,13,20,24;34:13,20; 41:24;42:2;43:9;64:6; 89:7
**photographs (9)**
80:15,17;81:2,4,6; 82:9,15,18,20
**pick (5)**
42:4,8;60:2,5;61:21
**picked (3)**
42:20;59:19,22
**picking (2)**
43:24;44:6
**picture (1)**
64:4
**pill (13)**
12:11;21:10,11,20; 29:4,7;50:13;51:5,13; 52:22;61:3;85:18,20
**pills (62)**
19:23,24;20:3,12; 22:19,22,22;27:6,8, 14,16,18,19,23;28:3, 8,11,14,16,16,18,23; 29:10,21,24;30:3,9, 19,22;31:20;32:19; 45:17,19;46:2,16,21, 23;48:11;49:17,18; 50:2,6,11,14,16,18,19, 20,24;51:14,21;52:3, 12,14,15;61:4;67:3; 68:3,17;72:19;86:2,4
**Pisani (3)**
5:2;90:8,23
**placed (8)**
36:12,16;37:14; 38:12;40:14,17,22; 56:20
**Plains (6)**
9:11;62:13,18; 63:12;71:9,13
**plaintiff (2)**
73:24;83:7
**plan (1)**
24:9
**plea (1)**
63:9
**plead (1)**
14:12
**please (9)**
5:15;13:16;44:4; 47:21;57:4;75:13; 77:8,8,23
**pled (1)**
14:14
**Plus (1)**
53:19
**point (25)**
21:25;25:12;29:9; 30:25;33:6,15;37:18, 25;38:12,16;40:14, 25;41:9;43:8;44:12, 15;49:9;56:23;57:6; 58:6;59:6,19;62:3; 65:7;75:17
**pointing (2)**
58:11,15
**points (1)**
14:2
**police (26)**
40:18;41:5;43:15; 49:4,6;52:18;58:13; 59:8,15;60:10,21; 61:18,24;62:3;66:14, 23;67:6,10;68:2,7,13; 80:15,25;81:5;82:25; 83:3
**position (1)**
9:12
**possession (6)**
22:4,21;33:4;63:2; 68:4;83:7
**possession's (1)**
51:10
**possibly (1)**
18:5
**post (2)**
64:13,17
**posted (1)**
64:15
**pregnant (2)**
8:25;23:21
**preparation (1)**
14:22
**prepared (1)**
48:3
**prescribed (1)**
12:6
**prescription (38)**
11:24;12:8;29:10, 15,19,21;30:3,6,8,13, 16,21;32:18;44:11; 45:18;48:21;52:10; 60:25,25;61:2;70:3,3, 11,15;79:20;80:5,8, 22,24;81:2,19;82:9, 24;83:4,6,7;84:22,23
**presence (1)**
81:2
**present (3)**
5:19;69:17;73:10
**presently (1)**
8:14
**preserving (1)**
60:13
**pressure (3)**
11:20,23;12:12
**pretty (2)**
47:6;56:22
**previous (1)**
12:18

principals (1)
10:3
prior (16)
12:19;22:23;23:7;
28:9;36:23;37:21;
42:2;45:25;53:24;
54:17;56:6;68:22;
70:10;71:15,18;84:15
probably (2)
52:23;78:9
problem (6)
5:18;20:22;50:16;
60:18;63:8;77:2
problems (1)
84:13
proceed (1)
48:3
proceeded (2)
21:22;22:10
proceedings (2)
90:11,13
processed (2)
64:3,4
Program (3)
71:6;72:21,22
properties (1)
10:3
property (1)
68:4
provided (7)
39:11;57:24;58:2,
16;60:24,25;66:12
psychiatrist (1)
75:21
psychologist (1)
75:22
Public (5)
5:3;68:19;73:23,24;
90:9
pull (2)
16:25;17:9
pulled (4)
17:10,11,20;32:5
purse (37)
18:22,23,24,25;
19:3,11,14,22;22:11,
14,14,24,24,25,25;
23:3,3,4,14,14,17,18;
27:8;28:4;32:17;
46:15;50:5,7,23,23;
51:6,11,15;53:2,4,9;
86:2
put (22)
18:22,22;35:2,18,
19,20,22,24;36:2,8;
40:10,12,16;41:2;
47:23;51:6,19,22;
52:2;55:5;63:9;66:22
putting (2)
51:15;86:6

