# EXHIBIT E
# PART 1

COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - X

SHERRIE DEANDA,

Plaintiff,

13 CV 1203 (KMK)

-against-

TIMOTHY HICKS, ANGELA CORPORALE, ROBERT PAVONE AND WILLIAM THOMAS IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES AS POLICE OFFICERS OF THE COUNTY OF WESTCHESTER,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - X

March 31, 2014
2:02 p.m.

EXAMINATION BEFORE TRIAL of the Defendant, TIMOTHY HICKS, taken pursuant to Order, held at the offices of Aronwald & Pykett, Esqs., 81 Main Street, White Plains, New York, before a Notary Public within and for the State of New York.

* * *

SANDY SAUNDERS REPORTING
254 South Main Street
Suite 216
New City, New York 10956
(845) 634-7561

A P P E A R A N C E S:

ARONWALD & PYKETT, ESQS.
Attorneys for Defendant
81 Main Street
Suite 450
White Plains, New York 10601

BY: WILLIAM I. ARONWALD, ESQ.

ROBERT F. MEEHAN
Westchester County Attorney
Attorney for County Defendants
600 Michaellan Office Building
148 Martine Avenue
White Plains, New York 10601

BY: TARYN A. CHAPMAN-LANGRIN

Also Present:

Sherrie Deanda

* * *

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties hereto that filing and sealing are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within examination may be signed and sworn to before any Notary Public with the same force and effect as though signed and sworn to before this Court.

(At the request of Mr. Aronwald the following documents were marked.)

(Whereupon, Third Amended Complaint was marked Plaintiff's Exhibit 1 for identification.)

(Whereupon, Answer To Third Amended Complaint was marked Plaintiff's Exhibit 2 for identification.)

(Whereupon, Defendant Hicks' Discovery Responses to Document Request and Responses to Interrogatories was marked Plaintiff's Exhibit 3 for identification.)

(Whereupon, Defendants' Disclosures Pursuant To Rule 26(a) was marked Plaintiff's Exhibit 4 for identification.)

T I M O T H Y  H I C K S, a Defendant herein, having been first duly sworn by Gale Salit, a Notary Public of the State of New York, was examined and testified as follows:

THE REPORTER: May I have your full name, please?

THE WITNESS: Timothy J. Hicks.

THE REPORTER: May I have your address?

- Timothy Hicks -

THE WITNESS: 1 Saw Mill River Parkway, Hawthorne, New York 10532.

EXAMINATION BY

MR. ARONWALD:

Q Officer Hicks, prior to coming here today to testify have you reviewed any documents in connection with this case?

A Yes.

Q What documents have you reviewed?

A The case file.

Q Okay.

A Felony Complaint.

Q When you say Felony Complaint are you referring to the incident report or are you referring to something that's separately referred to as a Felony Complaint?

A The Felony Complaint against the plaintiff.

Q And when you talk about case file, does that include what is referred to as the incident report?

A Correct.

Q Are there any other documents that are contained within the case file that are different

from the incident report?

A No.

Q So when you say case file you're referring only to the incident report?

A The case file -- anything in the case file was the entire arrest report that was sent to the District Attorney's office.

Q Where is the case file?

A Usually they are stored at our headquarters.

Q You said --

A So I reviewed a copy of the case file provided by counsel.

Q In other words, your attorney gave you a copy of the case file and you reviewed that?

A Correct.

Q Do you know whether the case file was provided by your counsel to plaintiff's counsel in this case?

A I don't know that.

MR. ARONWALD: So I will ask counsel. Have you provided me with the case file that the witness is referring to?

MS. CHAPMAN-LANGRIN: Absolutely.

There's a document, which I happen to have in front of me which is my copy, it says Westchester County Patrol Services Division and it has confidential on it.

MR. ARONWALD: When was that provided to me? Was that a Rule 26 discovery --

MS. CHAPMAN-LANGRIN: It might have been.

MR. ARONWALD: -- or was that in defendant's discovery responses to the --

MS. CHAPMAN-LANGRIN: I think it was Rule 26. Rule 26.

Q I show you what's been marked as Plaintiff's Exhibit 4 for identification. If you would turn to the fifth page. Is that what you're referring to?

A Yes.

Q That would be the case file that was provided to you by your attorney?

A Yes.

Q That's what you reviewed in anticipation of your testimony today?

A Yes.

Q When was it that you reviewed that?

A Friday.

Q So other than the case file and the Felony Complaint, did you review any other documents?

A I reviewed my notebook.

Q Anything else, other than your notebook?

MS. CHAPMAN-LANGRIN: Can I help him?

MR. ARONWALD: No.

Q Anything else other than your notebook?

A Oh, I reviewed a tape from Police Officer Caporale's police vehicle.

Q By the way, was your vehicle equipped with a video recorder?

A Yes.

Q Was your video recorder operational on May 28th of 2012?

A Yes.

Q Was the video recorder in operation during the stopping, questioning and arrest of Sherrie Deanda?

A Yes.

Q Where is that video?

A The video was not saved nor requested by the District Attorney prosecuting the case. As per my general orders, I'm not required to save said video. After six months the video is then removed from our database and no longer available because it was not requested.

Q Okay. The way the video operates is as soon as you put your lights on the video turns on, is that it?

A Correct.

