# EXHIBIT F

**COPY**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
SHERRIE DEANDA,

Plaintiff,

-against- 13 CV 1203 (KMK)

TIMOTHY HICKS, ANGELA CAPORALE, ROBERT PAVONE and WILLIAM THOMAS IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES AS POLICE OFFICERS OF THE COUNTY OF WESTCHESTER,

Defendants.

------------------------------------x

April 4, 2014
1:10 p.m.

EXAMINATION BEFORE TRIAL OF Defendant, ANGELA CAPORALE, held at the offices of Aronwald & Pykett, Esqs., 81 Main Street, White Plains, New York, pursuant to Order, before Erika Caren, a Notary Public of the State of New York.

Caporale

25

A P P E A R A N C E S

ARONWALD & PYKETT, ESQS.
Attorneys for Plaintiff
81 Main Street, Suite 450
White Plains, New York 10601

BY: WILLIAM ARONWALD, ESQ.

OFFICE OF THE WESTCHESTER COUNTY ATTORNEY
Attorneys for Defendants
Michaelian Office Building
148 Martine Avenue, 6th Floor
White Plains, New York 10601

BY: TARYN A. CHAPMAN-LANGRIN, Sr. Assistant County Attorney

IT IS HEREBY STIPULATED AND AGREED by and between counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the times of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before this court.

A N G E L A   C A P O R A L E ,

stating her business address as 1 Saw Mill River Parkway, Hawthorne, New York 10532, having been duly sworn by the notary public, was examined and testified as follows:

EXAMINATION BY MR. ARONWALD:

Q. Officer Caporale, just a couple of preliminary matters. I'm going to be asking you a series of questions. If for any reason you don't fully understand the questions, let me know instead of trying to guess at what I'm asking you. If you don't hear the entire question, just tell me that because I don't want you to guess as to what the unheard portion was. If any of my questions are confusing, let me know that as well.

I represent Sherrie Deanda. She's the plaintiff in the Federal civil rights action that was brought against you and three other members of Westchester County Department of Public Safety. That's what these questions will be about.

Before appearing today to be deposed, have you reviewed any documents?

A. Documents, my notebook entry.

MR. ARONWALD: Let's mark these two

pages as Plaintiff's Exhibit 6.

(Plaintiff's Exhibit 6, two pages of handwritten notes, marked for identification.)

Q. I'm going to show you what has been marked as Plaintiff's Exhibit 6. Would you just take a look at these two pages and tell me if you know what they are.

A. My notebook entry.

Q. As pertains to this case?

A. As pertains to May 28 of 2012.

Q. According to these notes, you were working 7:00 to 3:00 that day?

A. Yes.

Q. We'll get back to that in a minute.

Did you review any other documents prior to appearing today?

A. Dispatch log.

Q. What log?

A. Dispatch log.

MR. ARONWALD: Would you mark this as Plaintiff's Exhibit 7.

(Plaintiff's Exhibit 7, dispatch log, marked for identification.)

Q. Showing you Plaintiff's Exhibit 7, is that

Caporale

the dispatch log?

A. Yes.

Q. This is a document prepared by whom?

A. This is a record of the times that I was involved in a job.

Q. In the document, it doesn't identify itself as a dispatch log.

It just has some entries on it, correct?

A. Correct.

Q. It indicates that on May 28, at 2:07, the desk officer -- would that be Lieutenant Sullivan?

A. Yes.

Q. He was the desk officer at 2:07 or he was the person in charge of the tour that day?

A. He's the lieutenant in charge of the tour.

Q. At least during part of the period of your tour?

A. Yes.

Q. And the entry WC-042014-12, do you know what those numbers mean?

A. That's the blotter number for the job that this reflects.

Q. And this physical document itself, this was printed out January 17, 2014 at 15:46 or 3:46 in

the afternoon, correct?

A. That's what it says.

Q. It says, caller, call type, prisoner transport, and then it has caller, Sherrie Daenda, D-a-e-n-e-a.

What does the word caller signify?

A. That's just the way for them to identify the job.

Q. That doesn't mean she made a phone call?

A. No.

Q. In fact, at 2:07 on May 28, 2012, Sherrie Deanda was a prisoner in the custody of the Westchester County Department of Public Safety, correct?

A. Yes.

Q. Location of assignment, 77 South Lexington Avenue, White Plains, APT, Court.

What does APT stand for?

A. Apartment.

Q. The White Plains Court, it says, apartment and court.

We're talking about White Plains City Court, correct?

A. Correct.

Caporale

Q. Business name, White Plains Court. Description, one female from holding cell.
That refers to Sherrie Deanda?
A. Correct.
Q. Holding cell is a holding cell at the Westchester County Department of Public Safety headquarters in Hawthorne, correct?
A. Yes.
Q. And then officers involved, it has your name and serial number C1029.
That's your shield number?
A. Yes.
Q. Rank is PO, meaning police officer, correct?
A. Yes.
C1029 is actually my identification number. My shield number is 1025, but 1029 identifies me.
Q. Unit, it says, TRANS number 1.
A. Yes.
Q. What does that signify?
A. Transport 1.
Q. Transport one prisoner?
A. No. Transport 1 would be my I.D.

Caporale

Q. You were dispatched at 1:07, and ARV time 14:07.

What is that?

A. That's the arrival time. It's not a dispatch time. It's the time that I was en route.

Q. And 15:19, does that indicate the time that you arrived at White Plains City Court?

A. 15:19 would be the completion time of the job.

Q. In so far as any post-arrest activities, there came a time when you were assigned to transport Sherrie Deanda from the headquarters in Hawthorne to the White Plains City Court, correct?

A. Yes.

Q. And that was for the purpose of having her taken before a judge for the purpose of having bail set, correct?

A. For an arraignment.

Q. But there was no D.A. present, was there?

MS. CHAPMAN-LANGRIN: You can ask her if there was one.

Do you know?

A. I don't remember.

Q. Do you remember anything taking place that

day other than the judge setting bail in the amount of $5,000?

MS. CHAPMAN-LANGRIN: Note my objection to form.

A. I don't remember.

Q. What do you remember happened in the White Plains City Court once you brought Sherrie Deanda there?

A. She went into the courtroom to see the judge.

Q. Did you go into the courtroom also?

A. Yes.

Q. How long was she in that courtroom with the judge?

A. Maybe 20 minutes.

Q. Were there any other defendants there?

A. No.

Q. This was Memorial Day weekend?

A. Yes.

Q. And this arrest happened in the jurisdiction of the City of Yonkers?

A. Yes.

Q. Do you know how it is if she was arrested in the City of Yonkers she wasn't taken to the

Yonkers City Court and was taken to the White Plains Court?

A. Yonkers did not have court on the holiday.

Q. And that was Memorial Day?

A. Memorial Day.

Q. And as I understand your testimony, you don't remember whether there was an A.D.A. present?

A. I don't remember.

Q. Do you remember who the judge was?

A. No.

Q. Do you remember whether the judge was male or female?

A. No.

Q. Did you make any notes at all as to who the judge was?

A. No.

Q. Did you make any notes or memos as to what transpired in the White Plains City Court in your presence?

A. No.

Q. Do you know whether bail was set when you were with the prisoner in the White Plains City Court?

A. Bail was set.

Caporale

Q. Do you remember how much?

A. No.

Q. You said that she was taken there for arraignment.

A. Correct.

Q. When you use the term arraignment, what is your understanding of arraignment?

MS. CHAPMAN-LANGRIN: Just note my objection.

A. It's so that she can be advised of the charges against her and bail can be set, or she can be remanded to jail.

Q. Do you remember whether when she was taken to the White Plains City Court she was asked whether or not she was pleading guilty or not guilty?

A. I don't remember.

Q. Do you remember whether before you left the courtroom that day the judge instructed Sherrie Deanda as to when and where her next court date would be?

A. Yes.

Q. What do you remember she was told?

A. I don't.

Q. You remember that the judge told her when

she next had to be in court and what court it was, but you don't remember the specifics; is that correct?

A. Correct.

Q. Would it refresh your recollection if I told you that the judge instructed her to appear the next day in the Yonkers City Court?

