# EXHIBIT G

**COPY**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------x
SHERRIE DEANDA,

Plaintiff,

-against- 13 CV 1203 (KMK)

TIMOTHY HICKS, ANGELA CAPORALE, ROBERT PAVONE and WILLIAM THOMAS IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES AS POLICE OFFICERS OF THE COUNTY OF WESTCHESTER,

Defendants.

-------------------------------------x

April 1, 2014
1:10 p.m.

EXAMINATION BEFORE TRIAL OF Defendant, ROBERT PAVONE, held at the offices of Aronwald & Pykett, Esqs., 81 Main Street, White Plains, New York, pursuant to Order, before Erika Caren, a Notary Public of the State of New York.

* * *

SANDY SAUNDERS REPORTING
254 South Main Street, Suite 216
New City, New York 10956
(845) 634-7561

A P P E A R A N C E S

ARONWALD & PYKETT, ESQS.
Attorneys for Plaintiff
81 Main Street, Suite 450
White Plains, New York 10601

BY: WILLIAM ARONWALD, ESQ.

OFFICE OF THE WESTCHESTER COUNTY ATTORNEY
Attorneys for Defendants
Michaelian Office Building
148 Martine Avenue, 6th Floor
White Plains, New York 10601

BY: TARYN A. CHAPMAN-LANGRIN, Sr. Assistant County Attorney

IT IS HEREBY STIPULATED AND AGREED by and between counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the times of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before this court.

R O B E R T P A V O N E ,

stating his business address as 1 Saw Mill River Parkway, Hawthorne, New York 10532, having been duly sworn by the notary public, was examined and testified as follows:

EXAMINATION BY MR. ARONWALD:

Q. Sergeant Pavone, my name is William Aronwald. I'm representing the plaintiff in this action in which you and several other officers of the Westchester County Department of Public Safety are being sued for violating her civil rights.

Prior to appearing today, have you reviewed any documents in preparation for your appearance and testimony?

A. Yes.

Q. And which documents were those?

A. It was the incident report prepared by Officer Hicks.

Q. I want to show you --

MS. CHAPMAN-LANGRIN: Are you finished?

Q. Anything else?

A. Also, the case report that I prepared, as well as the felony complaint.

Pavone

Q. Looking at Plaintiff's Exhibit 4, have you seen that document before today?

A. The top document?

Q. Yes. I mean, starting with the top document.

The three or four pages up to the point where there's a signature, have you seen those pages before today?

A. Yes.

Q. You have?

A. Yes.

Q. When did you see those?

A. When I was first advised by the County's attorneys' office of the lawsuit.

Q. Do you know when that was?

A. No.

MS. CHAPMAN-LANGRIN: Are you sure?

MR. ARONWALD: We had the same thing yesterday. You said the point was well taken.

MS. CHAPMAN-LANGRIN: It was.

MR. ARONWALD: Don't point to anything, please.

MS. CHAPMAN-LANGRIN: Which exhibit is it?

MR. ARONWALD: 4.

Q. You said you saw that for the first time when you were advised that you were named in the action; is that correct?

A. I need to correct. Upon reading the top portion, where people are identified as John and Jane Does, the document I saw contained our names.

MR. ARONWALD: For the record, I don't believe that there was ever another discovery demand --

MS. CHAPMAN-LANGRIN: Directed --

MR. ARONWALD: This is what we had.

MS. CHAPMAN-LANGRIN: Yes. You did not put in any other discovery demand. These have only Timothy Hicks because he was in the action.

MR. ARONWALD: Others were named, but they were named as John Doe 1, Jane Doe 1.

Q. Just so we're clear, you're saying that prior to today you never did see this document, those first three pages?

A. Not to the best of my recollection.

Q. Forgetting about those first three pages, showing you what's attached to the document as the

Westchester County Department of Public Safety, Patrol Services Division, and then it has the word confidential at the bottom, have you seen this document before?

A. That's a cover sheet that's used on all cases.

Q. Do me a favor. Go through the document and if you see anything in there that you identify as a document that you have seen before today, tell me what it is.

A. Case cover sheet, case content checklist.

Q. As to each document that you identify that you've seen before, please identify which, if any of those documents, were actually prepared by you.

A. Detective supplemental report was prepared by me. Booking sheet, I have seen. It was not prepared by me. Incident report, I have seen. It was not prepared by me.

Q. You said a few minutes ago that one of the documents you reviewed in preparation for your testimony today was a document you referred to as the incident report.

Is this document the incident report you were referring to?

Pavone

A. Yes. It's labelled New York State Incident Report at the top.

Q. That's a two-paged document?

A. Correct.

Q. You had nothing to do with either of those two pages?

A. No.

Next document is the felony complaint.

Q. That's the document you alluded to earlier as one of the documents you reviewed prior to today, the felony complaint.

That was prepared by you?

A. Yes.

Q. It's not signed by you, correct?

A. No.

Q. And it's signed by?

A. P.O. Hicks.

Q. Do you recognize his signature?

A. Yes.

Q. Do you recall whether or not he signed it in your presence?

A. Yes.

Q. Is anything else in there that you recognize as something you've seen before?

A. There's another copy of the booking sheet. There's an E-Justice Commission made by communications, impound vehicle sheet, vehicle and traffic tickets, fingerprint response from DCJS, DMV license check for Sherrie Deanda, as well as license plate check, printout from drugs.com and evidence and property vouchers, copy of a North Carolina driver's license, copy of a New York State driver's license.

Q. If you take a look at those two driver's licenses, looking at the photograph of the individual depicted in the first driver's license, the name on that is what?

A. Monique Angela Sutton.

Q. Did you ever see that person on May 28, 2012?

A. No.

Q. Have you ever seen her since?

A. No.

Q. And the photograph of the driver's license on the next page, that's a driver's license in the name of Paula Fontenette?

A. Correct.

Q. Did you see that person on May 28, 2012?

Pavone

A. No.

Q. Or at any time thereafter?

A. No.

There's an additional property voucher, copy of the lab submission, this document has to do with the lab submission, evidence and property disposition record, evidence transfer receipt, additional evidence and property disposition record, property tracking history report, document from your law office to Sergeant Lavin of the property unit, document to you from Paul Stein, Yonkers City Court Bureau.

Q. That would be Assistant District Attorney Paul Stein, correct?

A. Yes. I believe he's a bureau chief in the A.D.A.'s office.

Additional Fax cover sheet also to Paul Stein, Bureau Chief, and a letter addressed to Mr. Stein.

Q. Of all of those documents, the only ones that you saw prior to today would have been the incident report and the felony complaint?

A. I have seen them all.

Q. Prior to today?

Pavone

A. Yes.

Q. Was that in preparation for your testimony here?

A. Yes.

Q. Did you see those documents on or about May 28, 2012?

A. Not all of them, no.

Q. Would it be correct that the only documents that were included within those you just referred to that you did see on or about May 28, 2012, would have been the incident report, felony complaint and the fingerprint response?

