# EXHIBIT I

**ORIGINAL**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------X
SHERRIE DEANDA,

Plaintiff,

INDEX NO.
13 CV 1203 (KMK)

-against-

TIMOTHY HICKS, ANGELA CAPORALE, ROBERT PAVONE AND WILLIAM THOMAS IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES AND A POLICE OFFICERS OF THE COUNTY OF WESTCHESTER,

Defendants.
----------------------------------------------------X

EXAMINATION before trial of the Non-party, PAULA FONTENETTE, taken pursuant to subpoena, held at 148 Martine Avenue, White Plains, New York, on April 7, 2013, at 10:00 a.m., before a Notary Public of the State of New York.

* * *

DOUGLASS REPORTING COMPANY
445 Hamilton Avenue - Suite 1102
White Plains, New York 10601
(914) 426-2400

A P P E A R A N C E S:

ARONWALD & PYKETT
Attorneys for Plaintiff
81 Main Street, Suite 450
White Plains, New York 10601

BY: WILLIAM I. ARONWALD, ESQ.

WESTCHESTER COUNTY LAW DEPARTMENT
Attorneys for Respondents
148 Martine Avenue
White Plains, New York 10601

BY: TARYN CHAPMAN-LANGRIN, ESQ.

IT IS HEREBY STIPULATED AND AGREED, by and between the attorneys for the respective parties hereto, that this examination may be sworn to before any Notary Public.

IT IS FURTHER STIPULATED AND AGREED that the sealing and filing of the said examination shall be waived.

IT IS FURTHER STIPULATED AND AGREED that all objections to questions except as to form shall be reserved for trial.

P A U L A M. F O N T E N E T T E, the Non-party herein, having been first duly sworn by Joseph Carollo, a Notary Public of the State of New York, was examined and testified as follows:

THE COURT REPORTER: Please state your name for the record.

THE WITNESS: Paula M. Fontenette.

THE COURT REPORTER: And your address.

THE WITNESS: [redacted]

EXAMINATION BY MS. LANGRIN:

Q. Good morning, Ms. Fontenette. My name is Taryn Chapman-Langrin, senior assistant county attorney representing Officer Hicks and a few of the other officers in this action. I'm just going to ask a couple of questions about what information you may know about the action.

I'm going to ask you to keep your responses verbal. That means no nods or shakes of the head because the court reporter can't pick that up. If you need speak with counsel for any reason let me know. If you need to go to the ladies room, get a drink of water, that can be accomplished.

Just let me know. If you for any reason you don't understand my question please let me know. I'll rephrase the question.

Who lives with you at 127 West 82nd Street?

A. My two daughters.

Q. What are their names and ages?

A. Keyra, K-E-Y-R-A. She's 31. And C-Y-T-I-A, Cytia. She's 26.

Q. And did you reside at 127 West 82nd Street, apartment 6A on May 28th, 2012?

A. Yes.

Q. And it's an apartment?

A. Yes.

Q. How long have you lived there?

A. Over 40 years.

Q. What is your date of birth?

A. 10/6/60.

Q. What is your marital status?

A. Divorced.

Q. When were you divorced?

MR. ARONWALD: Note my objection.

A. I think '91. I'm not sure.

Q. All right. Would you please describe your

educational background?

A. Graduated high school.

Q. What high school did you graduate?

A. Martin Luther King, Jr.

Q. Where is that?

A. Manhattan.

Q. So you have no college courses?

A. Not really.

Q. Have you ever been convicted of a crime?

A. No.

Q. Are you presently employed?

A. No.

Q. When were you last employed?

A. I don't know.

Q. Has it been ten years ago or something else? Five years ago?

A. In '99.

Q. What's the reason you're not employed?

A. Health.

Q. What about your health makes you not be employed at the present time?

MR. ARONWALD: Note my objection again.

A. A lot of limitations.

Q. Has it been determined that you are

disabled?

A. Yes.

Q. In what way? How are you disabled?

A. My limitations physically and mentally.

Q. What are you limitations physically?

A. I can't stand for very long.

Q. I notice you have a cane. Why do you use the cane?

A. Because my knees are bad and my lower back.

Q. Do you have a mental disability?

A. Suffer from depression.

Q. Now, do you receive disability income?

A. Yes.

Q. Okay. And how long have you received disability income?

A. I don't know.

Q. Ten years? Five years? Something else? You don't have to be exact.

A. Maybe ten years.

Q. Now, is disability income your sole source of income?

A. Mine, yes.

Q. Now, how is your disability treated? Are

you under care of a physician for your physical disability?

A. Yes.

Q. Okay. And how are you being treated for your disability?

MR. ARONWALD: You mean now or in May of 2012.

MS. LANGRIN: We'll do May of 2012.

A. Pain management.

Q. At that time May 28th, 2012, were you being treated by a specific physician?

A. My primary care doctor.

Q. Who is that?

A. Jessie Fields.

Q. Where is he located?

A. She.

Q. Mount Vernon?

A. In Harlem I guess you would call it.

Q. What type of pain medication would you receive for your condition in May of 2012?

MR. ARONWALD: May of 2012.

MS. LANGRIN: May of 2012.

A. Oxycodone.

Q. And did Dr. Fields prescribe the Oxycodone

for you?

A. Yes.

Q. How long had you been taking Oxycodone prior to May 28th, 2012?

A. For years. I don't know.

Q. Can you give me an approximation if you can?

MR. ARONWALD: If you can.

A. Maybe ten years.

Q. And in May 28th, 2012, at or about that time what was your prescription in terms of Oxycodone? What was your dosage amount you were required to take? How many times a day?

A. I'm not 100 percent sure at that time what the dosage was. I think it was two pills every four to six hours.

Q. Was there a maximum amount of pills you could take in one day?

A. Ten.

Q. This was at or about May 28th, 2012?

A. Yes.

Q. What was the dosage?

MR. ARONWALD: If you remember.

MS. LANGRIN: Counsel, please.

MR. ARONWALD: Let me just -- one of the problems we have is that she did sign a statement. All the information from the prescription was written down on the statement that she gave at that time.

The district attorney's office has provided both you and I only with a redacted statement and redacted all the prescription information including the dosage that she wrote out at that time. She never received the unredacted statement.

MS. LANGRIN: Understood.

MR. ARONWALD: So as you know I've requested a copy of the unredacted statement and as soon as I receive it, assuming I do, I'm going to give a copy of it to you.

MS. LANGRIN: Understood. But she can testify from her memory.

MR. ARONWALD: If she remembers.

MS. LANGRIN: That's it.

A. It could have been 15 milligrams or 20. I'm not exactly sure.

Q. Okay. What exactly is Oxycodone to your knowledge?

P. FONTENETTE

A. Pain medicine.

Q. And does your physical disability have a diagnosis, medical diagnosis associated with it?

A. Spinal stenosis and fibromyalgia.

Q. What is spinal stenosis?

A. Narrowing of the discs in my back.

Q. Narrowing of discs in your back?

A. Yes.

Q. And what is fibromyalgia? Is that the same thing or something different?

A. No. It's nerve.

Q. Nerve condition?

A. Yes.

Q. Is the nerve condition confined to any part of your body?

A. No.

Q. Just where? All over your body?

A. Yes.

Q. Now, did you review any documents in preparation for this deposition?

A. The one that's in front of you.

Q. That would be your supporting deposition which has been marked as Defendant's Exhibit A which has a date of June 25th, 2012. You recognize that?

A. Yes.

Q. And what is it?

A. My statement.

Q. Okay. And that's the only thing you reviewed in preparation for this deposition?

A. Yes.

Q. Did you review any testimony that your sister gave? That would be Sherrie Deanda. Did you review her testimony before coming here today?

A. No.

Q. Were your family members aware that you were taking Oxycodone prior to May 28th, 2012?

A. I assume so.

Q. Okay. Would that include Sherrie Deanda?

A. Yes.

Q. So Sherrie Deanda was aware you were taking Oxycodone prior to May 28th, 2012?

A. I think so.

Q. And let's get to the date of the incident which is May 28th, 2012. Now, did you become aware at some point that your sister had been stopped by an officer on the Bronx River Parkway on that date?

A. Yes.

Q. How did you become aware?

A. She called me.
Q. So she called you?
A. Yes.
Q. Do you know where she was when she called you?
A. On the highway.
Q. On whose phone did she call?
A. I don't know. I guess it was her phone.
Q. What was your conversation about when she called you on that day?
A. She told me she was pulled over for speeding and they were arresting her.
Q. Did she tell you anything else?
A. I asked her why and she said because of my pills.
Q. Meaning because of your pills?
A. Yes.
Q. And what about those pills did she tell you was causing her to be arrested? Did she tell you that?
A. They were in a container with no label.
Q. So that container with no label had pills in them?
A. Yes.

P. FONTENETTE

Q. And they were Oxycodone pills?

A. Yes.

Q. And the unlabeled pill container, did it belong to you?

A. Yes.

Q. And the Oxycodone pills that were in that unlabeled pill container also belonged to you?

A. Yes.

Q. And at the time your sister was pulled over on May 28th, 2012, you were not in possession of that unlabeled pill bottle?

A. She had it.

Q. So my question is: You were not in possession that have unlabeled pill bottle? And at the time your sister was pulled over on May 28th, 2012, you were not in possession of the Oxycodone pills that they found on her in the vehicle?

A. Right.

Q. So after you had the discussion with your sister then, what did you do next? Anything?

A. That was all she told me. She put the officer on the phone.

Q. So it was your sister who put the officer on the phone?

P. FONTENETTE

A. Yes.

Q. Where were you when your sister called you physically in terms of location?

A. In my apartment.

Q. And that would be in New York City?

A. Yes.

Q. Now, when you spoke to the officer on the phone was anyone with you?

A. There were other people in my apartment?

Q. Who were they?

A. My cousins Monique and Mark. I'm not sure if my daughters were there.

Q. Okay. But Monique and Mark were present with you when you had the conversation with the officer?

A. They were in the apartment. They weren't present with me.

Q. Okay. Where were they when you were having the conversation with the officer?

A. In another room.

Q. Were they able to overhear your conversation with the officer?

MR. ARONWALD: Objection to the form. It calls for speculation. They were in another

room. How could she know whether they overheard it or not?

MS. LANGRIN: All right.

Q. Okay. So what happened once your sister put the officer on the phone?

A. I asked him why he was arresting my sister.

Q. Did he tell you that your sister was under arrest at the time that you spoke to him?

A. I don't know. I don't remember.

Q. Okay. So you asked him why he had arrested your sister?

A. Yes.

Q. And what did he respond?

A. He didn't respond to it. He asked me who was coming to pick up the kids.

Q. So the officer asked you who was coming to pick up the kids?

A. Yes.

Q. Where do Monique and Mark reside?

A. North Carolina.

Q. How old are Monique and Mark?

A. I don't know.

Q. Approximate age? Older than you, younger

than you, something else?

