UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHERRIE DEANDA,

                              Plaintiff,

              -v-

TIMOTHY HICKS, WILLIAM THOMAS, ANGELA
CAPORALE, AND ROBERT PAVONE,

                              Defendants.

Case No. 13-CV-1203 (KMK)

OPINION & ORDER

Appearances

William I. Aronwald, Esq.
Aronwald & Pykett
White Plains, NY
*Counsel for Plaintiff*

Taryn Anita Chapman, Esq.
Westchester County Attorney's Office
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

        Plaintiff Sherrie Deanda ("Plaintiff" or "Deanda") brings this Action pursuant to 42

U.S.C. § 1983 against Defendants Timothy Hicks ("Hicks"), William Thomas ("Thomas"),

Angela Caporale ("Caporale"), and Robert Pavone ("Pavone") (collectively, "Defendants") in

their official and individual capacities as police officers of the Westchester County Police,

alleging violations of the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States

Constitution, Article I, Section 6 of the New York State Constitution, and New York State

common law, and claiming that Defendants defamed Plaintiff and engaged in outrageous

conduct, which caused Plaintiff emotional distress.  Before the Court is Plaintiff's Spoliation

Motion, (Dkt. No. 37), and Defendants' Motion For Summary Judgment, (Dkt. No. 45).  For the

following reasons, Plaintiff's Motion is denied, and Defendants' Motion is granted.

I.  Background

A.  The Facts

On May 28, 2012, Hicks arrested Deanda.  (Defs.' Rule 56.1 Statement of Material Facts

("Defs.' 56.1") ¶ 1 (Dkt. No. 48); Decl. of Taryn A. Chapman-Langrin in Supp. of Mot. For

Summ. J. ("Chapman-Langrin Decl.") Ex. N (Aff. of Timothy Hicks ("Hicks Aff.")) ¶ 5 (Dkt.

No. 46).)[1]  Prior to his employment with the Westchester County Department of Public Safety,

Hicks took a drug recognition course while he was employed with the Dutchess County Sheriff's

office.  (Defs.' 56.1 ¶ 2; Chapman-Langrin Decl. Ex. E (Dep. Tr. of Timothy Hicks ("Hicks

Tr.")) 66–68.)  Hicks participated in arrests for controlled substances during his prior

employment with the Dutchess County Sheriff's office and his employment with the New York

State Park Police.  (Defs.' 56.1 ¶ 3; Hicks Aff. ¶¶ 1, 3.)

On May 28, 2012, Deanda was speeding while she was traveling south on the Bronx

River Parkway, near the Vermont Terrace exit.  (Defs.' 56.1 ¶ 4; Chapman-Langrin Decl. Ex. A

(Sherrie Deanda's 50-h Tr. ("Deanda 50-h Tr.") 11.)  Hicks observed Deanda speeding and

signaled for her to pull her car to the side of the road.  (Defs.' 56.1 ¶ 5; Hicks Aff. ¶ 8.)  Two

children were seated in the rear seats of Deanda's vehicle.  (Defs.' 56.1 ¶ 6; Deanda 50-h Tr. 9;

---

[1] Plaintiff admits numerous facts stated in Defendants' Rule 56.1 Statement.  (*See* Pl.'s
Rule 56.1 Statement ("Pl.'s 56.1") (Dkt. No. 50).)  Accordingly, for ease of reference, the Court
cites to Defendants' 56.1 Statement and notes when the relevant facts are in dispute.

Hicks Aff. ¶ 21.)  Hicks approached the vehicle and requested to see Plaintiff's license and registration.  (Defs.' 56.1 ¶ 7; Hicks Tr. 85.)  Defendants claim that while Deanda was searching in a purse for her license, Hicks observed an unlabeled and transparent pill bottle, in plain view, containing blue pills, which he identified as oxycodone pills.  (Defs.' 56.1 ¶¶ 8, 10; Hicks Tr. 87–89.)[2]  Plaintiff disputes this fact, stating that "[i]t would not have been possible for . . . Hicks to see that the pills were blue simply by looking at the amber colored pill bottle."  (Pl.'s Rule 56.1 Statement ("Pl's 56.1") ¶ 8-A; *see also id.* ¶ 10 (Dkt. No. 50).)  Hicks requested that Deanda give him the unlabeled pill bottle, and Deanda complied with the request.  (Defs.' 56.1 ¶ 11; Hicks Tr. 89.)  Hicks told Deanda that the pills were oxycodone and Deanda told Hicks the same.  (Defs.' 56.1 ¶¶ 12–13; Hicks Tr. 98; Deanda 50-h Tr. 25; Pl.'s Third Amended Compl. ("TAC") ¶ 15 (Dkt. No 20).)  When Hicks asked Deanda if she had a prescription for the pills, she said that she did not.  (Defs.' 56.1 ¶ 14; Hicks Tr. 89; Chapman-Langrin Decl. Ex. K.)  Deanda told Hicks that her sister was at her house the night before, that her sister had left the pills there, and that she was on her way to return the pills to her.  (Defs.' 56.1 ¶ 15; Deanda 50-h Tr. 25–26.)  Defendants claim that "Hicks does not recall [Deanda] telling him" this information.  (Defs.' Resp. to Pl.'s Statement of Undisputed Material Facts ("Defs.' 56.1 Resp.") ¶ 15 (Dkt. No. 52); Hicks Aff. ¶ 15.)

Defendants claim that "[b]ased upon his observation of the oxycodone pills in an unlabeled pill bottle in plain view, without a prescription in [P]laintiff's possession, . . . Hicks

---

[2] The unlabeled pill bottle was located "right on top" of Deanda's purse.  (Defs.' 56.1 ¶ 9; Deanda 50-h Tr. 22.)

had probable cause to arrest . . . [P]laintiff," and that Hicks "had the authority to seize the

unlabeled pill bottle as per the New York Public Health Law, Article 33, Section[] 3387(1) and

Section[] 3302[33] . . . as [Deanda] was not an ultimate user within the meaning of the statute,

nor was her sister a member of her household for whom she was bringing the pills to, as they

reside in separate residences."  (Defs.' 56.1 ¶¶ 16–17.)  Plaintiff disputes these claims.  (Pl.'s

56.1 ¶¶ 16–17.)

Hicks went back to his police vehicle, checked Deanda's license and registration, and

returned to Deanda's vehicle.  (Defs.' 56.1 ¶ 18; Hicks Aff. ¶ 16.)  Plaintiff told Hicks that the

pills belonged to her sister and that her sister had a valid prescription for the pills.  (Defs.' 56.1

¶ 19; Chapman-Langrin Decl. Ex. D (Dep. Tr. of Sherrie Deanda ("Deanda Tr.")) 29; Hicks Aff.

¶ 14.)  Defendants claim that Deanda told Hicks that the purse belonged to her sister, (Defs.'

56.1 ¶ 20; Hicks Aff. ¶ 14), a claim that Plaintiff denies, (Pl.'s 56.1 ¶ 20; Deanda Tr. 22).  Hicks

decided to arrest Deanda within five minutes of speaking to her, based upon the fact that she did

not have a prescription for the pills and that they were contained in an unlabeled pill bottle.

(Defs.' 56.1 ¶ 21; Hicks Aff. ¶ 13.)[3]  Hicks called for back-up assistance because "he had a

female arrestee."  (Defs.' 56.1 ¶ 22; Hicks Aff. ¶ 16.)  Hicks asked Deanda to exit her vehicle,

and he placed her in the back of his police vehicle.  (Defs.' 56.1 ¶ 22; Hicks Aff. ¶ 17.)

Caporale arrived on the scene, patted down Deanda's person for weapons, and placed

Hicks's handcuffs on Deanda, who was then again placed in the backseat of Hicks's police

---

[3] Although Plaintiff does not dispute that Hicks made this determination within "five
minutes of speaking" to Deanda, (Def.'s 56.1 ¶ 21), there is nothing in the Hicks Affidavit,
which Defendants cite to support this statement, that supports that Hicks made this determination

vehicle.  (Defs.' 56.1 ¶ 23; Chapman-Langrin Decl. Ex. O (Aff. of Angela Caporale ("Caporale Aff.")) ¶ 15.)  Caporale did not have any substantive conversation with Deanda while she was at the scene.  (Defs.' 56.1 ¶ 24; Caporale Aff. ¶ 14.)  Deanda gave her cell phone to Hicks, and Hicks had a telephone conversation with Deanda's sister, Paula Fontanette ("Fontanette"), to discuss who would pick up the children that were in the back seat of Deanda's vehicle.  (Defs.' ¶¶ 25–26; Deanda 50-h Tr. 37; Hicks Aff. ¶ 22.)[4]  Plaintiff claims that during that conversation Fontanette told Hicks that the pills belonged to her, that she had a prescription for the pills, that she had left them at Plaintiff's home the night before, and that Plaintiff was bringing the pills back to her.  (Pl's. 56.1 ¶ 25-a; Chapman-Langrin Decl. Ex. I. (Dep. Tr. of Paula Fontanette ("Fontanette Tr.")) 23, 27.)  Defendants deny that Fontanette relayed this information.  (Defs.' 56.1 Resp. ¶ 25-A; Hicks Aff. ¶¶ 23–24.)  At the end of the conversation, it had not been determined who was picking up the children, and Hicks terminated the telephone call.  (Defs.' 56.1 ¶ 27.; Hicks Aff. ¶ 22; Fontanette Tr. 16, 18–19.)  The children were placed in the back seat of Caporale's vehicle, and the doors of the vehicle were locked.  (Defs.' 56.1 ¶ 28; Caporale Aff. ¶ 16.)

Hicks and Caporale performed an inventory search of Deanda's vehicle, which yielded nine loose oxycodone pills in the driver's side door panel, one oxycodone pill on the floor in the vicinity of the driver's seat, and 13 ½ Tramadol pills in the center console.  (Defs.' 56.1 ¶ 29; Hicks Aff. ¶ 26; Hicks Tr. 93; Chapman-Langrin Decl. Ex. S.)  The total number of pills

---

within five minutes.
   [4] The Parties refer to Plaintiff's sister as Fontanette, although the deposition transcript spells her last name as Fontenette.  The Court will use the spelling that the Parties use for the

contained in the unlabeled pill bottle was 40 oxycodone pills, for a total of 50 oxycodone pills in the vehicle.  (Defs.' 56.1 ¶ 29; Hicks Aff. ¶ 26; Hicks Tr. 93; Chapman-Langrin Decl. Ex. S.) The inventory search also revealed a total of $1266 in cash, including $100 in one-dollar bills. (Defs.' 56.1 ¶ 30; Hicks Tr. 92–93.)  A tow truck arrived to tow Plaintiff's vehicle from the scene.  (Defs.' 56.1 ¶ 31.)  Plaintiff was taken to the police headquarters in Hicks's vehicle.  (*Id.* ¶ 32.)  The children were taken to the police headquarters in Caporale's vehicle, and Caporale manipulated her police vehicle camera to face the rear seat of the vehicle to "show the children were not being harmed or [were not] otherwise unhappy."  (*Id.*; Caporale Aff. ¶¶ 18, 32–33.) Because she had two children in her custody on the way to the police headquarters, Caporale requested that the video from her police vehicle be preserved.  (Defs.' 56.1 ¶ 33; Caporale Aff. ¶ 34.)

At police headquarters, Deanda was processed and fingerprinted for criminal possession of a controlled substance in the fourth degree and speeding.  (Defs.' 56.1 ¶ 34; Chapman-Langrin Decl. Ex. K.)  Detective Pavone was assigned to Plaintiff's case and assisted Hicks in preparing the case file regarding Plaintiff's arrest.  (Defs.' 56.1 ¶ 35; Chapman-Langrin Decl. Ex. P (Aff. of Robert Pavone ("Pavone Aff.")) ¶ 7.)  Pavone drafted the felony complaint based on information he received from Hicks, and Hicks authored the incident report and "voucher[ed] the items seized as part of the inventory of [Deanda's] vehicle."  (Defs.' 56.1 ¶ 35; Pavone Aff. ¶ 7.) Deanda declined to give Pavone a statement concerning the circumstances of her arrest.  (Defs.' 56.1 ¶ 36; Pavone Aff. ¶ 26.)

---

sake of consistency.

Plaintiff states that "Hicks did not disclose to . . . Pavone that both Plaintiff and her sister told him that the pills belonged to Fontanette, that [Fontanette] had a prescription for the pills, that she had left them at Plaintiff's home the night before[,] . . . that Plaintiff was driving [to] the City to bring them back to her, [and that] Fontanette offered to bring the prescription bottle to 'wherever' she needed to in order to prove she had the prescription." (Pl.'s 56.1 ¶ 35-A; Chapman-Langrin Decl. Ex. G (Dep. Tr. of Robert Pavone ("Pavone Tr.")) 31–33.) Indeed, Defendants admit that "[o]n the date of the incident, . . . Hicks never told . . . Caporale, Pavone, or Thomas[,] [who Plaintiff alleges was the desk officer that Fontanette spoke with when she arrived at police headquarters, (*see* Pl.'s TAC ¶ 20], about his conversation with [Deanda] at the scene where she told him that the pills belonged to her sister, and that her sister had a valid prescription for the pills," or about Deanda's "conversation with him at the scene wherein [Deanda] claims that she told . . . Hicks that her sister had left the pills at her house the night before and that she was on her way to bring the pills to her at the time of the arrest." (Defs.' 56.1 ¶¶ 37–38; Hicks Aff. ¶ 31; Caporale Aff. ¶ 10; Pavone Aff. ¶¶ 18–19; Chapman-Langrin Decl. Ex. Q (Aff. of William Thomas ("Thomas Aff.")) ¶ 13.) Further, "inasmuch as . . . Hicks does not recall receiving additional information from [Fontanette] over the phone, he never told . . . Caporale, Pavone, or Thomas about his telephone conversation with [Fontanette]." (Defs.' 56.1 ¶ 39; Hicks Aff. ¶ 32; Caporale Aff. ¶ 11; Pavone Aff. ¶ 20; Thomas Aff. ¶ 14.) Hicks denies that Fontanette told him that she would bring her identification and prescription information to the scene or to the police headquarters. (Defs.' 56.1 ¶ 39; Hicks Aff. ¶ 23.) Pavone had no information regarding Hicks's conversation with Plaintiff at the scene of the

incident or Hicks's telephone conversation with Fontanette prior to his preparation of the felony complaint.  (Defs.' 56.1 ¶ 40; Pavone Aff. ¶¶ 19–20.)  Thomas did not have information regarding these conversations either.  (Defs.' 56.1 ¶ 41; Thomas Aff. ¶¶ 13–14.)