R

read (5)
39:3;77:24;83:17,
19;88:3
ready (1)
17:13
Real (1)
10:2
realize (1)
46:22
really (15)
12:10,24,25;27:21;
33:6;36:13;38:10;
40:8;42:15;44:13;
45:3;48:12,23;66:8;
83:9
reason (5)
5:15;8:23;53:8,23;
85:11
reassure (1)
47:22
recall (20)
13:4,4,7,24;14:16,
18;15:11;38:17,19;
40:3,5;43:23;48:15;
57:13,20;59:18;63:5;
65:22;67:5;69:7
receive (1)
72:20
received (1)
7:12
recess (1)
85:16
recognize (1)
17:21
recollection (1)
67:18
recommendation (1)
73:3
recommended (1)
72:11
record (6)
15:16;62:16;75:12;
77:24;86:11;90:13
recorded (2)
44:14;48:24
recorder (1)
44:14
records (1)
9:16
recovered (3)
49:16;52:25;53:4
refer (1)
28:16
referred (4)
20:19;39:14;42:20;
71:10
referring (1)
7:20
refers (1)
28:17
refresh (1)
67:18
regarding (1)
73:24
registration (2)
18:17;19:8
regularly (1)
11:20
related (1)
90:15
remember (13)
13:15,16;37:23;
38:25;39:4,9;48:12;
54:7;57:3,4;76:16,17;
78:7
remove (1)
70:3
removed (1)
70:12
removes (1)
70:14
rent (1)
10:12
rephrase (2)
5:15;19:19
reported (1)
90:11
Reporter (1)
90:8
represented (2)
63:14;65:6
representing (1)
5:9
reputation (1)
84:11
request (3)
41:15,18;58:6
requested (4)
67:25;68:6,12;89:6
REQUESTED_ (1)
75:15
required (4)
58:13;70:20,23,24
research (1)
20:24
reside (4)
6:10;16:13;21:7;
23:24
residence (1)
42:13
resides (2)
6:11;43:4
resolved (2)
14:8,10
respond (1)
29:13
responding (1)
44:8
response (1)
57:23
responses (1)
5:13
rest (1)
72:7
restroom (1)
5:17
result (5)
6:25;14:5;74:18;
75:18;85:25
return (3)
31:6;46:2,16
returned (1)
44:9
review (3)
14:21,25;17:4
reviewed (1)
15:8
rid (1)
51:19
ridicule (1)
73:25
right (27)
13:2;14:21;16:21;
17:19;20:7;26:9;
28:13;29:5;35:17;
36:16;37:25;39:12;
43:22;44:5;48:5;49:3;
54:12;56:6;59:3;
65:25;71:2;81:21,22,
25;82:7;83:24;84:3
rights (3)
57:25;58:3,14
River (1)
15:18
Road (1)
5:20
Robert (1)
57:10
Rockledge (1)
5:20
rolled (1)
18:16
room (1)
25:17
Roosevelt (1)
26:10
routinely (1)
70:2
Rule (1)
57:23

S

sad (1)
85:11
Safety (1)
68:19
salary (1)
10:7
Same (3)
6:20;62:8;82:24
sat (1)
48:20
Saturday (9)
25:4,20,25;26:5,8,
10,13,16;28:2
saved (1)
80:9
saw (8)
13:7,13;54:12;
61:17;71:22,24;
74:21;79:21
saying (8)
30:14;32:20,22,22;
34:18;35:3;36:14;
86:2
scared (6)
22:2,3;33:7;47:18,
19;48:19
scene (12)
44:22;45:11;49:8;
55:16,17,17,20;56:6,
11,12,13;62:9
sciences (1)
9:4
screen (1)
55:12
screwed (2)
50:5,17
searched (4)
38:17;49:9;52:3;
55:15
searching (3)
19:8;49:13;54:13
seat (2)
49:23,24
second (2)
15:15;65:25
secret (1)
64:19
Security (1)
6:13
seek (1)
70:23
seems (1)
47:10
Senior (1)
5:8
sent (3)
15:2,3;73:5
separate (1)
71:25
serious (1)
85:4
Services (2)
42:19,22
set (3)
64:9;90:12,18
several (1)
62:20
severe (1)
52:24
shaken (1)
38:10
shakes (1)
5:13
SHEET (1)
88:2
SHERRIE (86)
5:1,2;6:1;7:1;8:1;
9:1;10:1;11:1;12:1;
13:1;14:1;15:1;16:1;