Q The video continues to work until such time as you turn the video off?

A Correct.

Q And the video also captures audio as well as video?

A Correct.

Q So essentially from the time you put your lights on at least up until the time that you placed the plaintiff into your police car the video and the audio were operational, correct?

A Yes.

Q And they were operating?

A Yes.

Q So did you have a chance, by the way,

ever to look at the video?

A No.

Q But you understood at that time that the reason the video is prepared is to be used in connection with a criminal prosecution among other reasons, correct?

MS. CHAPMAN-LANGRIN: Just note my objection.

Q Correct?

A Can you say that one more time?

Q On the date of the incident, May 28th of 2012, it was your understanding that the reason that the video is made, the video and audio portions are made is for possible use in connection with any litigation arising from the stop and the arrest, correct?

A Possible use, yes.

Q Possible use. And as well as to protect you from any later claims by the person that you're stopping or arresting of police brutality or anything along those lines, correct?

A Yes.

Q By the way, who is the person who actually erased the video or destroyed the video?

MS. CHAPMAN-LANGRIN: Just note my objection to form.

A After six months it is just removed from our database, stored for six months. If it's requested that it can be obtained and given to the requesting party.

Q So you said that at no time did the District Attorney request the video?

A I can't say that for sure.

Q Do you have any knowledge that within the six-month period from May 28th, 2012 that there was no request by anyone to have that video preserved, do you know that for a fact?

MS. CHAPMAN-LANGRIN: Objection.

A No one requested it.

Q How do you know that?

A That I know of. No one requested it that I know of.

Q When you are saying it's removed from the database, when you use the word removed are you saying that it is erased or deleted?

A No, it's only stored in storage for six months.

Q Stored where?

A On our database at headquarters.

Q So is there some program where after six months it is automatically removed from the database or does someone mechanically have to go in to the program and remove it, if you know?

A I can't say for sure.

Q If I understand you correctly, the video would have been in the database for a period of six months from May 28th, 2012, correct?

A Yes.

Q The charges that you brought against Sherrie Deanda on May 28th of 2012, those charges were subsequently dismissed in the Yonkers City Court on July 25th of 2012, correct?

A I don't know when the charges were dismissed. I was never told, so I can't say that.

Q But anyway you would agree that the case was certainly pending in the Yonkers City Court until whenever it was that the charges were dismissed, correct?

MS. CHAPMAN-LANGRIN: Do you know?

A Yeah.

Q So if we were to assume for purposes of this discussion that the charges were not dismissed in the Yonkers City Court until July 25th, since that was less than two months from the date of the arrest, the video should have still been within the database of the Westchester County Department of Public Safety?

A Should have been.

Q Did there come a time when you learned that a Notice of Claim had been filed by Sherrie Deanda against among others you?

A Yes. I don't know exactly when it was, though.

(Recess held.)

Q Did you actually see the Notice of Claim that was filed against you in this case?

A Yes, a long time ago.

Q Do you recall when it was that you saw it?

A No.

Q Do you recall how it was that you first saw it?

A I believe my Special Investigations Unit Sergeant Greer served me the notice.

- Timothy Hicks -

Q Do you recall that the notice had a date on it?

A No.

Q Did you happen to take notice to see how close in time it was that your sergeant served the notice on you with respect to the date on the notice?

A No.

Q So as of that date you were aware that a Notice of Claim against you had been filed and that there was a possibility that you were about to be sued in connection with your arrest of Sherrie Deanda, correct?

A Yes.

Q So at that time what, if anything, did you do to make sure that the video that was stored in the database was not going to be removed from the database?

A I didn't do anything with it.

MR. ARONWALD: Can I have this marked as Plaintiff's Exhibit 5, please?

(Whereupon, Notice of Claim was marked Plaintiff's Exhibit 5 for identification.)

Q You can take a moment to look at that

if you'd like.

A (Perusing document.) Okay.

Q So that's the Notice of Claim that you were served by the sergeant?

A I can't say for sure that this was the exact form.

Q Are you saying you have no recollection of ever seeing that before today?

A No.

Q No, you have never seen it before today or no, you're not saying that you have not seen it before today?

A I can't say for sure that this is the actual form that I received.

Q But you do recall that you were served by your sergeant with a Notice of Claim signed by Sherrie Deanda against you, correct?

MS. CHAPMAN-LANGRIN: Objection. That's really not what he said. He said he can't recall if this is it.

MR. ARONWALD: I understand that and I didn't ask him whether this is it.

Q I'm asking, you did say a moment ago that you do recall being served with a Notice of

- Timothy Hicks -

Claim by your sergeant, a Notice of Claim by Sherrie Deanda against you relating to your May 28th, 2012 arrest, correct?

A Yes, but I can't say that this is the form that was served to me.

Q Did you make any entry in your memo book or in any of your diaries, account ledgers, anything like that, which indicates the date on which you were served with a copy of the Notice of Claim?

A No.

Q When you were served with the Notice of Claim your sergeant handed it to you, correct?

A I was informed over the telephone that there was a claim against me. That's how I was notified. I received a document in my mailbox of such a claim.

Q What, if anything, did you do with the document that you received in your mailbox?

A I don't recall.

Q How soon after you were notified by phone was it that you received the document in your mailbox?

A I don't recall.