A. No.

Q. Whenever that proceeding was completed in the White Plains City Court, was Sherrie Deanda released?

A. No.

Q. Did you have another assignment in terms of transporting her?

A. I transported her to the jail.

Q. To the Westchester County Jail?

A. Correct.

Q. Do you recall what time was it that you left headquarters with Ms. Deanda to take her to the White Plains City Court?

A. I don't recall. I could look at my notes and perhaps that would reflect it.

Q. Sure.

A. 14:50.

Q. To go through the notes, your tour began at 07:00, roll call was 5 minutes before then and Sergeant Thomas was the one that conducted the roll call?
A. Yes.
Q. And that's Sergeant William Thomas?
A. Yes.
Q. At 07:00 you were assigned 40A.
What is that?
A. 45 Adam.
Q. That's your call?
A. That's your unit, how you're identified.
Q. And VEH is vehicle?
A. Correct.
Q. And 14890 is the number of the vehicle?
A. Yes.
Q. At 7:25, you have available, parentheses, no AED.
What is that?
A. Automated external defibrillator.
Q. At 8:10 in the morning you have en route to B2S slash B, BRP at Vermont TER.
Could you tell us what that entry means.
A. En route to Baker 2.

Caporale

Q. Baker 2 would be the call sign for Officer Hicks?

A. Correct.

Q. Southbound is SB?

A. Yes.

Q. BRP is Bronx River Parkway?

A. Correct.

Q. And Vermont Terrace is where you were going?

A. The cross street.

Q. You were dispatched to go meet up with Officer Hicks, correct?

A. Correct.

Q. But that's not reflected in the dispatch log?

A. Not on this one.

Q. Is there another dispatch log that would reflect that, if you know?

A. This is the dispatch log for this particular assignment.

Q. You're going to meet up with Officer Hicks on May 28, that was a different assignment?

A. Correct.

Q. Would there be a dispatch log for that as

Caporale

well?

A. Yes.

*RQ MR. ARONWALD: We would ask for production of that pursuant to Rule 26.

Q. You have 8:10, en route to.

Does 08:10 signify when it was that you received the dispatch?

A. That's when I received it and when I was en route.

Q. The next entry is 08:16, on scene.

It took you six minutes from the time you received the dispatch to get to the scene where Officer Hicks was, correct?

A. Yes.

Q. When you were dispatched to that location, do you recall whether you were told what was occurring at that location and what your assignment or role would be?

A. Yes.

Q. And what was it?

A. To assist Officer Hicks with a female.

Q. At the time did you know that the female was under arrest?

A. No.

Q. Did you know why it was that Officer Hicks needed any assistance with a female?

A. No.

Q. As part of the rules, regulations and procedures of the Westchester County Department of Public Safety, as of May 28, 2012, was it the general practice that whenever a patrol officer was in the process of arresting a female that a female officer would be dispatched to assist in the arrest?

MS. CHAPMAN-LANGRIN: Note my objection to form, to assist in the arrest.

Q. Was there some rule, regulation or procedure in effect on May 28, 2012 which would indicate that under certain circumstances a female officer would be dispatched to assist a patrol officer with a female?

A. If a female is available, they would be dispatched to assist.

Q. You're saying at the time you did not know what you were assisting him with?

A. I knew that I was assisting him with a female.

Q. But you didn't know what assistance, if any, he required?

Caporale

A. Correct.

Q. It took you six minutes to get there, correct?

A. Yes.

Q. The next entry says, 09:02, on route to HQ, headquarters, with 2.

That means you had two people with you?

A. Yes.

Q. Do you know who those two people were?

A. Yes.

Q. Who were they?

A. Two children from the scene.

Q. Do you have any notes indicating what their names were?

A. I don't have any with me.

Q. Do you know what the ages of these children were?

A. Around ten.

Q. And you arrived at headquarters with the two children at 9:18 in the morning?

A. Correct.

Q. And then it was at 14:10 that you were en route to the White Plains City Court with Sherrie Deanda, correct?

A. Yes.

Q. What was the mode of transport?

When you transported her to the White Plains City Court, were you using the police vehicle that you were assigned that morning in which you transported the two children?

A. No.

Q. What kind of vehicle were you using?

A. Police van.

Q. Police van?

A. Correct.

Q. Was any other police officer with you at the time?

A. No.

Q. You were the driver?

A. Yes.

Q. And where was Sherrie Deanda during the period of transport?

A. In the back of the van.

Q. Is there anything separating the front compartment of the vehicle where the driver and the right seat passenger would sit and anybody that was in the rear of the van?

A. Yes.

Q. What is that?
A. A partition.
Q. Glass, plastic, plexiglass, metal, screen?
A. Metal.
Q. Was she restrained at all in the back of the van?
A. In handcuffs.
Q. Did she have any shackles on her legs, feet?
A. I don't recall.
Q. Is that something which is done, where if you're transporting a prisoner that their hands and legs would be shackled?
A. At my discretion for shackles.
Q. You don't recall on that day whether you placed her in shackles?
A. Correct.
Q. When you say, she was handcuffed, were her hands cuffed in front or back?
A. In front.
Q. Were the handcuffs secured to anything in the back of the van to make sure that she would not be moving around and trying to get out through the back door?

A. Her handcuffs would have been secured to a belt around her waist.

Q. If her legs weren't shackled then she was free to get up and move around in the back of the van?

A. You can't move around. There are seats and a divider. It would be divided in half, a couple of seats on one side and the other, and a partition in between that.

Q. When you placed her in the van, did you place her in the van through the rear of the van?

A. Yes.

Q. How many rows of seats are there in the van?

A. One row on each side.

Q. That row of seats is behind the two seats in the front of the van?

A. Correct.

Q. They're parallel to the seats in the front of the van, not vertical?

A. Correct.

Q. How many seats are there on each side of the partition?

A. Depends which van.

Q. On the van you used that day.

A. I don't know.

Q. What is the least amount of seats there would be in each row on each side of the partition?

A. Three.

Q. And the most?

A. Six.

Q. The only person that you were transporting was Sherrie Deanda?

A. Yes.

Q. Were you the one that removed her from the holding cell at the headquarters?

A. Yes.

Q. When she was in the cell, was she in handcuffs?

A. No.

Q. When you removed her from the cell, you were the one that placed her in handcuffs?

A. Yes.

Q. As I understand your testimony, she also wore a belt to which the handcuffs were secured?

A. Correct.

Q. Is that all one unit or you gave her a belt and the handcuffs and secured the handcuffs to

the belt?

A. The handcuffs are secured to the belt.

Q. The belt and the handcuffs are separate from each other, unless you're the one who secured the handcuffs to the belt, correct?

A. Yes.

Q. When you removed her from the cell, she was in the cell by herself or with other people?

A. By herself.

Q. And the cell was locked?

A. Yes.

Q. When you got to the White Plains City Court, you then removed her from the van?

A. Yes.

Q. Did any other officer assist you?

A. No.

Q. You took her into the White Plains City Court?

A. Yes.

Q. Through the side entrance, where the cars are?

A. Through the police department.

Q. She remained in handcuffs from the time you took her from the van into the White Plains City

Caporale

Court Building, correct?
A. Yes.
Q. She was in handcuffs during that period?
A. Yes.
Q. And you don't remember whether she was shackled or not?
A. Don't remember.
Q. When you got into the building, did you go directly to the courtroom?
A. Yes.
Q. When you say you went directly to the courtroom, the judge was already waiting there?
A. I don't remember.
Q. Do you remember whether before you physically entered the courtroom with her she was placed in a holding cell until the court was ready to conduct the proceeding?
A. I don't remember.
Q. Did there come a time after you arrived at the White Plains City Court building when you removed the handcuffs from her?
A. I don't remember.
Q. It's possible she was still in handcuffs while she was in the courtroom?

Caporale

MS. CHAPMAN-LANGRIN: Note my objection.

Q. Do you know whether --

A. She would have been in handcuffs in the courtroom.

Q. When you left the White Plains City Court then you took her back to the police van?

A. Yes.

Q. Still in handcuffs?

A. Yes.

Q. And then you put her in the back, as you had before you got to the White Plains City Court?

A. Yes.

Q. And then you proceeded directly, without stopping, to the Westchester County Jail in Valhalla?

A. Yes.

Q. And during that entire period of time she was in handcuffs?

A. Yes.

Q. According to your notes, the notebook, you arrived at the White Plains City Court at 14:25, 2:25 in the afternoon, and at 2:50 in the afternoon you were on route to the County Jail?