A. That's typically what we see because I didn't prepare a folder on this. I may not have seen all of those.

Q. When you prepared the felony complaint, did you refer to the incident report?

A. I don't recall.

Q. Do you recall which came first, Police Officer Hicks' incident report or your felony complaint?

A. I don't recall.

Q. You were not at the scene of Sherrie Deanda's arrest on May 28, 2012; is that correct?

A. I was not.

Q. You were not the arresting officer; is that correct?

A. I was not.

Q. You were not a witness to whatever occurred on May 28, 2012 on the Bronx River Parkway just prior to and up to the time of her arrest?

A. I was not.

Q. Do you know whether or not you received any telephone calls from Officer Hicks on May 28, 2012 while he was at the scene of Ms. Deanda's arrest?

A. I did not.

Q. With respect to these general questions, before you appeared here today, did you have an opportunity to review the third amended complaint, which has been marked as Plaintiff's Exhibit 1?

A. I don't recall which amended version of this I saw. I do recall seeing our names.

MR. ARONWALD: I think we can agree that the first time where his name was mentioned was the third amended complaint.

MS. CHAPMAN-LANGRIN: It was.

Q. Counsel has agreed that Plaintiff's

Exhibit 1, the third amended complaint, is the only complaint filed in this action which actually named you, Police Officer Caporale and Sergeant Thomas as defendants.

So you do recall seeing a complaint in which you were named as a defendant, correct?

A. Yes.

Q. And did you review that?

A. Yes.

Q. I'm showing you what has been marked as Plaintiff's Exhibit 2, which is the answer to the third amended complaint that was filed and served by your counsel, Taryn Chapman-Langrin, who is seated to your left.

Do you recall whether you've seen that before today?

A. I don't recall.

Q. Do you recall whether before you appeared today you were shown a copy of a transcript of the testimony that the plaintiff gave in connection with a 50H hearing held with respect to the claims in this case?

A. I'm sorry. Can you repeat that.

Transcript from?

Q. Of the testimony of Sherrie Deanda given to the County Attorney in connection with her claims in this action.

A. I don't recall seeing that.

Q. Other than your attorney, have you had occasion to discuss anything relating to this case with anyone else?

A. No.

Q. You've had no discussions concerning this case with Officer Hicks?

A. Prior to the lawsuit or after the lawsuit?

Q. Subsequent to the filing of the lawsuit and prior to today.

A. Nothing about the case itself, no.

Q. What about with respect to Police Officer Caporale?

A. No.

Q. What about with respect to Sergeant Thomas?

A. No.

Q. Whatever discussions you've had since the filing of this action with any of those individuals has had to do with matters totally unrelated to this

case?

A. Yes.

Q. You are a sergeant?

A. Yes.

Q. What, if any, role did you play with respect to the arrest of Sherrie Deanda on May 28, 2012?

A. I was not a sergeant at that time.

Q. You were a detective?

A. I was a detective.

Q. What, if any, role did you play in connection with the May 28, 2012 arrest of Sherrie Deanda by Police Officer Hicks?

A. At the time -- actually, it still continues. The detective division assists any time an officer comes in with a felony arrest.

Q. Assists in what way?

A. Paperwork preparation, drawing up the felony complaint. We have the complaints on the computer in our office. We were able to use boiler plate forms.

Q. As of May 28, 2012, in your capacity as a detective, did you have a rank superior to that of Police Officer Hicks?

Pavone

A. Detective is not a rank. It's a position.

Q. Is that position superior to that of a patrol officer?

A. It depends on your definition of superior.

Q. What is your definition?

A. As a detective, you are not a supervisor.

Q. Do you know what the purpose and function is of the rule that was in effect then and is still in effect today that a detective is required to assist a patrol officer whenever the patrol officer makes a felony arrest?

A. Largely, it's because the paperwork and process can be overwhelming for one officer. There are several documents that need to be prepared and evidence packaged. And we need to run criminal histories, which patrol officers aren't able to do.

Q. In the course of drawing the felony complaint, since you were not present at the seen of the arrest and were not involved in the arrest, what was the source of the information you put into the felony complaint?

A. It was provided to me by Officer Hicks.

Q. Was any of that information provided to you by anyone other than Police Officer Hicks?

A. No.

Q. None of the information you were given on that day was provided to you by Officer Caporale?

A. No.

Q. Were you aware at that time that Officer Caporale had provided backup to Officer Hicks on May 28, 2012?

A. Yes.

Q. I should have mentioned this earlier. If, during the course of my questioning of you, there's anything about my question that is unclear, I request that you let me know that. I don't want you to answer a question that you're not completely sure of. If you don't hear the entire question then let me know and I'll restate it. I don't want you to guess an try to fill in the blanks. If my question is confusing and you don't fully understand it, just tell me that the question was too confusing and you want me to rephrase it. I'm happy to do that. If in the course of the deposition you feel the need to speak to your lawyer then let me know that.

All right?

A. Understood.

Q. What is your educational background?

A. College and extensive training in law enforcement.
Q. What college did you graduate from?
A. Westchester Community.
Q. That was a two-year program?
A. Yes.
Q. What degree did you graduate with?
A. Electronics.
Q. When did you graduate from Westchester Community College?
A. 1994, I believe.
Q. Did you go to high school in Westchester?
A. Yes.
Q. What high school?
A. Yorktown.
Q. You've not taken any other formal education other than Westchester Community College after you graduated, correct?
A. Outside of law enforcement.
Q. We'll get to that in a minute. I'm talking about accredited educational institutions.
A. Correct.
Q. What is your date of birth?
A. 6/21/74.

Pavone

Q. When you were going to Westchester Community College, did you go into Westchester Community College upon graduating from high school?

A. Yes.

Q. In terms of your employment, can you just describe what your employment history has been since you graduated from Westchester Community College.

A. In 1994, I went to work for the New York City Department of Environmental Protection.

Q. In what capacity?

A. As a water supply inspector.

In 1995, I transferred to their police division, where I remained until 1999.

Q. Was that in Westchester?

A. Yes. I worked out of the Yorktown precinct.

Q. And the jurisdiction of that agency was what?

A. Eight counties in New York State.

Q. What was the mission of that agency?

A. Mainly, it was security of the water supply facilities, as well as enforcing of environmental crimes.

Q. You had that position for how long?

Pavone

A. Until 1999.

Q. At which point you went where?

A. Westchester County Police.

Q. And you've been there ever since?

A. Yes.

Q. Were you ever assigned to the patrol division?

A. Yes.

Q. For how long were you assigned to the patrol division?

A. From 1999 until late 2003.

Q. And what was your next assignment?

A. In 2003, I had been transferred to the newly-formed Environmental Crimes Unit.

Q. As a patrolman?

A. Yes.

Q. Going back to the patrol division, what were your duties?

A. I worked highway patrol, county office building, social service offices, Town of Cortland patrol, numerous assignments, the county airport.