A. Younger.

Q. They're younger than you? By about how many years?

A. Not sure.

Q. When your sister was stopped were there any other persons in the vehicle with her to your knowledge?

A. Her granddaughter.

Q. What's her granddaughter's name?

A. Jada.

Q. How old was Jada at or about May 28th, 2012?

A. Ten.

Q. And who else was in the vehicle with her sister?

A. Peyton.

Q. And who was Peyton in relation to your sister?

A. Cousin.

Q. And how old is Peyton?

A. I'm not sure if she was nine or ten. I'm not sure exactly.

Q. So the officer asked you who was coming to

pick up the kids. And did you have a conversation with him as to whether you would be able to pick up the kids?

A. What did I tell him? Well, I couldn't actually do it.

Q. Did he ask you whether you were able to pick up the kids?

A. He just asked me who was coming to pick up the kids.

Q. And what did you respond?

A. I said one of the kids' parents and myself.

Q. Why were you unable able to pick up the kids?

A. I don't drive.

Q. How long have you been not been driving? How long has it been since you don't drive?

A. I just don't drive.

Q. How long has it been since you don't drive? 10 years, 12 years?

A. I just have a driver's license.

Q. You're not answering my question. How long in terms of time has it been that you don't drive?

A. I'm still not getting it.

Q. You said you don't drive. What's the reason you don't drive?

A. I have phobias.

Q. And these phobias have caused you not to drive?

A. Yes.

Q. How long have these phobias made it where you don't want to drive?

A. Twenty years I guess.

Q. You have a driver's license?

A. Yes.

Q. So approximately how long were you on the telephone with Officer Hicks?

A. I don't know.

Q. Two minutes, three minutes or something else?

A. It was not long at all. I don't know.

Q. And during your conversation with the officer did he ask you who owned the pills, the Oxycodone pills?

A. No.

Q. And during your conversation with Officer Hicks did he ask you who owned the unlabeled pill

bottle?

A. No.

Q. During your conversation with Officer Hicks did he ask you whether you owned the Oxycodone pills?

A. No.

Q. During your conversation with Officer Hicks did he ask you whether you owned the unlabeled pill bottle?

A. No.

Q. So what else did you discuss with the officer on the cell phone?

MR. ARONWALD: You're asking to relate the entire conversation?

MS. LANGRIN: In sum and substance.

A. I asked him why was he arresting my sister.

Q. Did he respond?

A. No. He said who is coming to get the kids. But she already told me.

Q. Who is she?

A. My sister.

Q. Had already told you what?

A. She told me that he was questioning her

about the pills that belonged to me.

MR. ARONWALD: I'm going to object because if you're asking her to relate the entire conversation you have to let her relate the entire conversation.

MS. LANGRIN: I haven't said anything.

MR. ARONWALD: She began relating the conversation. You interrupted her and asked her a question as to what he said.

MS. LANGRIN: I don't believe I interrupted her.

MR. ARONWALD: Okay.

MS. LANGRIN: I did not interrupt her.

MR. ARONWALD: If you asking her to relate the entire conversation can you let her relate the entire conversation?

MS. LANGRIN: Let the record reflect I did not interrupt her. You interjected and interrupted. It was not me.

MR. ARONWALD: I'm not here to argue.

MS. LANGRIN: I know you're not. But you're saying I interjected and interrupted and I didn't.

MR. ARONWALD: The record speaks for

itself.

MS. LANGRIN: Absolutely.

MR. ARONWALD: I'm just asking if you're going to ask her to relate the entire conversation, let her relate it and then ask her when she's finished if she's finished relating it.

MS. LANGRIN: Well, I'll ask the question that I want to ask. But point well taken. What was the last question please?

(Record read back.)

MS. LANGRIN: There was no interruption.

Q. During your conversation.

MR. ARONWALD: Again, the record speaks for itself.

MS. LANGRIN: Please, counsel.

MR. ARONWALD: Please, counsel. Let's not argue with the record.

MS. LANGRIN: We're not arguing with the record.

MR. ARONWALD: Okay. Let's go forward.

MS. LANGRIN: I'd ask you to keep you're colloquy down. You know you're not supposed to do this in a deposition.

MR. ARONWALD: I can make my objections.

MS. LANGRIN: And you've made it, counsel. You've made it. You've made it.

MR. ARONWALD: Are you finished?

MS. LANGRIN: Are you finished?

MR. ARONWALD: No, not yet. I'm saying that I'm simply indicating for the record what my objection is and the record will speak for itself. That's all.

MS. LANGRIN: And the point is well taken. We already established that. We're moving forward.

MR. ARONWALD: Let's move forward.

MS. LANGRIN: Thank you.

MR. ARONWALD: You're welcome.

MS. LANGRIN: Thank you.

MR. ARONWALD: You're welcome again.

MS. LANGRIN: Thank you.

Q. What else did you discuss during your conversation with Officer Hicks?

A. Should I just tell you how it went when I got on the phone?

Q. You can do that.

A. I asked him why he was arresting my

sister. He didn't answer me. I said -- he asked me who was coming to get the kids. I told him that I have a prescription for the pills that she has.

Q. So you volunteered that information?

MR. ARONWALD: See, again--

MS. LANGRIN: Counsel, please. You cannot interruption the deposition, counsel. You cannot do it.

MR. ARONWALD: I'm objecting because you're not allowing her to answer the question.

MS. LANGRIN: Stop yelling.

MR. ARONWALD: I'm objecting because you're not letting her answer the question.

MS. LANGRIN: I let her answer the question.

MR. ARONWALD: She asked you before if you wanted her to tell you how the whole conversation went. You said you could do that. She began doing it and then you interrupted.

MS. LANGRIN: I object to your colloquy.

MR. ARONWALD: It's not colloquy. It's an objection, ma'am.

MS. LANGRIN: And don't call me ma'am. I've already been through this with you. I'm

counselor, Ms. Langrin or Taryn.

MR. ARONWALD: Counselor.

MS. LANGRIN: And don't do it begin.

MR. ARONWALD: Do not ever and I mean ever--

MS. LANGRIN: Off the record.

MR. ARONWALD: No, on the record.

MS. LANGRIN: Go ahead.

MR. ARONWALD: Do not ever talk to me in that tone of voice.

MS. LANGRIN: You will not call me ma'am. Do you understand? And don't point at me. Let the record reflect that you're pointing at me and you called me ma'am.

MR. ARONWALD: It was not meant as a sign of disrespect.

MS. LANGRIN: Well, I'm taking it that way. I told you at the last deposition do not call me ma'am.

MR. ARONWALD: If you take that way then don't be so thin-skinned.

MS. LANGRIN: Don't point your finger at me. Don't raise your voice.

MR. ARONWALD: Let this witness answer

your question.

MS. LANGRIN: And you don't be disrespectful.

MR. ARONWALD: I'm not being disrespectful. You're being disrespectful to the witness and I'm not going to stand idly by and let you do that.

MS. LANGRIN: Stop yelling. Don't point your finger at me again and don't call me ma'am. I'm not going to say it again.

MR. ARONWALD: Yes, counselor.

MS. LANGRIN: Thank you.

MR. ARONWALD: I'll call you counselor or ma'am or whatever.

MS. LANGRIN: No, you won't call me ma'am.

MR. ARONWALD: File a complaint against me for calling you ma'am.

MS. LANGRIN: I don't have to file a complaint against you. You act like you have some sense.

MR. ARONWALD: Just relate the conversation.

MS. LANGRIN: Where were we before the colloquy?

(Record read back.)

Q. So you volunteered the information that you had a valid prescription for the pills?

A. Yes.

Q. What else did you say to the officer?

A. I told him that I could bring it down, I could bring the bottle down, my prescription for the pill bottle down.

Q. That would be a labeled pill bottle?

A. Yes.

Q. And you told him you'd bring it down to where? The scene?

A. To wherever I needed to go. He never told me where I needed to go.

Q. What, if anything, did he reply when you told him you could bring the pill bottle down?

A. He wasn't talking. He said he wasn't talking to me about that. He just wanted to know who was coming to get the kids. And I said again I have the prescription for the pill bottle and I told him I don't know where to go if anything. But because I asked him about the pill bottle again he hung up.

Q. Okay. But prior to him hanging up you had

been on the phone for about two to three minutes?

MR. ARONWALD: Objection. Asked and answered.

MS. LANGRIN: I didn't ask that.

MR. ARONWALD: She said it was a short time. She didn't know whether it was two or three minutes. You can go back and see that that question was asked.

MS. LANGRIN: Well, I'm asking it again.

MR. ARONWALD: And I'm objecting because it's asked and answered.

Q. You had already been on the phone for some time?

MR. ARONWALD: Objection to the form of the question. Some time is -- quantify some time. She's already said she doesn't recall.

A. It wasn't long. That's all.

Q. Prior to him hanging up the phone on you as you put it he had already had the discussion with you as to who was going to pick up the children though, correct?

A. We never discussed it. He just said all I want to know is who is picking up the kids.

Q. Did you tell him who was going to pick up

the kids?

A. I told him I wasn't sure at that point. I hadn't consulted anybody.

Q. Before you got off the phone you never made a determination with him as to who was going to pick up the kids?

A. I'm not sure.

Q. Okay. After your call terminated with the officer then what did you do?

A. I know I went in the other room to speak to the parents, speak to my cousins, Peyton's parents.

Q. That would be Mark and Monique?

A. Mark and Monique.

Q. What did you speak with them about?

A. I told them that Sherrie was being arrested and we had to go pick up the kids.

Q. What did they say?

MR. ARONWALD: Objection.

A. I don't know what they said. Everybody was kind of frantic because they were leaving that day.

Q. Where were they going to?

A. Home.

Q. And home was in North Carolina?

A. Yes.

Q. Okay. Back to your conversation with the officer. Did you tell the officer that your sister was on her way to you to return the pills?

A. Yes, I did.

Q. And you volunteered that information?

A. Yes.

Q. What time was your telephone call with Officer Hicks?

A. I have no idea. It was in the morning. That's all I know.

Q. Do you know if it was around 8:00, 8:15, 8:20?

MR. ARONWALD: Objection. The witness already said she doesn't know.

MS. LANGRIN: I'm entitled to try to refresh her recollection.

MR. ARONWALD: I understand that.

Q. So you're not sure what time the telephone was? But it was in the early morning hours?

MR. ARONWALD: She didn't say early morning.

MS. LANGRIN: I'm asking her.

P. FONTENETTE

A. In the morning.

MS. LANGRIN: She said morning. Early morning hours.

MR. ARONWALD: No. She said morning.

MS. LANGRIN: Early morning.

MR. ARONWALD: Did she say early morning or did she say morning hours? I think she said morning hours.

MS. LANGRIN: To me it's the same thing.

MR. ARONWALD: To her it may not be. That's what's objectionable about the question.

MS. LANGRIN: Fine. Keep objecting.

Q. So at some point did you go--

MS. LANGRIN: There's a question pending. I'm talking.

MR. ARONWALD: Counselor, you just made a comment that was objectionable.

MS. LANGRIN: What was objectionable about it?

MR. ARONWALD: You said keep objecting. My job as was your job during the depositions I took to make whatever objections you that are necessary in order to protect the record because all--

MS. LANGRIN: Counselor, you're being obstructive, okay? I feel you are and you know you're not supposed to do that as per the rules.