On the date of the incident, Fontanette arrived at the police headquarters with Monique Sutton ("Sutton") to pick up the children.  (Defs.' 56.1 ¶ 42; Fontanette Tr. 33–34.)  Plaintiff claims that Fontanette told a police officer through the glass partition that she had the prescription bottle with her to prove that the pills belonged to her, but that the officer was not interested.  (Pl.'s 56.1 ¶ 42-A; Fontanette Tr. 34–36.)  Although Plaintiff alleges in her Third Amended Complaint that Thomas was the officer at the desk, (TAC ¶ 20), Fontanette testified that she cannot identify with certainty the officer that she allegedly spoke with at the police headquarters, (Defs.' 56.1 ¶ 47; Fontanette Tr. 34–35).  Specifically, Fontanette does not recall asking for a name of the officer, did not address any officer in particular at the window of the police headquarters, and is unable to describe the officer to whom she requested to speak with Hicks and to provide her prescription bottle and identification.  (Defs.' 56.1 ¶ 47; Fontanette Tr. 34–35.)  Fontanette testified that she remembered speaking to two officers, one male and one female.  (Fontanette Tr. 34.)  On the date of the incident, there were two other desk officers on duty with Thomas during the same time period that he was assigned as desk officer, and at various times during the day, other officers were also at the three desks behind the window at the headquarters.  (Defs.' 56.1 ¶ 48; Thomas Aff. ¶¶ 7–8.)  Thomas does not recall having a conversation with Fontanette.  (Defs.' 56.1 ¶ 46; Thomas Aff. ¶ 21.)  Caporale released the two children to Fontanette and Sutton, but did not have a conversation with Fontanette.  (Defs.' 56.1

8

¶ 43; Caporale Aff. ¶ 23.)  Neither Hicks nor Pavone had a conversation with Fontanette.  (Defs.'
56.1 ¶¶ 44–45; Hicks Aff. ¶ 30; Pavone Aff. ¶ 31.)  Neither Caporale, Pavone, nor Thomas was
advised by any other officer that Fontanette wanted to show them her identification and her
prescription bottle while she was at the police headquarters.  (Defs.' 56.1 ¶ 49; Caporale Aff.
¶ 25; Pavone Aff. ¶ 32; Thomas Aff. ¶ 22.)

Caporale took Deanda to the "White Plains Court for her arraignment[,] . . . and [Deanda]
was subsequently taken to the Westchester County Jail."  (Defs.' 56.1 ¶ 51; Caporale Aff. ¶¶ 26–
28.)  On June 25, 2012, at the request of the district attorney, Fontanette authored a sworn
written statement at the police headquarters regarding the circumstances of Deanda's arrest and
her ownership of the oxycodone pills.  (Defs.' 56.1 ¶ 52; Chapman-Langrin Decl. Ex. L.)  Police
Officer Grasso took photographs of Fontanette's prescription pill bottle containing the
oxycodone pills and Deanda's prescription for the Tramadol pills at the headquarters.  (Defs.'
56.1 ¶ 52; Chapman-Langrin Decl. Ex. U.)  On July 26, 2012, the Westchester County District
Attorney withdrew the criminal case against Plaintiff, after receiving the information from
Fontanette and from Deanda's attorney regarding, among other things, the identity of the
pharmacist that dispensed the oxycodone pills to Fontanette.  (Defs.' 56.1 ¶ 53.)

B.  Procedural History

Plaintiff filed the initial Complaint on February 22, 2013.  (Dkt. No. 1.)  Plaintiff filed a
First Amended Complaint on July 11, 2013, (Dkt. No. 10), a Second Amended Complaint on
November 20, 2013, (Dkt. No. 16), and a Third Amended Complaint ("TAC") on January 6,
2014, (Dkt. No. 20).  The TAC includes several claims based on the stop of Deanda's vehicle,

Deanda's arrest, and the events thereafter.  Specifically, Count One alleges violations of the

Fourth and Fourteenth Amendments; Count Two alleges that Defendants maliciously prosecuted

Deanda in violation of the Fifth, Sixth, and Fourteenth Amendments, Article I, Section 6 of the

New York State Constitution, and New York common law; Count Three alleges that Defendants

violated Plaintiff's rights to be free from abuse of process under state and federal law; Count

Four alleges that Defendants violated Plaintiff's federal and state due process rights; Count Five

alleges that Defendants conspired to deprive Plaintiff of her rights under the Fifth, Sixth, and

Fourteenth Amendments; Count Six alleges that Defendants published defamatory and false

statements regarding Plaintiff; and Count Seven alleges Defendants engaged in shocking and

outrageous conduct that caused Plaintiff emotional distress.  (*Id.* ¶¶ 52–85.)  Defendants filed an

Answer to the TAC on February 7, 2014.  (Dkt. No. 21.)

  Pursuant to a Scheduling Order dated June 16, 2014, (Dkt. No. 32), and subsequent

extensions of time, Plaintiff filed her Spoliation Motion and accompanying papers on October

10, 2014, (Dkt. Nos. 37, 38, 40, 42), and Defendants filed their opposition papers to the

Spoliation Motion on the same day, (Dkt. Nos. 39, 41).  Defendants filed their Motion For

Summary Judgment and accompanying papers on October 17, 2014, (Dkt. Nos. 45–48, 51–53),

and Plaintiff filed her opposition papers the same day, (Dkt. Nos. 49–50).  On July 29, 2015, the

Court issued an Order providing Plaintiff with an opportunity, pursuant to Federal Rule of Civil

Procedure 56(e), to point to evidence supporting the claim in her Local Rule 56.1 Statement that

Hicks could not see the color of the pills because the pill bottle was amber and not transparent.

(Order (Dkt. No. 56).)  Plaintiff responded to the Court's July 29, 2015 Order by letter dated

August 6, 2015, (Dkt. No. 58), and Defendants filed a response by letter dated August 12, 2015, (Dkt. No. 61).  On August 25, 2015, the Court issued an Order requesting supplemental briefing from both Parties on Plaintiff's claims for defamation and intentional infliction of emotional distress.  (Dkt. No. 62.)  Accordingly, Plaintiff filed a relevant letter dated September 2, 2015, (Dkt. No. 63), and Defendants filed a supplemental brief on the same day, (Dkt. No. 64).

## II.  Discussion

### A.  Spoliation Motion

#### 1.  Applicable Law

Spoliation is defined as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001) (internal quotation marks omitted); *see also West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (same).  "The spoliation of evidence germane 'to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction.'" *Byrnie*, 243 F.3d at 107 (quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)).  Sanctions for spoliation of evidence serve to "(1) deter[] parties from destroying evidence; (2) plac[e] the risk of an erroneous evaluation of the content of the destroyed evidence on the party responsible for its destruction; and (3) restor[e] the party harmed by the loss of evidence helpful to its case to where the party would have been in the absence of spoliation." *Id.* (internal quotation marks omitted).  "[D]etermining the proper sanction to impose for spoliation is 'confined to the sound discretion of the trial judge . . . and is assessed on a case-by-case

11

basis.'" *Adorno v. Port Auth.*, 258 F.R.D. 217, 227 (S.D.N.Y. 2009) (quoting *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)).

"[A] party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir. 2002) (internal quotation marks omitted); *see also Curcio v. Roosevelt Union Free Sch. Dist.*, 283 F.R.D. 102, 107 (E.D.N.Y. 2012) (same). As to the first element, an obligation to preserve the evidence at the time it was destroyed "usually arises when a party has notice that the evidence is relevant to litigation . . . but also on occasion in other circumstances, as for example when the party should have known that the evidence may be relevant to future litigation." *Byrnie*, 243 F.3d at 107 (internal quotation marks omitted); *see also Kronisch*, 150 F.3d at 126 (same). "While a litigant is under no duty to keep or retain every document in its possession, once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a litigation hold to ensure the preservation of relevant documents." *Adorno*, 258 F.R.D. at 227 (alterations and internal quotation marks omitted). For the purposes of the first prong, "[r]elevant documents are those that a party should reasonably know are relevant in the action, reasonably calculated to lead to the discovery of admissible evidence, reasonably likely to be

requested during discovery and/or are the subject of a pending discovery request." *Id.* (alterations and internal quotation marks omitted).

As to the second element, "at times [the Second Circuit has] required a party to have intentionally destroyed evidence; at other times [the Second Circuit has] required action in bad faith; and at other times [the Second Circuit] has allowed an adverse inference based on gross negligence," and, accordingly, "a case by case approach [is] appropriate" to determine whether an adverse inference is warranted. *Byrnie*, 243 F.3d at 107–08.  It is worth noting, however, that "intentional destruction of documents in the face of a duty to retain those documents is adequate." *Id.* at 109 (holding that the fact that the defendant had not "asserted that [its] destruction was merely accidental" was "evidence of intentional destruction sufficient to show a culpable state of mind").

Finally, as to the third element, "[w]hen evidence is destroyed in bad faith, that fact alone is sufficient to support an inference that the missing evidence would have been favorable to the party seeking sanctions, and therefore relevant." *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 121 (S.D.N.Y. 2008) (citing *Residential Funding*, 306 F.3d at 109)).  A finding that a party destroyed the evidence in gross negligence also supports an inference that the evidence would have been relevant. *See, e.g.*, *Crawford v. City of New London*, No. 11-CV-1371, 2014 WL 2168430, at *4 (D. Conn. May 23, 2014).  "By contrast, when the destruction is negligent, relevance must be proven by the party seeking the sanctions." *Id.*  "[I]n the context of an application for an adverse inference, relevance 'means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence.'" *Curcio*, 283 F.R.D. at 112 (quoting *Residential Funding*, 306

F.3d at 108–09).  Instead, "the moving party must show through extrinsic evidence that the destroyed evidence would have been favorable to [his or her] case." *Id.*

### 2.  Application

Plaintiff seeks "an adverse inference jury instruction based upon . . . Hicks'[s] failure to preserve the video/audio recording made from his patrol car during his stop, questioning[,] and arrest of Plaintiff on May 28, 2012."  (Pl.'s Mem. of Law in Supp. of Mot. For an Adverse Inference Jury Instruction ("Pl.'s Spoliation Mem.") 1 (Dkt. No. 40).)  During his deposition, Hicks testified that his vehicle was equipped with a video recorder, that the recorder that was operational at the time of Deanda's arrest, and that the recorder captured both audio and video of the exchange at the scene of the stop and arrest.  (Hicks Tr. 8–9; *see also* Aff. of William I. Aronwald ("Aronwald Aff.") ¶ 6 (Dkt. No. 38) (explaining same).)

Turning to the first element, Plaintiff argues that the duty to preserve the video/audio recording began at the earliest on May 28, 2012, the date of Plaintiff's arrest, and at the latest on July 27, 2012, the date of Plaintiff's Notice of Claim, which indicated that Plaintiff was asserting claims against Hicks.  (Pl.'s Spoliation Mem. 2.)  Defendants do not dispute these dates.  Indeed, Hicks testified that on the date of Plaintiff's arrest he understood that the reason that the video was made was for possible use in connection with any litigation arising from the stop and arrest. (Hicks Tr. 10.)  Moreover, Hicks testified that unless someone designates the video/audio recording as evidence, it is automatically removed from the County Police database six months from the date of the arrest.  (*Id.* at 8–11.)  Accordingly, pursuant to this policy, the evidence

14

would not have been automatically removed from the database until November 28, 2012, six months after Plaintiff's arrest and four months after Plaintiff filed her Notice of Claim.[5]

Nevertheless it is not clear that Hicks himself had a duty to preserve the evidence.  Hicks testified that:

> [The video/audio recording] was not saved or requested by the District Attorney prosecuting the case.  As per my general orders, I'm not required to save said video.  After six months the video is then removed from our database and no longer available because it was not requested.

(*Id.* at 9; *see also id.* at 18 ("I'm not required by my general orders to save such video").)  While Hicks acknowledged that it was his understanding that the reason the video/audio recordings were made is for possible use in connection with any litigation arising from incidents that the recordings captured, (*id.* at 10), he stated that he did not know if the district attorney or anyone else requested the video/audio recording, (*id.* at 11).  This testimony suggests that the district attorney, not Hicks, had the responsibility to preserve the evidence.  It at least suggests that this was Hicks's perception.  Moreover, Plaintiff points to nothing in the record, and the Court has not found anything in Hicks's testimony, that suggests that Hicks had the video/audio recording in his control when the duty to preserve it arose.  Instead, Hicks testified that the video/audio recording would have been "stored in storage for six months" in the "database at headquarters." (*Id.* at 11–12.)  Courts have held that an adverse inference instruction is not appropriate where the defendants in question did not have "any control over the [relevant] recordings, any duty to maintain them, or were in any way involved in the failure to preserve them."  *Grant v. Salius*,

---

[5] Hicks testified that although he learned of Plaintiff's Notice of Claim, he did not recall when he learned of it.  (Hicks Tr. 13.)