17:1;18:1;19:1;20:1;21:1;22:1;23:1;24:1;25:1;26:1;27:1;28:1;29:1;30:1;31:1;32:1;33:1;34:1;35:1;36:1;37:1;38:1;39:1;40:1;41:1;42:1;43:1;44:1;45:1;46:1;47:1;48:1;49:1;50:1;51:1;52:1;53:1;54:1;55:1;56:1;57:1;58:1;59:1;60:1;61:1;62:1;63:1;64:1;65:1;66:1;67:1;68:1;69:1;70:1;71:1;72:1;73:1;74:1;75:1;76:1;77:1;78:1;79:1;80:1;81:1;82:1;83:1;84:1;85:1;86:1;88:1;89:1;90:1
shop (1) 53:11
shopping (1) 53:13
shortly (1) 27:11
show (1) 83:3
shows (1) 50:7
shut (2) 44:13;48:24
side (7) 49:22;51:6,7,8,15,20,22
signed (2) 57:25;64:5
simple (1) 82:14
simply (2) 58:11,15
sinus (1) 52:24
sirens (1) 17:6
sister (56) 20:11;22:19,22;24:11,13;25:3,9;27:4,5;29:24;30:17;31:16,17;32:9;33:8,24;34:20;41:10,16,19,22;42:3,9,10,14;43:2,4,13,17;44:18,20,25;46:25;48:9,14;59:23,25;60:5,9,19;66:4,13,19,22;67:25;68:6,12,20,23;69:10,16,24;70:2;78:24;79:24;80:6
sister's (10) 20:25;22:7,14;24:15,17;29:14,19;30:10;46:2;70:11
sitting (2) 17:18;43:14
six (1) 72:18
Sixth (1) 8:15
sleep (1) 85:9
sleeping (1) 84:10
small (2) 19:2;22:25
smallest (1) 23:2
Social (1) 6:13
sole (1) 10:10
somebody (1) 74:6
someone (4) 42:7,12,16;55:25
Sometime (2) 55:4,6
sometimes (3) 12:3;84:23,24
somewhere (2) 25:14;42:12
son (7) 5:22;6:3,6;7:21,24;42:23;55:8
sons (3) 18:12;73:13,14
son's (4) 54:14,16;65:24;78:19
soon (1) 48:20
sorry (11) 6:2;7:21;24:21;26:5,6;43:8;46:7,21;48:4;59:14;74:20
sounded (1) 44:7
source (1) 10:10
South (3) 15:20;16:16,23
space (1) 75:12
Speak (8) 5:25;33:8;41:15,18,22;42:3;59:11,16
specific (1) 58:6
specifically (4) 30:18;41:15,18;62:23
specified (1) 58:7
specifies (1) 39:5
specimen (1) 72:3
speculative (1) 18:4
speed (2) 31:23;32:2
speeding (7) 13:10,14,17,20;31:19,21;32:16
spend (5) 25:19,24;26:3;27:3;64:23
spending (1) 24:14
spent (5) 25:22;26:5,7,16;65:11
spill (2) 86:2,4
spoke (7) 44:10;45:10;48:21;61:7,10,16;71:22
spoken (2) 47:15;61:12
ss (1) 90:5
stand (1) 81:13
standard (1) 11:13
stands (1) 77:8
stash (1) 64:19
State (3) 5:3;90:4,10
statement (17) 57:15;58:25;67:5,7;68:2,7,13,20,24;69:10,12,15,16,18,21,24;80:8
statements (1) 73:23
station (9) 40:18;52:18;67:6,10;68:2,7,13;69:8,9
status (1) 6:15
stay (5) 24:15,17;33:10,11,12
stayed (1) 31:6
step (9) 30:25;34:19,22,23,25;35:10,12,21;36:4
stepped (1) 35:14
still (11) 7:4;9:4;19:3;33:24;34:20;40:23;48:18,19;58:18,23;80:11
stop (2) 62:13;84:25
stopped (8) 13:9,10,17,19;31:19,21;32:16;48:23
stops (1) 12:18
Street (3) 6:11;21:8;71:14
strike (2) 36:20;44:18
study (1) 9:2
stuff (7) 23:20;24:4;27:21;28:7;51:10,25;70:17
subject (2) 57:22;82:11
substance (2) 22:5;63:3
suffer (2) 85:5,7
Summary (1) 84:3
Sunday (11) 25:4,25;26:4,6,16,18,20,22,23,25;27:12
sundress (1) 40:8
support (3) 7:2,3,4
supposed (5) 28:7;32:15;67:3;68:10;76:24
surcharge (1) 14:4
sure (28) 13:8;20:13;21:24;28:12,15,20;32:24;33:2;34:4,23,24;38:6,11;42:20;52:17;54:18,20,21;56:4,22;65:21,23;66:20,20;71:13;75:7;85:6;86:6
surprised (1) 24:15
Sutton (2) 16:8;24:25
SUV (4) 10:19,20;11:9,10
sworn (1) 5:2