- Timothy Hicks -

Q Well, was it like shortly thereafter or was it a week?

A I don't recall.

Q You have no recollection at all?

A No.

Q Do you have any recollection of destroying, throwing away or otherwise disposing of the document that was in your mailbox?

A No.

Q Before that had there ever been a Notice of Claim filed against you in connection with your official duties as a police officer of the County of Westchester?

A Never.

Q So this was a new experience for you?

A Correct.

Q So as you sit here now do you have any reason to believe that the Notice of Claim or the document that you received in your mailbox is still within your possession?

A Yes.

Q You have reason to believe it's not in your possession?

A No, I have reason to believe it still

is.

MR. ARONWALD: I'm calling for the production of the document that was in his mailbox.

DATA REQUESTED:______________________________

MS. CHAPMAN-LANGRIN: Okay. I'll take it under advisement. I'm not sure how it's relevant, but --

MR. ARONWALD: It's a Notice of Claim, I want to make sure -- I want to see when it was he received the Notice of Claim as it relates to a potential spoliation claim here.

Q After you received the Notice of Claim did you undertake any action whatsoever to ensure that the video that was made from your police car on May 28th, 2012 as it relates to your stopping and arresting Sherrie Deanda was not removed from the database?

A As I said before, I'm not required to by my general orders to save such video.

Q I'm not asking what your general orders require. I'm asking you whether or not once you knew that there was a potential for a

lawsuit being filed against you, a claim that you had falsely and maliciously arrested and prosecuted Sherrie Deanda, did you at that time do anything to make sure that the video that you made of your stopping her on May 28th, 2012 was not removed from the database?

A No.

Q By the way, in terms of the way the video operates, is there a way where you can disable the audio function of the video so that only the visual image is preserved, if you know?

A No.

Q By the way, before you begin a tour is it your custom and practice to check to make sure that all of the equipment that's supposed to be in the patrol car is in fact in working order?

A Yes.

Q As part of that practice and procedure, on May 28th, 2012 did you verify that the video and audio device within the patrol car was in fact in working order?

A Yes.

Q So as part of practice and procedure, and I just want to go through this. So from the

point that you began to pursue Sherrie Deanda on May 28th, 2012, and we'll get into the circumstances shortly, you put on your overhead lights, correct?

A To stop her, is what you're asking me?

Q Yes. But the camera doesn't begin to work until the lights are put on; is that correct?

A It records 30 seconds prior.

Q It records 30 seconds prior. So is it something that you have to initiate?

A When you turn the lights on it will start recording 30 seconds prior to your lights being activated.

Q I understand, okay.

So as soon as you put your lights on it began recording beginning 30 seconds before you actually put the lights on?

A Correct.

Q Do you have to manually do something to turn the video off or does it turn off automatically upon the occurrence of an event?

A You have to manually push stop recording.

- Timothy Hicks -

Q On May 28th, 2012 when was it that you pushed the button to manually stop the camera from recording?

A Back at headquarters.

Q So, in other words, any conversation that was taking place in the car would have been recorded, correct?

A Correct.

Q By the way, the camera that's in the car, is that a camera that simply projects forward or is there also a camera in the car which also projects backward into the rear seat?

A There's a camera in the back seat too.

Q Does the camera in the back seat also automatically engage as soon as you put the lights on?

A No, you have to manually switch them over.

Q You manually switch them over from front to back. So in other words, there's only one camera working at any given time?

A Correct.

Q On May 28th, 2012 did there come a time when you turned the camera that faces front

off and the camera that faces back on?
A I don't recall.
Q But regardless of whether you turned the camera facing front to the camera facing back was the one that was working, the audio function would still be working, correct, regardless of which camera it was?
A It should have that, yes.
Q So do you recall whether or not once you placed Sherrie Deanda in the police car, did you have any conversation with her while either of the two cameras was working?
A While she was in the back of the police car is what you're asking?
Q Yes. Let me withdraw the question.
As I understand from your testimony, the camera began working as soon as you put the lights on, correct?
A Correct.
Q The camera continued to work until you manually turned it off, which according to your testimony was when you got to headquarters?
A Correct.
Q At any time during the period when you

were transporting her from the scene of the arrest to headquarters in Hawthorne did you have or engage in any conversation with her?

A Very minimal.

Q But whatever that conversation was, it would have been recorded?

A Would have been.

Q Do you recall specifically what, if any, conversation you had with her during the period that you were transporting her from the scene of the arrest to headquarters? I'm not asking you to guess. I'm just asking what you recall.

A I can't recall precisely what was said other than telling her what she was under arrest for, saying when we get back we'll get somebody to pick the kids up.

Q When you get back to headquarters?

A Correct.

Q You'll have somebody pick the kids up. Is that something you said to her or she said to you?

A No, it's something that I said to her, we'll have somebody pick the kids up.

Q But at that time you understood that the kids were being separately transported to headquarters by a fellow officer?

A Correct.

Q And that was Officer?

A Angela Corporale.

Q By the way, lest I forget when we get into the circumstances of the arrest, other than yourself and Officer Corporale, were there any other police officers at the scene of the arrest on May 28th, 2012?

A No.

Q Were there any other officers involved in the stoppage and arrest and search of the car other than you and Officer Corporale?

A No.