Caporale

A. Yes.

Q. And you arrived at the County Jail at 15:05, which would be 3:05?

A. Yes.

Q. And you have clear at 15:25.

A. Yes.

Q. What happened between 15:05 and 15:25?

A. She was taken in at the jail.

Q. That's 20 minutes.

It didn't take 20 minutes, did it, to get her from the van into the County Jail, did it?

A. Yes.

Q. During that entire period of time she was still in handcuffs?

A. Yes.

Q. You did not remove the handcuffs until the Westchester County Jail accepted her in custody, correct?

A. I did not remove the handcuffs. They removed the handcuffs.

Q. Did they give the handcuffs back to you?

A. Yes.

Q. With the belt?

A. Yes.

Caporale

Q. When you say, 15:25 clear, that means your assignment was completed?

A. Correct.

Q. And then you proceeded back to headquarters, arriving at 15:35?

A. Yes.

Q. Before coming here, other than the dispatch log and other than your notebook, did you review any other documents?

A. No.

Q. Before coming to testify today, other than your lawyer, did you speak to anybody about the facts of this case or about this case?

A. No.

Q. When was the last time that you spoke to Officer Hicks?

A. This week.

Q. Do you know whether that was before or after he testified?

A. I don't know.

Q. Assuming he testified on Monday, this past Monday, March 31, did you speak to him since that time?

A. Mondays was March 31?

Caporale

Q. Yes.

A. Yes.

Q. You did speak with him after March 31?

A. Yes.

Q. And you and he had no discussion about this case or about his testimony?

A. No.

Q. When you spoke to him this week after March 31, were you aware at that time that he had testified on March 31?

A. No.

Q. When was the last time that you spoke to Sergeant Pavone?

A. Today.

Q. Did you have any discussions with Sergeant Pavone about this case?

A. No.

Q. Was he aware that you were coming here to testify today?

A. Yes.

Q. And were you aware when you spoke to him today that he had also testified this week?

A. No.

Q. And when was the last time that you spoke

Caporale

to Sergeant Thomas, William Thomas?

A. Last month.

Q. Are you aware that you are named as a defendant in this case?

A. Yes.

Q. Have you reviewed the complaint in this case?

A. No.

Q. Showing you what's marked as Plaintiff's Exhibit 1, have you ever seen that document before today?

A. I've seen the first page.

Q. But you haven't read it?

A. No.

Q. And have you seen what I'm showing you as Plaintiff's Exhibit 2, have you seen that before today?

A. No.

Q. And showing you what has been marked as Plaintiff's Exhibit 3, Plaintiff's Exhibit 4 --

MS. CHAPMAN-LANGRIN: Can we go one by one.

MR. ARONWALD: I'm just putting them before her.

Caporale

MS. CHAPMAN-LANGRIN: I have an objection on this there because this was done by Timothy Hicks, and she was not on here at the time.

MR. ARONWALD: What's the basis of your objection?

MS. CHAPMAN-LANGRIN: She wasn't at that time even a named defendant. It lists Jane and John does. Same as Exhibit 4, which is also really from Defendant Timothy Hicks, before she was named as a defendant.

You can ask her questions with that objection.

MR. ARONWALD: Thank you. I understand.

Q. Have you ever seen either of these documents before?

A. No.

Q. Prior to coming here today, were you ever shown a copy of the transcript of Sherrie Deanda's testimony?

A. No.

Q. No?

A. No.

Q. What is your date of birth?
A. 12/21/68.
Q. Can you tell us about your education.
A. High school.
Q. What high school?
A. Three high schools.
Q. What was the high school you graduated from?
A. Jamaica High School.
Q. In Queens?
A. Yes.
Q. What about your employment history after graduating high school?
A. I worked in medical billing in a radiology office for a hospital, temporary per diem for -- a temporary -- placement service. And I was a paramedic for New York City for 17 years.
Q. When you left that position, is that when you went into law enforcement?
A. Yes.
Q. Was your first job in law enforcement with the Westchester County Department of Public Safety?
A. Yes.
Q. When did you become a member of the

Westchester County Department of Public Safety?

A. 2004.

Q. Did you attend any academy before you became a police officer?

A. I attended the academy to become a police officer.

Q. Where was the academy?

A. In Hawthorne.

Q. New York City Police Academy and --

A. Westchester County Police Academy.

Q. How many weeks or months was the academy?

A. Twenty weeks.

Q. In the course of your training at the academy, did you receive any instruction concerning the New York State Penal Law?

A. Yes.

Q. New York State Criminal Procedure Law?

A. Yes.

Q. Public Health Law?

A. I don't recall.

Q. Did you also receive instruction on probable cause, what constitutes probable cause to make an arrest or conduct a search?

A. Yes.

Q. Directing your attention to May 28, 2012, your patrol vehicle was equipped with a camera in the car?
A. Yes.
Q. As of May 28, 2012, were all of the patrol vehicles similarly equipped?
A. I don't know.
Q. The vehicle that you were driving was equipped with this camera.
Did that camera operate both audio and visual?
A. Yes.
Q. When you were dispatched to assist Officer Hicks while you were en route to his location, were you using the overhead lights in the car?
A. Yes.
Q. And do the overhead lights automatically activate the camera?
A. Yes.
Q. And the camera takes video of what's going on in the front of the vehicle?
A. It depends what car you're in.
Q. In the car you had.
A. Yes.

Caporale

Q. Are you able also to switch the camera so that it basically is looking in the rear compartment of the car?

A. Not switch it.

Q. Does there come a time when the camera is no longer looking forward, but is now looking back in the rear of the car?

A. If I manipulate it.

Q. You turn the camera physically around so that it's facing the back?

A. Correct.

Q. Did you do that on May 28, 2012?

A. Yes.

Q. Just to follow this through, when you got the call, you switched on your lights, correct?

A. Yes.

Q. That activates the camera?

A. Yes.

Q. Does it operate the camera both video wise and audio wise, or only video wise?

A. It's simultaneous.

Q. It captures the audio and visual?

A. I have no control over one or the other. It does both at the same time.

Caporale

Q. Did there come a time when you manipulated the camera on May 28 so that it would be facing in the rear compartment?

MS. CHAPMAN-LANGRIN: Note my objection. Asked and answered.

A. Yes.

Q. Did there come a time when you manipulated the camera so that it was no longer facing forward, but was now facing the rear of the car?

MS. CHAPMAN-LANGRIN: I thought you asked it already.

A. Yes.

Q. When was that?

A. En route to headquarters.

Q. Was there an event that caused you to manipulate the camera so that it would now be facing the rear compartment?

A. No event.

Q. There came a time when you placed the two children in the rear of the car, didn't you?

A. Yes.

Q. Did you manipulate the camera to face the rear of the car once you placed the children in the rear of the car?

A. En route to headquarters.
Q. Not before?
A. No.
Q. The two children were in the back of your patrol car while you were still at the scene?
A. Yes.
Q. Was there a reason why you manipulated the camera so that it would be facing in the rear while you were en route to headquarters with the two children?
A. Yes.
Q. What was that reason?
A. So there was video of the children in the back of the car wearing their seatbelts and not being touched by me or anyone else.
Q. Do you recall how long a period of time it was from the time you put the two children in the rear of your patrol car until you left the scene en route to headquarters?
A. I don't recall.
Q. Have you watched the video?
A. Yes.
Q. On how many occasions?
A. One.

Caporale

Q. When was it that you did that?

A. Yesterday.

Q. Is it correct that you marked or had marked the video as evidence?

MS. CHAPMAN-LANGRIN: Note my objection. You can ask her. You haven't established a foundation. You didn't ask her what, if anything, you did with respect to the video.

MR. ARONWALD: I don't have to ask it that way.

MS. CHAPMAN-LANGRIN: I feel you do. Objection to form.

Q. You can answer.

A. Can you say it again.

Q. Did you have the video marked as evidence in connection with the case involving Sherrie Deanda?

MS. CHAPMAN-LANGRIN: Note my objection to form.