Q. With respect to the newly-formed Environmental Control Unit, what was your role there?

Pavone

A. We conducted mostly investigations of environmental crimes in Westchester County.

Q. What type of crimes?

A. Hazardous material spills.

Q. For how long were you assigned to that unit?

A. Until, I believe, 2006.

Q. And what happened in 2006?

A. 2006, I was reassigned to the General Investigations Unit.

Q. Was that in plain clothes or in uniform?

A. Plain clothes.

Q. And that was just investigating complaints or was it in conjunction with the activities of the patrol division?

A. It was investigations of all types, including those generated by patrol.

Q. For how long did you do that?

A. Until July 2013.

Q. And what happened then?

A. I was promoted to sergeant off the Civil Service list and reassigned back to the patrol division.

Q. As of May 28, 2012, you were a detective?

A. Yes.

Q. Did there come a time when you were promoted to detective?

A. 2004.

Q. At that time you were in what unit?

A. Still in the Environmental Unit.

Q. And detective is not a Civil Service list position, correct?

A. Correct.

Q. As of May 28, 2012, as a detective, other than providing assistance to patrol officers who had made felony arrests, you had really no responsibilities with respect to the operations of the patrol division, correct?

A. I'm sorry. Can you repeat that for me.

Q. May 28, 2012, you were a detective?

A. Yes.

Q. You were assigned to what unit?

A. General Investigations.

Q. As you indicated before, it was the policy then and today that the detective division provides assistance to patrol officers who make felony arrests, other than that assistance as a detective assigned to the General Investigations Division, you

Pavone

had no responsibilities with respect to the patrol division, correct?

A. We would investigate any crimes that they may have discovered that were reported to us.

Q. Other than that, you weren't involved in the operations of the patrol division?

A. Correct.

Q. Getting back to what you alluded to before in terms of education, before you joined the Westchester County Department of Public Safety, you went through some formalized law enforcement training, correct?

A. Correct.

Q. What did that training consist of?

A. Initially, it was the basic recruit school at the Westchester County Police Academy.

Q. How many weeks is that?

A. At the time I believe it was 16 weeks.

Q. And then was there any other formal training you went through after you finished the recruit training?

A. Over the course of my career, I've been through many trainings.

Q. Did you attend a 26-week academy program

under the auspices of the New York State Police in Utica?

A. No.

Q. Do you know whether or not it is the practice or custom of the Westchester County Department of Public Safety that officers who are coming on to the job do or are required to attend the 26-week academy program?

A. It's the first I've heard of it.

Q. But you didn't attend that program?

A. No.

Q. I believe you said that the recruit program by the Westchester County Department of Public Safety was a 12-week program?

A. I believe it was 16 weeks.

Q. Did that training include instruction and training on the subject of probable cause for making an arrest?

A. Yes.

Q. Did it also include training with respect to the New York State Penal Law?

A. Yes.

Q. And the New York State Criminal Procedure Law?

Pavone

A. Yes.

Q. Did any of that training relate to the New York State Public Health Law, specifically Article 33?

A. Yes.

Q. As a result of the 16-week training that you underwent prior to becoming a Westchester County Police Officer, did you become aware that Section 3305 of the New York State Penal Law has a relationship to the New York State Penal Law provisions concerning the criminal possession of a controlled substance?

MS. CHAPMAN-LANGRIN: I think you said 3305 of the New York State Penal Law.

MR. ARONWALD: I mean New York State Public Health Law.

Q. Did you become aware that Section 3305 of the Public Health Law has a specific relationship to the provisions of the New York State Penal Law relating to the criminal possession of a controlled substance?

A. I'm not sure if you're referring to academy training. I didn't follow.

Q. You've indicated that you went through a

Pavone

16-week training program.

A. Correct.

Q. Was that academy training?

A. Yes.

Q. And that was by the Westchester County Department of Public Safety?

A. Yes.

Q. During the course of those 16 weeks, did you receive instruction and training concerning the New York State Penal Law?

A. Yes.

Q. Including the provisions relating to the charge of criminal possession of a controlled substance?

A. Yes.

Q. Did you also receive training with respect to the New York State Criminal Procedure Law?

A. Yes.

Q. Did the training also include instruction relating to the provisions of the New York State Public Health Laws, including Article 33 of the Public Health Law?

A. Yes.

Q. During those 16 weeks, did you become

aware from the instruction and training that you received that there was a relationship between Article 33 of the Public Health Law and the New York State Penal Law provisions concerning the criminal possession of a controlled substance?

MS. CHAPMAN-LANGRIN: Note my objection to form, and I think it's vague what you mean by relationship. I'm not sure that the witness would understand that. Over objection, if he understands it.

Q. Do you understand it?

A. I believe so.

I attended the Police Academy 20 years ago. I don't know if I learned the relationship in that 16 weeks of training or in the 20 years since then.

Q. Based upon your experience as a police officer, including whatever training you received prior to or since you've been appointed a police officer, as of May 28, 2012, were you aware of a relationship between Section 3305 of the New York State Public Health Law and the Penal Law provisions relating to criminal possession of a controlled substance?

MS. CHAPMAN-LANGRIN: Note my objection.

A. They're two separate sections, two separate laws. I honestly don't know what relationship you're referring to.

Q. In the felony complaint that you prepared, you referred to Section 220.09 of New York State Penal Law, Class C Felony, criminal possession of a controlled substance in the 4th degree, correct?

A. Correct.

Q. And that was the charge that you put into the felony complaint, that's what she was charged with?

A. Yes.

Q. What you did in the felony complaint is you essentially recited the Penal Law Section 220.09, correct?

A. Correct.

Q. What you have in here is, quote, a person is guilty of criminal possession of a controlled substance in the 4th degree when he knowingly and unlawfully possesses one or more prescriptions, compounds, mixtures or substances containing a narcotic drug and said prescriptions, compounds,

mixtures or substances are of an aggregate weight of 1/8 ounce or more, close quote, correct?

A. Yes.

Q. Continuing, to wit. At the above date, time and location the defendant herein did knowingly and unlawfully possess a plastic bottle containing oxycodone pills, paren, 40 pills, close paren, in her purse.

That's what the charge was, correct?

A. Correct.

MR. ARONWALD: Off the record.

(Discussion held off the record.)

Q. As of May 28, 2012, were you aware that Section 220.00 of the New York State Penal Law which contains the definitions relating to violations involving controlled substances provides that the term, quote, unlawfully, close quote, means in violation of Article 33 of the Public Health Law?