MR. ARONWALD: And you're being unprofessional.

MS. LANGRIN: And so are you with the ma'am and pointing fingers you're way beyond unprofessional.

MR. ARONWALD: I'll tell you what. We can be here all day unless we get on the same track.

MS. LANGRIN: If you would be quiet maybe we can get through the deposition. Off the record.

(Discussion held off the record.)

MS. LANGRIN: Let the record reflect he's taking the witness outside. I'm back on the record. That he's taking the witness outside.

MR. ARONWALD: Now she's back on the record.

MS. LANGRIN: And let the record reflect he called me ma'am again when I specifically directed you not to.

Q. At some point did you go to the headquarters in Hawthorne?
A. Yes.
Q. And how did you get there?
A. My cousins drove me.
Q. That would be Mark and Monique?
A. Yes.
Q. What time did you arrive at headquarters?
A. I don't know what time it was.
Q. Was it around 10:00, 11:00 or something else?
A. Late morning, early afternoon. I'm not sure.
Q. Did you arrive before lunchtime?
MR. ARONWALD: Objection to the form of the question.
MS. LANGRIN: What's your objection to the form?
MR. ARONWALD: Objection is I don't know what lunchtime means to her or what it means to you.
Q. Did you arrive before 12:00 do you think?
A. I'm not sure.
Q. Okay. And when you arrived at

headquarters where did you go? You came into headquarters?

A. I walked in. I just walked in there and there was two officers behind glass.

Q. Two officers behind glass. Did you have a conversation with either both of those officers or one of those officers?

A. There were two people there. It wasn't anybody particular. I was just addressing whomever was going to answer the question.

Q. And did you have a conversation with either one of those two officers?

A. I told them I was here because my sister was arrested and I was bringing my prescription bottle proof of who the pills belonged to and also to pick up my relatives, little ones.

Q. That would be the children?

A. Yes.

Q. Okay. And can you describe the officers that you spoke with?

A. One was male and one was female. That's it.

Q. And did you get the male officer's name?

A. I don't remember if I did.

P. FONTENETTE

Q. As you sit here today do you know the name of the male officer that you spoke with?

A. I was told but I don't remember his name.

Q. Who told you his name? The counselor sitting here Mr. Aronwald told you his name?

A. Yes.

Q. On that day did you know his name, May 28th 2012?

A. I might have.

Q. What about the name of the female officer?

A. I don't know her name.

Q. Okay. Could you describe the male officer?

A. No.

Q. Height, weight?

A. No.

Q. Race?

A. Caucasian.

Q. The way he wore his hair? Curly, straight or anything else? When you had the conversation with the male officer who was with you?

A. At the station? Mark and Monique were there. They were sitting down.

Q. So could they overhear your conversation

with the officer?

MR. ARONWALD: Objection. Speculative.

Q. Do you know if they heard your conversation with the male officer?

MS. LANGRIN: She can answer, counselor.

MR. ARONWALD: Excuse me. Please let me just get objection out of my mouth before you jump over me.

MS. LANGRIN: Fine. Go ahead.

MR. ARONWALD: Objection.

Q. Could they overhear your conversation you were having with the male officer?

MR. ARONWALD: Objection. Speculative.

Q. Were they standing right with you or near you when you were having the conversation with the male officer?

A. I was at the glass by myself.

Q. So you were at the glass by yourself. Okay. When you told the male officer that you had your prescription bottle as proof, what, if anything, did he respond to you?

A. He wasn't interested.

Q. Did he respond in words to you?

A. He did. I don't know exactly what he said

P. FONTENETTE

but he wasn't interested.

Q. Now, how do you conclude that he wasn't interested?

A. They basically paid no attention to it.

Q. Paid no attention to you?

A. To me, yes.

Q. When this officer did not pay attention to you as you put it, did you ask to speak to another officer to show that other officer your prescription bottle?

A. I don't know.

Q. Okay. When that other officer appeared to be disinterested to you when you wanted to show him your prescription bottle did you ask to speak with the commanding officer of the headquarters there?

A. No.

Q. Did you ask to speak with the male officer's supervisor?

A. No. What did I say to him?

Q. Could you just answer that question? Did you ask to speak with the male officer's supervisor?

MR. ARONWALD: Objection. I think the witness is trying to recollect whether she did or didn't.

P. FONTENETTE

Q. Could you please answer the question? Did you ask to speak with the male officer's supervisor when he did not pay attention to you?

A. Not in those words, no.

Q. In some other words?

A. I just asked if there was somebody else I could speak to.

Q. And what was responded to you?

A. No.

Q. All right. At any point in time have you filed any written complaints with the Department of Public Safety that the officers appeared to be disinterested with you when you came to headquarters and wanted to show your prescription bottle on May 28th, 2012?

A. Repeat that.

Q. At any time after May 28th, 2012, or on that day did you put in any written complaints with the police department or the department of Public Safety about the fact that the officers --

A. No.

Q. -- appeared to be disinterested in you when you wanted to show your prescription bottle?

MR. ARONWALD: Other than the document

that's in evidence as an exhibit?

MS. LANGRIN: It's only about she wanted to show her prescription bottle on May 28th, 2012.

MR. ARONWALD: Counselor, the statement basically is a narrative. I'm just asking you when you ask her whether she filed any written complaint I'm asking your excluding from the question Exhibit 1, correct?

MS. LANGRIN: Yes, I am.

MR. ARONWALD: Thank you.

Q. On that day did you file any written complaints?

A. No.

Q. At any time between May 28th and June 25th, 2012, did you file any written complaints with the police department about the fact that the officers appeared to be disinterested when you wanted to show your prescription?

MR. ARONWALD: Other than the exhibit, correct?

Q. Other than this supporting deposition.

MR. ARONWALD: Which is dated June 25th.

A. No.

Q. So after the officer appeared to be disinterested in you when you wanted to show your prescription bottle then what happened next?
A. I asked him about the kids.
Q. Okay. What, if anything, did he respond?
A. Proof of who I am.
Q. In terms of picking up the kids?
A. Yes.
Q. Do you know 100 percent, can you say for sure 100 percent that the officer you spoke with was William Thomas?
A. No.
Q. So when you told the officer you had pro of who you are what did he say?
A. He took my driver's license and my cousin's driver's license.
Q. And then what happened next?
A. I still tried to say something about the pill bottle.
Q. Okay. So at some point were the kids brought out to you?
A. Yes.
Q. And who brought the children out to you?
A. I'm not sure.

P. FONTENETTE

Q. Was it the female officer that brought the children out to you?

A. I'm not sure. I'm really not sure.

Q. All right. But the children were brought out to you?

A. Yes.

Q. Were they brought out to you by an officer?

A. Yes.

Q. And at the time that the children were brought out to you by an officer did you tell that officer that you had your prescription bottle as proof?

A. The two people that were there, yes.

Q. I'm talking about the officer whoever that was brought the children out to you. Did you tell that officer that you had your prescription bottle as proof?

A. I'm not 100 percent sure.

Q. Okay. Do you know the name of the arresting officer?

A. Didn't you just mention his name? I don't.

Q. If you don't you can say you don't.

A. I don't.

Q. To your knowledge did you see the arresting officer or speak to the arresting officer while you were at headquarters on May 28th, 2012?

A. To my understanding--

MR. ARONWALD: The question is do you know. Yes or no?

A. No.

MS. LANGRIN: That wasn't the question. Please read back the question. That was not the question.

(Record read back.)

A. I'm not sure.

Q. To your knowledge did you see or speak with the officer that you spoke with on the phone while your sister was still on the scene at headquarters on May 28th, 2012?

A. Yes. Okay. Yes.

Q. You spoke to him while you were at headquarters?

A. Yes.

Q. How was it that you spoke to him at headquarters?

A. I thought those were the only two people

there, the person who arrested her and the person that he called in to take care of the girls.

Q. Okay. So when you first arrived at the desk are you saying that the male officer was the arresting officer you spoke with on the cell phone?

A. I can't say that it's him 100 percent sure, no. But that's who I thought I was talking to.

Q. You thought when you came in to the headquarters you were talking to the arresting officer that you spoke with on the phone?

A. Yes.

Q. Okay. So did you see your sister at all, Sherrie Deanda, when you went to headquarters on May 28th, 2012?

A. No.

Q. The children were turned over to your custody?

A. Yes.

Q. Did you have any conversation with them?

A. I asked them how they were.

MR. ARONWALD: Objection to any conversation she had with the children.

Q. Go ahead.

P. FONTENETTE

A. How they were and what happened.

Q. What did they say?

MR. ARONWALD: Same objection.

Q. Continue.

A. They told me they were just in the back there and officers were asking them a bunch of questions.

Q. Did they tell you what questions the officers were asking them?

A. Asking them questions about their parents, where they lived, what their parents did for a living.

Q. Okay. Did they tell you anything else?

MR. ARONWALD: Continuing line of objection to any questions referring to the conversation or discussion that she had with the children.

A. That's all I remember.

Q. That's all you remember?

A. Yes.

Q. So then approximately what time did you leave headquarters on May 28th, 2012?

A. I don't know what time it was. It must have been early afternoon.

Q. Was that around 12:00 or 1:00?

A. I don't know. I don't know the time.

Q. Okay. And Monique and Mark Sutton left with you?

A. Yes. They drove me.

Q. Now, neither of the two children were your children?

A. Right.

Q. So why did you come down to headquarters to pick them up?

MR. ARONWALD: Objection.

A. Because I was the only person who knew about what was going on at that time. My sister called me and one of the children were theirs.

Q. All right. So after your sister was arrested when did you see her again for the first time?

MR. ARONWALD: Objection.

A. I'm not sure.

Q. Okay. Did you see her that same day, May 28th, 2012?

A. I don't remember.

Q. All right. I'm going to show you what's been marked as Defendant's Exhibit A. And at the

top it says supporting deposition and it has a date on it 6/25/12. I just want to ask you to take a look at it. And do you recognize it?

A. Yes.

Q. Okay. What is it?

A. My statement.

Q. Okay. Does this exhibit have a date on it?

A. On the bottom.

Q. What's the date?

A. 6/25/12.

Q. Is that your signature there to the left at the bottom?

A. Yes.

Q. Okay. Now on this Exhibit A is there anything on this exhibit that is not your writing?

A. Witnessed by.

Q. So that's not your writing?

A. No.

Q. All right. Everything else on the document is your writing?

MR. ARONWALD: Well except for the portions that are blacked out. She didn't black out anything.

MS. LANGRIN: I'm not asking about that.

MR. ARONWALD: You're showing her a document. The document does have portions that are blacked out. Your asking if there's anything not in her writing.

Q. Do you know if the information that is blacked out where it says this is my prescription info, did you put any writing there?

A. Yes.

Q. So that would be your handwriting although it's blacked out?

A. Yes.

Q. And what about at the top where it says Paula Fontenette, top right? And that's also blacked out. Looks like underneath is name and address of deponent. Did you write something there where it's blacked out?