No. 09-CV-21, 2011 WL 5826041, at *2 (D. Conn. Nov. 18, 2011); *see also Holloway v. Dep't of Corr.*, No. 11-CV-1290, 2013 WL 628648, at *6 (D. Conn. Feb. 20, 2013) ("[T]he fact that the video tape was not preserved without more is insufficient to establish that any particular defendant had both control over and a duty to preserve the video tape at the time it was destroyed[,] much less a culpable state of mind."); *Field Day, LLC v. County of Suffolk*, No. 04-CV-2202, 2010 WL 1286622, at *13 (E.D.N.Y. Mar. 25, 2010) (refusing to give an adverse inference charge where the plaintiffs did not show that the individual defendants, as opposed to the county defendant, actually spoliated evidence); *cf. Thomas v. Kelly*, 903 F. Supp. 2d 237, 259 & n.10 (S.D.N.Y. 2012) (explaining that it was appropriate to hold the individual officer, as well as the city defendant, responsible for "failing to preserve evidence he at one time controlled and had a duty to maintain" when the officer had the evidence "within his control when the duty to preserve it arose," which was when the plaintiff filed a complaint the next day). It is at the very least unclear, then, that Hicks, as opposed to another person, department, or entity such as the district attorney or Westchester County, had a duty to preserve the video/audio recording.

Assuming that Hicks had a duty to preserve the video/audio recording, and thus, turning to the second element, "intentional destruction of [evidence] in the face of a duty to retain th[e] [evidence] is adequate" to support an adverse inference and the fact that a defendant "acted with a culpable state of mind." *Byrnie*, 243 F.3d at 109. Plaintiff points to nothing in the record to show that Hicks intended to destroy the video/audio recording, and, therefore, a finding of bad faith is not warranted. While "[s]ome courts have categorically held that 'the failure to implement a litigation hold at the outset of litigation amounts to gross negligence,'" *Curcio*, 283

16

F.R.D. at 111 (quoting *Toussie v. County of Suffolk*, No. 01-CV-6716, 2007 WL 4565160, at *8 (E.D.N.Y. Dec. 21, 2007)), the Second Circuit has made clear that "a failure to institute a litigation hold [does not] constitute[] gross negligence *per se*," *Chin v. Port Auth.*, 685 .3d 135, 162 (2d Cir. 2012) (internal quotation marks omitted). This is especially the case "[i]n the context of a motion brought solely against . . . an individual, not a municipality." *Curcio*, 283 F.R.D. at 111. Accordingly, any fault on Hicks's part that the video/audio recording was not preserved was negligent, or at most, grossly negligent.

Nonetheless, under the third element, Plaintiff's request for an adverse inference is not warranted. "[T]o obtain an adverse inference instruction, a party must establish that the unavailable evidence is 'relevant' to its claims or defenses." *Residential Funding*, 306 F.3d at 108. Again, "'relevant' in this context means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence," and, instead, "the party seeking the adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction." *Id.* at 109 (alterations and internal quotation marks omitted). The Court emphasizes that in this context, it must "take care not to hold [Plaintiff] to too strict a standard of proof regarding the likely contents of the destroyed or unavailable evidence because doing so would subvert the purposes of the adverse inference and would allow parties who have destroyed evidence to profit from that destruction." *Id.* (alterations and internal quotation marks omitted). Further, "[w]here a party destroys evidence in bad faith, that bad faith alone is sufficient circumstantial evidence from which a reasonable trier of fact could conclude that the

missing evidence was unfavorable to that party." *Id.* Indeed, where a defendant has acted willfully in failing to preserve evidence, a plaintiff "need not show that the evidence it seeks is likely relevant to its claim." *Chevron Corp. v. Donziger*, 296 F.R.D. 168, 223 (S.D.N.Y. 2013); *see also Curcio*, 283 F.R.D. at 112 ("In certain limited circumstances, relevance may be inferred if the spoliator is shown to have a sufficiently culpable state of mind." (internal quotation marks omitted)). Nevertheless, a finding of gross negligence—the willful intent that the Court assumes Hicks had here—does not require an adverse inference. *See Chin*, 685 F.3d at 162 ("[A] finding of gross negligence merely permits, rather than requires, a district court to give an adverse inference instruction."); *Residential Funding*, 306 F.3d at 108 (explaining that "where a party seeking an adverse inference adduces evidence that its opponent destroyed potential evidence (or otherwise rendered it unavailable) in bad faith or through gross negligence (satisfying the culpable state of mind factor), that same evidence of the opponent's state of mind *will frequently also be sufficient* to permit a jury to conclude that the missing evidence is favorable to the party (satisfying the 'relevance' factor)" (emphasis added) (some internal quotation marks omitted)); *Hawley v. Mphasis Corp.*, 302 F.R.D. 37, 48 (S.D.N.Y. 2014) ("While prejudice may be presumed upon a showing of bad faith or gross negligence, it is a rebuttable presumption, and the spoliating party has an opportunity to demonstrate a lack of prejudice by, for example, demonstrating that the innocent party had access to the evidence alleged to have been destroyed or that the evidence would not support the innocent party's claims or defenses."); *Mastr Adjustable Rate Mortg. Tr. 2006-0A2 v. UBS Real Estate Secs. Inc.*, 295 F.R.D. 77, 87 (S.D.N.Y. 2013) (same).

18

Here, Defendants argue that the video/audio recording lacks relevance to Plaintiff's claims.  Specifically, Defendants contend that the video/audio recording would "not assist [P]laintiff in establishing that she was in lawful possession of the oxycodone pills at the time of the arrest[,] . . . . show that she possessed a prescription for the pills, or even that she possessed a prescription bearing her sister as the owner of the pills[,] . . . . show that [Hicks] took the pills from her, put them in an unmarked container[,] and planted them on her[,] . . . [or] show that she did not possess the oxycodone pills in an unlabeled pill container."  (Reply Mem. of Law in Supp. of Defs.' Summ. J. and Mem. of Law in Opp'n to Pl.'s Mot. For an Adverse Inference ("Defs.' Reply") 8 (Dkt. No. 51).)  Plaintiff argues, in turn, that the video/audio recording is "the best evidence of the conversation between Hicks and Plaintiff," (Aronwald Aff. ¶ 6), and would settle or at the very least shed light on a key dispute between the Parties concerning whether Hicks had probable cause to arrest Plaintiff.  In particular, Plaintiff explains that "[a]lthough Hicks acknowledges that [Plaintiff] told him that the pills belonged to her sister for which she had a prescription, he denies [that] she told him that Fontanette left them [at] her home the night before and she was driving to the City to return them to her."  (*Id.* ¶ 4; *compare* Pl.'s 56.1 ¶ 15 (stating that Plaintiff told Hicks that her sister was at the house the night before, that her sister had left the pills there, and that she was on her way to return the pills to her) *with* Defs.' 56.1 Resp. ¶ 15 (claiming that Hicks does not recall Plaintiff telling him this information).)

The Court agrees with Plaintiff that the video/audio recording might have been the best evidence of the conversations that occurred between Hicks and Plaintiff and between Hicks and Fontanette.  Nevertheless, for the reasons explained below, Defendants are correct that what is

19

allegedly captured on the video/audio recording from Plaintiff's perspective is not relevant to

Plaintiff's claims and that its contents would not have ultimately been helpful to Plaintiff's case.

In other words, even accepting Plaintiff's version of events as true, which Plaintiff argues would

have been captured by the video/audio recording, the conversations that Plaintiff contends

occurred do not affect the analysis of the claims here, as explained below.  Thus, the adverse

inference would not "plac[e] the risk of an erroneous evaluation of the content of the destroyed

evidence on the party responsible for its destruction" or "restor[e] [Plaintiff] . . . to where [she]

would have been in the absence of spoliation," *Byrnie*, 243 F.3d at 107, because the Court

assumes, for the purpose of deciding the Motion, the accuracy of Plaintiff's version of events.

Accordingly, no adverse inference is warranted.  *See Simoes v. Target Corp.*, No. 11-CV-2032,

2013 WL 2948083, at *7 (E.D.N.Y. June 14, 2013) (explaining that because it was not clear how

the surveillance video would have been favorable to the plaintiff's negligence claim in light of

"the record evidence identified by [the] plaintiff," the "relevance element" was not satisfied, and,

therefore, the plaintiff's request for an adverse inference failed); *Port Auth. Police Asian Jade

Soc. of N.Y. & N.J. Inc. v. Port Auth.*, 601 F. Supp. 2d 566, 570–71 (S.D.N.Y. 2009) ("Because

an adverse inference instruction is not required to restore the plaintiffs to the position they would

occupy but for the spoliation, an adverse inference instruction is not warranted."); *Zubulake v.

UBS Warburg, LLC*, 220 F.R.D. 212, 222 (S.D.N.Y. 2003) ("In sum, although [the defendant]

had a duty to preserve all of the backup tapes at issue, and destroyed them with the requisite

culpability, [the plaintiff] cannot demonstrate that the lost evidence would have supported her

claims.  Under the circumstances, it would be inappropriate to give an adverse inference instruction to the jury.").

In any event, even if the Court were to grant the adverse inference, "an adverse inference alone would not preclude granting summary judgment to the defendants in this case." *Valenti v. Penn. Mut. Life Ins. Co.*, 850 F. Supp. 2d 455, 453 (S.D.N.Y. 2012); *see also Bank of Am., N.A. v. Fisher*, 927 F. Supp. 2d 15, 26 (E.D.N.Y. 2013) (same).  "In borderline cases, an inference of spoliation, in combination with some (not insubstantial) evidence for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment." *Byrnie*, 243 F.3d at 107 (internal quotation marks omitted).  Here, however, even taking Plaintiff's account of the exchange between herself and Hicks and between Hicks and her sister as true, which the Court does below in resolving the Motion for Summary Judgment, there is no evidence in the record that warrants denying Defendants' Motion, as explained below.  *See Valenti*, 850 F. Supp. 2d at 454 (explaining that an adverse inference would not preclude granting summary judgment because there was an absence of some other "not insubstantial evidence of a triable issue of fact" (internal quotation marks omitted)).  In other words, even if the Court granted Plaintiff's Motion for Spoliation and imposed an adverse inference sanction, such a sanction would not alter the outcome of the Summary Judgment Motion.[6]

---

[6] In her Motion for Spoliation, Plaintiff does not request any other relief besides an

21

B.  Summary Judgment Motion

    1.  Standard of Review

Summary judgment shall be granted where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir.

2014) (same).  "In determining whether summary judgment is appropriate," a court must

"construe the facts in the light most favorable to the non-moving party and . . . resolve all

ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653

F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper*

*Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014)

(same).  Additionally, "[i]t is the movant's burden to show that no genuine factual dispute

exists."  *Vt. Teddy Bear Co*., *v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also*

*Aurora Comm. Corp. v. Approved Funding Corp.,* No. 13-CV-230, 2014 WL 1386633, at *2

(S.D.N.Y. Apr. 9, 2014) (same).  "However, when the burden of proof at trial would fall on the

nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to

the trier of fact on an essential element of the nonmovant's claim," in which case "the

nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue

of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. PriceWaterhouse*

*Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alterations and internal quotation marks

omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to

---

adverse inference instruction.

create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker v. City of New York*, No. 11-CV-2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing, inter alia, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .")).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod,* 653 F.3d at 164 (internal quotation marks omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, MDL No. 1358, No. M21-88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same). Thus, a court's goal should be "'to isolate and dispose of factually unsupported claims.'" *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)); *see also Schatzki v. Weiser Capital Mgmt., LLC*, No. 10-CV-4685, 2013 WL 6189465, at *14 (S.D.N.Y. Nov. 26, 2013) (same).

23

### 2.  Defendants Caporale, Pavone, and Thomas

Plaintiff concedes that, "[b]ased upon the pre-trial discovery, notably the depositions of the parties and non-party witness Paula Fontanette, Plaintiff has no objection to summary judgment in favor of Defendants Angela Caporale, Robert Pavone, and William Thomas." (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. For Summ. J. ("Pl.'s Mem") 1 (Dkt. No. 49).) Accordingly, the Court grants Defendants' Motion for Summary Judgment as to these Defendants.  *See Torres-Sylvan v. Am. Civil Liberties Union*, No. 01-CV-343, 2005 WL 1719788, at *1 n.1 (S.D.N.Y. July 22, 2005) (dismissing the plaintiff's claims for intentional infliction of emotional distress where the plaintiff conceded in her opposition to summary judgment that the claim should be dismissed); *Valdez v. MGS Realty & Mgmt. Corp.*, No. 96-CV-5122, 2000 WL 511024, at *2 (S.D.N.Y. Apr. 28, 2000) (granting the defendant's motion for summary judgment with respect to claims that the plaintiffs conceded in their opposition papers that they were not able to prove).

### 3.  Qualified Immunity

Hicks invokes qualified immunity as to all of Plaintiff's claims.  "The doctrine of qualified immunity protects government officials from suit if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (internal quotation marks omitted); *see also Lee v. McCue*, No. 04-CV-6077, 2007 WL 2230100, at *2 (S.D.N.Y. July 25, 2007) (same).  "This is a doctrine that seeks to balance the twin facts that civil actions for damages may offer the only realistic avenue for vindication of constitutional guarantees and

24

that such suits nevertheless can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Jones v. Palmey*, 465 F.3d 46, 55 (2d Cir. 2006) (internal quotation marks omitted). As to the latter fact, "the Supreme Court has described the 'central purpose' of qualified immunity as preventing threats of liability that would be 'potentially disabling' to officials." *Amore v. Novarro*, 624 F.3d 522, 529–530 (2d Cir. 2010) (quoting *Elder v. Holloway*, 510 U.S. 510, 514 (1994)). Accordingly, the Second Circuit has "developed a standard for determining whether an officer is entitled to qualified immunity that is forgiving and protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted).

To determine whether a defendant is entitled to qualified immunity, a court assesses: "(1) whether a plaintiff has shown facts making out a violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the officer to believe the conduct at issue was lawful." *Gonzalez*, 728 F.3d at 154 (internal quotation marks omitted). "The objective reasonableness test is met—and the defendant is entitled to immunity—if officers of reasonable competence could disagree on the legality of the defendant's actions." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 216 (2d Cir. 2000) (internal quotation marks omitted). Accordingly, "if the court determines that the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendant's conduct under the circumstances, summary judgment for the officer is appropriate." *Id.* (alterations and internal quotation marks omitted).

The Court thus turns to the merits of Plaintiff's constitutional claims, analyzing them through the lens of qualified immunity.