T

talk (1) 68:8
talked (7) 45:7,19;68:14,16;73:6,6;81:16
talking (5) 43:23,24;44:7;49:7;66:8
Taryn (1) 5:8
TASC (12) 70:20,23,25;71:2,3,4,5,16,17;72:5,6,21
tasks (1) 85:10
Tate (2) 74:23;75:5
Tate's (1) 89:7
telephone (9) 27:5;41:10,21;43:11,20;44:17;45:11;46:24;75:10
telling (3) 34:6;46:12;66:7
ten (2) 16:11,11
test (1) 72:2
tested (1) 72:17
testified (2) 5:4;85:19
testify (1) 76:8
testimony (2) 15:5;81:12
thinking (2) 28:6;51:10
Third (3) 39:5;53:16;58:7
this_day (1) 90:19
Thomas (1) 61:13
thought (9) 17:14;18:17;22:2;46:12,19;51:18;70:16;72:18,19
three (9) 67:22;71:22,22,25,25;72:12,14;79:12;85:3
three-part (1) 71:8
throughout (1) 20:22
ticket (1) 14:6
tight (1) 50:6
times (3) 71:5;72:12,15
tinted (2) 11:11,14
tissue (1) 48:2
today (1) 69:23
together (2) 24:13;48:2
told (35) 12:7;19:25;22:4,16,18;27:7;30:2,6;31:18;

32:15;35:2,6,9;42:7,
10,17;44:12,20;45:16,
16,22,23;46:4,11;
47:22;60:24;61:4;
64:20;65:12;66:10;
73:2,2;79:18;80:16;
82:2
**took (12)**
17:12;20:12;26:14;
51:5,19;53:25;54:2;
56:10;62:6;72:16;
80:15;81:2
**top (4)**
50:16;85:19,20,25
**total (1)**
79:15
**totally (2)**
34:13;64:4
**tow (3)**
56:7,9,11
**town (2)**
24:17;75:7
**traffic (1)**
12:18
**transcript (1)**
90:12
**transmitted (1)**
34:21
**transport (1)**
63:20
**traveling (1)**
15:21
**treat (1)**
11:22
**treated (2)**
47:16;84:16
**Treatment (1)**
70:21
**tried (1)**
47:22
**trip (2)**
78:5,6
**trouble (3)**
51:12;66:9;84:10
**truck (3)**
56:7,9,11
**true (1)**
90:13
**trump (1)**
83:14
**trying (11)**
38:7;45:20;46:14,
16,17,20;48:19,22;
52:19,20;75:23
**Turn (1)**
34:25
**Turned (1)**
7:8
**TV (1)**
50:7
**Two (4)**
8:19;78:20;85:2;
86:12
**Tylenol (1)**
52:2
**type (9)**
6:22;7:16;9:24;
10:18;18:25;27:16,
19;29:3;84:24
**Tyreek (1)**
79:7
**T-Y-R-E-E-K (1)**
79:7

**U**

**ultimately (2)**
71:12;75:25
**Ultram (5)**
12:2,4;72:13,16,17
**um (1)**
11:17
**unclear (2)**
7:23;37:16
**undergo (2)**
70:20;71:5
**undergone (2)**
71:16,17
**unhappy (1)**
85:11
**University (1)**
8:21
**unlabeled (10)**
21:11,12,20;28:23;
29:7;50:13;51:13;
79:20;82:11;85:18
**Unlawful (1)**
63:2
**up (27)**
5:25;8:22;19:11;
24:14;31:4,22;37:17;
38:10;42:4,8,20;
43:24;44:6,13;45:21;
48:24;50:15;59:19,
22;60:2,5;61:21;
69:23;75:3,17;80:18;
82:13
**upon (3)**
39:23;55:19;60:16
**upset (1)**
66:8
**upsetting (2)**
47:11,12
**urine (2)**
72:2,3
**use (5)**
19:18;23:14;53:14,
14,15
**used (1)**
23:3
**usually (3)**
23:2,2;24:15

**V**

**Vaguely (3)**
40:4,6,9
**Valhalla (1)**
63:17
**valid (2)**
83:3,6
**vehicle (91)**
8:6,9,12;10:14,15,
16,18,25;11:4,6,11;
16:4,6,25;17:12,16;
18:15;31:2,6,7,7,9,12,
14,15;33:16,19,23;
34:16,19,21,22,23,25;
35:10,12,15,18,20,21;
36:2,3,4,6,17,18,18,
19,24;37:3,5,7,14,16;
40:11,12,15,17,18,23,
23;41:2,3,5,7;47:6,7;
48:15,18;49:9,13,16;
50:25;51:17;52:4,15;
54:5,11,13,13,17;
55:6,15,19,23,24;
56:2,5,10;73:11;86:5
**verbal (1)**
5:13
**videos (1)**
14:23
**Village (1)**
13:3
**voice (1)**
8:22
**volume (1)**
50:8
**volunteered (2)**
29:23;46:13