Q And in terms of the search of the car, did both you and Officer Corporale search the car or was it only one of you?

A We did not search the car.

Q Did you look through the car at the scene before the tow truck removed the car?

A We inventoried the car.

Q So what you did was you conducted what

is often referred to as an inventory search of the car?

A Correct.

Q And an inventory search of the car is designed to record everything in the car, correct?

A To safeguard the property that's in the car.

Q Safeguard the property in the car, to again protect the arresting officer from any later claims that there was stuff in the car at the time of the stop which was no longer in the car when it was released, correct?

A Correct.

Q When you do an inventory search of the car, who conducted the inventory search on May 28th, 2012?

A Both myself and Officer Corporale.

Q It is custom and practice that there be two officers present when an inventory is being conducted so that there's a witness to what was observed in the car, correct?

A No.

Q Is there another reason why two

officers do an inventory search of the car?

A It's not required.

Q It's not required that there be two officers doing the inventory?

A No.

Q In this case at the time of the inventory where were the two children that were in the car?

A At the time of the inventory the two children were in Officer Caporale's police vehicle.

Q So at the time that the kids were in Officer Caporale's police vehicle during the period of time that you and she were doing the inventory of Sherrie Deanda's car, there was no one with the two children?

MS. CHAPMAN-LANGRIN: Just note my objection.

A As far as somebody being in the vehicle with them, no.

Q Or by the vehicle just making sure that the two kids were okay?

A The kids were fine in the back of the police car.

Q The kids were confined to the back of the police car?

A They were fine, not confined. I said fine.

Q The kids were fine, okay. But however they may have been at the time they were placed in the police car, there was no one there to make sure they continued to be fine while the inventory search was being conducted, correct?

A We were within close proximity of the police vehicle.

Q Okay. But while you were in close proximity of the police vehicle, your attention was focused on what was in the car, not the two children in the back of the car, correct?

A My attention was also focused on the prisoner that I had in the back of my patrol vehicle.

Q Your patrol vehicle was locked.

A Both vehicles were locked.

Q Your arrestee, Sherrie Deanda, was in handcuffs?

A Yes, at the time of inventory.

Q In fact, it's custom and practice

that -- well, she was handcuffed at the time you put her in the back of the car, wasn't she?

A No.

Q When was she handcuffed?

A She was handcuffed by Angela Corporale and searched by Angela Corporale after she arrived on scene. When Angela Corporale arrived on scene the plaintiff was already in the back of my patrol vehicle for my safety and for the children's safety.

Q So just so I understand. You are saying with absolute certainty that the person that placed Sherrie Deanda in handcuffs was not you?

A Correct.

Q But was Officer Corporale?

A Correct.

Q I asked you before whether you had seen any documents in preparation for your testimony and you said that you had scene the case file, the Felony Complaint, your notebook and the tape that was made from Officer Caporale's car, correct?

A Correct.

Q How long after you stopped Sherrie Deanda was it that Officer Corporale arrived on the scene?

A The arrest time was recorded at 8:12. So the stop of the vehicle was at 7:51. 7:51. So 21 minutes.

Q By the way, did she arrive on the scene of her own volition or did she arrive on the scene because you had requested backup?

A I requested a female officer to conduct a prisoner search and to have a female present to avoid false accusations.

Q How soon after you stopped Sherrie Deanda was it that you made a determination that you were going to place her in custody?

A After I spoke to the operator of the vehicle --

Q When you say operator, just so we are clear --

A The plaintiff.

Q -- can you just use the person's name? Her name is Sherrie Deanda.

A Sherrie Deanda. After I stopped Sherrie Deanda and I determined that I was going

to make an arrest I advised my communications that I needed a female officer.

Q The stop of the car was you said at what time?

A 7:51 a.m.

Q 7:51 a.m., that's when you stopped the car?

A Correct.

Q At what time was it that you decided you were going to arrest her?

A I made a determination that I was going to arrest her within a few minutes after speaking to her. And I returned to my patrol vehicle to get a female officer there. I can't exactly tell you how long.

Q When you say a few minutes, can you quantify for that; is a few minutes less than five minutes?

A I would say within five minutes of speaking to Sherrie Deanda.

Q So if you stopped her at 7:51, then by 7:56 you would have made a determination that you were going to arrest her?

A Correct.

Q And yet you waited 16 minutes before you asked for backup by a female officer?

A I never said that.

MS. CHAPMAN-LANGRIN: Objection. That's not what he said.

Q 21 minutes. Excuse me. Did you just say 21 minutes?

MS. CHAPMAN-LANGRIN: That's not what he said. He said it took 21 minutes for her to arrive I believe.

MR. ARONWALD: Can you read back the portion where it was mentioned about 21 minutes?

(The requested answer was repeated.)

Q So 21 minutes after the stop is when Officer Corporale arrived on the scene, okay. So at what time was it that you requested backup? And again, if you don't know --

A I don't know what time it was.

Q I don't want you to guess.

You have no notebook entry or any other document or record which would reflect the time it was that you requested backup by a female officer, correct?

A No.

Q Or is that not correct?

A No.

Q Correct you don't have any documents or is that incorrect?

MS. CHAPMAN-LANGRIN: Well, I think it's a little confusing how you are stating the question. Objection to form.

Q Do you know of any documents that you prepared which would indicate the time at which you requested a backup by a female officer?