A. I didn't have it marked as evidence.

Q. Did you do anything with respect to the video to make sure that it was preserved in the database?

A. I requested that it was preserved.
Q. When did you request that?
A. That day.
Q. That day?
A. Yes.
Q. Was there a reason you did that?
A. Because people tend to make accusations about their children when they're not in their custody, and this would have shown that they were happy and safe while in my custody.
Q. Do you know whether there is a period of time in which, as a matter of procedure, a video is removed from the data base of the Westchester County Department of Public Safety?
A. I don't know.
Q. You watched the video yesterday.
Did you notice on the video that only certain portions have the audio.
MS. CHAPMAN-LANGRIN: Note my objection.
A. Yes.
Q. Do you know why it was that not everything was recorded audio wise while the camera was functioning?

Caporale

A. Not everything?

I don't understand.

MS. CHAPMAN-LANGRIN: That's why I objected to form.

MR. ARONWALD: You made your objection.

MS. CHAPMAN-LANGRIN: I'm entitled to object.

MR. ARONWALD: You stated the objection.

MS. CHAPMAN-LANGRIN: So what are you talking about?

MR. ARONWALD: You said, that's why I made the objection. You don't need to do that. Your objection is noted.

MS. CHAPMAN-LANGRIN: I'm entitled to make the objection, and don't lecture me on that. I don't appreciate it.

MR. ARONWALD: Why don't you report it to the judge?

MS. CHAPMAN-LANGRIN: I don't have to do that. I will object when it's objectionable.

MR. ARONWALD: And don't object when

Caporale

it's not.

Q. I'm trying to find out if you know why when you watch the video, the video has no audio from the time you arrived at the scene where Officer Hicks was until the camera was manipulated to face the back, where the two children were.

Do you know why that is?

A. There is audio in the car the entire time the children are in the car and the entire time I'm in the car.

Q. There's no audio outside the car?

A. No.

Q. Do you have any remote audio which allows you to also record the audio even when you're outside the car?

A. Some cars.

Q. What about your car that day?

A. I don't remember.

Q. Do you know why it is that some cars are equipped with the remote audio so that when you leave the car the audio is still being recorded?

A. Some have it and some don't.

Q. Do you know what the purpose of it is?

If you don't know, you don't know. I'm

just asking.

A. Do I know what the purpose of the audio is?

Q. Of the remote audio.

A. To be able to record when I stop a vehicle.

Q. Is there any record, to your knowledge, which would show whether the patrol vehicle that you were using and May 28, 2012 was equipped with a remote audio function?

A. I don't know.

Q. You don't know whether there is any --

A. No.

MR. ARONWALD: I'll ask that we leave a space in the transcript so if the witness learns the answer to that question she can put it in the transcript.

*INSERT:______________________________________________

Q. Going back to the point where you arrived at the scene where Officer Hicks was, do you recall what, if any, conversation you had with him upon your arrival?

A. Not much.

Q. What do you remember?

Caporale

A. I remember him saying he had pulled over a car for speeding and found drugs.

Q. Did he tell you where it was he found the drugs?

A. I don't remember.

Q. Do you remember whether he told you what kind of drugs?

A. Pills.

Q. Do you remember whether he told you what kind of pills they were?

A. I don't remember.

Q. Did you make any notes at all or memoranda of any of the conversation you had with Officer Hicks while you were at the scene?

A. No.

Q. Did he tell you how fast she was going?

A. No.

Q. Did he tell you that there were two children in the back seat of the car?

A. Yes.

Q. Did he tell you that Sherrie Deanda claimed that the pills were not her's, but belonged to her sister, who had a prescription for the pills?

A. I'm sorry.

Do I remember or did he tell me that?

Q. Did he tell you that?

A. No.

Q. Did he tell you that Ms. Deanda told him that her sister had inadvertently left the pills at her home, Sherrie Deanda's home, the night before and she was on her way to the city to return them to her, did Officer Hicks tell you that that's what she said?

A. No.

Q. When you arrived at the scene, do you remember where Sherrie Deanda was?

A. I don't remember.

Q. Do you know whether she was already in Officer Hicks' car or whether she was outside the car?

A. Because I've reviewed the video, I know that she was in the car, but I don't remember.

Q. Thank you.

All of this was captured on the video from your car?

MS. CHAPMAN-LANGRIN: What was?

MR. ARONWALD: When she arrived on the scene and approached the car and saw Sherrie

Caporale

Deanda in the car.

MS. CHAPMAN-LANGRIN: I just wanted to make sure the transcript was clear.

MR. ARONWALD: Thank you.

MS. CHAPMAN-LANGRIN: You're welcome.

Q. Am I correct?

A. Yes.

Q. Did Officer Hicks tell you that before you arrived he had a telephone discussion with Sherrie Deanda's sister?

A. No.

Q. And so he didn't tell you that Sherrie Deanda's sister told him that the pills were her's and that she had a valid prescription for the pills?

A. No.

Q. And he didn't tell you that Sherrie Deanda's sister had offered to come to the scene with the prescription?

A. No.

Q. And when you transported Sherrie Deanda to the White Plains City Court, you had no information that Sherrie Deanda had said that the pills were not her's, that they were her sister's, that her sister had a prescription for them, you did not know that

Caporale

when you took her to the White Plains City Court?

A. Correct.

Q. While you were at the scene, did you engage in any conversation with Sherrie Deanda?

A. Not conversation.

Q. Did you have any conversation with either of the two children concerning what, if anything, they saw or heard about Sherrie Deanda being stopped and taken into custody by Officer Hicks?

A. No.

Q. When you were transporting Sherrie Deanda from the headquarters in Hawthorne to the White Plains City Court, did you and she engage in any conversation?

A. No.

Q. And while you were in the White Plains City Court building with her, did she have any conversation or say anything to you?

A. I'm sure.

Q. Do you have any recollection of what it was that she said to you while you were at the White Plains City Court?

A. No.

Q. Do you recall whether she said anything to

Caporale

you from the time you removed her from the cell and arrived at the White Plains City Court?

A. No.

Q. When you left the White Plains City Court to transport her to the White Plains City Jail, did she say anything to you?

A. No.

Q. You didn't ask her any questions?

A. No.

Q. In the White Plains City Court, did the judge ask you any questions concerning the circumstances of Sherrie Deanda's arrest?

A. I don't remember.

Q. Did you have any paperwork with you when you went to the White Plains City Court with Sherrie Deanda?

A. Yes.

Q. What was the paperwork?

A. The complaint.

Q. The felony complaint or the incident report?

A. Probably both.

Q. Showing you what has been marked as Plaintiff's Exhibit 4, I ask that you take a look at

Caporale

these two pages which are labelled New York State incident report, and tell me whether this is one of the documents that you took with you when you went to the White Plains City Court with Sherrie Deanda.

A. I don't recall.

Q. The next page is labeled felony complaint.

Do you know whether this is a document that you took with you to the White Plains City Court?

A. Could be.

Q. You have no recollection?

A. No.

Q. You're not saying that you took either or both of these documents --

A. I'm saying, I probably did, but they would have been in a manila envelope and I wouldn't have looked at them.

Q. And the manila envelope which held the documents was given to you by whom?

A. The desk officer.

Q. Do you remember who the desk officer was?

A. Sergeant Thomas.

Q. Were you aware before you left for the

Caporale

White Plains City Court that Sherrie Deanda's sister, Paula Fontenette, had come to the headquarters?

A. Yes.

Q. How did you know that?

A. Because they came to pick up the children.

Q. Did they speak to you when they came to pick up the children?

A. No.

Q. Did you at any time on May 28 actually see Sherrie Deanda's sister, Paula Fontenette, and the other two people?

A. Yes.

Q. When was that in relationship to your leaving with Sherrie Deanda to take her to the White Plains City Court?

A. Couple of minutes.

Q. And how do you know that they were there to pick up to the children?

A. Because they came in the front door and someone called me and said they're here to pick up the kids.

Q. Did you have anything at all to do with releasing the kids to the people to came to the

headquarters?

A. It was me.

Q. Looking at Plaintiff's Exhibit 4 and directing your attention to a copy of the North Carolina state driver's license in the name of Monique Angela Sutton, there's some handwriting on this.

Do you recognize the handwriting?