A. Yes.

Q. When you prepared the felony complaint and you charged Sherrie Deanda with knowingly and unlawfully possessing .21 ounces of oxycodone pills, your use of the term unlawfully was in the context of the definition of unlawfully of Section 220 of

the Penal Law, correct?

MS. CHAPMAN-LANGRIN: Note my objection.

Q. Correct?

A. Yes.

Q. Were you aware on May 28, 2012 that Section 3305 of the New York State Health Law, which is part of Article 33, as referred to in Penal Law 220.00, Section 2 provides as follows as of May 28, 2012 and today, the provisions of this article restricting the possession and control of controlled substances and official New York State prescription forms shall not apply, Subdivision C, to temporary incidental possession by employees or agents of persons lawfully entitled to possession?

Were you aware of that?

A. Yes.

Q. When you prepared the felony complaint, at the time you drew the felony complaint, had Officer Hicks provided you with any information whatsoever other than what is set forth in his incident report in the narrative portion?

A. No.

Q. Did you make any notes memorializing

whatever information Officer Hicks gave you during the period that you were assisting him in his arrest of Sherrie Deanda?

A. No.

Q. If I understand you correctly, Officer Hicks never advised you on May 28, 2012, prior to the time that you prepared the felony complaint, that at the time that he had stopped and questioned Sherrie Deanda she told him that the oxycodone pills belonged to her sister, Paula Fontenette, and that her sister had a prescription for the pills?

A. No.

Q. Did Officer Hicks, prior to your preparation of the felony complaint, ever tell you that while at the scene of Sherrie Deanda's arrest, he also had a conversation with Paula Fontenette?

A. No.

Q. Did Officer Hicks ever tell you, prior to the time that you prepared the felony complaint, that during his conversation with Paula Fontenette she told him that the oxycodone pills were her's and that she had a valid prescription for them?

MS. CHAPMAN-LANGRIN: Note my objection. It's not established that she

Pavone

actually told Officer Hicks all that, but note my objection.

Q. Did he ever tell you that?

A. No.

Q. Did he ever tell you, prior to the time that you prepared the felony complaint, that Paula Fontenette had offered to come to the scene or headquarters with the prescription for the oxycodone pills?

MS. CHAPMAN-LANGRIN: Note my objection.

Q. Did he ever tell you that?

A. No.

Q. At the time that you prepared the felony complaint, you were totally unaware of any conversations that he had with Paula Fontenette, correct?

A. Correct.

Q. And you were totally unaware that during his discussion with Sherrie Deanda, prior to placing her under arrest, she told him the pills belonged to her sister, Paula Fontenette, and Paula Fontenette had a valid prescription for them?

A. I was unaware.

Q. Did he tell you that Sherrie Deanda, prior to being arrested by him, told him that she was, in fact, on her way to the City to return the pills to her sister?

A. I was not told that.

Q. And were you ever told by Officer Hicks, prior to your preparation of felony complaint, that Paula Fontenette had left the pills in Sherrie Deanda's home the night before?

MS. CHAPMAN-LANGRIN: Note my objection.

A. No.

Q. As a sergeant assigned to the Patrol Division today, and relating back to the period of time that you were a patrol officer, are the police marked vehicles that are used on patrol for Westchester County, are they equipped with cameras?

A. Some of them are.

Q. With respect to those that are, those are cameras that function both with video and audio?

A. Yes.

Q. And that camera, those cars that are equipped with those cameras, those cameras are activated automatically whenever the driver turns on

Pavone

the overhead lights, correct?

A. Yes.

Q. And the time that the recording begins goes back 30 seconds from the time when the officer activates the overheard lights, correct?

A. That, I couldn't tell you.

Q. And the camera continues to operate until it is manually turned offer by the patrol officer?

A. Yes.

Q. The camera has two fields of view, the first being going forward from the dashboard?

A. Correct.

Q. And it also can be switched so that the camera is focused on the rear seat of the vehicle?

A. I was unaware of that.

Q. Do you know for how long those videos are preserved?

A. I do not.

Q. You don't know whether there is some fixed point in time when the video is removed from the data base?

A. I do not know that.

Q. Do you know what, if any, procedures are in place which a patrol officer needs to follow in

order to mark a video as evidence in a particular case?

A. You have to understand. When I was in patrol, we still used VHS tapes. At the time we would removed the tape and voucher it. Now it's all digital.

Q. You're a supervisor of the Patrol Division?

A. Yes.

Q. As a supervisor in the Patrol Division, do you know whether there are any procedures or requirements by which a patrol officer would mark a video as evidence in a particular case?

A. Yes.

Q. And what is that procedure?

A. He would have to make note of the time and position on the recording which he wished to preserve. And he would have to notify the supervisor, who would in turn notify the officer who handles the downloading of those videos.

Q. You also would agree, would you not, that the purpose and objective of these video cameras is to memorialize what happens during the course of a pursuit and/or an arrest by a Patrol Division

officer?

MS. CHAPMAN-LANGRIN: Note my objection.

A. Correct.

Q. And it's also designed to provide evidence that can be used later in court in the prosecution of someone that's been arrested, correct?

A. Correct.

Q. And it is also to be used to protect the officer from any claims by anyone he stops or arrests of brutality or some other abuse, correct?

A. Correct.

Q. In the process of assisting Officer Hicks on May 28, 2012 in connection with his arrest, did you advise or suggest to him that he mark the video that was made from his car on May 28, 2012 relating to the stopping and arresting of Sherrie Deanda as evidence?

A. No.

Q. In the Detective Division on May 28, 2012, were you working a specific tour in terms of hours?

A. It was a day tour.

Q. The day tour comprises what hours?

A. The Detective Division, it's flexible. It

varies.

Q. Which is not the same as the Patrol Division?

A. Correct.

Q. You were working the day tour that day?

A. Yes.

Q. And that day tour, whatever the hours were, it fell within whatever Officer Hicks' tour was that day?

A. Correct.

Q. Do you recall who the desk officer was on May 28, 2012 at the time that Sherrie Deanda was brought in for processing?

A. I don't recall.

Q. Did you have anything to do at all with the processing of Sherrie Deanda after she was brought in by Officer Hicks?

A. No.

Q. You had nothing to do with the photographing or fingerprinting of her?

A. No.

Q. Did you have any contact with her?

A. Yes.

Q. And what was that?

A. When she was in the booking room, I had gone in there just to introduce myself. As a standard practice, I asked her if she had any desire to talk to me and I provided her the opportunity to give a written statement, and she declined.

Q. Up to that point you did not advise her of her Miranda Rights?

MS. CHAPMAN-LANGRIN: Note my objection.

A. No.

Q. To your knowledge, neither did Officer Hicks, correct?

MS. CHAPMAN-LANGRIN: Note my objection as to what Officer Hicks did.