A. Yes.

Q. So everything on this document is your handwriting but for where it says witnessed by?

A. Yes.

MR. ARONWALD: Again just so that there's no reason for doubt or confusion I would like the record to indicate, you can ask it, she is

not the one who blacked out these portions.

MS. LANGRIN: The record so states. I've already established that the writing under the blacked-out portions was hers. We understand that she did not actually do the blacking out. The record reflects that.

Q. Could you please read the statement?

MR. ARONWALD: Aloud or to herself?

Q. Read the statement aloud.

A. To whom it may concern, I, Paula M. Fontenette was at my sister's house over memorial day weekend, Sherrie R. Deanda. I switched purses with her and left my pills in her bag. The very next morning she was on her way to my house to return them to me and was pulled over. While pulling out her driver's license the officer saw the pill bottle and asked to see it. There was no label on it because I remove the label beforehand which I do with all my prescriptions because it's nobody's business. I put enough pills for the weekend in a separate bottle so as to not walk around with a very large amount. I spoke to the officer on the phone to explain the situation but he didn't want to hear and hung up on me. I came down to the station with

the prescription bottle and no one wanted to hear or see anything.

Q. Where were you when you made this statement?

MR. ARONWALD: Would you let her read the rest of it?

MS. LANGRIN: I had her read what I wanted her to read.

MR. ARONWALD: Excuse me. Please read back the question. The question was would you read the statement aloud. I just want to verify that was the question.

MS. LANGRIN: That was the question.

MR. ARONWALD: Fine. Well, let the witness finish the answer by explaining the other writing on the document.

MS. LANGRIN: No. I will ask her about that.

MR. ARONWALD: Well, then I'm objecting.

MS. LANGRIN: Object. So you've objected.

MR. ARONWALD: I'm objecting because counselor is not permitting the witness to answer the question that the counselor asked.

MS. LANGRIN: You've objected.

P. FONTENETTE

Q. You started out with to whom it may concern and you say you were at your sister's house memorial day weekend. When did you arrive at your sister's house for that weekend?

A. I don't know.

Q. Did you arrive on the Friday which would be May 25th? Did you arrive at her house on May 26th which would be Saturday? Did you arrive at her house on May 27th which would be Sunday?

A. I'm not sure if I went Thursday or Friday.

Q. Okay. But you believe you went to her house either Thursday or Friday?

A. Yes.

Q. Did you spend the night over her house from Thursday to Friday?

MR. ARONWALD: Assuming she went there on the Thursday.

Q. Assuming you went there on the Thursday you spent the night from Thursday to Friday.

A. Yes.

Q. Did you spend again from Friday to Saturday?

A. No.

Q. So for Friday to Saturday you went home at

some point?

A. Yes.

Q. When did you go home?

A. I'm not sure which day it was. I'm not sure which day it was.

Q. You either went home on Friday or Saturday?

A. I don't know. It could have even been Saturday or Sunday.

Q. Did you spend the night from Saturday to Sunday?

A. I'm not sure.

Q. But at some point during the memorial day weekend if you spent the night from Friday to Saturday you did go home at some point?

A. Yes.

Q. And then when you went home at some point did you come back to your sister's house?

A. No.

Q. So once you went home you stayed home?

A. Yes.

Q. So at some point then did you have a conversation with your sister where it was determined that you had left the pills at her house?

P. FONTENETTE

A. Yes.

Q. Okay. And how did you become aware of that?

A. I went to take them out of the purse.

Q. You went to take them out of the purse?

A. Yes.

Q. What do you mean you went to take them out of the purse?

A. The purse that I switched my things back into, I went in there to get them and they weren't there.

Q. So what did you do when you found that information out?

A. I called her and told her and she told me she would bring them to me.

Q. When you called her what night did you call her to ask her to bring them to you?

A. I'm not sure.

Q. Was it Sunday night that you had the conversation and asked her to bring them to you?

A. I'm not sure. I'm not sure which day it was. I'm not sure which day anything happened because there was a lot going on.

Q. There was a lot going on. What was going

on?

A. We were having a cookout and my niece went into labor.

Q. When you told your sister that she needed to bring the pills to you did you tell her it was urgent?

A. I don't think I used those words.

Q. What words did you use?

A. I just asked her if she'd bring them.

Q. Did you tell her it was an emergency that she had to bring the pills?

A. I wanted them that morning and she had to come anyway.

Q. But did you use the words with her that it was an emergency that she had to bring the pills?

A. I told her she had to bring my pills. I don't know if I said emergency or not.

Q. Now, you also mentioned in your statement that there was no label on the bottle because you remove the label beforehand. Why do you remove the label?

A. Because I don't want everybody knowing what I take, anybody knowing really.

Q. Where do you normally keep your pills? Do

you keep them at home normally?

A. The bulk of them because it's a whole bunch of pills.

Q. Other times do you keep your pills in your purse?

A. Yes.

Q. Do you expect anyone to go into your purse to see your pills?

A. People go into my purse.

Q. So people around you go into your purse?

A. Yes.

Q. Who has gone into your purse?

MR. ARONWALD: Objection to this whole line of questioning.

MS. LANGRIN: Okay.

A. Anybody. Say if somebody wants something from me, it's in my purse, they go get it.

Q. So if that's the scenario then you don't want them to see what pills you're taking?

A. I mean, it's just nobody's business. That's all. It's my pills. Period.

Q. How do you remove the labels? By hand or something else?

A. Peel it off.

P. FONTENETTE

Q. So you peel it off. Also on Exhibit A you also said that you put enough pills for the weekend in a separate bottle so as not to walk around with a very large amount. So when you're at Sherrie's house for the weekend, the unlabeled pill bottle she was found with, that was a separate bottle you had put your pills in?

A. Yes.

Q. So that means you had other pills at home?

A. I'm not sure if I did or not. I'm not sure if that was the end or what. I don't know.

Q. Now, you said that you don't want to walk around with a very large amount. What do you mean by that?

A. My prescription is for a large amount of pills.

Q. Okay. And what's that quantity?

MR. ARONWALD: Back at that time you mean?

A. At that time it just depends on what the milligrams were at that time.

Q. Okay. So do you know what the quantity of the pills that were prescribed at that time, May 28th, 2012?

A. No. Only because I'm not sure if it was

15 milligrams or 20 milligrams because that would determine how many pills.

Q. Okay. At some point the unlabeled pill bottle that was in Sherrie's possession on May 28th, 2012, was that ever returned to you by the police department?

A. The bill bottle?

Q. The unlabeled pill bottle.

A. No.

Q. Also on June 25th, 2012, did you bring your prescription bottle down to the headquarters on June 25th, 2012?

A. Yes.

Q. And was a photograph taken of your prescription pill bottle on June 25th, 2012?

A. Yes.

Q. Okay.

A. Which day again?

Q. June 25th, 2012.

A. Okay. Yes.

Q. And who did you come down to the station with at that time?

A. Sherrie and my lawyer.

Q. That would be the lawyer sitting to your

left?

A. Yes.

Q. And a photograph was taken of your prescription pill bottle. Did you keep that prescription pill bottle after the photograph was taken?

A. Yes.

Q. And do you have that at the present time?

A. No.

Q. Okay. What did you do with it?

A. I peeled the label off of that one and threw it in the trash.

Q. But the point is after the photograph was taken of your prescription pill bottle on June 25th, 2012, it was given back to you?

A. Yes.

Q. So at some point after the photograph was taken you had possession again of the prescription pill bottle?

A. Yes.

Q. But you don't have it at the present time?

A. No.

Q. And the unlabeled bottle that was found on Sherrie, you don't have that either?

P. FONTENETTE

A. No.

Q. Do you know what happened to it?

A. They kept it.

Q. So the police department never returned the unlabeled pill bottle?

A. Right.

Q. That was in possession with Sherrie on May 28th, 2012?

A. Right.

Q. Who requested that you come down to the police station on June 25th, 2012, to give this statement which has been marked as Exhibit A?

A. I don't know.

Q. Did the police department ask you to come down and make that statement?

A. I don't recall.

Q. Okay. Did the police department ask you to come down and bring your prescription pill bottle on June 25th, 2012?

A. I don't think so.

Q. Now let's look at Exhibit A. There's a Paula Fontenette in the top right-hand corner and underneath is redacted. Do you recall what, if anything, you had filled out on that?

A. My address.

Q. And what was the address that you believe you put there?

A. 127 West 82nd Street.

Q. Say the full address?

A. Apartment 6A.

Q. New York, New York?

A. New York, New York 10024.

Q. Then we go behind. Could you read this portion here that begins with this?

A. This is my prescription info.

Q. Do you recall what you put there?

A. The RX number. The information that was on it, the RX number.

MR. ARONWALD: Don't guess.

MS. LANGRIN: She's not guessing. She's explaining.

MR. ARONWALD: She said I don't know.

MS. LANGRIN: But she continued and you interrupt the answer. Please don't do that.

Q. Continue please.

A. The RX number, the name of the prescription, the doctor's name who wrote it, the quantity and I think the date on the pill bottle.

Q. Do you recall what the date on the pill bottle was?

A. No.

Q. After May 28th, 2012, do you know whether the pills were actually taken from Sherrie that were found with her at the time of her arrest?

MR. ARONWALD: Objection. Speculative.

Q. You can answer.

A. They took them.

Q. They did take them. Okay. And then at some point were those pills returned to you?

A. Yes.

Q. When were those pills returned to you?

MR. ARONWALD: Objection. It's totally irrelevant.

A. I'm not sure.

Q. Was it two months after, three months after the date of the incident or something else?

A. I don't know.

Q. Okay.

MR. ARONWALD: Let the record reflect again that all the information that counsel is asking this witness about is information that is within counsel's possession because it's

information that she provided to me as part of Rule 26, discovery.

MS. LANGRIN: Even so I'm entitled to ask this witness about it. You made your objection and I'm making mine. Whether or not I provided information or not I'm still entitled to ask this witness or any other witness anything.

Q. Since the pills were taken from Sherrie on the date of the incident those pills that were belonging to you, the Oxycodone, when was the next time you had the prescription filled of Oxycodone?

A. I don't know.

Q. Well, did there come a time where you had to have the prescription refilled since the pills were taken from Sherrie?

A. I get a prescription every month.

Q. So the next time you would have filled the prescription was the next month after the incident?

MR. ARONWALD: She's not saying that. She's already said she doesn't know.

MS. LANGRIN: She'll tell me what she's saying.

MR. ARONWALD: You're putting words in her mouth. She said she doesn't know.

MS. LANGRIN: She can say that.

MR. ARONWALD: She already did say it.

MS. LANGRIN: Counsel, please. You're interrupting the deposition, all right? And I'm a little surprised because you made a big deal about it during other witnesses' depositions, okay? Really please.

MR. ARONWALD: I'm objecting because you're asking a question--

MS. LANGRIN: Fine. You've already done it. You've already done it.

MR. ARONWALD: Don't raise your voice. And now you're pointing all fine five fingers at me.

MS. LANGRIN: I'm not.

MR. ARONWALD: Yes, you are. Too bad we don't video this deposition.

MS. LANGRIN: And you just pointed your finger at me.