### a.  Unreasonable Search and Seizure

In the First Cause of Action, Plaintiff alleges that Hicks violated her right to be secure in her person against unreasonable searches and seizures under the Fourth and Fourteenth Amendments.  (TAC ¶¶ 52–56.)  The Fourth Amendment prohibits "unreasonable searches and seizures."  U.S. Const. amend. IV.  "The temporary detention of a person when the police have stopped her vehicle, regardless of its brevity or limited intrusiveness, constitutes a seizure for Fourth Amendment purposes, and thus must not be unreasonable."  *Gilles v. Repicky*, 511 F.3d 239, 244–45 (2d Cir. 2007); *see also Diamondstone v. Macaluso*, 148 F.3d 113, 123 (2d Cir. 1998) (same); *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994) ("An ordinary traffic stop constitutes a limited seizure within the meaning of the Fourth and Fourteenth Amendments." (internal quotation marks omitted)).  "Accordingly, such stops must be justified by probable cause or a reasonable suspicion based on specific and articulable facts of unlawful conduct."  *Id.* (internal quotation marks omitted).

"Traffic stops are presumptively reasonable under the Fourth Amendment if the officer has probable cause to believe that a traffic infraction has occurred."  *United States v. Foreste*, 780 F.3d 518, 523 (2d Cir. 2015); *see also United States v. Harrell*, 268 F.3d 141, 148 (2d Cir. 2001) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." (internal quotation marks omitted)); *United States v. Dhinsa*, 171 F.3d 721, 725 (2d Cir. 1999) (explaining that

26

"because . . . the officers observed a traffic violation, an objective circumstance [existed] that justifie[d] a traffic stop"); *Scopo*, 19 F.3d at 781 (holding that "[a]lthough [the driver's] traffic violation, failure to signal while changing lanes[,] . . . was minor, the officers acted within their authority in stopping [the driver] for the violation").

There is no dispute that on the date of the stop Hicks observed Deanda speeding on the Bronx River Parkway.  (Defs.' 56.1 ¶¶ 4–5; Pl.'s 56.1 ¶¶ 4–5.)  Accordingly, as Plaintiff concedes, Hicks's initial stop was reasonable based on his observation that Deanda was speeding.  (*See* Pl.'s Mem. 7 ("Certainly, Officer Hicks was justified in pulling Plaintiff over once he observed her speeding on the Bronx River Parkway.").)  Nevertheless, Plaintiff contends that the subsequent seizure of the pill bottle was not lawful.  (*Id.* at 12–13.)  "In general, law enforcement officials, pursuant to the [F]ourth [A]mendment, must obtain a search warrant in order to seize an individual's property."  *Scopo*, 19 F.3d at 782.  However, "the 'plain view' exception to the [F]ourth [A]mendment warrant requirement authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity."  *Id.* (some internal quotation marks omitted); *see also United States v. Delva*, 13 F. Supp. 3d 269, 275 (S.D.N.Y. 2014) ("When law enforcement are engaged in otherwise lawful activities . . . and see illegal or evidentiary items in plain view, they may seize them without a warrant.").  Under the plain view exception to the warrant requirement, "a police officer may seize evidence when in plain view if: (1) the officer's initial intrusion was permissible under the [F]ourth [A]mendment; (2) the discovery of the evidence is inadvertent;

27

and (3) the incriminating nature of the evidence found is immediately apparent." *Scopo*, 19 F.3d at 782 (internal quotation marks omitted); *see also Delva*, 13 F. Supp. 3d at 275–76 (same). Here, for the reasons explained above, there is no doubt that the first element has been satisfied—Hicks stopped Deanda's vehicle because of an observed traffic violation.  Moreover, Plaintiff does not contest that "the discovery of the [pill bottle was] inadvertent." *Scopo*, 19 F.3d at 782.  The Parties agree that Hicks observed the pill bottle when Deanda was searching in the purse for her license.

The Parties disagree, however, as to whether the third element was satisfied—specifically, whether the potentially incriminating nature of the pill bottle was readily apparent. "[U]nder the plain view doctrine, the incriminating nature of an object is generally deemed readily apparent where law enforcement have reason to believe it is or contains evidence of a crime." *Delva*, 13 F. Supp. 3d at 276 (internal quotation marks omitted).  However, "[i]t is not necessary that an officer know with certainty that an object seized is or contains evidence of a crime at the moment of seizure; it is enough that there be probable cause to associate the object with criminal activity." *Id.*  In other words, "[f]or an item's criminal nature to be 'immediately apparent,' a reasonable agent must conclude that there is 'probable cause' to believe that the item constitutes evidence or fruit of a crime without conducting some further search of the object." *Untied States v. Echevarria*, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010) (quoting *United States v. Grubczak*, 793 F.2d 458, 461 (2d Cir. 1986)).  "Whether an object is perceived as evidence or containing evidence of a crime depends on the assessment of the law enforcement officer at the scene." *Delva*, 13 F. Supp. 3d at 276; *see also Echevarria*, 692 F. Supp. 2d at 332 (same);

28

*United States v. Benn*, 441 F. Supp. 1268, 1272 (E.D.N.Y. 1977) ("The question [of whether an object's criminality is immediately apparent] must not be decided by the mere subjective views or inarticulate hunches of the police official but by an objective standard.").

As relevant here, Section 3345 of New York's Public Health Law provides that "[e]xcept for the purpose of current use by the person . . . for whom such substance was prescribed or dispensed, it shall be unlawful for an ultimate user of controlled substances to possess such substance outside of the original container in which it was dispensed."  *See also Michaels v. City of New York*, No. 10-CV-2666, 2011 WL 570125, at *6 n.2 (S.D.N.Y. Feb. 16, 2011) ("Carrying a controlled substance . . . outside of the original container in which it was dispensed violates New York Public Health Law section 3345."); *People v. Flelden*, No. 15-NY-022889, 2015 WL 4460568, at *6 (N.Y. Crim. Ct. July 22, 2015) (explaining that "[o]nly the person for whom the substance was prescribed is permitted to possess a . . . controlled substance, and the substance must remain in the original container in which it was dispensed" (citing Pub. Health Law § 3345)).  Moreover, pursuant to Section 3333, "[n]o controlled substance may be . . . dispensed or sold unless it is enclosed within a suitable container, and [a]ffixed to such container is a label upon which" several pieces of identifying information are "indelibly typed, printed, or otherwise legibly written."  Finally, Section 3387 permits any police officer to seize "[a]ny controlled substance . . . which has been manufactured, distributed, or dispensed or acquired in violation of th[e] [Public Health Law], or the lawful possession of which cannot be immediately ascertained."

To begin, the Court notes that Hicks did not have information that Plaintiff was in unlawful possession of a controlled substance at the time of the traffic stop. Moreover, there were no other manifested facts, other than the observed pill bottle, that suggested Plaintiff was in possession of a controlled substance. Accordingly, this is not a case where an otherwise benign object was or became significant in the context of a permissible search. *Cf. Delva*, 13 F. Supp. 3d at 276 (explaining that "[o]rdinary, everyday objects such as cell phones, laptops, and cameras may take on a different character depending on the context in which they are found"); *United States v. Rudaj*, 390 F. Supp. 2d 395, 403 (S.D.N.Y. 2005) (explaining that the "incriminating character of the keys was immediately apparent to the agents" because "[t]he seizing agent had been informed prior to the arrest that [the defendant] was believed to be involved in illegal gambling" and "further recognized the keys on the dresser as matching the type of lock commonly used to secure gambling machines[,]" and the keys were discovered "in the immediate vicinity of large amounts of cash").

Even so, pursuant to the plain view doctrine, the illegality of the pill bottle was "immediately apparent" if Hicks had "reason to believe it [was] or contain[ed] evidence of a crime," or was contraband in and of itself. *Delva*, 13 F. Supp. 3d at 276. In his deposition testimony, Hicks stated that from his vantage point, he observed that the pills were blue, even though the pill bottle was amber, and that, because the bottle was transparent, he was able to see that the bottle did not have a label. (Hicks Tr. 87–88.) In her Statement pursuant to Local Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1"), Deanda disputes the possibility that Hicks could see

that the pills were blue by looking at the amber colored pill bottle.  (Pl.'s 56.1 ¶ 8-A.)  Moreover,

Deanda disputes that the "unlabeled pill bottle was transparent."  (Pl.'s 56.1 ¶ 10.)  However,

Deanda points to nothing in the record to support these assertions.  Instead, after these claims,

Plaintiff cites only to the relevant portions of Hicks's deposition testimony, in which Hicks

testified that he was able to see that the pills were blue and that the bottle did not have a label.

> Rule 56(c) of the Federal Rules of Civil Procedure states:

> A party asserting a fact . . . is genuinely disputed must support this assertion by (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Federal Rule 56(e), in turn, provides that "[i]f a party fails to properly support an assertion of

fact . . . the court may (1) give an opportunity to properly support . . . the fact; (2) consider the

fact undisputed for the purposes of the motion; (3) grant summary judgment if the motion and

supporting materials . . . show that the movant is entitled to it; or (4) issue any other appropriate

order."  Similarly, Local Rule 56.1(d) requires that each assertion made by the movant or

opponent in their 56.1 Statements "be followed by citation to evidence which would be

admissible[.]"  Moreover, if a party fails to properly support a statement by an adequate citation

to the record, the Court may properly disregard that assertion.  *See Holtz v. Rockefeller & Co.,*

*Inc.*, 258 F.3d 62, 73–74 (2d Cir. 2001) (noting that "district courts in the Southern and Eastern

Districts of New York have interpreted current Local Rule 56.1 to provide that where there are

no citations or where the cited materials do not support the factual assertions in the [s]tatements,

the [c]ourt is free to disregard the assertion" and collecting cases (brackets and internal quotation marks omitted)).

In its July 29, 2015 Order, the Court, pursuant to its discretion under Federal Rule of Civil Procedure 56(e), and in an abundance of caution, provided Plaintiff an opportunity to support these assertions with citations to the record, before it "permissibly disregard[ed] Plaintiff's statements that Hicks could not see the color of the pills because the bottle was amber and the bottle was not transparent." (Order 4–5 (Dkt. No. 56).) In response, Plaintiff conceded that "there is nothing in the record supporting [her] claim that Hicks could not see the color of the pills because the bottle was amber and the bottle not transparent." (Letter from William I. Aronwald to Court (Aug. 6, 2015) ("Pl.'s Aug. 6 Letter") (Dkt. No. 58).) Nevertheless, Plaintiff indicated that she "does dispute Hicks'[s] claim that he observed blue pills in the amber bottle" and explained that "[t]he bottle is in Plaintiff's possession and will be available at trial for the jury's examination." (*Id.*) This belated and unverified assertion is insufficient to create a material issue of fact as to what Hicks observed through the pill bottle for the following reasons. First, as discussed above, Plaintiff cannot rely on her assertion in her Local 56.1 Statement to create a material issue of fact in the absence record evidence to support her claim. Plaintiff's counsel concedes that there is no such evidence in the record, including any testimony from Plaintiff. Indeed, the Court has found nothing that disputes Hicks's claim of what he observed or could observe. As relevant, during Deanda's deposition, the following exchange occurred:

> Q: Did there come a time when [Hicks] observed something in your purse?
> A: Yes.
> Q: When he observed that, did he ask to see it?
> A: Yes.

32

Q: Did he use the words, "May I see that?"  Let me rephrase it.  What is it that he observed, to your knowledge?
A: When I opened my purse, he said you—what did he say?  He said, "What are those pills?"  That's what he asked.  He said "What are those pills?  What's in the bottle?"  I told him—I don't think I said anything immediately.  He said "Those are OxyContin.  Those are OxyContin pills.  Let me see that bottle."  So I gave it to him.
Q: You gave him the bottle?
A: Yes.

(Deanda Tr. 19–20.)  Similarly, at the 50-h hearing, Deanda stated that "[w]hen [she] went into [her] purse to get the license [Hicks] saw [she] had a bunch of stuff in there and he saw [that she] had pills.  He questioned [her] about the pills and [she] told him—he said, Can I see those? [She] said sure.  [She] gave it [sic] to him."  (Deanda 50-h Tr. 20.)  Furthermore, while Deanda could have offered a declaration refuting Hicks's claim based on her knowledge of the appearance of the pill bottle or its position in the purse, there was no such declaration submitted during the course of discovery.  In short, throughout the course of discovery, Deanda did not testify, state, or otherwise declare that Hicks could not see the pill bottle or its contents, or that it was not transparent.

Plaintiff's belated claim that the pill bottle is in her "possession and will be available at trial for the jury's examination," (Pl.'s Aug. 6 Letter 1), is problematic.  Defendants state in a letter dated August 12, 2015 that Plaintiff "ha[d] not before [then] made [the pill] bottle available to [D]efendants."  (Letter from Taryn A. Chapman-Langrin to Court (Aug. 12, 2015) ("Defs.' Aug. 15 Letter") 1 (Dkt. No. 61).)  Plaintiff does not explain why the pill bottle was not produced in discovery.  Additionally, Defendants point out that Fontanette had testified on April 7, 2013 that the police department never returned the seized pill bottle, (*see* Fontanette Tr. 56–

33

58), even though documents in the record supported that the unlabeled pill bottle was returned on February 18, 2013, (*see* Reply Decl. of Taryn A. Chapman-Langrin in Supp. of Mot. For Summ. J. & in Opp'n of Pl.'s Mot. For Adverse Inference Ex. A (Dkt. No. 53).) (Defs.' Aug. 15 Letter 1). Defendants highlighted this inconsistency in their briefing, (*see* Defs.' Reply Mem. 5), and Plaintiff did not respond. Moreover, Plaintiff does not clarify this inconsistency in the August 6, 2015 letter. Finally, it is worth noting that Plaintiff failed to submit a photograph of the pill bottle or an affidavit supporting that it was in her possession with the August 6, 2015 letter. Because Plaintiff failed to produce the pill bottle in discovery and offers no explanation for her failure to produce it or, for that matter, what the pill bottle would show or how it would support her claim that Hicks could not observe the pills or the alleged fact that the bottle was unlabeled, Plaintiff cannot rely on the pill bottle now to create an issue of material fact. In short, there is no admissible evidence that supports Plaintiff's claim that Hicks could not see the color of the pills or that Hicks could not see that the bottle was unlabeled. The Court simply cannot declare that a material dispute of fact exists without evidence in the record supporting the dispute.[7]

---

[7] Indeed, it is unfortunate that if Plaintiff's counsel planned to argue in good faith that Hicks could not observe the color of the pills or that Hicks could not determine that the bottle was unlabeled, Plaintiff's counsel did not ensure that the record contained some evidence to refute Hicks's claim. It is even more inexplicable in light of the fact that Plaintiff's counsel offered to produce the pill bottle—which could have been turned over in discovery—for the jury's inspection more than a year after the close of discovery and only on prompting from the Court to identify evidence that supported Plaintiff's attempt to create an issue of material fact. Finally, the Court also notes that Plaintiff was given two opportunities to file amended complaints after the close of discovery, and there was no allegation made whatsoever that Hicks could not see the bottle or its contents.