**W**

**wait (3)**
15:22;24:20;35:3
**waited (1)**
62:19
**waiver (1)**
64:5
**walk (2)**
41:5;56:22
**walked (2)**
47:9,18
**wallet (2)**
23:3,15
**water (2)**
5:17;12:11
**way (9)**
14:10;22:7;32:7;
45:25;46:2;50:17;
57:22;64:3;90:16
**week (5)**
15:13;22:23;23:7;
72:12,15
**weekend (9)**
23:18,19;24:8,11,
14,24;25:4;55:4,6
**weekends (1)**
53:11
**weeks (1)**
53:24
**West (2)**
6:11;21:8
**Westchester (7)**
7:15,24;63:18,19,
23;90:6,9
**What's (7)**
5:19;8:16;9:12;
12:4;16:19;19:24;
23:22
**WHEREOF (1)**
90:18
**wherever (1)**
40:19
**White (6)**
9:11;62:13,17;
63:12;71:9,13
**whole (5)**
45:7;46:20;47:15;
54:2;78:17
**Who's (2)**
78:16;79:6
**whose (2)**
56:5;79:11
**William (1)**
61:13
**willing (1)**
58:11
**window (1)**
18:16
**windows (1)**
11:11
**withdrawn (4)**
75:25;76:5,20;78:3
**within (3)**
5:3;58:15;90:9
**WITNESS (8)**
29:18;45:6;48:4,8;
49:6;54:22;71:2;
90:18
**words (1)**
19:18
**work (2)**
42:18;84:14
**working (1)**
9:21
**World (2)**
78:11;79:2
**write (3)**
67:4,7;68:24
**written (3)**
66:16,18,23
**wrote (2)**
69:17,24

**Y**

**year (7)**
5:24;6:9;8:19,19;
9:3;10:23;16:12
**years (1)**
9:23
**yellow (4)**
52:3,13,14,22
**yellow/brown (1)**
52:13
**York (8)**
5:4,20;6:12,12;
21:9,9;90:4,10
**younger (2)**
17:25;18:5

**Z**

**ZOLOFT (2)**
11:25;84:21
**ZOLOFT's (1)**
84:24
**ZYRTEC (1)**
11:19

**1**

**10 (1)**
42:14
**10/6/62 (1)**
8:17
**10024 (1)**
21:9
**1003 (1)**
6:12
**105 (1)**
10:9
**10530 (1)**
5:20
**10605 (1)**
9:11
**11:43 (1)**
86:13
**12 (2)**
16:12;84:25
**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 (1)**
6:14
**127 (1)**
21:8
**14 (1)**
5:20
**145th (1)**
6:11
**15 (1)**
42:14
**17th (1)**
78:8
**18 (1)**
7:8
**19 (1)**
9:23
**1997 (1)**
6:18

**2**

**200 (1)**
6:11
**2000 (1)**

6:18
**2011 (1)**
12:23
**2012 (12)**
10:5,24;11:12;14:5;
15:11,13;17:21;
66:15;71:16;73:12;
74:4;75:19
**2014 (1)**
90:19
**24th (1)**
78:8
**25 (1)**
42:14
**257 (1)**
9:11
**25th (2)**
67:14;69:17
**26 (1)**
57:23
**26th (1)**
65:22
**28 (4)**
11:12;14:5;15:13;
17:20
**28th (7)**
10:5;15:11;66:15;
71:16;73:12;74:4;
75:19
**29 (1)**
6:2
**29th (2)**
65:10;66:2

**3**

**30 (2)**
5:24;42:15
**31 (1)**
6:9
**32 (1)**
6:9
**33 (4)**
83:14,17,19;84:4

**4**

**40 (1)**
32:3

**5**

**5 (2)**
6:12;89:4
**5:30 (1)**
64:22
**50 (1)**
32:6
**50-h (1)**
15:6
**53 (1)**
21:6

**6**

**6 (1)**
6:12
**6A (1)**
21:8

**7**

**70 (1)**
32:7
**75 (1)**
89:7

**8**

**8:15 (1)**
16:3
**8:30 (1)**
65:5
**82nd (1)**
21:8