A No.

Q But when you requested the backup that was done over the police radio?

A Correct.

Q Do you know how long those radio calls are maintained by the Westchester County Department of Public Safety?

A No.

Q Do you know whether or not, for example, that radio call is still in existence?

A No.

MR. ARONWALD: So I'm asking for the production of any radio call that was made

by the witness requesting female backup on May 28th, 2012.

DATA REQUESTED:______________________________

MR. ARONWALD: And just for the record can we have a concession that Plaintiff's Exhibit 5 is in fact a copy of the Notice of Claim that was served on the county attorney? You have a copy, I gave it to you.

MS. CHAPMAN-LANGRIN: That was served on the county attorney?

MR. ARONWALD: Yes.

MS. CHAPMAN-LANGRIN: This looks like the Notice of Claim that was served on the county attorney.

MR. ARONWALD: And the date it was served was July 27, 2012 according to the receipt stamp?

MS. CHAPMAN-LANGRIN: Well, it was actually served on the county clerk. There's a stamp here that says July 27, 2012, served on the county clerk stamp.

MR. ARONWALD: Okay.

Q So now getting back to May 28th, 2012.

- Timothy Hicks -

The video camera that was turned on as soon as you put the lights on, that camera only records what can be seen through the windshield, the front windshield of the police car, correct?

A No.

Q What does it show?

A There's two separate cameras. There's one in the back seat, one in the front facing forward.

Q When you put the lights on it's the forward camera that's working, correct?

A Yes.

Q So my question is: When you put the lights on and the camera begins to record from 30 seconds before you turn the lights on, the picture that it is capturing is the picture that you are seeing through the front windshield of your car?

A Correct.

Q When you pulled her over and she pulled over, did you park your vehicle in back of her car, on the road beside her car or at some other position?

A Behind her vehicle.

Q Directly behind her vehicle?
A Slightly to the left.
Q Slightly to the left on to the lane of traffic, correct?
A Right.
Q The lights were still on?
A Correct.
Q How far behind her car was your car positioned?
A Approximately 15 feet.
Q Is the audio function based upon a device that you're wearing on your person or is it something that's self-contained within the camera?
A There's an audio remote that can be clipped to your person to record audio at the vehicle when you do a traffic stop, and there's also audio in the rear seat.
Q So at the time on May 28th, 2012 you were wearing the audio remote?
A I can't recall.
Q Well, would it have captured the audio, if you were not wearing the audio remote would the camera itself have captured the audio

portion?

A Inside my vehicle, yes.

Q Only inside the vehicle?

A If the remote was on, yes.

Q Was the remote on?

A I can't recall.

Q Well, was it your practice as of May 28th, 2012 when making a traffic stop to make sure that the audio was on?

A Say that one more time.

Q As of May 28th, 2012 was it your practice when making a traffic stop to make sure that the audio remote was on so that the camera would record both audio as well as visual?

A Yes.

Q You have no reason to believe that the audio remote was not on on May 28th, 2012?

A Yes.

Q Yes, you do or yes, you don't?

A I have no reason to believe it wasn't on.

Q When Officer Corporale arrived on the scene approximately 21 minutes after you stopped Sherrie Deanda where was her vehicle positioned

in reference to your vehicle?

A Directly behind mine.

Q By the way, just so we are clear, both your vehicle and her vehicle were marked vehicles?

A Yes.

Q And when she pulled up behind your vehicle her lights were on as well?

A Yes.

Q You indicated that one of the things that you saw was the tape that was made from her car?

A Correct.

Q And the tape that was made from her car you're referring to May 28th, 2012?

A Correct.

Q So what you're saying is that for whatever reason the tape that was made from her car was not removed from the database?

MS. CHAPMAN-LANGRIN: Well, he didn't say that. But if you want ask it a different way... I'm objecting to form.

Q You can answer the question anyway.

MS. CHAPMAN-LANGRIN: Well, I'm

objecting to form. So if you could rephrase it.

Q When was it that you saw the tape that was made from Officer Corporale's vehicle?

A Friday.

Q And how is it that you saw the video, who gave it to you to look at?

A Counsel.

Q When you say counsel you mean your attorney seated to your left?

A Correct.

Q Where was it that when you saw the video?

A In her office.

Q Was anyone present other than you and she?

A No.

Q Officer Corporale was not present?

A No.

Q Do you know when it was that that tape came into the possession of your counsel?

A No.

Q Do you know whether anyone requested that the video made from Officer Corporale's

- Timothy Hicks -

police vehicle not be removed from the database?

A Officer Corporale saved the video.

Q How do you know that?

A Because she marked it as evidence, okay, because the children were in the back of the vehicle.

Q So in other words, there is a procedure within the patrol guide or whatever it is that you operate under whereby the arresting officer can designate the video/audio recording as evidence in connection with the arrest, correct?

A That they may designate.

Q They may?

A Right.

Q But they are not required to?

A Correct.

Q In this case Officer Corporale in her discretion labelled the video that was made from her car as evidence?

MS. CHAPMAN-LANGRIN: Note my objection to form. We're not saying she labelled it as evidence. But I think what he's saying is she may have requested that

it be saved.

MR. ARONWALD: I think he said she labelled it as evidence, that's what he said.