A. This is mine.

Q. Did you make the copy of the driver's license?

A. I don't remember.

Q. According to your notes, you released Payton, paren, child in vehicle, close paren.

Who is Payton?

A. One of the children.

Q. Do you know if Payton was in any way related to Monique Sutton?

A. I don't remember.

Q. Was there a reason why you had a copy of the driver's license for Monique Sutton?

A. Because that's who I released Payton to.

Q. The function of the copying the driver's license would be so that there was no question of

what the person looked like and what her name was, in other words, it's a photo I.D. of the of the person you released the children to?

A. Yes.

Q. There's another copy of a driver's license in the name of Paula Fontenette.

Do you recognize the handwriting?

A. Released Jada is my handwriting.

Q. And child in vehicle, is that your handwriting?

A. No.

Q. Going back to the previous driver's license, paren, child in vehicle, is that your handwriting?

A. No.

Q. Do you know whose it is?

A. No.

Q. Do you know what Jada's last name was?

A. I don't remember.

Q. At the time that you released the child to Paula Fontenette, did you know what, if any, relationship there was between the child and Paula Fontenette?

A. At the time I released her I would have

Caporale

known, but I don't remember now.

Q. You didn't make any notes as to what the relationship was?

A. I didn't.

Q. Do you know whether anybody else did?

A. I don't know.

Q. Do you remember who it was that called you to authorize you to release the children to Ms. Sutton and Ms. Fontenette?

A. I don't remember.

Q. Do you know whether it was Sergeant Thomas?

A. I don't know.

Q. When you say, they came in the front entrance, when they come in through the front entrance, they come in contact with the desk officer?

A. If he's there.

Q. If he's not there, someone else is there?

A. Yes.

Q. Did you have any conversation with Paula Fontenette during the period that she was in the headquarters building?

A. No.

Caporale

Q. Were you present during any conversation that she had with a desk officer?
A. I wasn't.
Q. Were you instructed or directed by somebody to release the children to Monique Sutton and Paula Fontenette?
A. Yes.
Q. Do you remember who directed or instructed you to do that?
A. Sergeant Thomas, I think.
Q. Were you present during any conversation between Paula Fontenette and Sergeant Thomas before he directed you to release the children to them?
A. No.
Q. Were you present during any conversation that Paula Fontenette had with any other police officer other than you before you were directed to release the children to her and Monique Sutton?
A. Your question was too long. I lost you.
I didn't speak to anybody.
Q. Were you present during the period when Paula Fontenette had a conversation with any other police officer, other than you?
A. I was not present.

Caporale

Q. Just so we're clear, you were not the arresting officer with respect to Sherrie Deanda?

A. Correct.

Q. Officer Hicks was?

A. Yes.

Q. Let's go back to what we started in the beginning, when you said you were dispatched to assist with a female.

Once you arrived at the scene, did you then find out in what way you were going to be assisting him?

A. I found out en route that I would be assisting with a female.

Q. But at the time you didn't know what form of assistance you would be giving, you just knew it was a female?

A. Correct.

Q. When you arrived at the scene, you had a conversation with him which you already related.

In what form did you assist him in the arrest of Sherrie Deanda, that's my question.

A. Search.

Q. Like a pat down, or was it a full search?

A. Pat down.

Caporale

Q. She was in a sundress, if you remember; is that correct?

A. I didn't remember, but I reviewed the video yesterday so now I know.

Q. Other than patting her down, you also assisted Officer Hicks in doing a search of the vehicle, her vehicle, correct?

A. Yes.

Q. And what kind of a search was that?

A. Inventory search.

Q. At the time that you arrived, do you know where Sherrie Deanda's purse was?

A. No.

Q. Do you recall whether it was in the car or in Officer Hicks' possession?

A. No.

Q. Did you or Officer Hicks actually voucher the items that were seized in connection with Ms. Deanda's arrest?

A. Officer Hicks.

Q. Did that include, if you know, her cell phone?

A. I don't know.

Q. Did you ever see her cell phone on May 28,

2012 before you transported the children to the headquarters building?

A. I don't think so.

MR. ARONWALD: Nothing further. Thank you.

(Time noted: 2:20 p.m.)

A C K N O W L E D G E M E N T

I, ANGELA CAPORALE, hereby certify, I have read the transcript of my testimony taken under oath in my deposition of April 4, 2014; that the transcript is a true, complete and correct record of what was asked, answered and said during this deposition, and that the answers on the record as given by me are true and correct.

______________________________

ANGELA CAPORALE

Sworn and subscribed to before me

this _____ day of ____________ 2014.

_________________________

Notary Public

C E R T I F I C A T E

State of New York)

ss

County of New York)

I, ERIKA CAREN, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That ANGELA CAPORALE, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given in such proceeding.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness, whereof, I have hereunto set my hand this 16th day of April, 2014.

Erika Caren

ERIKA CAREN

## I N D E X


| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| A. Caporale | Mr. Aronwald | 4 |


## E X H I B I T S


| PLAINTIFF'S | DESCRIPTION | PAGE |
|---|---|---|
| 6 | Two pages of handwritten notes | 5 |
| 7 | Dispatach log | 5 |

| REQUEST FOR PRODUCTION | PAGE |
|---|---|
| Dispatch log | 16 |

| INFORMATION TO BE INSERTED | PAGE |
|---|---|
| Whether the car the witness was driving on day in question was equipped with a remote audio function | 41 |

# Errata Sheet

NAME OF CASE: SHERRIE DEANDA -against- TIMOTHY HICKS, ANGELA CAPORALE

DATE OF DEPOSITION: 04/04/2014

NAME OF WITNESS: ANGELA CAPORALE

Reason Codes:

1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

_______________________

**$**

**$5,000** 10:3

**0**

**07:00** 14:3,9
**08:10** 16:7
**08:16** 16:11
**09:02** 18:6

**1**

**1** 4:3 8:20,23,25 29:11
**1025** 8:18
**1029** 8:18
**10532** 4:4
**12/21/68** 31:3
**14890** 14:16
**14:07** 9:3
**14:10** 18:23
**14:25** 25:23
**14:50** 13:25
**15:05** 26:4,8
**15:19** 9:7,9
**15:25** 26:6,8 27:2
**15:35** 27:6
**15:46** 6:25
**17** 6:25 31:18
**1:07** 9:2

**2**

**2** 14:25 15:2 18:7 29:17
**20** 10:16 26:10,11
**2004** 32:3
**2012** 5:11 7:12 17:7,14 33:2,6 34:13 41:10 55:2
**2014** 6:25 56:7,19
**26** 16:5
**28** 6:11 7:12 15:23 17:7,14 33:2,6 34:13 35:3 41:10 48:11 54:25
**2:07** 6:11,14 7:12
**2:20** 55:7
**2:25** 25:24
**2:50** 25:24

**3**

**3** 29:21
**31** 27:23,25 28:4, 10,11
**3:00** 5:13
**3:05** 26:4
**3:46** 6:25

**4**

**4** 29:21 30:10 46:25 49:4 56:7
**40A** 14:9
**45** 14:11

**5**

**5** 14:3

**6**

**6** 5:2,3,6

**7**

**7** 5:22,23,25
**77** 7:17
**7:00** 5:13
**7:25** 14:18

**8**

**8:10** 14:22 16:6

**9**

**9:18** 18:21

**A**

**A.D.A.** 11:8
**academy** 32:4,6, 8,10,11,12,15
**accepted** 26:18
**accusations** 38:8
**action** 4:18
**activate** 33:19
**activates** 34:18
**activities** 9:11
**Adam** 14:11
**address** 4:3
**advised** 12:11
**AED** 14:19
**afternoon** 7:2 25:24
**ages** 18:17
**amount** 10:2 22:4
**Angela** 49:7 56:5, 15
**answers** 56:11
**apartment** 7:20, 21
**appearing** 4:22 5:17
**approached** 43:25
**April** 56:7
**APT** 7:18,19
**ARONWALD** 4:7, 25 5:21 16:4 29:24 30:6,15 37:11 39:6,10,14,20,25 41:15 43:24 55:5
**arraignment** 9:19 12:5,7,8
**arrest** 10:21 16:24 17:10,12 32:24 46:13 53:22 54:20
**arrested** 10:24
**arresting** 17:9 53:3
**arrival** 9:5 41:23
**arrived** 9:8 24:20 25:23 26:3 40:5 41:20 43:12,24 44:10 46:3 53:10, 19 54:12
**arriving** 27:6
**ARV** 9:2
**assigned** 9:12 14:9 19:6
**assignment** 7:17 13:14 15:21,23 16:18 27:3
**assist** 16:22 17:10,12,16,19 23:16 33:14 53:9, 21
**assistance** 17:3, 24 53:16
**assisted** 54:7
**assisting** 17:21, 22 53:12,14
**Assuming** 27:22
**attend** 32:4
**attended** 32:6
**attention** 33:2 49:5
**audio** 33:11 34:21,23 38:19,24 40:4,9,12,14,15, 21,22 41:3,5,11
**authorize** 51:9
**Automated** 14:21
**automatically** 33:18
**Avenue** 7:18
**aware** 28:10,19,22 29:4 47:25