A. I can't answer that.

Q. Is part of the record-keeping procedures as part of the Public Health Division as of May 28, 2012, when someone is advised of their Miranda Rights, they're asked to sign an acknowledgment of rights?

A. Yes.

Q. Did you ever see one in the case of Sherrie Deanda?

A. No.

Pavone

Q. Were you aware that there were two young children in Sherrie Deanda's car at the time that she was stopped by Officer Hicks?

A. Yes.

Q. Did you have anything at all to do with those two children?

A. No.

Q. Did you have any discussions with officer Caporale on May 28, 2012 relating to the arrest of Sherrie Deanda?

A. I don't recall.

Q. I'm sure I know the answers to these questions, but they're for the record.

You had nothing at all to do with the supervision of either Officer Hicks or Officer Caporale on May 28, 2012 relating to the arrest and or prosecution of Sherrie Deanda?

A. That is correct.

Q. You had no involvement whatsoever in having her transported, her being Sherrie Deanda, to the White Plains City Court for setting of bail?

A. No.

Q. Or transporting her from the White Plains City Court to the Westchester County Jail until bail

was posted?

A. No.

MR. ARONWALD: I don't have any further questions. Thank you very much.

(Time noted: 2:20 p.m.)

A C K N O W L E D G E M E N T

I, ROBERT PAVONE, hereby certify, I have read the transcript of my testimony taken under oath in my deposition of April 1, 2014; that the transcript is a true, complete and correct record of what was asked, answered and said during this deposition, and that the answers on the record as given by me are true and correct.

_____________________________

ROBERT PAVONE

Sworn and subscribed to before me

this ____ day of __________ 2014.

_________________________

Notary Public

C E R T I F I C A T E

State of New York)

ss

County of New York)

I, ERIKA CAREN, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That ROBERT PAVONE, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given in such proceeding.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness, whereof, I have hereunto set my hand this 16th day of April, 2014.

Erika Caren

ERIKA CAREN

Errata Sheet

NAME OF CASE: SHERRIE DEANDA -against- TIMOTHY HICKS, ANGELA CAPORALE

DATE OF DEPOSITION: 04/01/2014

NAME OF WITNESS: ROBERT PAVONE

Reason Codes:

1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

_______________________

**1**

**1** 4:3 6:19 12:18 13:2 41:7
**1/8** 29:3
**10532** 4:4
**12-week** 24:15
**16** 23:19 24:16 26:9,25 27:16
**16-week** 25:7 26:2
**1994** 18:12 19:9
**1995** 19:13
**1999** 19:14 20:2, 12

**2**

**2** 13:12 30:10
**20** 27:14,16
**2003** 20:12,14
**2004** 22:5
**2006** 21:8,9,10
**2012** 9:17,25 11:7, 12,25 12:7,12 15:8,13,23 17:8 21:25 22:11,17 27:21 29:14 30:7, 11 31:7 36:15,17, 21 37:13 38:19 39:10,17
**2013** 21:20
**2014** 41:7,19
**21** 29:23
**220** 29:25
**220.00** 29:15 30:10
**220.09** 28:8,18
**26-week** 23:25 24:9
**28** 9:16,25 11:7, 11,25 12:7,11 15:7,13,23 17:8 21:25 22:11,17 27:21 29:14 30:7, 10 31:7 36:15,17, 21 37:13 38:18 39:10,17
**2:20** 40:6

**3**

**30** 34:5
**33** 25:5 26:22 27:4 29:19 30:9
**3305** 25:10,15,18 27:22 30:8

**4**

**4** 6:2
**40** 29:8
**4th** 28:10,22

**5**

**50H** 13:22

**6**

**6/21/74** 18:25

**A**

**A.d.a.'s** 10:17
**abuse** 36:12
**academy** 23:17, 25 24:9 25:24 26:4 27:14
**accredited** 18:22
**acknowledgment** 38:20
**action** 4:10 6:5,17 13:3 14:4,24
**activated** 33:25
**activates** 34:6
**activities** 21:15
**additional** 10:5,9, 18
**address** 4:3
**addressed** 10:19
**advise** 36:16 38:7
**advised** 5:14 6:4 31:7 38:19
**agency** 19:18,21
**agents** 30:15
**aggregate** 29:2
**agree** 12:21 35:22
**agreed** 12:25
**airport** 20:22
**alluded** 8:10 23:9
**amended** 12:17, 19,23 13:2,13
**and/or** 35:25
**Angela** 9:15
**answers** 39:13 41:11
**appearance** 4:15
**appeared** 12:16 13:19
**appearing** 4:13
**apply** 30:14
**appointed** 27:20
**April** 41:7
**Aronwald** 4:7,9 5:19,22 6:2,9,13, 18 12:21 25:16 29:12 40:4
**arrest** 11:25 12:8, 13 15:7,13,17 16:12,20 24:19 31:3,16 32:22 35:25 36:15 39:10, 17
**arrested** 33:3 36:8
**arresting** 12:3 36:18
**arrests** 22:13,24 36:12
**article** 25:4 26:22 27:4 29:19 30:9,11
**assigned** 20:7,10 21:6 22:19,25 33:14
**assignment** 20:13
**assignments** 20:22
**assist** 16:11
**assistance** 22:12,23,24
**Assistant** 10:14
**assisting** 31:3 36:14
**assists** 15:16,18
**attached** 6:25
**attend** 23:25 24:8, 11
**attended** 27:14
**attorney** 10:14 14:3,6
**attorneys'** 5:15
**audio** 33:21
**auspices** 24:2
**automatically** 33:25
**aware** 17:6 25:9, 18 27:2,21 29:14 30:7,17 39:2

**B**

**back** 20:18 21:23 23:9 33:15 34:5
**background** 17:25
**backup** 17:7
**bail** 39:22,25
**base** 34:22
**Based** 27:18
**basic** 23:16
**begins** 34:4
**belonged** 31:11 32:22
**birth** 18:24
**blanks** 17:17
**boiler** 15:21
**booking** 7:17 38:2
**bottle** 29:7
**bottom** 7:4
**Bronx** 12:7
**brought** 37:14,18
**brutality** 36:12
**building** 20:21
**bureau** 10:13,16, 19
**business** 4:3

**C**

**calls** 12:11
**camera** 33:23 34:8,11,15
**cameras** 33:18, 21,24 35:23
**capacity** 15:23 19:11
**Caporale** 13:4 14:18 17:4,7 39:10,17
**car** 36:17 39:3
**career** 23:23
**Carolina** 9:8
**cars** 33:23
**case** 4:24 7:12 13:23 14:7,11,16 15:2 35:3,14 38:23
**cases** 7:7
**certify** 41:5
**Chapman-langrin** 4:21 5:18, 21,24 6:12,14 12:24 25:14 27:7 28:2 30:3 31:24 33:11 36:3 38:9,14
**charge** 26:14 28:12 29:10
**charged** 28:13 29:22