MR. ARONWALD: We're doing a lot of finger pointing and a lot of talking.

MS. LANGRIN: Yes, I think so. Absolutely.

MR. ARONWALD: I'm objecting on the ground

that counsel is asking questions that have already been asked and answered.

MS. LANGRIN: I have not. I absolutely have not.

Q. When was the next time you received a fill of your prescription after May 28th, 2012?

A. I'm not sure.

Q. At some point did you go on a vacation with the family in June, actually in July of 2012?

MR. ARONWALD: Objection.

A. I don't know.

Q. Did you go to Disney World with your family in or about July of 2012?

MR. ARONWALD: Objection. After May 28th 2012 or before?

MS. LANGRIN: I specifically gave her a date. Counsel, please. I said in July of 2012 did you go on a vacation with your family. I gave her the time period.

MR. ARONWALD: Can I have the question read back about 2012 in Disneyland please?

(Record read back.)

MS. LANGRIN: I'd like the record to reflect I feel as a counselor of law for the

P. FONTENETTE

State of New York that this counsel Bill Aronwald has been obstructive to this deposition. I'd like the record to reflect that.

MR. ARONWALD: And let he the record reflect counselor, Counselor Langrin-Chapman--

MS. LANGRIN: It's Chapman-Langrin. Say my name correctly. Chapman-Langrin.

MR. ARONWALD: If counselor actually believes that then I am requesting that counsel file a complaint against me with the grievance committee so the grievance committee can determine whether or not I have violated any rules of professional conduct.

MS. LANGRIN: I don't have to do that. That's my opinion. I don't have to.

MR. ARONWALD: I'm inviting you to.

Q. Could you please answer the question that's pending?

A. I'm not sure.

Q. You're not sure if you went on vacation with your family in of 2012?

A. Right.

Q. Now you say that you left--

MS. LANGRIN: Strike that.

Q. The officer observed the unlabeled pill bottle in a purse that was with Sherrie on the date of the arrest. Do you know that?

MR. ARONWALD: Objection.

Q. Answer please.

MR. ARONWALD: Speculative. How does she know that?

MS. LANGRIN: She'll say that they doesn't know.

Q. Please answer the question.

MR. ARONWALD: Objection to the form of the question.

A. I don't know. I don't know how he observed it.

Q. Did Sherrie have a purse with her on May 28th, 2012?

MR. ARONWALD: Objection. She wasn't there.

MS. LANGRIN: So she can say that.

A. I assume so.

Q. Did Sherrie have a purse belonging to you on May 28th, 2012?

A. No.

P. FONTENETTE

Q. Okay. So any purses Sherrie had to your knowledge on May 28th, 2012, belonged to Sherrie?

A. Yes.

Q. Other than your Oxycodone pills did you leave any other personal belongings of yours at your sister's house?

A. I don't know.

MS. LANGRIN: Off the record.

(Discussion held off the record.)

Q. Mr. Fontenette, you said you had a conversation the night before where you told your sister she needed to bring the pills to you?

A. Yes.

Q. That you had left?

A. Yes.

Q. And during that conversation did you tell her what type of pills you had left?

A. I don't think so.

Q. Okay. And during that telephone conversation did you tell her that the pills were in an unlabeled pill bottle?

A. No.

Q. Is there any reason why you didn't tell her that?

P. FONTENETTE

A. I didn't know I needed to.

Q. I appreciate it. Thank you so much. I'm finished.

(Time noted: 11:10 a.m.)

Paula M. Fontenette

PAULA M. FONTENETTE

Subscribed and sworn to before me this 13th day of May 2014.

Cindy Y. Matos, Notary Public.

CINDY Y MATOS
Notary Public - State of New York
NO. 01MA6277396
Qualified in New York County
My Commission Expires 3/4/17

P. FONTENETTE

I N D E X

DEFENDANT'S EXHIBITS:

A: Supporting Deposition Dated 6/25/12

C E R T I F I C A T I O N

I, JOSEPH CAROLLO, a Court Reporter and Notary Public within and for the State of New York, do hereby certify:

That the witness whose deposition is herein before set forth, was duly sworn by me, and that the within transcript is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 7th day of April, 2014.

Joseph Carollo

JOSEPH CAROLLO

## A

able (4)
15:22;18:3,7,14
Absolutely (3)
22:3;62:24;63:4
accomplished (1)
4:25
act (1)
26:20
action (2)
4:17,19
actually (5)
18:6;48:6;60:6;
63:10;64:10
address (5)
4:10;47:17;59:2,3,6
addressing (1)
34:10
afternoon (2)
33:13;44:25
again (15)
6:23;22:15;23:18;
26:10,11;27:20,23;
28:10;32:24;45:17;
47:23;50:22;56:19;
57:19;60:23
again- (1)
24:6
against (3)
26:17,20;64:12
age (1)
16:25
ages (1)
5:8
ago (2)
6:16,17
ahead (3)
25:9;36:10;43:25
all- (1)
31:25
allowing (1)
24:11
Aloud (3)
48:9,10;49:12
although (1)
47:11
amount (6)
9:13,18;48:23;55:5,
14,16
answered (3)
28:4,12;63:3
apartment (7)
4:12;5:12,14;15:5,
10,17;59:7
appeared (5)
37:13;38:13,23;
39:19;40:2
Approximate (1)
16:25
approximately (2)
19:14;44:22
approximation (1)
9:7
argue (2)
21:21;22:19
arguing (1)
22:20
ARONWALD (115)
5:23;6:23;8:7,22;
9:9,24;10:2,14,20;
15:24;20:14;21:3,8,
13,15,21,25;22:4,15,
18,22;23:2,5,7,14,16,
18;24:6,10,13,17,22;
25:3,5,8,10,16,21,25;
26:5,12,14,17,22;
28:3,6,11,15;29:20;
30:16,20,23;31:5,7,
11,17,21;32:6,11,21;
33:16,20;35:6;36:3,7,
11,14;37:23;38:25;
39:6,12,21,24;42:7;
43:23;44:4,15;45:12,
19;46:23;47:3,23;
48:9;49:6,10,15,20,
22;50:17;54:14;
55:19;59:16,19;60:8,
15,22;61:20,24;62:3,
9,13,17,21,25;63:11,
15,21;64:3,6,10,18;
65:6,8,13,19
around (7)
30:14;33:11;45:2;
48:22;54:11;55:4,14
arrest (3)
16:10;60:7;65:5
arrested (6)
13:20;16:13;29:18;
34:15;43:2;45:17
arresting (9)
13:13;16:7;20:17;
23:25;41:22;42:4,4;
43:6,11
arrive (7)
33:9,15,23;50:4,7,8,
9
arrived (2)
33:25;43:4
assistant (1)
4:15
associated (1)
11:4
assume (2)
12:14;65:22
assuming (3)
10:16;50:17,19
attention (4)
37:5,6,8;38:4
attorney (1)
4:16
attorney's (1)
10:7
aware (5)
12:12,17,21,25;
52:3

## B

back (19)
7:11;11:7,8;22:12;
27:2;28:8;30:4;32:19,
21;42:11,13;44:6;
49:11;51:19;52:10;
55:19;57:16;63:22,23
background (1)
6:2
bad (2)
7:10;62:17
bag (1)
48:14
basically (2)
37:5;39:7
become (3)
12:21,25;52:3
beforehand (2)
48:19;53:21
began (2)
21:8;24:20
begin (1)
25:4
begins (1)
59:11
behind (3)
34:5,6;59:10
believes (1)
64:11
belong (1)
14:5
belonged (4)
14:8;21:2;34:16;
66:3
belonging (2)
61:11;65:23
belongings (1)
66:6
beyond (1)
32:9
big (1)
62:6
bill (2)
56:8;64:2
birth (1)
5:18
black (1)
46:25
blacked (7)
46:24;47:5,8,12,16,
18;48:2
blacked-out (1)
48:5
blacking (1)
48:6
body (2)
11:16,18
both (2)
10:8;34:7
bottle (44)
14:12,15;20:2,10;
27:8,9,10,17,21,23;
34:16;36:21;37:11,
15;38:15,24;39:4;
40:4,20;41:13,18;
48:18,22;49:2;53:20;
55:4,6,7;56:5,8,9,12,
16;57:5,6,15,20,24;
58:6,19;59:25;60:3;
65:4;66:22
bottom (2)
46:10,14
bring (15)
27:7,8,12,17;52:16,
18,21;53:6,10,12,16,
17;56:11;58:19;66:13
bringing (1)
34:15
Bronx (1)
12:23
brought (7)
40:22,24;41:2,5,8,
12,17
bulk (1)
54:3
bunch (2)
44:7;54:4
business (2)
48:21;54:21

## C

call (11)
8:19;13:8;24:24;
25:12,20;26:10,14,16;
29:9;30:10;52:18
called (11)
13:2,3,5,11;15:3;
25:15;32:24;43:3;
45:15;52:15,17
calling (1)
26:18
calls (1)
15:25
came (4)
34:2;38:14;43:10;
48:25
can (21)
4:25;9:7,8,9;10:18;
21:16;23:2,24;28:8;
32:11,15;34:20;36:6;
40:10;41:25;47:25;
60:9;62:2;63:21;
64:13;65:21
cane (2)
7:8,9
care (3)
8:2,13;43:3
Carolina (2)
16:22;30:2
Carollo (1)
4:4
Caucasian (1)
35:19
caused (1)
19:6
causing (1)
13:20
cell (2)
20:13;43:6
Chapman-Langrin (3)
4:15;64:8,9
children (13)
28:21;34:18;40:24;
41:3,5,11,17;43:18,
24;44:18;45:7,8,15
City (1)
15:6
college (1)
6:8
colloquy (4)
22:24;24:21,22;
26:25
coming (8)
12:10;16:17,18;
17:25;18:9;20:20;
24:3;27:20
commanding (1)
37:16
comment (1)
31:18
committee (2)
64:13,13
complaint (4)
26:17,20;39:9;
64:12
complaints (4)
38:12,19;39:14,17
concern (2)
48:11;50:3
conclude (1)
37:3
condition (3)
8:21;11:13,15
conduct (1)
64:15
confined (1)
11:15
confusion (1)
47:24
consulted (1)
29:4
container (4)
13:22,23;14:4,8
Continue (2)
44:5;59:22
continued (1)
59:20
Continuing (1)
44:15
conversation (36)
13:10;15:15,20,23;
18:2;19:20,24;20:4,8,
15;21:5,6,9,16,17;
22:6,14;23:21;24:19;
26:23;30:4;34:7,12;

35:21,25;36:5,12,16;43:21,24;44:17;51:24;52:21;66:12,17,21
**convicted (1)** 6:10
**cookout (1)** 53:3
**copy (2)** 10:15,17
**corner (1)** 58:23
**correctly (1)** 64:9
**counsel (13)** 4:23;9:25;22:17,18;23:3;24:7,8;60:23;62:4;63:2,18;64:2,11
**counselor (15)** 25:2,3;26:12,14;31:17;32:2;35:5;36:6;39:6;49:23,24;63:25;64:7,7,10
**counsel's (1)** 60:25
**county (1)** 4:15
**couple (1)** 4:18
**courses (1)** 6:8
**COURT (3)** 4:7,10,22
**Cousin (1)** 17:21
**cousins (3)** 15:12;29:12;33:6
**cousin's (1)** 40:17
**crime (1)** 6:10
**Curly (1)** 35:20
**custody (1)** 43:19
**Cytia (1)** 5:10
**C-Y-T-I-A (1)** 5:10