The Court, then, properly disregards Plaintiff's attempt to dispute that Hicks could not see the color of the pills through the bottle and that the bottle was not transparent, and accepts Hicks's claims that he was able to see that the pills were blue and that the bottle was unlabeled. *See Johnson v. County of Nassau*, No. 10-CV-6061, 2014 WL 4700025, at *2 n.1 (E.D.N.Y. Sept. 22, 2014) (noting that the court was "disregard[ing] all assertions in the Rule 56.1 statements that are unsupported by the record"), *reconsideration denied*, 2015 WL 393871 (E.D.N.Y. Jan. 30, 2015); *Krachenfels v. N. Shore Long Is. Jewish Health Sys.*, No. 13-CV-243, 2014 WL 3867560, at *2 n.1 (E.D.N.Y. July 29, 2014) (same); *Jenkins v. Holder*, No. 11-CV-268, 2014 WL 1311449, at *1 (E.D.N.Y. Mar. 28, 2014 (citing *Holtz* for the proposition that "Local Rule 56.1 should be interpreted to provide that where there are no citations or where the cited materials do not support the factual assertions in the [s]tatements, the [c]ourt is free to disregard the assertion" (brackets and internal quotation marks omitted)); *Watt v. N.Y. Botanical Garden*, No. 98-CV-1095, 2000 WL 193626, at *1 n.1 (S.D.N.Y. Feb. 16, 2000) ("[W]here there are no citations or where the cited materials do not support the factual assertions in the [56.1] [s]tatements, the Court is free to disregard the assertion.").

Based on Hicks's deposition testimony, which is uncontested by any other evidence in the record, and in light of the relevant New York laws explained above, the Court concludes that there is no material dispute of fact as to whether the incriminating nature of the pills and pill bottle was readily apparent to Hicks. From his vantage point, Hicks observed the pills were blue and observed that the pill bottle did not have a label. (Hicks Tr. 87–88.) Hicks also testified that "[t]hrough [his] training and experience as a police officer, [he] observed th[e] pills and

immediately identified them as [o]xycodone hydrochloride." (*Id.* at 88–89.)  In particular, Hicks

had received a drug recognition course from the Dutchess County Sheriff's Department, in which

he was trained on how to identify controlled substances like oxycodone.  (*Id.* at 66–68.)  Because

New York law makes it unlawful for a person, including the ultimate user, to possess a

controlled substance outside of its original container and requires that original container to

include a label, Hicks's identification of the pills as oxycodone and his observation that the pills

were in an unlabeled bottle made the incriminating nature of the pills and the bottle readily

apparent.  Under the plain view doctrine, then, Hicks did not violate Plaintiff's Fourth

Amendment rights by seizing the pill bottle.[8]  *See Santos v. Zabbara*, 984 F. Supp. 2d 106, 124

(E.D.N.Y. 2013) (granting summary judgment in favor of the officers where "[t]he roosters

seized from the shed were in boxes[,] but they were out in the open[,] [and] [t]he razor-blade

---

[8] It is also worth noting that Deanda's account of the initial conversation between herself and Hicks suggests that Deanda consented to Hicks's inspection of the pill bottle.  "It is well settled that a warrantless search does not violate the Fourth Amendment if the authorities have obtained the voluntary consent of a person authorized to grant such consent, and that so long as the police do not coerce consent a search conducted on the basis of consent is not an unreasonable search."  *United States v. Hernandez*, 85 F.3d 1023, 1028–29 (2d Cir. 1996); *see also United States v. Gomez*, No. 14-CV-63, 2015 WL 3936397, at *2 (D. Conn. June 25, 2015) (applying principle in the context of a traffic stop).  "The test for determining the validity of the consent . . . is an objective one inasmuch as only unreasonable searches are prescribed by the Fourth Amendment, and that the issue of reasonableness is to be measured by an objective standard."  *United States v. Walker*, 922 F. Supp. 724, 727 (N.D.N.Y. 1996) (internal quotation marks omitted).  "[C]onsent may be inferred from an individual's words, act, or conduct."  *Id.* (internal quotation marks omitted).  Here, Deanda testified that when Hicks asked her to see the pills, she gave them to him.  (Deanda Tr. 19–20.)  Indeed, "Plaintiff does not dispute that . . . Hicks requested that [P]laintiff give him the unlabeled pill bottle, and she complied with the request."  (Pl.'s 56.1 ¶ 11.)  Because "[c]onsent may . . . be inferred from the absence of any objection[,] . . . [and] it [is not] necessary . . . that [a person] know of [her] right to refuse consent . . . to [make] a finding of voluntariness," *id.* at 728, this exchange supports that Deanda consented to Hicks's seizure of the pills.

bracelets around the roosters' legs and their 'surgically removed' waddles signaled to the officers that the roosters were possessed for the illegal purpose of animal fighting" under the plain view doctrine); *Waddlington v. City of New York*, 971 F. Supp. 2d 286, 293 (E.D.N.Y. 2013) (granting the defendants' motion for summary judgment in part because "the only evidence [the] [p]laintiff submit[ted] that the illegal items were not in plain view [was] [an] unsworn statement to the police," which was inadmissible, and, therefore the plaintiff had "not submitted any admissible evidence to demonstrate that the illegal items seized . . . were not in plain view"); *Crocco v. Advance Stores Co. Inc.*, 421 F. Supp. 2d 485, 510 (D. Conn. 2006) (explaining that the plaintiff had "proffered no evidence suggesting that the papers in her car were hidden from view or that they were not immediately identifiable as [incriminating] documents" and therefore granting summary judgment to the defendants); *cf. Stancuna v. Sherman*, 563 F. Supp. 2d 349, 355–56 (D. Conn. 2008) (denying summary judgment where the defendant claimed that the vehicles were in plain view "either outside on the driveway or in the garage," whereas the plaintiff "testified that he himself saw [the defendant] inside the garage using a video record" and "expressed his surprise that the main door to his garage was open, the implication being that [the defendant] may have been the one to open it"); *Gombert v. Lynch*, No. 01-CV-1913, 2005 WL 356770, at *4 (D. Conn. Feb. 15, 2005) (denying the motions for summary judgment where the parties submitted "contradictory affidavits [that] create[d] an issue [as to whether the containers in a vehicle were in plain view] that must be resolved by the trier of fact and [could not] be resolved by the court on summary judgment").

Moreover, to the extent that Plaintiff challenges the seizure of her person in the traffic stop, this claim fails.  "The law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver even though the purpose of the stop is limited and the resulting detention quite brief."  *Brendlin v. California*, 551 U.S. 249, 255 (2007).  "A seizure for a traffic violation justifies a police investigation of that violation[,]" and "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission—to address the traffic violation that warranted the stop."  *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015).  "Because addressing the infraction is the purpose of the stop, it may last no longer than necessary to effectuate that purpose," and, accordingly, "[a]uthority for the seizure ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."  *Id.* (brackets and internal quotation marks omitted).  As the Second Circuit has explained, the relevant inquiry when a person is questioned by an officer during a traffic stop is whether the officer's questions "measurably extended the duration of the stop such that the stop, lawful at its inception, became unconstitutional."  *United States v. Harrison*, 606 F.3d 42, 45 (2d Cir. 2010) (internal quotation marks omitted).

Again, there is no dispute that Plaintiff was stopped because she was speeding. Moreover, Plaintiff does not present evidence of, or even allege that the stop lasted longer than was required or should have been required for Hicks to address the speeding violation.  Indeed, there is nothing in the record that suggests the duration of the stop exceeded what is permissible under the Fourth Amendment.  Instead, it is undisputed that when Hicks approached the vehicle, he requested to see Plaintiff's license and registration, (Defs.' 56.1 ¶ 7), which is clearly

permissible in a traffic stop.  *See Rodriguez* 135 S. Ct. at 1615 (explaining that "an officer's mission [in a traffic stop] includes ordinary inquiries incident to the traffic stop[,]" such as "checking the driver's license").  Hicks claims that while Deanda was searching in the purse for her license, Hicks observed the pill bottle and asked Plaintiff to give him the pill bottle, which she did.  (Defs.' 56.1 ¶¶ 8, 11.)  Hicks then told Deanda that the pills were oxycodone and asked Deanda if she had a prescription, to which she replied that she did not.  (*Id.* ¶¶ 12–14.)  Deanda explained that her sister was at her house the night before, that her sister had left the pills there, and that she was on her way to return the pills to her.  (*Id.* ¶ 15.)  From this sequence of events, and absent any claims to the contrary by Plaintiff, there is no reason to believe that this interaction "measurably extended the duration of the stop such that the stop, lawful at its inception, became unconstitutional."  *Harrison*, 606 F.3d at 45 (explaining that "[l]onger intervals than five to six minutes have been deemed tolerable" for an officer's questioning); *United States v. Santillian*, No. 13-CR-138, 2013 WL 4017167, at *7 (S.D.N.Y. Aug. 7, 2013) (seventeen minutes between the officer's approach of the vehicle and the consent to the search of the car was reasonable for a traffic stop).  The seizure of Plaintiff's person, then, was reasonable. Because the Court finds that there was no unreasonable search and seizure of the pill bottle or of Plaintiff's person, and, accordingly, no underlying constitutional violation, it is not necessary to further address whether Hicks is entitled to qualified immunity as to these issues.  Defendants' Motion for Summary Judgment is granted as to Plaintiff's claims for unreasonable search and seizure.

### b.  False Arrest

A "§ 1983 claim for false arrest derives from [the] Fourth Amendment right to remain

free from unreasonable seizures, which includes the right to remain free from arrest absent

probable cause." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006); *see also Widget v. Town of*

*Poughkeepsie*, No. 12-CV-3459, 2013 WL 1104273, at *4 (S.D.N.Y. Mar. 18, 2013) (same).  "In

analyzing § 1983 claims for unconstitutional false arrest, [courts] have generally looked to the

law of the state in which the arrest occurred."  *Jaegly*, 439 F.3d at 151 (internal quotation marks

omitted); *see also Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) ("A § 1983

claim for false arrest . . . is substantially the same as a claim for false arrest under New York

law." (internal quotation marks omitted)).  Under New York Law, which is applicable here, "an

action for false arrest requires that the plaintiff show that '(1) the defendant intended to confine

him [or her], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent

to the confinement[,] and (4) the confinement was not otherwise privileged.'"  *Ackerson*, 702

F.3d at 19 (quoting *Broughton v. State*, 335 N.E.2d 310, 314 (N.Y. 1975)).

"Probable cause 'is a complete defense to an action for false arrest' brought under New

York law or § 1983."  *Id.* (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)); *see also*

*Conte v. County of Nassau*, No. 06-CV-4746, 2010 WL 3924677, at *12 (E.D.N.Y. Sept. 30,

2010) (same).  "Probable cause to arrest exists when the officers have . . . reasonably trustworthy

information as to [] facts and circumstances that are sufficient to warrant a person of reasonable

caution in the belief that an offense has been . . . committed by the person to be arrested."

*Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007).  To determine whether probable cause

40

existed for an arrest, a court "assess[es] whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Ackerson*, 702 F.3d at 19 (internal quotation marks omitted).  Moreover, "probable cause does not require an awareness of a particular crime, but only that some crime may have been committed." *Id.* at 20 (internal quotation marks omitted).  In other words, "Defendants prevail if there was probable cause to arrest Plaintiff for any single offense." *Id.* (alterations and internal quotation marks omitted). "The burden of establishing the absence of probable cause rests on the plaintiff," and "[t]he question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Sethi v. Nassau County*, No. 11-CV-6380, 2014 WL 2526620, at *4 (E.D.N.Y. June 3, 2014) (internal quotation marks omitted); *see also Nickey v. City of New York*, No. 11-CV-3207, 2013 WL 5447510, at *5 (E.D.N.Y. Sept. 27, 2013) ("[W]hen the facts material to a probable cause determination are undisputed, the matter is a question of law properly decided by the [c]ourt.").

"Even if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004).  "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Walczyk v. Rio*, 496 F.3d 139, 163 (2d Cir. 2007) (internal quotation marks omitted); *see also Amore*, 624 F.3d at 536 (same).  Accordingly, "the analytically distinct test for qualified immunity is more favorable to the officers than the one for

41

probable cause; arguable probable cause will suffice to confer qualified immunity for the arrest."

*Escalera*, 361 F.3d at 742 (internal quotation marks omitted).  Nevertheless, "[a]rguable

probable cause must not be misunderstood to mean almost probable cause."  *Zellner*, 494 F.3d at

370 (internal quotation marks omitted).