MS. CHAPMAN-LANGRIN: Is that what he said, that she labelled it as evidence? Could you read it back, please, what he said?

MR. ARONWALD: Or saved it as evidence.

(The requested answer was repeated.)

Q So what you are saying, just so we are clear, Officer Corporale for whatever the reason marked the video that was made from her police car on May 28th of 2012 as evidence, correct; isn't that what you just said?

A Correct.

Q And the video, was that a video facing frontward or facing backward?

A The video as it starts was facing forward. When the children were put in the car she turned the camera around manually to the back seat.

Q And how long was it between the time

that she arrived on the scene with the lights flashing until she placed the two children in the rear of the car?

A I can't say for sure.

Q Well, would it have been more than five minutes?

A Approximately.

Q What occurred first, did she first search Sherrie Deanda and place her in handcuffs or did she first remove the children and put them in the back of her car?

A I removed Sherrie Deanda from my vehicle, walked around to the passenger side of my vehicle where Officer Corporale searched her for weapons, okay. And then handcuffed her and placed her in the rear of my vehicle.

Q And then?

A And then we removed the children and put them in the back of Angela Corporale's vehicle.

Q You say we, are you saying that you and Officer Corporale removed the children and put them in the back or did Officer Corporale do that herself?

A We both did. I walked the children back safely to her vehicle and we put them in the back of her vehicle.

Q Before Officer Corporale arrived on the scene did you do anything to ensure yourself that Sherrie Deanda was not carrying any weapons?

A No.

Q You didn't do a pat down?

A No.

Q So you are saying that from the time that you removed her from the car and put her in the back of your car you did not do anything to determine whether she was in possession of any weapons?

A No.

Q And that was not done until Officer Corporale arrived on the scene?

A Correct.

Q You also testified a moment ago that you're absolutely certain that it was Officer Corporale and not you that handcuffed Sherrie Deanda?

A Correct.

Q By the way, in connection with your

status as a defendant in this case did you review any of the pleadings in this case? You know what I mean by pleadings?

A No, not specifically.

Q Did you review the Complaint that was filed in Federal Court by Sherrie Deanda against you?

A Yes.

Q Did you meet with your counsel to review the Complaint allegations?

A Yes.

Q And did you meet with your counsel concerning her preparation of your Answer to the Complaint that was filed against you by Sherrie Deanda?

A Yes.

Q Did you review the Answer before it was served on plaintiff and her counsel?

A Review the Answer?

Q Yes. In other words, after your attorney prepared your Answer to our Complaint were you given an opportunity to review it to make sure that it accurately refected your recollections of the circumstances of May 28th,

2012?

A Yes.

Q Would you please take a look at what is marked as Plaintiff's Exhibit 2? And would you take a look at that and tell me whether or not you recognize that as the Answer that was filed and served on your behalf in this case?

A (Perusing document.) Yes.

Q Now, would you also take a look at what's been marked as Plaintiff's Exhibit 1, the Third Amended Complaint?

A Yes.

Q You did review that, correct?

A Yes.

Q Would you look at the Third Amended Complaint, specifically paragraph sixteen of the Complaint?

A (Complying.)

Q And that reads, paragraph sixteen, "Defendant Hicks then ordered plaintiff out of her automobile, arrested and handcuffed her and then placed her inside his police vehicle."

You see that that's what is alleged in paragraph sixteen of the Third Amended Complaint?

A Yes.

Q Now would you please turn to your Answer, which is Plaintiff's Exhibit 2 I believe, and would you turn to paragraph thirteen of your Answer?

A Okay.

Q Paragraph thirteen reads, "Admits the allegations contained in paragraph sixteen of the Third Amended Complaint." You see that?

A Okay.

Q So in your Answer you are admitting that you "ordered plaintiff out of her automobile, arrested and handcuffed her and then placed her inside his police vehicle."

You see that, correct?

A Correct.

Q When your counsel gave you the Answer to review did you at that time tell her --

MS. CHAPMAN-LANGRIN: Note my objection. Attorney/client privilege. You are going there.

Q Just so we're clear, because I'm not sure that I had asked this before. At no time did you mark the video/audio tape that was made

- Timothy Hicks -

in connection with the May 28th, 2012 --

MS. CHAPMAN-LANGRIN: Asked and answered.

MR. ARONWALD: Excuse me, ma'am, I didn't ask this question.

MS. CHAPMAN-LANGRIN: You did.

MR. ARONWALD: No, I did not.

MS. CHAPMAN-LANGRIN: You did.

MR. ARONWALD: Well, if I did I'll ask it again.

MS. CHAPMAN-LANGRIN: You are not supposed to ask the same question --

MR. ARONWALD: I disagree with you that I asked it.

MS. CHAPMAN-LANGRIN: You did.

MR. ARONWALD: You want to fight over it or what?

MS. CHAPMAN-LANGRIN: I'm objecting. You already asked him that.

Q Did you mark the video/audio tape as evidence?

A No.

MS. CHAPMAN-LANGRIN: Objection.

Q By the way, in connection with this

case did you do anything to actually verify that the video/audio tape has in fact been removed from the database?

A No.

MR. ARONWALD: So I'm calling for the production of the video that was made from his police car on May 28th, 2012 to the extent that it is still within the database.

MS. CHAPMAN-LANGRIN: It is not within the database.