**B**

**B2s** 14:23
**back** 5:15 19:20 20:6,20,23,25 21:5 25:8,12 26:22 27:5 34:7,11 36:5,15 40:7 42:20 50:13 53:7
**bail** 9:17 10:2 11:22,25 12:12
**Baker** 14:25 15:2
**base** 38:14
**basically** 34:3
**basis** 30:6
**began** 14:2
**beginning** 53:8
**belonged** 42:23
**belt** 21:3 22:22,25 23:2,3,4,6 26:24
**billing** 31:15
**birth** 31:2
**blotter** 6:22
**Bronx** 15:7
**brought** 4:19 10:8
**BRP** 14:23 15:7
**building** 24:2,9, 21 45:18 51:24 55:3
**business** 4:3 8:2

**C**

**C1029** 8:11,17
**call** 7:4,10 14:3,5, 12 15:2 34:16
**called** 48:22 51:8
**caller** 7:4,5,7
**camera** 33:3,10, 11,19,21 34:2,6, 10,18,20 35:3,9, 17,23 36:9 38:24 40:6
**Caporale** 4:1,8 55:1 56:5,15
**captured** 43:21
**captures** 34:23

**car** 33:4,16,23,24 34:4,8 35:10,21, 24,25 36:6,15,19 40:9,10,11,12,16, 18,22 42:3,20 43:16,17,19,22,25 44:2 54:15

**Carolina** 49:6

**cars** 23:21 40:17, 20

**case** 5:10 27:14 28:7,17 29:5,8 37:18

**caused** 35:16

**cell** 8:3,6 22:13, 15,18 23:8,9,11 24:17 46:2 54:22, 25

**certify** 56:5

**CHAPMAN-LANGRIN** 9:21 10:4 12:9 17:11 25:2 29:22 30:2,8 35:5,11 37:6,13, 38:20 39:4,8,12, 17,22 43:23 44:3,6

**charge** 6:15,16

**charges** 12:12

**child** 49:15 50:10, 14,21,23

**children** 18:13, 18,21 19:7 35:21, 24 36:5,11,14,18 38:9 40:7,10 42:20 45:8 48:7,9,20 49:17 50:4 51:9 52:6,14,19 55:2

**circumstances** 17:15 46:13

**city** 7:23 9:8,14 10:8,22,25 11:2, 19,23 12:15 13:8, 11,21 18:24 19:5 23:13,18,25 24:21 25:7,13,23 31:18 32:10 43:8 44:22 45:2,14,18,23 46:3,5,6,11,16 47:5,10 48:2,17

**civil** 4:18

**claimed** 42:23

**clear** 26:6 27:2 44:4 53:2

**close** 49:15

**compartment** 19:22 34:3 35:4,18

**complaint** 29:7 46:20,21 47:8

**complete** 56:8

**completed** 13:10 27:3

**completion** 9:9

**conduct** 24:18 32:24

**conducted** 14:4

**confusing** 4:16

**connection** 37:18 54:19

**constitutes** 32:23

**contact** 51:17

**control** 34:24

**conversation** 41:22 42:14 45:5, 6,7,15,19 51:22 52:2,12,16,23 53:20

**copy** 30:21 49:5, 11,21 50:6

**copying** 49:24

**correct** 6:9,10 7:2,15,24,25 8:5,8, 15 9:14,18 12:6 13:4,5,18 14:15 15:4,8,13,14,24 16:14 18:2,4,22,25 19:12 20:18 21:19, 22 22:23 23:6 24:2 26:19 27:4 34:12, 16 37:4 44:7 45:3 53:4,18 54:3,8 56:9,12

**County** 4:20 7:14 8:7 13:17 17:6 25:16,25 26:3,12, 18 31:23 32:2,11 38:14

**couple** 4:8 21:9

48:18

**court** 7:18,21,22, 24 8:2 9:8,14 10:8 11:2,3,4,19,24 12:15,20 13:2,8, 11,21 18:24 19:5 23:14,19 24:2,17, 21 25:7,13,23 44:22 45:2,14,18, 23 46:3,5,11,16 47:5,11 48:2,17

**courtroom** 10:10, 12,14 12:19 24:10, 13,16,25 25:6

**Criminal** 32:18

**cross** 15:11

**cuffed** 20:20

**custody** 7:13 26:18 38:10,11 45:10

## D

**D-a-e-n-e-a** 7:6

**D.A.** 9:20

**Daenda** 7:5

**data** 38:14

**database** 37:25

**date** 12:20 31:2

**day** 5:13 6:15 10:2,19 11:5,6 12:19 13:8 20:16 22:2 38:4,5 40:18 56:19

**Deanda** 4:17 7:13 8:4 9:13 10:8 12:20 13:11,20 18:25 19:18 22:10 37:19 42:22 43:5, 13 44:2,21,23 45:5,9,12 46:17 47:5 48:16 53:3,22

**Deanda's** 30:21 43:7 44:11,14,18 46:13 48:2,12 54:13,20

**defendant** 29:5 30:9,11,12

**defendants** 10:17

**defibrillator** 14:21

**department** 4:20 7:14 8:7 17:6 31:23 32:2 38:15

**depends** 21:25 33:23

**deposed** 4:22

**deposition** 56:7, 10

**Description** 8:3

**desk** 6:12,14 47:22,23 51:17 52:3

**diem** 31:16

**directed** 52:5,9, 14,18

**directing** 33:2 49:5

**directly** 24:10,12 25:15

**discretion** 20:15

**discussion** 28:6 44:10

**discussions** 28:16

**dispatch** 5:18,20, 23 6:2,8 9:6 15:15, 18,20,25 16:8,13 27:9

**dispatched** 9:2 15:12 16:16 17:10, 16,19 33:14 53:8

**divided** 21:8

**divider** 21:8

**document** 6:4,7, 24 29:11 47:9

**documents** 4:23, 24 5:16 27:10 30:18 47:4,16,21

**door** 20:25 48:21

**driver** 19:16,22

**driver's** 49:6,11, 22,24 50:6,13

**driving** 33:9

**drugs** 42:3,5,8

**duly** 4:5

## E

**education** 31:4

**effect** 17:14

**employment** 31:13

**en** 9:6 14:22,25 16:6,10 18:23 35:15 36:2,10,19 53:13

**enforcement** 31:20,22

**engage** 45:5,14

**entered** 24:16

**entire** 4:13 25:19 26:14 40:9,10

**entitled** 39:8,17

**entrance** 23:21 51:16,17

**entries** 6:9

**entry** 4:24 5:9 6:20 14:24 16:11 18:6

**envelope** 47:18, 20

**equipped** 33:3,7, 10 40:21 41:10

**established** 37:8

**event** 35:16,19

**evidence** 37:5,17, 22

**EXAMINATION** 4:7

**examined** 4:5

**Exhibit** 5:2,3,6,22, 23,25 29:11,17,21 30:10 46:25 49:4

**external** 14:21

F

face 35:23 40:6
facing 34:11 35:3, 9,10,17 36:9
fact 7:12
facts 27:14
fast 42:17
Federal 4:18
feel 37:13
feet 20:10
felony 46:21 47:7
female 8:3 11:13 16:22,23 17:3,9, 15,17,18,23 53:9, 14,17
find 40:3 53:11
follow 34:15
Fontenette 48:3, 12 50:7,22,24 51:10,23 52:7,13, 17,23
form 10:5 17:12 37:14,21 39:5 53:15,21
forward 34:7 35:9
found 42:3,4 53:13
foundation 37:8
free 21:5
front 19:21 20:20, 21 21:18,20 33:22 48:21 51:15,16
full 53:24
fully 4:11
function 41:11 49:24
functioning 38:25