**check** 9:6,7
**checklist** 7:12
**chief** 10:16,19
**children** 39:3,7
**City** 10:12 19:10 33:4 39:22,25
**civil** 4:12 21:22 22:8
**claims** 13:22 14:3 36:11
**Class** 28:9
**clear** 6:20
**close** 29:3,8,18
**clothes** 21:12,13
**college** 18:2,4,11, 18 19:3,4,8
**Commission** 9:3
**communications** 9:4
**Community** 18:5, 11,18 19:3,4,8
**complaint** 4:25 8:9,12 10:23 11:13,17,22 12:17, 23 13:2,3,6,13 15:20 16:19,22 28:7,13,16 29:21 30:19,20 31:8,15, 20 32:7,16 33:8
**complaints** 15:20 21:14
**complete** 41:8
**completely** 17:14
**compounds** 28:24,25
**comprises** 36:24
**computer** 15:21
**conducted** 21:2
**confidential** 7:4
**confusing** 17:18, 19
**conjunction** 21:15
**connection** 13:21 14:3 15:13 36:15
**consist** 23:15
**contact** 37:23
**contained** 6:8
**content** 7:12
**context** 29:24
**continues** 15:16 34:8
**Continuing** 29:5
**control** 20:24 30:12
**controlled** 25:13, 21 26:14 27:6,24 28:10,21 29:17 30:12
**conversation** 31:17,21
**conversations** 32:17
**copy** 9:2,8,9 10:6 13:20
**correct** 6:5,6 8:5, 15 9:24 10:15 11:9,25 12:4 13:7 18:19,23 22:9,10, 15 23:3,8,13,14 26:3 28:10,11,18, 19 29:3,10,11 30:2,5 32:18,19 34:2,6,13 36:5,8,9, 12,13 37:5,11 38:13 39:19 41:9, 12
**correctly** 31:6
**Cortland** 20:21
**counsel** 12:25 13:14
**counties** 19:20
**county** 4:11 7:2 14:3 20:4,20,22 21:3 23:11,17 24:6,14 25:8 26:6 33:18 39:25
**County's** 5:14
**court** 10:12 36:7 39:22,25
**cover** 7:6,12 10:18
**crimes** 19:24 20:15 21:3, 23:4
**criminal** 16:16 24:24 25:12,21 26:14,18 27:5,24 28:9,21
**custom** 24:6

### D

**dashboard** 34:12
**data** 34:22
**date** 18:24 29:5
**day** 17:4 36:23,24 37:6,8,10 41:19
**DCJS** 9:5
**Deanda** 9:6 14:2 15:7,14 29:22 31:4,10 32:21 33:2 36:18 37:13,17 38:24 39:11,18,21
**Deanda's** 11:25 12:12 31:16 33:10 39:3
**declined** 38:6
**defendant** 13:7 29:6
**defendants** 13:5
**definition** 16:5,6 29:25
**definitions** 29:16
**degree** 18:8 28:10,22
**demand** 6:11,15
**Department** 4:11 7:2 19:10 23:11 24:7,14 26:7
**depends** 16:5
**depicted** 9:13
**deposition** 17:21 41:7,10
**describe** 19:7
**designed** 36:6
**desire** 38:4
**desk** 37:12
**detective** 7:16 15:10,11,16,24 16:2,7,10 21:25 22:4,8,11,17,22,24 36:21,25
**digital** 35:7
**Directed** 6:12
**discovered** 23:5
**discovery** 6:10, 15
**discuss** 14:7
**discussion** 29:13 32:21
**discussions** 14:10,23 39:9
**disposition** 10:8, 9
**District** 10:14
**division** 7:3 15:16 19:14 20:8,11,18 21:16,24 22:15,22, 25 23:3,7 33:15 35:9,11,25 36:21, 25 37:4 38:18
**DMV** 9:5
**document** 5:3,4,6 6:8,21,25 7:5,8,10, 13,22,24 8:4,9,10 10:6,10,12
**documents** 4:14, 17 7:15,21 8:11 10:21 11:6,10 16:15
**Doe** 6:19
**downloading** 35:21
**drawing** 15:19 16:18
**drew** 30:20
**driver** 33:25
**driver's** 9:9,11, 13,21,22
**drug** 28:25
**drugs.com** 9:7
**duly** 4:5
**duties** 20:19

### E

**E-justice** 9:3
**earlier** 17:10
**education** 18:18 23:10
**educational** 17:25 18:22
**effect** 16:9,10
**Electronics** 18:9
**employees** 30:15
**employment** 19:6,7
**enforcement** 18:3,20 23:12
**enforcing** 19:23
**entire** 17:15
**entitled** 30:16
**environmental** 19:10,24 20:15,24 21:3 22:7
**equipped** 33:18, 24
**essentially** 28:17
**established** 31:25
**evidence** 10:7,8,9 16:16 35:2,14 36:6,19
**EXAMINATION** 4:7
**examined** 4:5
**exhibit** 5:2,24 12:18 13:2,12
**experience** 27:18
**extensive** 18:2

### F

**facilities** 19:23

fact 33:4
favor 7:8
Fax 10:18
feel 17:21
fell 37:9
felony 4:25 8:9,12 10:23 11:12,17,21 15:17,20 16:12,18, 22 22:13,23 28:7, 9,13,16 29:21 30:19,20 31:8,15, 20 32:7,15 33:8
fields 34:11
filed 13:3,13
filing 14:14,24
fill 17:17
fingerprint 9:5 11:13
fingerprinting 37:21
finished 4:22 23:21
fixed 34:20
flexible 36:25
focused 34:15
folder 11:15
follow 25:24 34:25
Fontenette 9:23 31:11,17,21 32:8, 17,23 33:9
Forgetting 6:24
form 27:8
formal 18:17 23:20
formalized 23:12
forms 15:22 30:14
forward 34:12
fully 17:18
function 16:8 33:21

G

gave 13:21 31:2
general 12:15 21:10 22:20,25
generated 21:18
give 38:6
graduate 18:4,8, 10
graduated 18:19 19:8
graduating 19:4
guess 17:17
guilty 28:21

H

handles 35:21
happened 21:9, 21
happy 17:20
Hawthorne 4:4
Hazardous 21:5
headquarters 32:9
Health 25:4,17,19 26:22,23 27:4,23 29:19 30:8 38:18
hear 17:15
heard 24:10
hearing 13:22
held 13:22 29:13
Hicks 4:19 6:16 8:18 14:11 15:14, 25 16:23,25 17:7 30:21 31:2,7,14,19 32:2 33:7 36:14 37:18 38:13,15 39:4,16
Hicks' 11:21 37:9
high 18:13,15 19:4
highway 20:20
histories 16:17
history 10:10 19:7
home 33:10
honestly 28:5
hours 36:22,24 37:8