**D**

**date (13)** 5:18;11:25;12:20,23;46:2,8,11;59:25;60:2,19;61:10;63:18;65:4
**dated (1)** 39:24
**daughters (2)** 5:7;15:13
**day (17)** 9:14,19;13:11;29:23;32:12;35:8;38:19;39:13;45:21;48:13;50:4;51:5,6,14;52:22,23;56:19
**deal (1)** 62:7
**Deanda (5)** 12:9,15,17;43:15;48:13
**Defendant's (2)** 11:24;45:25
**Department (8)** 38:12,20,20;39:18;56:7;58:5,15,18
**depends (1)** 55:20
**deponent (1)** 47:17
**deposition (12)** 11:21,23;12:6;22:25;24:8;25:19;32:15;39:23;46:2;62:5,18;64:4
**depositions (2)** 31:22;62:8
**depression (1)** 7:13
**describe (3)** 5:25;34:20;35:13
**desk (1)** 43:5
**determination (1)** 29:6
**determine (2)** 56:3;64:14
**determined (2)** 6:25;51:25
**diagnosis (2)** 11:4,4
**different (1)** 11:11
**directed (1)** 32:25
**disability (8)** 7:12,14,17,22,25;8:3,6;11:3
**disabled (2)** 7:2,4
**discovery (1)** 61:3
**discs (2)** 11:7,8
**discuss (2)** 20:12;23:20
**discussed (1)** 28:23
**discussion (5)** 14:20;28:20;32:17;44:17;66:10
**disinterested (5)** 37:14;38:14,23;39:19;40:3
**Disney (1)** 63:13
**Disneyland (1)** 63:22
**disrespect (1)** 25:17
**disrespectful (3)** 26:4,6,6
**district (1)** 10:7
**Divorced (2)** 5:21,22
**doctor (1)** 8:13
**doctor's (1)** 59:24
**document (6)** 38:25;46:22;47:4,4,20;49:17
**documents (1)** 11:20
**done (2)** 62:11,12
**dosage (4)** 9:13,16,23;10:10
**doubt (1)** 47:24
**down (15)** 10:5;22:24;27:7,8,9,12,17;35:24;45:10;48:25;56:12,22;58:11,16,19
**Dr (1)** 8:25
**drink (1)** 4:25
**drive (9)** 18:16,18,19,21,25;19:3,4,7,10
**driver's (5)** 18:22;19:12;40:16,17;48:17
**driving (1)** 18:17
**drove (2)** 33:6;45:6
**duly (1)** 4:3
**during (11)** 19:20,24;20:4,8;22:14;23:20;31:22;51:14;62:7;66:17,20

**E**

**early (7)** 30:22,23;31:3,6,7;33:13;44:25
**educational (1)** 6:2
**either (5)** 34:7,13;50:13;51:7;57:25
**else (16)** 6:17;7:19;13:14;17:2,16;19:18;20:12;23:20;27:6;33:12;35:21;38:7;44:14;46:21;54:24;60:19
**emergency (3)** 53:11,16,18
**employed (4)** 6:12,14,19,22
**end (1)** 55:12
**enough (2)** 48:21;55:3
**entire (6)** 20:15;21:4,6,16,17;22:5
**entitled (3)** 30:18;61:4,7
**established (2)** 23:12;48:4
**even (2)** 51:9;61:4
**ever- (1)** 25:6
**Everybody (2)** 29:21;53:23
**evidence (1)** 39:2
**exact (1)** 7:20
**exactly (4)** 10:23,24;17:24;36:25
**EXAMINATION (1)** 4:13
**examined (1)** 4:5
**except (1)** 46:23
**excluding (1)** 39:9
**Excuse (2)** 36:7;49:10
**Exhibit (11)** 11:24;39:2,10,21;45:25;46:8,16,17;55:2;58:13,22
**expect (1)** 54:8
**explain (1)** 48:24
**explaining (2)** 49:16;59:18

**F**

**fact (2)** 38:21;39:18
**family (5)** 12:12;63:10,14,19;64:23
**feel (2)** 32:3;63:25
**female (3)** 34:22;35:11;41:2
**few (1)** 4:16
**fibromyalgia (2)** 11:5,10
**Fields (2)** 8:15,25
**File (5)** 26:17,19;39:13,17;64:12
**filed (2)** 38:12;39:8
**fill (1)** 63:6
**filled (3)** 58:25;61:12,18
**Fine (5)** 31:13;36:10;49:15;62:11,14
**finger (4)** 25:23;26:10;62:20,21
**fingers (2)** 32:9;62:14
**finish (1)** 49:16
**finished (4)** 22:7,7;23:5,6
**first (3)** 4:3;43:4;45:17
**Five (3)** 6:17;7:19;62:14
**follows (1)** 4:6
**FONTENETTE (69)** 4:1,9,14;5:1;6:1;7:1;8:1;9:1;10:1;11:1;12:1;13:1;14:1;15:1;16:1;17:1;18:1;19:1;20:1;21:1;22:1;23:1;24:1;25:1;26:1;27:1;28:1;29:1;30:1;31:1;32:1;33:1;34:1;35:1;36:1;37:1;38:1;39:1;40:1;41:1;42:1;43:1;44:1;45:1;46:1;47:1,15;48:1,12;49:1;50:1;51:1;52:1;53:1;54:1;55:1;56:1;57:1;58:1,23;59:1;60:1;61:1;62:1;63:1;64:1;65:1;66:1,11
**form (5)** 15:24;28:15;33:16,19;65:13
**forward (3)** 22:22;23:13,14
**found (5)** 14:18;52:13;55:7;57:24;60:7
**four (1)** 9:16

frantic (1)
29:22
Friday (9)
50:7,11,13,16,20,
22,25;51:7,15
front (1)
11:22
full (1)
59:6

**G**

gave (4)
10:6;12:9;63:17,20
girls (1)
43:3
given (1)
57:16
glass (4)
34:5,6;36:18,19
go- (1)
31:14
Good (1)
4:14
graduate (1)
6:4
Graduated (1)
6:3
granddaughter (1)
17:10
granddaughter's (1)
17:11
grievance (2)
64:12,13
ground (1)
62:25
guess (4)
8:19;13:9;19:11;
59:16
guessing (1)
59:17

**H**

hair (1)
35:20
hand (1)
54:23
handwriting (2)
47:11,21
hanging (2)
27:25;28:19
happened (6)
16:5;40:4,18;44:2;
52:23;58:3
Harlem (1)
8:19
Hawthorne (1)
33:3
head (1)
4:22
headquarters (15)
33:3,9;34:2,3;
37:16;38:14;42:5,18,
21,24;43:11,15;
44:23;45:10;56:12
Health (2)
6:20,21
hear (2)
48:24;49:2
heard (1)
36:4
Height (1)
35:16
held (2)
32:17;66:10
herein (1)
4:3
herself (1)
48:9
Hicks (7)
4:16;19:15,25;20:5,
9;23:21;30:11
high (2)
6:3,4
highway (1)
13:7
Home (11)
29:25;30:2;50:25;
51:4,7,16,18,21,21;
54:2;55:10
hours (5)
9:17;30:22;31:4,8,9
house (12)
48:12,15;50:3,5,8,
10,13,15;51:19,25;
55:6;66:7
hung (2)
27:24;48:25

**I**

idea (1)
30:12
idly (1)
26:7
incident (4)
12:20;60:19;61:10,
19
include (1)
12:15
including (1)
10:10
income (4)
7:14,17,22,23
indicate (1)
47:25
indicating (1)
23:8
info (2)
47:9;59:12
information (13)
4:18;10:4,10;24:5;
27:3;30:8;47:7;52:14;
59:14;60:23,24;61:2,
7
interested (3)
36:23;37:2,4
interjected (2)
21:19,23
interrupt (3)
21:14,19;59:21
interrupted (5)
21:9,12,20,23;
24:20
interrupting (1)
62:5
interruption (2)
22:13;24:8
into (7)
34:2;52:11;53:4;
54:8,10,11,13
inviting (1)
64:18
irrelevant (1)
60:16

**J**

Jada (2)
17:12,13
Jessie (1)
8:15
job (2)
31:22,22
Joseph (1)
4:4
Jr (1)
6:5
July (3)
63:10,14,18
jump (1)
36:9
June (11)
11:25;39:17,24;
56:11,13,16,20;57:15;
58:12,20;63:10

**K**

keep (8)
4:20;22:23;31:13,
21;53:25;54:2,5;57:5
kept (1)
58:4
Keyra (1)
5:9
K-E-Y-R-A (1)
5:9
kids (17)
16:17,19;18:2,4,8,
10,15;20:21;24:3;
27:20;28:24;29:2,7,
18;40:5,8,21
kids' (1)
18:12
kind (1)
29:22
King (1)
6:5
knees (1)
7:10
knew (1)
45:13
knowing (2)
53:23,24
knowledge (5)
10:25;17:9;42:3,15;
66:3

**L**

label (8)
13:22,23;48:18,19;
53:20,21,22;57:12
labeled (1)
27:10
labels (1)
54:23
labor (1)
53:4
ladies (1)
4:24
LANGRIN (92)
4:13;8:9,23;9:25;
10:13,18,21;16:4;
20:16;21:7,11,14,18,
22;22:3,9,13,17,20,
23;23:3,6,11,15,17,
19;24:7,12,15,21,24;
25:2,4,7,9,12,18,23;
26:3,9,13,16,19,24;
28:5,10;30:18,25;
31:3,6,10,13,15,19;
32:2,8,14,18,23;
33:18;36:6,10;39:3,
11;42:10;47:2;48:3;
49:8,14,18,21,25;
54:16;59:17,20;61:4,
22;62:2,4,11,16,19,
23;63:4,17,24;64:8,
16;65:2,10,21;66:9
Langrin-Chapman- (1)
64:7
large (4)
48:23;55:5,14,16
last (3)
6:14;22:11;25:19
Late (1)
33:13
law (1)
63:25
lawyer (2)
56:24,25
leave (2)
44:23;66:6
leaving (1)
29:22
left (7)
45:4;46:13;48:14;
51:25;57:2;66:15,18
left- (1)
64:25
letting (1)
24:14
license (5)
18:22;19:12;40:16,
17;48:17
limitations (3)
6:24;7:5,6
line (2)
44:15;54:15
little (2)
34:17;62:6
lived (2)
5:16;44:12
lives (1)
5:5
living (1)
44:13
located (1)
8:16
location (1)
15:4
long (12)
5:16;7:7,16;9:4;
18:17,18,20,24;19:9,
14,19;28:18
look (2)
46:4;58:22
Looks (1)
47:16
lot (5)
6:24;52:24,25;
62:21,22
lower (1)
7:10
lunchtime (2)
33:15,21
Luther (1)
6:5