Here, Hicks claims he had probable cause to arrest Plaintiff pursuant to New York Penal

Law § 220.09, titled Criminal Possession of a Controlled Substance in the Fourth Degree, and

various provisions of the New York Public Health Law.  (Defs.' Mem. 8, 10.)  Under New York

law, "[a] person is guilty of criminal possession of a controlled substance in the fourth degree

when he [or she] knowingly and unlawfully possesses . . . a narcotic drug."  N.Y. Penal Law

§ 220.09(1).  To possess, in turn, "means to have physical possession or otherwise to exercise

dominion or control over" the relevant substance.  *Id.* § 10.00(8); *see also People v. Recore*, 867

N.Y.S. 2d 293, 294 (App. Div. 2008) (applying the definition of possession in § 10.00(8) in the

context of analyzing a conviction under Penal Law § 222.09).  "'Unlawfully' means in violation

of article thirty-three of the public health law."  N.Y. Penal Law § 220.00(2).  Section 3304 of

the New York Public Health Law makes it "unlawful for any person to . . . possess, have under

his [or her] control, . . . or transport a controlled substance, except as expressly allowed by this

article."  A person is allowed to possess a substance such as oxycodone if it was obtained by

prescription.  *See* N.Y. Penal Law § 220.00(15).  Moreover, as explained above, Section 3345 of

the New York Public Health Law provides that "[e]xcept for the purpose of current use by the

person . . . for whom such substance was prescribed or dispensed, it shall be unlawful for an

ultimate user of controlled substances to possess such substance outside of the original container

in which it was dispensed." "Ultimate user" is defined as a "person who lawfully obtains and possesses a controlled substance for his [or her] own use or the use by a member of his [or her] household," and "a person designated, by a practitioner on a prescription, to obtain such substance on behalf of the patient for whom such substance is intended." *Id.* § 3302. Pursuant to Section 3333, an original container must contain a label. Finally, Section 3305 provides that the provisions that restrict the possession and control of controlled substances do not apply "to temporary incidental possession by employees or agents of persons lawfully entitled to possession." An agent is defined under the statute as "an authorized person who acts on behalf of or at the direction of a manufacturer, distributer or dispenser." *Id.* § 3302(3).

It is undisputed that at the time that Hicks arrested Deanda, Deanda told Hicks that the pills were oxycodone, (Defs.' 56.1 ¶ 13; Pl.'s 56.1 ¶ 13), and that when Hicks asked Deanda if she had a prescription for the pills, she responded "no," (Defs.' 56.1 ¶14; Pl.'s 56.1 ¶ 14). Moreover, according to Plaintiff's version of events, Deanda told Hicks that her sister was at her house the night before, that her sister had left the pills there, and that she was on her way to return the pills to her. (Pl.'s 56.1 ¶ 15.) Based on this information, including Plaintiff's account of the incident, Hicks arguably had probable cause to arrest Plaintiff because at the time of Plaintiff's arrest, it is undisputed that Plaintiff knowingly possessed the oxycodone pills in a bottle without the required label, did not have a prescription, and was not the ultimate user, which, taken together, are "sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime," *Jocks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003) (internal quotation marks omitted), specifically a violation of New York

Penal Law § 220.09.  Hicks, therefore, is entitled to qualified immunity on this claim because it was objectively reasonable for Hicks to believe that probable cause existed based on Deanda's possession of the pills in an unlabeled bottle and without a prescription.

Plaintiff contends that she was in lawful possession of the pills, and therefore, Hicks did not have probable cause to arrest her.  (Pl.'s Mem. 13–14.)  To begin, "[n]either the ultimate disposition of an action, nor the crimes eventually charged, are dispositive of a probable cause determination."  *Betts v. Shearman*, No. 12-CV-3195, 2013 WL 311124, at *6 (S.D.N.Y. Jan. 24, 2013).  Accordingly, the fact that the Westchester County District Attorney's Office withdrew the criminal case against Plaintiff does not, without more, negate probable cause.  Instead, as mentioned above, the inquiry is "whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest" Plaintiff.  *Ackerson*, 702 F.3d at 19 (internal quotation marks omitted).  Plaintiff argues that Hicks did not have probable cause to arrest Plaintiff because of the information that both she and her sister conveyed to Hicks— specifically that Deanda's sister, Fontanette, was at Deanda's house the night before the incident, Fontanette had a valid prescription for the pills, Fontanette left the pills at Deanda's house, and Deanda was on her way to return the pills to Fontanette.  (Pl.'s 56.1 ¶ 15; Defs.' 56.1 ¶ 19; Pl.'s 56.1 ¶¶ 19, 25-a).

It is far from clear that Plaintiff's version of events, taken as true, constitutes a defense to possession of a controlled substance in the fourth degree.  Plaintiff relies on New York Public Health Law § 3305 to argue that she was in lawful possession of the pills.  As noted, Section 3305 provides that the prohibition of controlled substances does not apply to "temporary

44

incidental possession by employees or agents of persons lawfully entitled to possession, or by persons whose possession is for the purpose of aiding public officers in performing their official duties." Plaintiff argues that in returning the pills to Fontanette, she was acting as an "agent[] of [a] person[] lawfully entitled to possession." (Pl.'s Mem. 14–16.) As Defendants point out, however, Article 33 defines "[a]gent" as "an authorized person who acts on behalf of or at the direction of a manufacturer, distributer, or dispenser." N.Y. Pub. Health Law § 3302(3). Plaintiff was not an agent, then, as defined by the plain language of the statute. The Court notes that in *People v. Stone*, 364 N.Y.S.2d 739 (Sup. Ct. 1975), the trial court held that a husband was an agent within the meaning of Section 3305 of the Public Health law, and, therefore, was not guilty of picking up, at his wife's request, a single dose of methadone. The court explained that the defendant "had lived with his common law wife . . . for at least five years and was the father of her . . . child[,] . . . . provided a home and support for her[,] . . . [and] bore a moral, if not a legal responsibility for her well being and continued health," and that, therefore, the defendant was an agent within the meaning of Section 3305 because agency could be established by conduct or oral agreement. *Id.* at 742–43. Three years after the trial court's decision in *Stone*, however, the New York Court of Appeals explained that "[t]he obvious intent of [New York Public Health Law § 3305] is to exempt from penal sanction those employees or agents of others whose possession is not proscribed such as, for example, pharmacists' assistants or private citizens acting for and under the direction of the police." *People v. Sierra*, 379 N.E.2d 196, 199 (N.Y. 1978). Moreover, the Court of Appeals noted that "[i]t is precisely because possession by an agent may be unlawful that it was necessary to enact [Section 3305] and provide protection to

certain agents." *Id.*  Because Plaintiff was not acting as an agent of a manufacturer, distributer, or dispenser, or at the behest of the police, it is far from clear that Section 3305 applies to her activity or that her version of the facts constitutes a defense to criminal possession of a controlled substance in the fourth degree.  At the very least, officers of reasonable competence could disagree as to whether this exemption applies in these circumstances, and it was not objectively unreasonable for Hicks to arrest Plaintiff based on her possession of the pills even if this defense would have ultimately been successful.  *See Widget*, 2013 WL 1104273, at *6 (explaining that "[j]ustification, which includes self-defense, is an exculpatory defense" under New York law, but concluding that "[e]ven if [the] [p]laintiff were ultimately able to establish justification, the arresting [o]fficers were not required to adjudicate the issue at the time of the arrest"); *cf. Hein v. North Carolina*, 135 S.Ct. 530, 534 (2014) (holding that "a mistake of law can nonetheless give rise to the reasonable suspicion necessary to uphold [a] seizure under the Fourth Amendment").

Even assuming that Plaintiff could ultimately establish that she was acting as an agent within the meaning of the statute, Hicks did not have a duty to further investigate the explanations that Plaintiff and Fontanette provided.  "[A]lthough a police officer is generally not required to investigate an arrestee's claim of innocence, 'under some circumstances, a police officer's awareness of the facts supporting a defense can eliminate probable cause.'"  *Conte*, 2010 WL 3924677, at *14 (quoting *Jocks*, 316 F.3d at 135).  Nevertheless, "[a]rresting officers do not have to credit or investigate an arrestee's self-serving claims," *Michaels*, 2011 WL 570125, at *6, and "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to . . . eliminate every theoretically plausible claim of innocence before

making an arrest," *Widget*, 2013 WL 1104273, at *6 (quoting *Panetta v. Crowley*, 460 F.3d 388, 396 (2d Cir. 2006)); *see also Lundt v. City of New York*, No. 12-CV-1737, 2013 WL 5298458, at *3 (S.D.N.Y. Sept. 20, 2013) (same). "The crucial question then, is whether the arresting officers deliberately disregarded facts known to them which established" a defense. *Widget*, 2013 WL 1104273, at *6; *see also Prevost v. City of New York*, No. 13-CV-3760, 2014 WL 6907560, at *3 (S.D.N.Y Dec. 9, 2014) ("It is well-settled that even though there is no duty to investigate defenses or unverified claims of justification offered by the arrestee before making an arrest, an officer is not permitted to deliberately disregard facts that establish justification." (internal quotation marks omitted)).

After observing Deanda with oxycodone pills that she confirmed were not hers and for which she did not have a prescription, Hicks had, at the very least, arguable probable cause to believe that Deanda was in violation of New York Penal Law § 220.09. Hicks was under no obligation to credit Deanda's self-serving claims that the oxycodone pills belonged to her sister and that her sister had a prescription for the pills, or to verify Fontanette's account of the pill bottle before arresting Plaintiff. *See Jocks*, 316 F.3d at 136 (explaining that there is no duty on an "arresting officer to investigate exculpatory defenses offered by the person being arrested or to assess the credibility of unverified claims of justification before making an arrest"); *Lundt*, 2013 WL 5298458, at *3 ("An arresting officer has no duty to investigate exculpatory defenses, or to assess the credibility of claims regarding exculpatory defenses."); *Michaels*, 2011 WL 570125, at *6 (same). This is not a case, as in *Jocks v. Tavernier*, where the arresting officer witnessed the plaintiff's actions that gave rise to a self-defense claim and deliberately

disregarded those facts before arresting the plaintiff. *See Jocks*, 316 F.3d at 132, 136 (holding that the district court correctly denied the arresting officer's motion for summary judgment as to the issue of whether the plaintiff acted in self-defense when the off-duty arresting officer drew his service pistol and said, "[w]hy don't I blow your fucking brains out," and the plaintiff threw a phone headset at the arresting officer, striking him in the mouth); *see also Rennols v. City of New York*, No. 00-CV-6692, 2003 WL 22427752, at *4 (E.D.N.Y. Oct. 23, 2003) (distinguishing *Jocks* on the grounds that the officers in the case before the court did not deliberately disregard facts that were *known* to them).[9]  Instead, crediting Plaintiff's account of the events as true for the purpose of resolving the instant Motion, Hicks declined to accept Deanda's and Fontanette's explanations to negate the probable cause that Deanda's possession of the pill bottle, without a prescription, had established.  *See Michaels*, 2011 WL 570125, at *6 (holding that even though the defendant claimed he had a prescription for the Klonopin pills at the time of his arrest, it was nevertheless objectively reasonable for the arresting officers to find probable cause that the plaintiff possessed a controlled substance in violation of [New York Public Health Law § 3345]"); *Rennols*, 2003 WL 22427752, at *6 (explaining that unlike the arresting officer in *Jocks*, the arresting officers in the case before the court "at worst . . . failed to investigate and learn facts that they never knew, after hearing a second version of the story they did not have a

---

[9] Indeed, in *Jocks*, the Second Circuit held that the arresting officer was entitled to partial summary judgment on the issue of whether the arrestee's explanation that his violent conduct was an emergency measure.  *Jocks*, 316 F.3d at 136.  According to the Court, it was "true that [the arresting officer] had [the arrestee's] unsubstantiated claims about the emergency, . . . but . . . [the officer] was neither compelled to accept these assertions at face value nor to investigate them."  *Id.*

duty to credit"); *cf. Carpenter v. City of New York*, 984 F. Supp. 2d 255, 267 (S.D.N.Y. 2013)

(explaining that the arresting officers "had probable cause to believe that [the arrestee]

committed a crime, and had no duty to investigate an exculpatory defense, particularly one that

would require the officers to evaluate [the arrestee's] intent").[10]   Because there is no question of

material fact as to whether Hicks had at least arguable probable cause to arrest Plaintiff, and that

Hicks was not required to accept the explanations provided by Plaintiff and her sister, viewed in

the light most favorable to Plaintiff, it cannot be said that Hicks's "judgment was so flawed that

no reasonable officer would have made a similar choice."  *Lennon v. Miller*, 66 F.3d 416, 425

(2d Cir. 1995).  Accordingly, the Court concludes that Hicks is entitled to summary judgment as

to the false arrest claim on qualified immunity grounds.

### c.  Malicious Prosecution

In her Second Cause of Action, Plaintiff asserts claims for malicious prosecution under

state and federal law, (TAC ¶¶ 57–64), and in her Fourth Cause of Action, Plaintiff alleges that

Defendants withheld "exculpatory and/or impeaching evidence, which omission resulted in the

District Attorney's decision to file the felony complaint" against Plaintiff, (*id.* ¶¶ 71–76).[11]

"While the tort of malicious prosecution protects against the consequences of wrongful

---

[10] To the extent that Plaintiff believes that Hicks should have waited for Fontanette to produce evidence of her prescription (and assuming that this is proof that might have negated probable cause), the law imposed no such requirement on Hicks.  *See Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) ("Although a better procedure may have been for the officers to investigate [the] plaintiff's version of events more completely, the arresting officer does not have to prove [the] [p]laintiff's version wrong before arresting [her].").