MR. ARONWALD: I know, but how do we know that?

MS. CHAPMAN-LANGRIN: Because I'm telling you that it's not within the database. He didn't conduct the search, I did.

MR. ARONWALD: So you're representing that you conducted a search and you were told that the video that had been made from his police car on May 28th has been removed from the database?

MS. CHAPMAN-LANGRIN: Yes, I was told that.

MR. ARONWALD: Then I'm asking that

you advise us as to the date on which it was removed from the database.

MS. CHAPMAN-LANGRIN: I object. He already testified it's been removed.

MR. ARONWALD: No, he testified --

MS. CHAPMAN-LANGRIN: Counsel, you are interrupting me. He testified it's usually automatically removed within six months. So six months from the date of the incident it would have automatically been removed.

MR. ARONWALD: I'm asking that we verify that. I think I'm entitled to know when it was removed from the database. He's testified to what his understanding is. He's also testified that he's not responsible for the removal. I think we're entitled to know when it was removed.

MS. CHAPMAN-LANGRIN: We'll take it under advisement.

MR. ARONWALD: Just let the record reflect that I made the request.

MS. CHAPMAN-LANGRIN: Absolutely.

DATA REQUESTED:______________________________

Q By the way, I'm showing you what has

been marked as Plaintiff's Exhibit 4 for identification. I think you have that in front of you, Plaintiff's Exhibit 4. Plaintiff's Exhibit 4 is Defendant's Disclosures Pursuant to Rule 26(a).

Have you seen this document --

A No.

Q -- before today?

A No.

Q You have not, okay.

So you're saying that up until my handing this to you your counsel had never shown this to you?

MS. CHAPMAN-LANGRIN: Defendant's Disclosure Pursuant to Rule 26(a)?

MR. ARONWALD: Yes.

MS. CHAPMAN-LANGRIN: No, I did not show him that specific document.

MR. ARONWALD: Excuse me, ma'am, you're not testifying. I'm asking him a question.

Q The question is: Are you saying that until I just handed this to you today you had never before seen what has been marked as

Plaintiff's Exhibit 4?

A No.

Q Showing you what's been marked as Plaintiff's Exhibit 3 for identification, which was Defendant Hicks' Discovery Response to Document Requests and Response to Interrogatories. Have you ever seen this document before today?

A No.

Q When your lawyer showed you the Answer that was going to be filed did you make any corrections in it?

A Which Answer, what are you talking about?

Q The Answer that I showed you before.

A I don't know what you're talking about, you have to tell me.

Q Okay, no problem. Happy to do it.

MS. CHAPMAN-LANGRIN: I think it's getting into a little bit of attorney/client privilege.

MR. ARONWALD: I'm asking whether he made any corrections. I'm not asking whether he told you there were any

corrections. I'm asking whether he made any corrections, did he mark the document up.

MS. CHAPMAN-LANGRIN: Which one are you talking about?

MR. ARONWALD: The Answer to the Third Amended Complaint.

Q Did you make any corrections to that?

A I've only spoken to my counsel over the phone. I never made any written corrections of any form.

Q But you testified that you had seen the document, correct?

MS. CHAPMAN-LANGRIN: You didn't ask him when, when he had seen it.

Q When did you see the document for the first time, if you remember?

A This Amended Complaint or --

Q The Answer to the Third Amended Complaint.

MS. CHAPMAN-LANGRIN: Which is Exhibit --

Q It's Plaintiff's Exhibit 3, isn't it?

A This is 2. I don't know. 3, 4, 2.

Q Plaintiff's Exhibit 2.

- Timothy Hicks -

A Okay.

Q That's the document in wh the allegations in paragraph sixtee. Complaint. So I'm asking you when was the fi.. time you saw that document?

A I can't recall.

Q Was it earlier than Friday?

A No.

Q So any conversations that you had with your attorney concerning the preparation of the Answer was by phone?

MS. CHAPMAN-LANGRIN: You know, I strenuously object. It's attorney/client privilege.

MR. ARONWALD: I'm not asking what he said to you. He already testified that he had discussions with you concerning the preparation of your Answer to the Complaint. I'm just trying to narrow it down.

Q So whatever discussions you had with her concerning her preparation of an Answer to the Complaint was over the telephone?

MS. CHAPMAN-LANGRIN: Over objection.

A Yes.

Q Included within the universe of documents you looked at in connection with this case, did you also have an opportunity to read the 50-h hearing transcript by Sherrie Deanda?

A Yes.

Q So when was it you reviewed that?

A Friday.

Q Were you provided with any documents by your counsel on Friday to review over the weekend?

MS. CHAPMAN-LANGRIN: Note my objection to form.

Q Were you provided with any documents by your attorney on Friday in connection with this case?

A Yes.

Q What documents?

A A case file, the Felony Complaint, the Amended Complaint and the 50-h.

Q Transcript?

A Right.

Q Did you read that over the weekend, any of it?

A Yes.

- Timothy Hicks -

Q Prior to your appearance here today, other than with your attorney, did you have any discussions concerning the facts of this case with anyone?

MS. CHAPMAN-LANGRIN: Other than with his attorney.

MR. ARONWALD: I said other than his attorney.

A No.