G

gave 22:24
general 17:8
give 26:22
giving 53:16
Glass 20:4
graduated 31:8
graduating 31:14
guess 4:12,14
guilty 12:16

H

half 21:8
handcuffed 20:19
handcuffs 20:8, 22 21:2 22:16,19, 22,25 23:3,4,6,24 24:4,22,24 25:5, 10,20 26:15,17,20, 21,22
hands 20:13,20
handwriting 49:7,9 50:8,9,11, 15
handwritten 5:4
happened 10:7, 21 26:8
happy 38:11
Hawthorne 4:4 8:8 9:14 32:9 45:13
headquarters 8:8 9:13 13:20 18:7,20 22:13 27:6 35:15 36:2,10,20 45:13 48:4 49:2 51:24 55:3
Health 32:20
hear 4:13
heard 45:9
held 47:20
Hicks 15:3,13,22 16:14,22 17:2 27:17 30:4,11 33:15 40:6 41:21 42:15 44:9 45:10 53:5 54:7,18,21
Hicks' 54:16
high 31:5,6,7,8, 10,14
history 31:13
holding 8:3,6 22:13 24:17
holiday 11:4
home 43:7
hospital 31:16
HQ 18:7

I

I.D. 8:25 50:3
identification 5:4,24 8:17
identified 14:13
identifies 8:19
identify 6:7 7:8
inadvertently 43:6
incident 46:21 47:3
include 54:22
indicating 18:14
information 44:22
INSERT 41:19
instructed 12:19 13:7 52:5,9
instruction 32:15,22
Inventory 54:11
involved 6:6 8:10
involving 37:18
items 54:19

J

Jada 50:9
Jada's 50:19
jail 12:13 13:16,17 25:16,25 26:3,9, 12,18 46:6
Jamaica 31:10
Jane 30:10
January 6:25
job 6:6,22 7:9 9:10 31:22
John 30:10
judge 9:17 10:2, 11,15 11:10,12,16 12:19,25 13:7 24:13 39:21 46:12
jurisdiction 10:22

K

kids 48:23,25
kind 19:9 42:8,11 54:10
knew 17:22 53:16
knowledge 41:8

L

labeled 47:7
labelled 47:2
law 31:20,22 32:16,18,20
lawyer 27:13
learns 41:17
leave 40:22 41:15
leaving 48:16
lecture 39:18
left 12:18 13:20 25:7 36:19 43:6 46:5 47:25
legs 20:9,14 21:4
Lexington 7:17
license 49:6,12, 22,25 50:6,14
lieutenant 6:12, 16
lights 33:16,18 34:16
lists 30:9
location 7:17 16:16,18 33:15
locked 23:11
log 5:18,19,20,23 6:2,8 15:16,18,20, 25 27:9
long 10:14 36:17 52:20
longer 34:7 35:9
looked 47:19 50:2
lost 52:20

M

made 7:10 39:6, 15
make 11:15,18 20:23 37:24 38:8 39:18 42:13 44:4 49:11 51:3
male 11:12
manila 47:18,20
manipulate 34:9 35:17,23
manipulated 35:2, 36:8 40:6
March 27:23,25 28:4,10,11
mark 4:25 5:21
marked 5:4,5,24 29:10,20 37:4,5, 17,22 46:24
matter 38:13
matters 4:9
meaning 8:14
means 14:24 18:8 27:2
medical 31:15
meet 15:12,22
member 31:25
members 4:19

**memoranda** 42:13
**Memorial** 10:19 11:5,6
**memos** 11:18
**metal** 20:4,5
**Mill** 4:3
**mine** 49:10
**minute** 5:15
**minutes** 10:16 14:3 16:12 18:3 26:10,11 48:18
**mode** 19:3
**Monday** 27:22,23
**Mondays** 27:25
**Monique** 49:7,19, 22 52:6,19
**month** 29:3
**months** 32:12
**morning** 14:22 18:21 19:6
**move** 21:5,7
**moving** 20:24

**N**

**named** 29:4 30:9, 12
**names** 18:15
**needed** 17:3
**night** 43:7
**North** 49:5
**notary** 4:5 56:23
**note** 10:4 12:9 17:11 25:2 35:5 37:6, 38:20
**notebook** 4:24 5:9 25:22 27:9
**noted** 39:16 55:7
**notes** 5:4,12 11:15,18 13:22 14:2 18:14 25:22 42:13 49:14 51:3
**notice** 38:18
**number** 6:22 8:11,12,18,20 14:16
**numbers** 6:21

**O**

**oath** 56:7
**object** 39:9,23,25
**objected** 39:5
**objection** 10:5 12:10 17:12 30:3, 7,14 35:6 37:7,14, 38:21 39:7,11,15, 16,18
**objectionable** 39:24
**occasions** 36:24
**occurring** 16:18
**offered** 44:18
**office** 31:16
**officer** 4:8 6:12, 8:14 15:2,13,22 16:14,22 17:2,8, 10,16,17 19:13 23:16 27:17 32:5,7 33:14 40:5 41:21 42:14 43:9,16 44:9 45:10 47:22,23 51:18 52:3,18,24 53:3,5 54:7,16,18, 21
**officers** 8:10
**operate** 33:11 34:20
**overhead** 33:16, 18

**P**

**p.m.** 55:7
**pages** 5:2,3,7 47:2
**paperwork** 46:15, 19
**parallel** 21:20
**paramedic** 31:18
**paren** 49:15 50:14
**parentheses** 14:18
**Parkway** 4:4 15:7
**part** 6:17 17:5
**partition** 20:3 21:10,24 22:5
**passenger** 19:23
**past** 27:22
**pat** 53:24,25
**patrol** 17:8,16 33:3, 36:6,19 41:9
**patting** 54:6
**Paula** 48:3,12 50:7,22,23 51:22 52:7,13,17,23
**Pavone** 28:14,17
**Payton** 49:15,16, 18,23
**Penal** 32:16
**people** 18:8,10 23:9 38:8 48:13,25
**period** 6:17 19:19 24:4 25:19 26:14 36:17 38:12 51:23 52:22
**person** 6:15 22:9 50:2,4
**pertains** 5:10,11
**phone** 7:10 54:23, 25
**photo** 50:3
**physical** 6:24
**physically** 24:16 34:10
**pick** 48:7,9,20,22
**pills** 42:9,11,23,24 43:6 44:14,15,23
**place** 9:25 21:12
**placement** 31:17
**Plains** 7:18,21,23 8:2 9:8,14 10:8 11:2,19,23 12:15 13:11,21 18:24 19:5 23:13,18,25 24:21 25:7,13,23 44:22 45:2,14,17, 23 46:3,5,6,11,16 47:5,10 48:2,17
**plaintiff** 4:18
**plaintiff's** 5:2,3,6, 22,23,25 29:10,17, 21 46:25 49:4
**plastic** 20:4
**pleading** 12:16
**plexiglass** 20:4
**PO** 8:14
**point** 41:20
**police** 8:14 19:5, 10,11,13 23:23 25:8 32:5,6,10,11 52:17,24
**portion** 4:15
**portions** 38:19
**position** 31:19
**possession** 54:16
**post-arrest** 9:11
**practice** 17:8
**preliminary** 4:9
**prepared** 6:4
**prescription** 42:24 44:15,19,25
**presence** 11:20
**present** 9:20 11:8 52:2,12,16,22,25
**preserved** 37:24 38:2
**previous** 50:13
**printed** 6:25
**prior** 5:16 30:20
**prisoner** 7:4,13 8:24 11:23 20:13
**probable** 32:23
**procedure** 17:14 32:18 38:13
**procedures** 17:6
**proceeded** 25:15 27:5
**proceeding** 13:10 24:18
**process** 17:9
**production** 16:5
**public** 4:5,20 7:14 17:7 31:23 32:2,20 38:15 56:23
**pulled** 42:2
**purpose** 9:16,17 40:24 41:3
**purse** 54:13
**pursuant** 16:5
**put** 25:12 36:18 41:17
**putting** 29:24