I

identified 6:7
identify 7:9,13,14
impound 9:4
incident 7:18,23, 24 8:3 10:23 11:12,18,21 30:22
incidental 30:15
include 24:17,21 26:20
included 11:10
including 21:18 26:13,22 27:19
individual 9:13
individuals 14:24
information 16:21,24 17:3 30:21 31:2
Initially 23:16
inspector 19:12
institutions 18:22
instruction 24:17 26:10,20 27:2
introduce 38:3
investigate 23:4
investigating 21:14
investigations 21:2,11,17 22:20, 25
involved 16:20 23:6
involvement 39:20
involving 29:17

J

Jail 39:25
Jane 6:8,19
job 24:8
John 6:7,19
joined 23:10
July 21:20
jurisdiction 19:18

K

knowingly 28:22 29:6,22
knowledge 38:12

L

lab 10:6,7
labelled 8:2
Largely 16:13
late 20:12
Lavin 10:11
law 10:11 18:2,20 23:12 24:22,25 25:4,10,11,15,17, 19,20 26:11,18,23 27:4,5,23 28:9,17 29:15,19 30:2,8,9
lawfully 30:16
laws 26:22 28:5
lawsuit 5:15 14:12,13,14
lawyer 17:22
learned 27:15
left 13:15 33:9
letter 10:19
license 9:6,9,10, 13,21,22
licenses 9:12
lights 34:2,6
list 21:23 22:8
location 29:6
long 19:25 20:10 21:6,19 34:17

M

made 9:3 22:13 36:17
make 22:23 30:25 35:17
makes 16:12
making 24:18
manually 34:9
mark 35:2,13 36:16
marked 12:18 13:11 33:17
material 21:5
matters 14:25
means 29:18
memorialize 35:24
memorializing 30:25
mentioned 12:23 17:10
Mill 4:3
minute 18:21
minutes 7:20
Miranda 38:8,19
mission 19:21
mixtures 28:24 29:2
Monique 9:15

N

named 6:4,18,19 13:3,7
names 6:8 12:20
narcotic 28:25
narrative 30:23
newly-formed 20:15,23

night 33:10
North 9:8
notary 4:5 41:23
note 27:7 28:2 30:3 31:24 32:2, 33:11 35:17 36:3 38:9,14
noted 40:6
notes 30:25
notify 35:19,20
numerous 20:22

O

oath 41:7
objection 27:8,11 28:3 30:4 31:25 32:3, 33:12 36:4 38:10,15
objective 35:23
occasion 14:7
occurred 12:7
offer 34:9
offered 32:8
office 5:15 10:11, 17 15:21 20:20
officer 4:19 11:21 12:3,11 13:4 14:11,17 15:14,17, 25 16:4,11,14,23, 25 17:4,6,7 25:9 27:19,21 30:20 31:2,6,14,19 32:2 33:7,16 34:5,9,25 35:13,20 36:2,11, 14 37:9,12,18 38:12,15 39:4,9,16
officers 4:10 16:17 22:12,23 24:7
offices 20:21
official 30:13
operate 34:8
operations 22:14 23:7
opportunity 12:17 38:5
order 35:2
ounce 29:3
ounces 29:23
overhead 34:2
overheard 34:6
overwhelming 16:14
oxycodone 29:8, 23 31:10,22 32:9

P

p.m. 40:6
P.O. 8:18
packaged 16:16
pages 5:7,8 6:22, 24 8:7
paperwork 15:19 16:13
paren 29:8
Parkway 4:4 12:7
part 30:9 38:17,18
patrol 7:3 16:4,11, 17 20:7,11,18,20, 22 21:16,18,23 22:12,15,23 23:2,7 33:14,16,17 34:9, 25 35:5,8,11,13,25 37:3
patrolman 20:16
Paul 10:12,15,18
Paula 9:23 31:11, 17,21 32:7,17,23 33:9
Pavone 4:1,8 40:1 41:5,15
Penal 24:22 25:10,11,15,20 26:11 27:5,23 28:9,17 29:15 30:2,9
people 6:7
period 31:3 33:15
person 9:16,25 28:20
persons 30:16
photograph 9:12, 21
photographing 37:21
pills 29:8,23 31:10,12,22 32:10, 22 33:4,9
place 34:25
placing 32:21
plain 21:12,13
Plains 39:22,24
plaintiff 4:9 13:21
Plaintiff's 5:2 12:18,25 13:12
plastic 29:7
plate 9:7 15:22
play 15:6,12
point 5:7,20,22 20:3 34:21 38:7
police 11:20 13:4 14:17 15:14, 16:25 19:13 20:4 23:17 24:2 25:9 27:14, 18,20 33:16
policy 22:21
portion 6:7 30:23
position 16:2,3 19:25 22:9 35:18
possess 29:7
possesses 28:23
possessing 29:23
possession 25:12,21 26:14 27:6,24 28:9,21 30:12,15,16
posted 40:2
practice 24:6 38:4
precinct 19:17
preparation 4:14 7:21 11:3 15:19 31:15 33:8
prepare 11:15
prepared 4:18,24 7:15,16,18,19 8:13 11:17 16:15 28:7 29:21 30:19 31:8, 20 32:7,15
prescription 30:13 31:12,23 32:9,24
prescriptions 28:23,25
presence 8:22
present 16:19
preserve 35:19
preserved 34:18
printout 9:7
prior 4:13 6:21 8:11 10:22,25 12:8 14:12,15 25:8 27:20 31:7,14,19 32:6,21 33:2,8
probable 24:18
procedure 24:24 26:18 35:16
procedures 34:24 35:12 38:17
process 36:14
processing 37:14,17
program 18:6 23:25 24:9,11,14, 15 26:2
promoted 21:22 22:4
property 9:8 10:5, 7,9,10,11
prosecution 36:7 39:18
protect 36:10
Protection 19:10
provide 36:6
provided 16:23, 24 17:4,7 30:21 38:5
providing 22:12
provisions 25:12, 20 26:13,21 27:5, 23 30:11
public 4:5,11 7:2 23:11 24:7,15 25:4,17,19 26:7, 22,23 27:4,23 29:19 38:18 41:23
purpose 16:8 35:23
purse 29:9
pursuit 35:25
put 6:15 16:21 28:12

Q

question 17:12, 14,15,17,19
questioned 31:9
questioning 17:11
questions 12:15 39:14 40:5
quote 28:20 29:3, 18

R

rank 15:24 16:2
read 41:6
reading 6:6
rear 34:15
reassigned 21:10,23
recall 8:21 11:19, 20,23 12:19,20 13:6,16,18,19 14:5 37:12,15 39:12
receipt 10:8
receive 26:10,17
received 12:10 27:3,19
recited 28:17
recognize 8:19, 25