**M**

ma'am (11)
24:23,24;25:12,15,
20;26:11,15,16,18;
32:9,24
makes (1)
6:21
making (1)
61:6
male (13)
34:22,24;35:3,13,
22;36:5,13,17,20;
37:18,22;38:3;43:5
management (1)
8:10
Manhattan (1)
6:7
many (3)
9:14;17:5;56:3
marital (1)
5:20
Mark (9)

15:12,14;16:21,23;29:14,15;33:7;35:23;45:4
**marked (3)** 11:24;45:25;58:13
**Martin (1)** 6:5
**maximum (1)** 9:18
**may (42)** 4:19;5:12;8:7,9,11,21,22,23;9:5,11,21;12:13,18,21;14:11,16;17:13;31:11;35:9;38:16,18;39:4,16;42:5,18;43:16;44:23;45:22;48:11;50:2,8,8,10;55:24;56:5;58:9;60:5;63:7,15;65:18,24;66:3
**Maybe (3)** 7:21;9:10;32:14
**mean (6)** 8:7;25:5;52:8;54:21;55:14,19
**Meaning (1)** 13:17
**means (4)** 4:21;33:21,21;55:10
**meant (1)** 25:16
**medical (1)** 11:4
**medication (1)** 8:20
**medicine (1)** 11:2
**members (1)** 12:12
**memorial (3)** 48:12;50:4;51:14
**memory (1)** 10:19
**mental (1)** 7:12
**mentally (1)** 7:5
**mention (1)** 41:23
**mentioned (1)** 53:19
**might (1)** 35:10
**milligrams (4)** 10:22;55:21;56:2,2
**Mine (2)** 7:24;61:6
**minutes (4)** 19:17,17;28:2,8
**Monique (9)** 15:12,14;16:21,23;29:14,15;33:7;35:23;45:4
**month (2)** 61:17,19
**months (2)** 60:18,18
**morning (15)** 4:14;30:12,22,24;31:2,3,4,5,6,7,8,9;33:13;48:15;53:13
**Mount (1)** 8:18
**mouth (2)** 36:8;61:25
**move (1)** 23:14
**moving (1)** 23:12
**must (1)** 44:24
**myself (2)** 18:13;36:18

**N**

**name (17)** 4:8,14;17:11;34:24;35:2,4,5,6,8,11,12;41:21,23;47:16;59:23,24;64:9
**names (1)** 5:8
**narrative (1)** 39:7
**Narrowing (2)** 11:7,8
**near (1)** 36:15
**necessary (1)** 31:24
**need (2)** 4:23,24
**needed (4)** 27:14,15;53:5;66:13
**neither (1)** 45:7
**nerve (3)** 11:12,13,15
**New (9)** 4:5,12,12;15:6;59:8,8,9,9;64:2
**next (8)** 14:21;40:4,18;48:15;61:11,18,19;63:6
**niece (1)** 53:3
**night (7)** 50:15,20;51:11,15;52:17,20;66:12
**nine (1)** 17:23
**nobody's (2)** 48:20;54:21
**nods (1)** 4:21
**Non-party (1)** 4:3
**normally (2)** 53:25;54:2
**North (2)** 16:22;30:2
**Notary (1)** 4:4
**Note (2)** 5:23;6:23
**notice (1)** 7:8
**number (3)** 59:14,15,23

**O**

**object (3)** 21:3;24:21;49:21
**objected (2)** 49:21,25
**objecting (9)** 24:10,13;28:11;31:13,21;49:20,22;62:9,25
**objection (31)** 5:23;6:23;15:24;23:9;24:23;28:3,15;29:20;30:16;33:16,18,20;36:3,8,11,14;37:23;43:23;44:4,16;45:12,19;54:14;60:8,15;61:5;63:11,15;65:6,13,19
**objectionable (3)** 31:12,18,19
**objections (2)** 23:2;31:23
**observed (2)** 65:3,16
**obstructive (2)** 32:3;64:3
**Off (9)** 25:7;29:5;32:15,17;54:25;55:2;57:12;66:9,10
**office (1)** 10:7
**Officer (56)** 4:16;12:23;14:23,24;15:8,16,20,23;16:6,18;17:25;19:15,21,24;20:4,8,13;23:21;27:6;29:10;30:5,5,11;35:3,11,14,22;36:2,5,13,17,20;37:8,10,10,13,16;40:2,11,14;41:2,9,12,13,16,18,22;42:4,4,16;43:5,6,12;48:17,23;65:3
**officers (12)** 4:17;34:5,6,7,8,13,20;38:13,21;39:19;44:7,10
**officer's (4)** 34:24;37:19,22;38:3
**old (3)** 16:23;17:13,22
**Older (1)** 16:25
**once (2)** 16:5;51:21
**one (12)** 9:19;10:2;11:22;18:12;34:8,13,22,22;45:15;48:2;49:2;57:12
**ones (1)** 34:17
**only (6)** 10:8;12:5;39:3;42:25;45:13;55:25
**opinion (1)** 64:17
**order (1)** 31:24
**out (25)** 10:11;36:8;40:22,24;41:3,6,8,12,17;46:24,25;47:5,8,12,16,18;48:2,6,17;50:2;52:5,6,8,14;58:25
**outside (2)** 32:19,20
**Over (10)** 5:17;11:18;13:12;14:11,16;36:9;43:18;48:12,16;50:15
**overhear (3)** 15:22;35:25;36:12
**overheard (1)** 16:3
**owned (4)** 19:21,25;20:5,9
**Oxycodone (15)** 8:24,25;9:4,13;10:24;12:13,18;14:2,7,17;19:22;20:5;61:11,12;66:5

**P**

**paid (2)** 37:5,6
**Pain (3)** 8:10,20;11:2
**parents (5)** 18:12;29:12,13;44:11,12
**Parkway (1)** 12:23
**part (2)** 11:16;61:2
**particular (1)** 34:10
**Paula (4)** 4:9;47:15;48:11;58:23
**pay (2)** 37:8;38:4
**Peel (2)** 54:25;55:2
**peeled (1)** 57:12
**pending (2)** 31:15;64:20
**people (6)** 15:10;34:9;41:15;42:25;54:10,11
**per (1)** 32:4
**percent (5)** 9:15;40:10,11;41:20;43:7
**Period (2)** 54:22;63:20
**permitting (1)** 49:23
**person (3)** 43:2,2;45:13
**personal (1)** 66:6
**persons (1)** 17:8
**Peyton (3)** 17:18,19,22
**Peyton's (1)** 29:12
**phobias (3)** 19:5,6,9
**phone (16)** 13:8,9;14:23,25;15:9;16:6;20:13;23:23;28:2,13,19;29:5;42:16;43:6,12;48:23
**photograph (5)** 56:15;57:4,6,14,18
**physical (2)** 8:2;11:3
**physically (3)** 7:5,6;15:4
**physician (2)** 8:2,12
**pick (14)** 4:22;16:17,19;18:2,3,8,9,14;28:21,25;29:7,18;34:17;45:11
**picking (2)** 28:24;40:8
**pill (27)** 14:4,8,12,15;19:25;20:10;27:9,10,17,21,23;40:20;48:18;55:6;

56:4,9,16;57:5,6,15, 20;58:6,19;59:25; 60:2;65:3;66:22
**pills (46)** 9:16,18;13:16,17, 19,23;14:2,7,18; 19:21,22;20:6;21:2; 24:4;27:4;30:6;34:16; 48:14,21;51:25;53:6, 12,16,17,25;54:4,5,9, 20,22;55:3,8,10,17, 23;56:3;60:6,12,14; 61:9,10,15;66:5,13, 18,21
**Please (22)** 4:7;5:3,25;9:25; 22:11,17,18;24:7; 36:7;38:2;42:11;48:8; 49:10;59:21,22;62:4, 8;63:18,22;64:19; 65:7,12
**point (21)** 12:22;22:10;23:11; 25:13,23;26:9;29:3; 31:14;33:2;38:11; 40:21;51:2,14,16,18, 23;56:4;57:14,18; 60:12;63:9
**pointed (1)** 62:19
**pointing (4)** 25:14;32:9;62:14, 22
**police (7)** 38:20;39:18;56:6; 58:5,12,15,18
**portion (1)** 59:11
**portions (4)** 46:24;47:4;48:2,5
**possession (7)** 14:11,15,17;56:5; 57:19;58:8;60:25
**preparation (2)** 11:21;12:6
**prescribe (1)** 8:25
**prescribed (1)** 55:23
**prescription (35)** 9:12;10:5,9;24:4; 27:4,8,21;34:15; 36:21;37:10,15; 38:15,24;39:4,20; 40:4;41:13,18;47:8; 49:2;55:16;56:12,16; 57:5,6,15,19;58:19; 59:12,24;61:12,15,17, 19;63:7
**prescriptions (1)** 48:20
**present (5)** 6:22;15:14,18;57:9, 22
**presently (1)** 6:12
**primary (1)** 8:13
**prior (5)** 9:5;12:13,18;27:25; 28:19
**problems (1)** 10:3
**professional (1)** 64:15
**proof (6)** 34:16;36:21;40:7, 14;41:14,19
**protect (1)** 31:24
**provided (3)** 10:8;61:2,6
**Public (3)** 4:4;38:13,20
**pulled (4)** 13:12;14:10,16; 48:16
**pulling (1)** 48:17
**purse (13)** 52:5,6,9,10;54:6,8, 10,11,13,18;65:4,17, 23
**purses (2)** 48:13;66:2
**put (12)** 14:22,24;16:6; 28:20;37:9;38:19; 47:9;48:21;55:3,8; 59:4,13
**putting (1)** 61:24

**Q**

**quantify (1)** 28:16
**quantity (3)** 55:18,22;59:25
**question- (1)** 62:10
**quiet (1)** 32:14

**R**

**Race (1)** 35:18
**raise (2)** 25:24;62:13
**read (14)** 22:12;27:2;42:11, 13;48:8,10;49:6,8,9, 10,12;59:10;63:22,23
**really (4)** 6:9;41:4;53:24; 62:8
**reason (6)** 4:23;5:2;6:19;19:4; 47:24;66:24
**recall (5)** 28:17;58:17,24; 59:13;60:2
**receive (3)** 7:14;8:21;10:16
**received (3)** 7:16;10:11;63:6
**recognize (2)** 11:25;46:4
**recollect (1)** 37:24
**recollection (1)** 30:19
**record (31)** 4:8;21:18,25;22:12, 15,19,21;23:8,9;25:7, 8,14;27:2;31:24; 32:16,17,18,20,22,23; 42:13;47:25;48:3,7; 60:22;63:23,24;64:4, 6;66:9,10
**redacted (3)** 10:8,9;58:24
**referring (1)** 44:16
**refilled (1)** 61:15
**reflect (8)** 21:18;25:14;32:18, 23;60:22;63:25;64:4, 7
**reflects (1)** 48:7
**refresh (1)** 30:19
**relate (8)** 20:14;21:4,5,15,16; 22:5,6;26:22
**relating (2)** 21:8;22:8
**relation (1)** 17:19
**relatives (1)** 34:17
**remember (7)** 9:24;16:11;34:25; 35:4;44:19,20;45:23
**remembers (1)** 10:20
**remove (4)** 48:19;53:21,21; 54:23
**Repeat (1)** 38:17
**rephrase (1)** 5:4
**reply (1)** 27:16
**REPORTER (3)** 4:7,10,22
**representing (1)** 4:16
**requested (2)** 10:15;58:11
**requesting (1)** 64:11
**required (1)** 9:14
**reside (2)** 5:11;16:21
**respond (7)** 16:15,16;18:11; 20:19;36:22,24;40:6
**responded (1)** 38:9
**responses (1)** 4:21
**rest (1)** 49:7
**return (2)** 30:6;48:16
**returned (4)** 56:6;58:5;60:12,14
**review (3)** 11:20;12:8,10
**reviewed (1)** 12:6
**right (15)** 5:25;14:19;16:4; 36:15;38:11;41:5; 45:9,16,24;46:21; 47:15;58:7,10;62:5; 64:24
**right-hand (1)** 58:23
**River (1)** 12:23
**room (4)** 4:24;15:21;16:2; 29:11
**Rule (1)** 61:3
**rules (2)** 32:5;64:15
**RX (3)** 59:14,15,23