[11] Plaintiff's Fourth Cause of Action could also be construed as alleging a due process violation, as discussed below.

prosecution, public policy favors bringing criminals to justice, and accusers must be allowed room for benign misjudgments." *Smith-Hunter v. Harvey*, 734 N.E.2d 750, 752 (N.Y. 2000). "The law therefore places a heavy burden on malicious prosecution plaintiffs . . . ." *Id.*; *see also Rothstein v. Carriere*, 373 F.3d 275, 292 (2d Cir. 2004) (same). "[T]o prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his [or her] rights under the Fourth Amendment, and establish the elements of a malicious prosecution claim under state law." *Roberts v. Babkiewicz*, 582 F.3d 418, 420 (2d Cir. 2009); *see also Coyle v. Coyle*, 354 F. Supp. 2d 207, 213 (E.D.N.Y. 2005) ("Liability for the New York common law tort of malicious prosecution also gives rise to liability under 42 U.S.C. §1983."). "The elements of a malicious prosecution claim under New York law are '(1) that the defendant initiated a prosecution against the plaintiff, (2) that the defendant lacked probable cause to believe the proceeding could succeed, (3) that the defendant acted with malice, and (4) that the prosecution was terminated in the plaintiff's favor.'" *Rohman*, 215 F.3d at 215 (quoting *Posr v. Ct. Officer Shield # 207*, 180 F.3d 409, 417 (2d Cir. 1999)).

Plaintiff argues that Hicks lacked probable cause to believe that the proceeding could succeed and that he acted with malice because he lacked probable cause to arrest Plaintiff in the first instance. (Pl.'s Mem. 18–21.) "[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003); *see also Manganiello v. City of New York*, 612 F.3d 149, 161-62 (2d Cir. 2010) (same). "The determination of probable cause in the context of malicious prosecution is essentially the same as for false arrest, except that a claim for malicious prosecution must be

evaluated in light of the facts known or believed at the time the prosecution is initiated, rather than at the time of the arrest." *Gaston v. City of New York*, 851 F. Supp. 2d 780, 793 (S.D.N.Y. 2012) (internal quotation marks omitted).  In other words, "continuing probable cause is a complete defense to a constitutional claim of malicious prosecution." *Betts v. Sherman*, 751 F.3d 78, 82 (2d Cir. 2014).  Under New York law, where "probable cause existed for the arrest itself, a plaintiff pursuing a malicious prosecution claim must establish that probable cause somehow dissipated between the time of the arrest and the commencement of the prosecution." *Id.* (internal quotation marks omitted).  Probable cause dissipates if "the groundless nature of the charges [is] made apparent by the discovery of some intervening fact." *Id.* (internal quotation marks omitted); *see also Kinzer v. Jackson*, 316 F.3d 139, 144 (2d Cir. 2003) (same); *Ellis v. La Vecchia*, 567 F. Supp. 2d 601, 607 (S.D.N.Y. 2008) ("Because probable cause may dissipate between arrest and prosecution, courts must also examine probable cause to initiate the criminal proceeding.").  "The New York Court of Appeals has noted that 'the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.'" *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) (quoting *Colon v. City of New York*, 455 N.E.2d 1248, 1250 (N.Y. 1983)).  Accordingly, "[w]hile [Hicks] has qualified immunity against the claim for false arrest, given that when he made the arrest it was objectively reasonable for him to believe that he had probable cause to do so, [the relevant inquiry for Plaintiff's malicious prosecution claim is] whether, between the time of the arrest and the time he arrived at the police station and actually charged [Plaintiff], he had received information that was sufficient to eliminate probable cause as to any of the crimes charged." *Id.* at 572.

51

Here, Plaintiff alleges nothing to suggest that between the time that Hicks arrested Plaintiff and the time that he assisted Pavone in drafting the felony complaint or authored the incident report that Hicks received any information to eliminate or even reduce probable cause as to criminal possession of a controlled substance.  Rather, the only new information that Hicks learned was from the inventory of Plaintiff's car, which yielded a total of 50 oxycodone pills, 13 ½ Tramadol pills, and $1,266 in cash.  (Defs.' 56.1 ¶¶ 29–30.)  Although Fontanette claims that she arrived at the police headquarters later that day and told a police officer through the glass partition that she had the prescription bottle with her to prove that the pills belonged to her, (Fontanette Tr. 34–35), Plaintiff does not dispute the fact that Fontanette did not have a conversation with Hicks, (Defs.' 56.1 ¶ 44), and Plaintiff does not allege that Hicks was aware that Fontanette arrived at the police headquarters with the prescription.  There is no evidence, or even a claim, then, that Hicks learned additional information that eliminated or reduced probable cause between the time that he arrested Plaintiff and the time that he drafted the incident report and relayed information to Pavone to draft the felony complaint.   It is worth noting that even if there was evidence that Hicks had learned Fontanette had arrived with the prescription, it is far from clear that this additional information would have eliminated probable cause based on the fact that the relevant statutes prohibiting possession of a controlled substance criminalize a non-user's possession of the substance, with only some exceptions that, at least arguably, are not applicable to Plaintiff's activity.  *See Rogers v. City of Amsterdam*, 303 F.3d 155, 159 (2d Cir. 2002) (holding that the police officer was entitled to qualified immunity from the malicious

prosecution claim where reasonable officers could disagree over whether there was probable cause to arrest and "nothing occurred between the arrest and prosecution to alter this").

To the extent that Plaintiff's malicious prosecution claim is based on Hicks's omission of information in the incident report regarding the fact that Deanda told Hicks that the pills belonged to Fontanette, who had a prescription, and the alleged fact that Fontanette corroborated Plaintiff's claims in her telephone conversation with Hicks, the Court finds that it was, at the very least, objectively reasonable for Hicks to believe that he was not withholding material information. "Although there is a presumption that a prosecutor exercises independent judgment in deciding whether to initiate and continue a criminal proceeding, an arresting officer may be held liable for malicious prosecution when a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors . . . or when [he or] she withholds relevant and material information." *Mitchell v. Victoria Home*, 434 F. Supp. 2d 219, 227 (S.D.N.Y. 2006) (citations and internal quotation marks omitted); *see also Costello v. Milano*, 20 F. Supp. 3d 406, 415 (S.D.N.Y. 2014) (same). The incident report does not contain information about Deanda's claims that the pills belonged to Fontanette or about any conversation that Hicks had with Fontanette. (*See* Chapman-Langrin Decl. Ex. K.) Nevertheless, as discussed above, the fact that Fontanette had a prescription for the pills does not clearly constitute a defense to possession of them in the circumstances of this case and, hence, it was not objectively unreasonable for Hicks to fail to include that information. There is no dispute of material fact, then, as to whether Hicks had arguable probable cause to institute criminal proceedings against Plaintiff, and as probable cause is a complete defense to a claim of

malicious prosecution, the Court does not reach the other elements of the malicious prosecution claim. *See Sullivan v. LaPlante*, No. 03-CV-359, 2005 WL 1972555, at *8 & n.17 (N.D.N.Y. Aug. 16, 2005) (granting the defendant's motion for summary judgment as to the plaintiff's malicious prosecution claim because "probable cause is a complete defense" and noting that "[t]he court [did] not reach the parties' arguments on the favorable termination and malice elements of the claim for malicious prosecution"). In short, because there was at least arguable probable cause, the Court grants summary judgment as to the malicious prosecution claim on qualified immunity grounds.

### d.  Abuse of Process

In her Third Cause of Action, Plaintiff alleges that Defendants violated her rights to be free from abuse of process under state and federal law.  (TAC ¶¶ 65–70.)  A defendant may be liable under § 1983 for abuse of process. *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994).  "In New York, a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act, (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino*, 331 F.3d at 76 (internal quotation marks omitted).  Some courts have held that the "existence of probable cause offers a complete defense to a claim of abuse of process," *Almonte v. City of New York*, No. 03-CV-507, 2005 WL 1229739, at *5 (E.D.N.Y. May 20, 2005) (collecting cases), and have, accordingly, dismissed a plaintiff's claims of abuse of process where, as here, there was probable cause to arrest the plaintiff, *see id.* (granting summary judgement on the abuse-of-process claim after finding that

the defendants had probable cause to arrest the plaintiff). Other courts, however, have rejected

the principle that probable cause is a complete defense to an abuse-of-process claim. *See*

*Goldring v. Zumo*, No. 14-CV-4861, 2015 WL 148451, at *5 (E.D.N.Y. Jan. 12, 2015)

(explaining that "[t]he Second Circuit has long recognized that probable cause is not a complete

defense to malicious abuse of process," and discussing the confusion of district courts in the

Second Circuit as to whether probable cause is a complete defense to an abuse-of-process claim).

The Court need not, however, resolve this issue here because Plaintiff's abuse of process claim

fails on other grounds. *See O'Brien v. City of Yonkers*, No. 07-CV-3974, 2013 WL 1234966, at

*18 n.18 (S.D.N.Y. Mar. 22, 2013) (noting the ambiguity as to whether probable cause is a

defense to an abuse of process claim and declining to resolve the issue "[b]ecause [the] [p]laintiff

[had] failed to raise a genuine issue of material fact with regard to the collateral objective

prong"). Plaintiff has not alleged facts or presented evidence to create a genuine issue of

material fact that suggests there was any reason for her arrest, the felony complaint, or the

incident report other than her prosecution and possible conviction. For example, Plaintiff does

not allege or cite to any evidence to show that Hicks arrested Plaintiff because he had "an

ulterior purpose or objective in facilitating the prosecution," *Savino*, 331 F.3d at 77 (emphasis

omitted), like "curry[ing] favor with [someone]," *Kanciper v. Lato*, 989 F. Supp. 2d 216, 237

(E.D.N.Y. 2013), or leveraging Plaintiff's arrest for other collateral purposes, *see Pinter v. City

of New York*, 976 F. Supp. 2d 539, 569 (S.D.N.Y. 2013) (finding evidence of a collateral

objective for the plaintiff's arrest where the city used "prostitution arrests for leverage in

negotiations over nuisance abatement[] . . . proceedings against video stores frequented largely,

55

although not entirely, by members of the gay, lesbian, bisexual, and transgender communities"). Accordingly, summary judgment as to the abuse-of-process claim is warranted. *See Savino*, 331 F.3d at 77 ("[T]o state a claim for abuse of criminal process, it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him [or her] by pursuing his arrest and prosecution[,] [but, rather,] he [or she] must claim that they aimed to achieve a collateral purpose beyond or in addition to his [or her] criminal prosecution."); *Pierre v. City of New York*, No. 05-CV-5018, 2007 WL 2403573, at *12 (E.D.N.Y. Aug. 17, 2007) (holding that the plaintiffs' abuse-of-process claims failed "because there is no evidence in the record that [the] defendants aimed to achieve an objective other than [the plaintiffs'] prosecution and conviction" and citing cases); *cf. Bouche v. City of Mount Vernon*, No. 11-CV-5246, 2012 WL 987592, at *7 (S.D.N.Y. Mar. 23, 2012) (dismissing the plaintiff's claim for abuse of process where the plaintiff had "not pled that the officers sought to achieve a collateral objective beyond or in addition to an arrest of a suspect and to close a homicide case").

### e. *Brady* Violation

As mentioned above, Plaintiff's Fourth Cause of Action alleges that Defendants "withheld from the Westchester County District Attorney . . . material favorable to . . . Plaintiff as exculpatory and/or impeaching evidence, which omission resulted in the District Attorney's decision to file the felony complaint charging Plaintiff with Criminal Possession of a Controlled Substance in the Fourth Degree . . . ."  (TAC ¶¶ 71–76.)  "Under *Brady* [*v. Maryland*, 373 U.S. 83 (1963)], the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is material either to guilt or to punishment."  *United States v.*

56

*Cacace*, —F.3d.—, 2015 WL 4636534, at *4 (2d Cir. Aug. 5, 2015) (internal quotation marks omitted).  "There are three components of a true *Brady* violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) (en banc). The Second Circuit has held that "evidence is not suppressed for *Brady* purposes if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence."  *Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015) (alterations and internal quotation marks omitted); *see also United States v. Zagari*, 111 F.3d 307, 320 (2d Cir. 1997) ("*Brady* cannot be violated if the defendants had actual knowledge of the relevant information . . . .").

"Police officers can be held liable for *Brady* due process violations under § 1983 if they withhold exculpatory evidence from prosecutors."  *Bermudez v. City of New York*, 790 F.3d 368, 376 n.4 (2d Cir. 2015).  "[P]olice satisfy their obligations under *Brady* when they turn exculpatory evidence over to the prosecutors," *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992), "unless there is some indication that the police have suppressed evidence," *McCaffrey v. City of New York*, No. 11-CV-1636, 2013 WL 494025, at *12 (S.D.N.Y. Feb. 7, 2013).  In particular, "[a] § 1983 claim is stated where a plaintiff can demonstrate that police have turned over fabricated evidence to the prosecutor.  Such conduct can be redressed, not as a *Brady* violation, but because it violates the right not to be deprived of liberty on the basis of false and fabricated evidence."  *Myers v. County of Nassau*, 825 F. Supp. 2d 359, 367 (E.D.N.Y.

2011) (citing *Ricciuti v. N.Y.C. Trans. Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)).

Plaintiff does not allege that Hicks fabricated evidence in his incident report or the felony complaint.  Instead, Plaintiff claims that Hicks violated Plaintiff's rights by omitting allegedly exculpatory information.  Plaintiff has not cited any case, however, in which a police officer has been held liable for a *Brady* violation based on allegedly incomplete information in an incident report or a felony complaint in a case that is never indicted.  Instead, courts have held that a police officer may be liable under § 1983 for turning over fabricated evidence and that this "conduct can be redressed, not as a *Brady* violation, but because it violates the right not to be deprived of liberty on the basis of false and fabricated evidence."  *Myers*, 825 F. Supp. 2d at 367. In other words, in this context, Plaintiff's claim of a *Brady* violation is duplicative of her malicious prosecution claim, discussed above.