Q Since the inception of this lawsuit, have you had any discussions with any of your co-defendants, namely Robert Pavone, Angela Corporale or William Thomas?

A No.

Q What is your education?

A I have an Associate's Degree in criminal justice.

Q From where?

A Dutchess Community College.

Q Is that a two-year program?

A Correct.

Q When did you receive that degree?

A 2005.

Q Was that the highest level of

education you have?

A Correct.

Q What high school did you graduate from?

A Millbrook High School.

Q Near Sky Acres?

A Yes.

Q By the way, how old are you?

A I'm 28.

Q What's your date of birth?

A 7/14/85.

Q Social?

RULING CONTEMPLATED:_______________________

MS. CHAPMAN-LANGRIN: Note my objection. For what reason?

MR. ARONWALD: Same reason you asked her for her social.

MS. CHAPMAN-LANGRIN: That's because she also had some emotional and some mental stress and I need to get medical records.

What's your reason for asking him?

MR. ARONWALD: Basically you're objecting to his being able to answer social security?

- Timothy Hicks -

MS. CHAPMAN-LANGRIN: I am.

MR. ARONWALD: Mark the question for a ruling.

Q Your employment history?

A I was employed from 2005 to 2006 as a part-time deputy sheriff with the Dutchess County Sheriff's Office. From 2006 until 2008 I was employed by the New York State Park Police, Long Island region. 2008 till current I've been employed by the Department of Public Safety, Westchester County Department of Public Safety.

Q Since your employment by the Westchester County Department of Public Safety could you please take us through what your various work assignments were?

A Since my employment from Westchester County?

Q Yes.

A I've been assigned to the patrol division and currently cover the Bronx River Parkway.

Q As part of the patrol division?

A As part of the patrol division.

Q So from 2008 until the present you've

- Timothy Hicks -

been assigned to the patrol division?

A Correct.

Q And your duties as part of the patrol division consist of what?

A Provide police services to county residents and patrons of any park, parkway or county property in the County of Westchester.

Q For how long is it that you've been assigned to patrol the Bronx River Parkway?

A I would say the last two years.

Q So prior to May 28th of 2012 for how long had you been assigned to patrol the Bronx River Parkway?

A Prior to that I was the 72 car which encompass the entire county, and I was covering the Bronx River Parkway then too.

Q You say for the last two years you've been assigned to patrol the Bronx River Parkway?

A Correct.

Q So your assignment to patrol the Bronx River Parkway began prior to May 28th, 2012, correct?

A Yeah, the posts change. Sometimes they assign you to different places. But my --

mainly I cover the Bronx River Parkway.

Q That was your assignment on May 28th, 2012?

A Correct.

Q Are you married?

A No.

Q In terms of your Associate's Degree in criminal justice, that was a two-year program, what exactly was the course of study?

A Criminal Procedure Law, Penal Law, Vehicle and Traffic Law.

Q Just if you can basically elaborate on that. I mean when you say it was Criminal Procedure Law, Penal Law and Vehicle and Traffic Law, what do you mean? You took a two-year course of study, so what exactly -- what did the study consist of as it relates to the Penal Law?

A I took over 60 credits. I don't know exactly what -- this was in '05. I took physical education, English, social studies.

Q I'm only focusing now on that portion of the program that related to the Penal Law.

A Okay.

Q When you say that you were training or

studying the Penal Law, what did that consist of; the entire Penal Law, specific portions of the Penal Law?

A I would say specific portions. I don't think they covered the whole thing. I can't say for certain.

Q As part of the studying that you had at the Dutchess Community College criminal justice program, did you receive any training or study concerning the issue of probable cause?

A Yes.

Q Do you recall how much of the two-year program of study dealt with the issue of probable cause?

A No.

Q With respect to your work as a part-time deputy sheriff in Dutchess County during the period of 2005 to 2006, what do you mean by part time?

A I was part-time sheriff. I went through the full police academy. And was acting as a sheriff. All right. Sorry.

MS. CHAPMAN-LANGRIN: Just explain it the best way you can.

- Timothy Hicks -

A I was a part-time deputy sheriff, so as a sheriff that would be called in and fill in when they needed me to, in full duty as a police officer in the County of Dutchess.

Q I understand that. But I mean basically were you working any specific number of hours per week, any specific days per week?

A It fluctuated. It fluctuates between eight and twenty hours a week. Sometimes less, sometimes more.

Q So during the period of time that you were a part-time sheriff in Dutchess County did you have any other employment?

A I worked as a painter for Matt's Auto Body in Salt Point.

Q In where?

A Salt Point.

Q So that was your principal employment during those years, and the part-time sheriff was sort of just fill in as needed?

A They were both part time.

Q Did you make any arrests during the period of time that you were a part-time deputy sheriff in Dutchess County?

A Yes.

Q Were any of those arrests for criminal possession of a controlled substance?

A No.

Q When you worked --

A Correction. I was involved in arrests that were for criminal possession of controlled substances.

Q But you were not the arresting officer?

A No.

Q That was my next question. So as a part-time sheriff were you working in conjunction with other full-time deputy sheriffs?

A Correct.

Q And during the period of time in 2006 to 2008 you were working as a New York State Park Police, Long Island region, correct?

A Correct.

Q Did you make any arrests during those two years?

A Just arrests, you're just talking about arrests?

Q Yes.