**Q**

**Queens** 31:11
**question** 4:13 41:17 49:25 52:20 53:22
**questions** 4:10, 11,15,21 30:13 46:9,12

**R**

**radiology** 31:15
**Rank** 8:14
**read** 29:14 56:6
**ready** 24:17
**rear** 19:24 21:12 34:3,8 35:4,10,18, 21,24,25 36:9,19
**reason** 4:10 36:8, 13 38:7 49:21
**recall** 13:19,22 16:17 20:11,16 32:21 36:17, 41:21 45:25 47:6 54:15
**receive** 32:15,22

**received** 16:8,9, 13
**recognize** 49:9 50:8
**recollection** 13:6 45:21 47:13
**record** 6:5 40:15 41:6,8 56:9,11
**recorded** 38:24 40:22
**refers** 8:4
**reflect** 13:23 15:19
**reflected** 15:15
**reflects** 6:23
**refresh** 13:6
**regulation** 17:13
**regulations** 17:5
**related** 49:19 53:20
**relationship** 48:15 50:23 51:4
**release** 51:9 52:6, 14,19
**released** 13:12 49:14,23 50:4,9, 21,25
**releasing** 48:25
**remained** 23:24
**remanded** 12:13
**remember** 9:24, 25 10:6,7 11:8,9, 10,12 12:2,14,17, 18,23,25 13:3 24:6,8,14,15,19,23 40:19 41:25 42:2, 6,7,10,12 43:2,13, 14,19 46:14 47:23 49:13, 50:20 51:2, 8,11 52:9 54:2,4
**remote** 40:14,21 41:5,11
**remove** 26:17,20
**removed** 22:12, 18 23:8,14 24:22 26:21 38:14 46:2
**report** 39:20 46:22 47:3
**represent** 4:17
**request** 38:3
**requested** 38:2
**required** 17:25
**respect** 37:9,23 53:3
**restrained** 20:6
**return** 43:8
**review** 5:16 27:10
**reviewed** 4:23 29:7 43:18 54:4
**rights** 4:18
**River** 4:4 15:7
**role** 16:19
**roll** 14:3,4
**route** 9:6 14:22,25 16:6,10 18:6,24 25:25 35:15 36:2, 10,20 53:13
**row** 21:16,17 22:5
**rows** 21:14
**RQ** 16:4
**rule** 16:5 17:13
**rules** 17:5

**S**

**safe** 38:11
**Safety** 4:20 7:14 17:7 31:23 32:2 38:15
**SB** 15:5
**scene** 16:11, 18:13 36:6,19 40:5 41:21 42:15 43:12, 25 44:18 45:4 53:10,19
**school** 31:5,6,8, 10,14
**schools** 31:7
**screen** 20:4
**search** 32:24 53:23,24 54:7,10, 11
**seat** 19:23 42:20
**seatbelts** 36:15
**seats** 21:7,9,14, 17,20,23 22:4
**secured** 20:22 21:2 22:22,25 23:3,5
**seized** 54:19
**separate** 23:4
**separating** 19:21
**Sergeant** 14:4,7 28:14,16 29:2 47:24 51:12 52:11, 13
**serial** 8:11
**series** 4:10
**service** 31:17
**set** 9:18 11:22,25 12:12
**setting** 10:2
**shackled** 20:14 21:4 24:7
**shackles** 20:9,15, 17
**Sherrie** 4:17 7:5, 12 8:4 9:13 10:8 12:19 13:11 18:24 19:18 22:10 30:21 37:18 42:22 43:7, 13,25 44:10,13,17, 21,23 45:5,9,12 46:13,16 47:5 48:2,12,16 53:3,22 54:13
**shield** 8:12,18
**show** 5:5 41:9
**showing** 5:25 29:10,16,20 46:24
**shown** 30:21 38:10
**side** 21:9,16,23 22:5 23:21
**sign** 15:2
**signify** 7:7 8:22 16:7
**similarly** 33:7
**simultaneous** 34:22
**sister** 42:24 43:6 44:11,14,18,24 48:3,12
**sister's** 44:24
**sit** 19:23
**slash** 14:23
**South** 7:17
**Southbound** 15:5
**space** 41:16
**speak** 27:13,23 28:4 48:8 52:21
**specifics** 13:3
**speeding** 42:3
**spoke** 27:16 28:9, 13,22,25
**stand** 7:19
**started** 53:7
**state** 32:16,18 47:2 49:6
**stated** 39:10
**stating** 4:3
**stop** 41:6
**stopped** 45:9
**stopping** 25:16
**street** 15:11
**subscribed** 56:18
**Sullivan** 6:12
**sundress** 54:2
**Sutton** 49:7,19,22 51:10 52:6,19
**switch** 34:2,5
**switched** 34:16
**sworn** 4:5 56:18

**T**

**takes** 33:21
**taking** 9:25
**talking** 7:23 39:13
**telephone** 44:10
**temporary** 31:16, 17
**ten** 18:19
**tend** 38:8
**TER** 14:23
**term** 12:7
**terms** 13:14
**Terrace** 15:9
**testified** 4:6 27:20,22 28:11,23
**testify** 27:12 28:20
**testimony** 11:7 22:21 28:7 30:22 56:6
**Thomas** 14:4,7 29:2 47:24 51:13 52:11,13
**thought** 35:11
**time** 9:2,5,6,7,9,12 13:19 16:12,23 17:20 19:14 23:24 24:20 25:19 26:14 27:16,24 28:10,13, 25 30:5,9 34:6,25 35:2,8,20 36:17,18 38:13 40:5,9,10 46:2 48:11 50:21, 25 53:15 54:12 55:7
**times** 6:5
**Timothy** 30:4,11
**today** 4:22 5:17 27:12 28:15,20,23 29:12,18 30:20
**told** 12:23,25 13:7 16:17 42:7,10 43:5 44:14
**touched** 36:16

**tour** 6:15,16,18 14:2

**training** 32:14

**TRANS** 8:20

**transcript** 30:21 41:16,18 44:4 56:6,8

**transpired** 11:19

**transport** 7:5 8:23,24,25 9:13 19:3,19 46:6

**transported** 13:16 19:4,7 44:21 55:2

**transporting** 13:15 20:13 22:9 45:12

**true** 56:8,11

**turn** 34:10

**Twenty** 32:13

**type** 7:4

U

**understand** 4:11 11:7 22:21 30:16 39:3

**understanding** 12:8

**unheard** 4:15

**unit** 8:20 14:13 22:24

V

**Valhalla** 25:17

**valid** 44:15

**van** 19:10,11,20, 24 20:7,23 21:6, 11,12,15,18,21,25 22:2 23:14,25 25:8 26:12

**VEH** 14:14

**vehicle** 14:14,16 19:5,9,22 33:3,9, 22 41:7,9 49:15 50:10,14 54:8

**vehicles** 33:7

**Vermont** 14:23 15:9

**vertical** 21:21

**video** 33:21 34:20,21 36:14,22 37:5,10,17,24 38:13,17,18 40:4 43:18,21 54:5

**visual** 33:12 34:23

**voucher** 54:18

W

**waist** 21:3

**waiting** 24:13

**wanted** 44:3

**watch** 40:4

**watched** 36:22 38:17

**WC-042014-12** 6:20

**wearing** 36:15

**week** 27:18 28:9, 23

**weekend** 10:19

**weeks** 32:12,13

**Westchester** 4:20 7:14 8:7 13:17 17:6 25:16 26:18 31:23 32:2, 11 38:14

**White** 7:18,21,23 8:2 9:8,14 10:7 11:2,19,23 12:15 13:11,21 18:24 19:4 23:13,18,25 24:21 25:7,13,23 44:22 45:2,13,17, 22 46:3,5,6,11,16 47:5,10 48:2,16

**William** 14:7 29:2

**wise** 34:20,21 38:24

**word** 7:7

**words** 50:3

**wore** 22:22

**worked** 31:15

**working** 5:12

Y

**years** 31:18

**yesterday** 37:3 38:17 54:5

**Yonkers** 10:22,25 11:2,4 13:8

**York** 4:4 31:18 32:10,16,18 47:2