**recollection** 6:23
**record** 6:9 10:8,9 29:12,13 39:14 41:9,11
**record-keeping** 38:17
**recording** 34:4 35:18
**recruit** 23:16,22 24:13
**refer** 11:18
**referred** 7:22 11:11 28:8 30:9
**referring** 7:25 25:23 28:6
**relate** 25:3
**relating** 14:7 25:21 26:13,21 27:24 29:16 33:15 36:17 39:10,17
**relationship** 25:11,19 27:3,9, 15,22 28:6
**remained** 19:14
**removed** 34:21 35:6
**repeat** 13:24 22:16
**rephrase** 17:20
**report** 4:18,24 7:16,18,23,24 8:3 10:10,23 11:12,18, 21 30:22
**reported** 23:5
**representing** 4:9
**request** 17:13
**required** 16:10 24:8
**requirements** 35:13
**respect** 12:15 13:22 14:17,20 15:7 20:23 22:14 23:2 24:21 26:17 33:20
**response** 9:5 11:13
**responsibilities** 22:14 23:2
**restate** 17:16
**restricting** 30:12
**result** 25:7
**return** 33:4
**review** 12:17 13:9
**reviewed** 4:14 7:21 8:11
**rights** 4:12 38:8, 20,21
**River** 4:4 12:7
**ROBERT** 41:5,15
**role** 15:6,12 20:24
**room** 38:2
**rule** 16:9
**run** 16:16

**S**

**Safety** 4:11 7:2 23:11 24:7,15 26:7
**scene** 11:24 12:12 31:16 32:8
**school** 18:13,15 19:4 23:16
**seat** 34:15
**seated** 13:14
**seconds** 34:5
**Section** 25:9,18 27:22 28:8,17 29:15,25 30:8,10
**sections** 28:4
**security** 19:22
**separate** 28:4,5
**sergeant** 4:8 10:11 13:4 14:20 15:4,9 21:22 33:14
**served** 13:13
**service** 20:21 21:23 22:8
**Services** 7:3
**set** 30:22
**setting** 39:22
**sheet** 7:6,12,17 9:3,4
**sheet also** 10:18
**Sherrie** 9:6 11:24 14:2 15:7,13 29:22 31:4,10,16 32:21 33:2,9 36:18 37:13,17 38:24 39:3,11,18,21
**show** 4:20
**showing** 6:25 13:11
**shown** 13:20
**sign** 38:20
**signature** 5:8 8:19
**signed** 8:15,17,21
**sister** 31:11,12 32:23 33:5
**social** 20:21
**source** 16:21
**speak** 17:22
**specific** 25:19 36:22
**specifically** 25:4
**spills** 21:5
**standard** 38:4
**starting** 5:5
**State** 8:2 9:9 19:20 24:2,22,24 25:4,10,11,15,16, 20 26:11,18,21 27:5,23 28:8 29:15 30:8,13
**statement** 38:6
**stating** 4:3
**Stein** 10:12,15,19, 20
**stopped** 31:9 39:4
**stopping** 36:18
**stops** 36:11
**Subdivision** 30:14
**subject** 24:18
**submission** 10:6, 7
**subscribed** 41:18
**Subsequent** 14:14
**substance** 25:13, 22 26:15 27:6,25 28:10,22
**substances** 28:24 29:2,17 30:13
**sued** 4:12
**suggest** 36:16
**superior** 15:24 16:3,5
**supervision** 39:16
**supervisor** 16:7 35:8,11,20
**supplemental** 7:16
**supply** 19:12,23
**Sutton** 9:15
**switched** 34:14
**sworn** 4:5 41:18

**T**

**talk** 38:5
**talking** 18:22
**tape** 35:6
**tapes** 35:5
**Taryn** 13:14
**telephone** 12:11
**temporary** 30:14
**term** 29:18,24
**terms** 19:6 23:10 36:22
**testified** 4:6
**testimony** 4:15 7:22 11:3 13:21 14:2 41:6
**thing** 5:19
**Thomas** 13:4 14:21
**tickets** 9:5
**time** 10:3 12:8,22 15:9,15,16 17:6 22:3,6 23:19 29:6 30:20 31:8,9,20 32:6,15 33:16 34:4,5,21 35:5,17 37:13 39:3 40:6
**Timothy** 6:16
**today** 4:13 5:3,9 6:21 7:10,22 8:11 10:22,25 12:16 13:17,20 14:15 16:10 22:22 30:11 33:15
**told** 31:10,22 32:2, 22 33:3,6,7
**top** 5:4,5 6:6 8:3
**totally** 14:25 32:16,20
**tour** 36:22,23,24 37:6,8,9
**Town** 20:21
**tracking** 10:10
**traffic** 9:5
**training** 18:2 23:13,15,21,22 24:17,18,21 25:3, 7,24 26:2,4,10,17, 20 27:2,16,19
**trainings** 23:24
**transcript** 13:20, 25 41:6,8
**transfer** 10:8
**transferred** 19:13 20:14
**transported** 39:21
**transporting** 39:24
**true** 41:8,11
**turn** 35:20

turned 34:9
turns 33:25
two-paged 8:4
two-year 18:6
type 21:4
types 21:17
typically 11:14

U

unaware 32:16, 20,25 34:16
unclear 17:12
understand 17:18 27:10,12 31:6 35:4
understands 27:11
Understood 17:24
underwent 25:8
uniform 21:12
unit 10:11 20:15, 24 21:7,11 22:6,7, 19
unlawfully 28:23 29:7,18,23,24,25
unrelated 14:25
Utica 24:3

V

vague 27:8
valid 31:23 32:24
varies 37:2
vehicle 9:4 34:15
vehicles 33:17
version 12:19
VHS 35:5
video 34:21 35:2, 14,23 36:16
videos 34:17 35:21
view 34:11
violating 4:12
violation 29:19
violations 29:16
voucher 10:5 35:6
vouchers 9:8

W

water 19:12,22
weeks 23:18,19 24:16 26:9,25 27:16
weight 29:2
Westchester 4:11 7:2 18:5,10, 13,18 19:2,3,8,15 20:4 21:3 23:11,17 24:6,14 25:8 26:6 33:18 39:25
whatsoever 30:21 39:20
White 39:22,24
William 4:8
wished 35:18
wit 29:5
word 7:3
work 19:9
worked 19:16 20:20
working 36:22 37:6
written 38:6

Y

years 27:14,16
yesterday 5:20
Yonkers 10:12
York 4:4 8:2 19:9, 20 24:2,22,24 25:4,10,11,15,16, 20 26:11,18,21 27:4,22 28:8 29:15 30:8,13
Yorktown 19:16
young 39:2