**S**

**Safety (2)** 38:13,21
**same (5)** 11:11;31:10;32:12; 44:4;45:21
**Saturday (7)** 50:9,23,25;51:8,10, 11,16
**saw (1)** 48:17
**saying (5)** 21:23;23:7;43:5; 61:20,23
**scenario (1)** 54:19
**scene (2)** 27:13;42:17
**school (2)** 6:3,4
**senior (1)** 4:15
**sense (1)** 26:21
**separate (3)** 48:22;55:4,7
**shakes (1)** 4:21
**Sherrie (17)** 12:9,15,17;29:17; 43:15;48:13;56:24; 57:25;58:8;60:6;61:9, 16;65:4,17,23;66:2,3
**Sherrie's (2)** 55:5;56:5
**short (1)** 28:6
**show (8)** 37:10,14;38:15,24; 39:4,20;40:3;45:24
**showing (1)** 47:3
**sign (2)** 10:3;25:16
**signature (1)** 46:13
**simply (1)** 23:8
**sister (26)** 12:9,22;14:10,16, 21,24;15:3;16:5,8,9, 13;17:7,17,20;20:18, 23;24:2;30:5;34:14; 42:17;43:14;45:14, 16;51:24;53:5;66:13
**sister's (5)** 48:12;50:3,5;51:19; 66:7
**sit (1)** 35:2
**sitting (3)** 35:6,24;56:25
**situation (1)** 48:24
**six (1)** 9:17
**sole (1)** 7:22
**somebody (2)** 38:7;54:17
**soon (1)** 10:16
**source (1)** 7:22
**speak (13)** 4:23;23:9;29:11,12, 16;37:9,15,18,22;

38:3,8;42:4,15
**speaks (2)** 21:25;22:15
**specific (1)** 8:12
**specifically (2)** 32:24;63:17
**speculation (1)** 15:25
**Speculative (4)** 36:3,14;60:8;65:8
**speeding (1)** 13:13
**spend (3)** 50:15,22;51:11
**spent (2)** 50:20;51:15
**Spinal (2)** 11:5,6
**spoke (11)** 15:8;16:10;34:21;35:3;40:11;42:16,20,23;43:6,12;48:23
**stand (2)** 7:7;26:7
**standing (1)** 36:15
**started (1)** 50:2
**State (3)** 4:5,7;64:2
**statement (15)** 10:4,5,9,12,15;12:4;39:6;46:7;48:8,10;49:5,12;53:19;58:13,16
**states (1)** 48:3
**station (4)** 35:23;48:25;56:22;58:12
**status (1)** 5:20
**stayed (1)** 51:21
**stenosis (2)** 11:5,6
**still (4)** 19:2;40:19;42:17;61:7
**Stop (2)** 24:12;26:9
**stopped (2)** 12:22;17:7
**straight (1)** 35:20
**Street (4)** 4:11;5:6,12;59:5
**Strike (1)** 65:2
**substance (1)** 20:16
**Suffer (1)** 7:13
**sum (1)** 20:16
**Sunday (4)** 50:10;51:10,12;52:20
**supervisor (3)** 37:19,22;38:3
**supporting (3)** 11:23;39:23;46:2
**supposed (2)** 22:24;32:4
**sure (35)** 5:24;9:15;10:23;15:12;17:6,23,24;29:3,8;30:21;33:14,24;40:11,25;41:4,4,20;42:14;43:8;45:20;50:11;51:5,6,13;52:19,22,22,23;55:11,12,25;60:17;63:8;64:21,22
**surprised (1)** 62:6
**Sutton (1)** 45:4
**switched (2)** 48:13;52:10
**sworn (1)** 4:4

**T**

**talk (1)** 25:10
**talking (7)** 27:18,19;31:16;41:16;43:8,11;62:22
**Taryn (2)** 4:15;25:2
**telephone (4)** 19:15;30:10,21;66:20
**ten (7)** 6:16;7:19,21;9:10,20;17:15,23
**terminated (1)** 29:9
**terms (4)** 9:12;15:4;18:24;40:8
**testified (1)** 4:5
**testify (1)** 10:19
**testimony (2)** 12:8,10
**theirs (1)** 45:15
**thin-skinned (1)** 25:22
**Thomas (1)** 40:12
**though (1)** 28:22
**thought (3)** 42:25;43:8,10
**three (4)** 19:17;28:2,8;60:18
**threw (1)** 57:13
**Thursday (6)** 50:11,13,16,18,19,20
**times (2)** 9:14;54:5
**today (2)** 12:10;35:2
**told (26)** 13:12;14:22;20:21,24,25;24:3;25:19;27:7,12,14,17,21;29:3,17;34:14;35:4,5,6;36:20;40:14;44:6;52:15,15;53:5,17;66:12
**tone (1)** 25:11
**took (3)** 31:23;40:16;60:10
**top (4)** 46:2;47:14,15;58:23
**totally (1)** 60:15
**track (1)** 32:13
**trash (1)** 57:13
**treated (3)** 7:25;8:5,12
**tried (1)** 40:19
**try (1)** 30:18
**trying (1)** 37:24
**turned (1)** 43:18
**Twenty (1)** 19:11
**two (13)** 5:7;9:16;19:17;28:2,7;34:5,6,9,13;41:15;42:25;45:7;60:18
**type (2)** 8:20;66:18

**U**

**unable (1)** 18:14
**under (3)** 8:2;16:9;48:4
**underneath (2)** 47:16;58:24
**understanding- (1)** 42:6
**Understood (2)** 10:13,18
**unlabeled (13)** 14:4,8,12,15;19:25;20:9;55:6;56:4,9;57:24;58:6;65:3;66:22
**unless (1)** 32:12
**unprofessional (2)** 32:7,10
**unredacted (2)** 10:12,15
**up (20)** 4:23;16:17,19;18:2,3,8,9,14;27:24,25;28:19,21,24,25;29:7,18;34:17;40:8;45:11;48:25
**urgent (1)** 53:7
**use (3)** 7:8;53:9,15
**used (1)** 53:8

**V**

**vacation (3)** 63:9,19;64:22
**valid (1)** 27:4
**vehicle (3)** 14:18;17:8,16
**verbal (1)** 4:21
**verify (1)** 49:13
**Vernon (1)** 8:18
**video (1)** 62:18
**violated (1)** 64:14
**voice (3)** 25:11,24;62:13
**volunteered (3)** 24:5;27:3;30:8

**W**

**walk (3)** 48:22;55:4,13
**walked (2)** 34:4,4
**wants (1)** 54:17
**water (1)** 4:25
**way (7)** 7:4;25:19,21;30:6;32:9;35:20;48:15
**weekend (7)** 48:13,21;50:4,5;51:15;55:3,6
**weight (1)** 35:16
**welcome (2)** 23:16,18
**weren't (2)** 15:17;52:11
**West (4)** 4:11;5:5,11;59:5
**What's (8)** 6:19;17:11;19:3;31:12;33:18;45:24;46:11;55:18
**wherever (1)** 27:14
**whole (3)** 24:18;54:3,14
**whomever (1)** 34:10
**whose (1)** 13:8
**William (1)** 40:12
**within (1)** 60:25
**WITNESS (14)** 4:9,11;25:25;26:7;30:16;32:19,20;37:24;49:16,23;60:24;61:5,8,8
**Witnessed (2)** 46:18;47:21
**witnesses' (1)** 62:7
**words (7)** 36:24;38:5,6;53:8,9,15;61:24
**wore (1)** 35:20
**World (1)** 63:13
**write (1)** 47:17
**writing (7)** 46:17,19,22;47:6,9;48:4;49:17
**written (6)** 10:5;38:12,19;39:8,13,17
**wrote (2)** 10:10;59:24

**Y**

**years (12)** 5:17;6:16,17;7:19,19,21;9:6,10;17:5;18:21,21;19:11
**yelling (2)**

24:12;26:9
**York (9)**
4:5,12,12;15:6;
59:8,8,9,9;64:2
**younger (3)**
16:25;17:3,4

**1**

**1 (1)**
39:10
**1:00 (1)**
45:2
**10 (1)**
18:21
**10/6/60 (1)**
5:19
**10:00 (1)**
33:11
**100 (5)**
9:15;40:10,11;
41:20;43:7
**10024 (2)**
4:12;59:9
**11:00 (1)**
33:11
**12 (1)**
18:21
**12:00 (2)**
33:23;45:2
**127 (4)**
4:11;5:5,11;59:5
**15 (2)**
10:22;56:2

**2**

**20 (2)**
10:22;56:2
**2012 (48)**
5:12;8:8,9,11,21,22,
23;9:5,11,21;11:25;
12:13,18,21;14:11,17;
17:14;35:9;38:16,18;
39:5,17;42:5,18;
43:16;44:23;45:22;
55:24;56:6,11,13,16,
20;57:16;58:9,12,20;
60:5;63:7,10,14,16,
18,22;64:23;65:18,
24;66:3
**25th (11)**
11:25;39:17,24;
50:8;56:11,13,16,20;
57:15;58:12,20
**26 (2)**
5:10;61:3
**26th (1)**
50:9
**27th (1)**
50:10
**28th (30)**
5:12;8:11;9:5,11,
21;12:13,18,21;14:11,
16;17:13;35:9;38:16,
18;39:4,16;42:5,18;
43:16;44:23;45:22;
55:24;56:5;58:9;60:5;
63:7,15;65:18,24;
66:3

**3**

**31 (1)**
5:9

**4**

**40 (1)**
5:17

**6**

**6/25/12 (2)**
46:3,12
**6A (3)**
4:12;5:12;59:7

**8**

**8:00 (1)**
30:14
**8:15 (1)**
30:14
**8:20 (1)**
30:15
**82nd (4)**
4:11;5:5,11;59:5

**9**

**91 (1)**
5:24
**99 (1)**
6:18