Even assuming, however, that a claim under § 1983 could succeed on the theory that an officer omitted information in an incident report and/or felony complaint and that the information allegedly omitted was exculpatory, Plaintiff cannot allege the second element of a *Brady* claim—that the evidence was suppressed.  Plaintiff had knowledge of her claims and her sister's claims that the oxycodone pills belonged to Fontanette, that Fontanette had a valid prescription for the pills, and that Plaintiff was in the process of bringing the pills to Fontanette when she was stopped by Hicks.  Indeed, according to Plaintiff, Assistant District Attorney Paul Stein asked that Fontanette provide this information in a sworn statement, "[b]ased upon the information provided by Plaintiff's counsel."  (TAC ¶ 39.)  Hicks's omission from the incident report and the felony complaint of the information that Deanda and Fontanette allegedly relayed

to him, then, did not constitute suppression for the purposes of a *Brady* violation.  *See Rivera v. Smith*, No. 03-CV-4198, 2015 WL 631379, at *7 (E.D.N.Y. Feb. 12, 2015) (explaining that there was no suppression "in the *Brady* sense" where a witness's "modification as to the thrust of what he was told by [the petitioner] on the night of the homicide was initially discovered by the defense," who then "notified the prosecution," because "[t]his scenario[] does not, ipso facto, implicate *Brady*"); *cf. McCaffrey*, 2013 WL 494025, at *13 (denying summary judgment on the plaintiff's *Brady* claim because the defense counsel lacked an "essential fact" that "could have bolstered the credibility" of a witness).  Accordingly, Plaintiff's claim for failure to relay allegedly exculpatory information fails, and summary judgment is granted as to this claim.

### f.  Conspiracy Claim

In her Fifth Cause of Action, Plaintiff alleges that Defendants acted in concert to deprive Plaintiff of her constitutional rights.  (TAC ¶¶ 77–79).  "Title 42 U.S.C. § 1985(3) prohibits, in pertinent part, conspiracies undertaken 'for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws.'"  *Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of N.Y., Inc.*, 968 F.2d 286, 290 (2d Cir. 1992) (quoting 42 U.S.C. § 1985(3)).  "The elements of a claim under § 1985(3) are: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, . . . ; [and] (3) an act in furtherance of the conspiracy; (4) whereby a person is . . . deprived of any right of a citizen of the United States."  *Brown v. City of Oneonta*, 221 F.3d 329, 341 (2d Cir. 1999) (alterations in original) (internal quotation marks omitted); *see also Bliss v. Rochester City Sch. Dist.*, 196 F.

Supp. 2d 314, 337 (W.D.N.Y. 2002) (same), *aff'd* 103 F. App'x (2d Cir. 2004), *aff'd sub nom.*

*Eaton v. Rochester City Sch. Dist.*,100 F. App'x 855 (2d Cir. 2004), *aff'd sub nom. Coons v. Bd.*

*of Educ. Of Rochester City Sch. Dist.*, 100 F. App'x (2d Cir. 2004). "[A] plaintiff must provide

some factual basis supporting a meeting of the minds, such that [the] defendants entered into an

agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d

Cir. 2003) (internal quotation marks omitted). "[A]n action will lie under § 1985(3) when a

plaintiff is injured by a private conspiracy to interfere with his [or her] constitutional rights, so

long as there is some racial, or perhaps otherwise class-based, invidiously discriminatory animus

behind the conspirators' action." *Jews for Jesus*, 968 F.2d at 290–91 (second alteration in

original) (internal quotation marks omitted); *see also Graham v. Henderson*, 89 F.3d 75, 82 (2d

Cir. 1996) ("The conspiracy must be motivated by racial or related class-based discriminatory

animus."). "[C]laims of conspiracy that are vague and provide no basis in fact must be

dismissed." *Van Dunk v. St. Lawrence*, 604 F. Supp. 2d 654, 663 (S.D.N.Y. 2009) (internal

quotation marks omitted).

Plaintiff does not address her conspiracy claim in her opposition papers to the instant

Motion. "When a party 'offer[s] no response' to its opponent's motion to dismiss a claim, that

claim is abandoned.'" *Paul v. Bank of Am., N.A.*, No. 11-CV-81, 2011 WL 5570789, at *2 (D.

Conn. Nov. 16, 2011) (quoting *Molinari v. Bloomberg*, 564 F.3d 587, 609 n.15 (2d Cir. 2009)).

Accordingly, the Court deems this claim abandoned and grants Defendants' Motion as to these

claims. *See id.* (explaining that because the plaintiff failed to address a claim in opposition to

summary judgment, "it appears to th[e] court that he has abandoned it"); *see also Codrington v.*

60

*City of New York*, No. 12-CV-1650, 2015 WL 893567, at *14 (E.D.N.Y. Mar. 2, 2015) (deeming claims abandoned where the defendants moved for summary judgment against certain claims but the plaintiff's opposition did not address the arguments); *Avola v. Louisiana-Pacific Corp.*, 991 F. Supp. 2d 381, 390 (E.D.N.Y. 2014) (same).  In any event, because the Court grants summary judgment as to the alleged underlying constitutional violations, the conspiracy claim necessarily fails.  *See Young v. Suffolk County*, 922 F. Supp. 2d 368, 394 (E.D.N.Y. 2013) (explaining that because the "plaintiff's underlying Section 1983 cause of action . . . cannot be established . . . her claim for conspiracy . . . must also fail"); *Cipolla v. County of Rensselaer*, 129 F. Supp. 2d 436, 450 (N.D.N.Y. 2001) ("[T]o recover Section 1983 damages for conspiracy, Plaintiffs must prove that their constitutional rights were actually violated.").  Therefore, summary judgment is granted to Defendants on the conspiracy claim.

### 4.  Punitive Damages

"Punitive damages are available in a § 1983 action when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir. 1996); *see also New Windsor Volunteer Ambulance Corps, Inc. v. Myers*, 442 F.3d 101, 121 (2d Cir. 2006) (same); *Milfort v. Prevete*, 3 F. Supp. 3d 14, 23 (E.D.N.Y. 2014) (same).  Because the Court finds that no reasonable jury could find a constitutional violation, however, the claim for punitive damages fails.  Moreover, Plaintiff has proffered no evidence that Hicks was motivated by evil motive or intent.  Summary judgment on Plaintiff's claim for punitive damages, then, is granted.

### 5.  Defamation

Plaintiff also alleges a claim for defamation.  (*See* TAC ¶¶ 80–82.)  As an initial matter, it is not clear from the TAC on what grounds Plaintiff's defamation claim is based, and, accordingly, it is far from settled that the TAC sufficiently "gives fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Phelps v. Kapnolas*, 308 F.3d 180, 186 (2d Cir. 2002) (internal quotation marks omitted).  Nevertheless, even assuming, arguendo, that Plaintiff's defamation claim satisfies the pleading requirements of Federal Rule of Civil Procedure 8, the claim does not withstand a motion for summary judgment for the following reasons.  *See Livermore v. City of New York*, No. 08-CV-4442, 2011 WL 182052, at *7 (S.D.N.Y. 2011) (assuming that the plaintiff had adequately pled the claim but finding that the plaintiff could not survive a motion for summary judgment).

"Libel is a method of defamation expressed in writing or print."  *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000); *see also Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001) (explaining that "[g]enerally, spoken defamatory words are slander; written defamatory words are libel").  To recover for libel under New York law, a plaintiff must "prove five elements: (1) a written defamatory statement of fact regarding the plaintiff; (2) published to a third party by the defendant; (3) [the] defendant's fault; (4) the falsity of the defamatory statement; and (5) injury to [the] plaintiff."  *Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir 2001).  Plaintiff's counsel explained in a letter to the Court that "[t]he defamatory and false statement at issue is the felony complaint . . . Hicks prepared or caused to be prepared and filed . . . ."  (Letter from William I. Aronwald to Court (Sept. 2, 2015) ("Pl.'s Sept. 2 Letter") 1

(Dkt. No. 63).)  Plaintiff alleges that "[h]er employers and her assistant at work[] learned of [Plaintiff's arrest], as did a friend, Deirdre Tate, who read something about it." (*Id.*)  The felony complaint states that Hicks accuses Deanda of criminal possession of a controlled substance in the fourth degree, which offense was "committed at southbound Bronx River Parkway/Vermont Terrace in the City of Yonkers, County of Westchester, State of New York on May 28, 2012 at approximately 8:12 AM." (TAC Ex. A.)  The felony complaint describes the elements of the offense and states that "[a]t the above date, time, and location, the defendant herein did knowingly and unlawfully possess a plastic bottle containing .21 ounces of oxycodone pills (40 pills) in her purse." (*Id.*)  Moreover, Hicks explained that his conclusion that the substance was oxycodone was "based in part on [his] training and experience as a police officer in the recognition of oxycodone." (*Id.*)

Here, there is no evidence that Hicks made a statement against Plaintiff that was false, nor does Plaintiff identify which statement in the felony complaint is allegedly false.  Indeed, Plaintiff does not dispute that she was in possession of the oxycodone pills that were in the pill bottle on the date and time at issue.  Moreover, to the extent that Plaintiff takes issue with Hicks's statement that she was in "unlawful" possession of the pills in violation of New York law, it is not clear, in light of New York law as discussed above, that this statement is false. Plaintiff, therefore, has not shown, or even alleged for that matter, that any statement Hicks made in the felony complaint is false, which is necessarily fatal to her defamation claim.  *See Hohmann v. GTECH Corp.*, 910 F. Supp. 2d 400, 408 (D. Conn. 2012) (explaining that the "failure to allege falsity is not a mere formality" and the defamation claims at issue "fail because

63

they do not allege falsity"); *Cummins v. Suntrust Cap. Markets, Inc.*, 649 F. Supp. 2d 224 249–50 (S.D.N.Y. 2009) (explaining that the defamation claim was not supported because although the plaintiff alleged "that the statement was defamatory because it attempted to impute a quality of rapaciousness to the plaintiff and suggested that he was a dishonest CEO[,] . . . . [t]hose statements were not made and the factual statements that were made have not been shown to be false").  Accordingly, summary judgment as to Plaintiff's claim for defamation is granted.

### 6.  Intentional Infliction of Emotional Distress

Finally, Plaintiff asserts a claim for intentional infliction of emotional distress ("IIED"). (*See* TAC ¶¶ 83–84.)  Under New York Law, to establish a cause of action for IIED, a plaintiff must prove: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing severe emotional distress; (iii) a causal connection between the conduct and the injury; and (iv) severe emotional distress." *Carroll v. Bayerische Landesbank*, 150 F. Supp. 2d 531, 538 (S.D.N.Y. 2001) (citing *Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993)).  The IIED tort "provides a remedy for the damages that arise out of a defendant engaging in 'extreme and outrageous conduct, which so transcends the bounds of decency as to be regarded as atrocious and intolerable in a civil society.'" *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 157 (2d Cir. 2014) (quoting *Freihofer v. Hearst Corp.*, 480 N.E.2d 349, 355 (N.Y. 1985)); *see also Marmelstein v. Kehillat New Hempstead*, 892 N.E.2d 375, 379 (N.Y. 2008) (same).  "The standard for extreme and outrageous conduct is extremely difficult to satisfy." *Ponticelli v. Zurich Am. Ins. Grp.*, 16 F. Supp. 2d 414, 440 (S.D.N.Y. 1998) (collecting cases); *see also Conboy v. AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001) (same).  Indeed, the New

York Court of Appeals has noted that "every one [of the IIED tort claims considered by the Court] ha[s] failed because the alleged conduct was not sufficiently outrageous." *Howell*, 612 N.E.2d at 702. Finally, as relevant here, "although the New York Court of Appeals has not set forth detailed guidelines for when the tort may be available, it has cautioned that a claim for IIED may not be sustainable 'where the conduct complained of falls well within the ambit of other traditional tort liability.'" *Turley*, 774 F.3d at 159 (quoting *Fischer v. Maloney*, 373 N.E.2d 1215, 1217 (N.Y. 1978)); *see also Lopez v. City of New York*, No. 14-CV-1660, 2014 WL 5090041, at *4 (S.D.N.Y. Oct. 10, 2014) ("New York law considers IIED a theory of recovery that is to be invoked only as a last resort, and requires dismissal of an IIED claim based on conduct that falls within the ambit of other tort liability." (citation and internal quotation marks omitted)); *Audrey v. Career Inst. of Health & Tech.*, No. 06-CV-5612, 2014 WL 2048310, at *3 (E.D.N.Y. May 18, 2014) (same).

Here, Plaintiff fails to establish that the conduct she alleges was "extreme and outrageous conduct, which so transcends the bounds of decency as to be regarded as atrocious and intolerable in a civil society." *Turley*, 774 F.3d at 157 (internal quotation marks omitted). Instead, as discussed above, Hicks had probable cause (or at least arguable probable cause) to arrest and charge Plaintiff with criminal possession of a controlled substance in the fourth degree. Moreover, the conduct of which Plaintiff complains falls within the scope of claims of unreasonable search and seizure, false arrest, and malicious prosecution, as discussed above. *See Turley*, 774 F.3d at 159 (explaining that "a claim for IIED may not be sustainable where the conduct complained of falls well within the ambit of other traditional tort liability" (internal

quotation marks omitted)); *Murphy v. City of Rochester*, 986 F. Supp. 2d 257, 271 (W.D.N.Y. 2013) (holding that "the allegedly outrageous conduct complained of by [the plaintiff] falls within the scope of the other traditional torts he has pleaded (i.e., false arrest; malicious prosecution; abuse of process; . . . and defamation by libel and slander)"); *Yang Feng Zhao v. City of New York*, 656 F. Supp. 2d 375, 405 (S.D.N.Y. 2009) (holding that because "the alleged conduct fits well within the traditional tort theories of false arrest, malicious prosecution, and assault and battery. . . the claim of intentional infliction of emotional distress will not fly"); *Moore v. City of New York*, 219 F. Supp. 2d 335, 339 (E.D.N.Y. 2002) (explaining that "since the conduct complained of [was] encompassed in [the] plaintiff's claims for assault and battery and malicious prosecution, [the] plaintiff's claim for intentional infliction of emotional distress must [have been] dismissed"). Accordingly, the motion for summary judgment is granted as to Plaintiff's claim for IIED.

### III. Conclusion

For the reasons stated above, Plaintiff's Spoliation Motion is denied, and Defendants' Motion For Summary Judgment is granted. The Clerk of the Court is respectfully requested to terminate the pending motions, (*see* Dkt. Nos. 37, 45), and close the case.

SO ORDERED.

Dated: September 30 , 2015
     White Plains, New York

                                    KENNETH M. KARAS
                                    UNITED STATES DISTRICT JUDGE